**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

FRANCES CLARITY STOKES and THOMAS ALLEN GRAY, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

BIOGEN INC., CHRISTOPHER A. VIEBACHER, MICHAEL VOUNATSOS, MICHAEL R. MCDONNELL, and PRIYA SINGHAL,

Defendants.

Case No. No. 1:24-cv-12691-IN

CLASS ACTION

JURY TRIAL DEMANDED

**FIRST AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 2

III. PARTIES ........ 3

IV. NON-PARTY CONFIDENTIAL WITNESSES ........ 4

V. RELEVANT BACKGROUND ........ 7

A. Overview of Biogen and Its Business ........ 7

B. New Drug Development and Approval ........ 9

C. Generic Competition in the United States ........ 12

VI. BIOGEN'S ATTEMPTS TO OFFSET DECLINES IN ITS CORE BUSINESS FAIL .. 18

A. Sales In Biogen's Flagship MS Franchise Begin to Decline ........ 18

B. Biogen Devised Dual Strategies to Stave Off the Declines in Its MS Franchise ........ 20

1. Biogen Planned to Switch Patients from Tecfidera to a New Biosimilar Known as Vumerity Before Generic Tecfidera Became Available ........ 21

2. Biogen Planned to Replicate Its Success in MS By Entering the Nascent Market for Drugs to Treat AD ........ 24

C. Biogen's Dual Strategies Backfire ........ 29

1. Generic Tecfidera Entered the Market Long Before Biogen Completed the Switch to Vumerity ........ 29

2. Aduhelm Fails Commercially After Investigations Place Biogen at the Center of a Scandal Surrounding Its Approval by the FDA ........ 32

VII. BIOGEN PAID PBMs TO STIFLE TECFIDERA GENERIC COMPETITION ........ 39

A. Biogen Relied on a Complex Distribution and Payment Network to Sell OTC Prescription Drugs in the United States ........ 40

1. The Marketplace for Prescription Drugs in the United States ........ 40

2. The Unique Role of PBMs in the Drug Reimbursement System ........ 41

3. PBMs Suffered from Conflicts of Interest that Brand Manufacturers Exploited to Suppress Generic Drug Competition ........ 44

B. Biogen Paid PBMs to Suppress Competition from Generic Tecfidera ........ 50

1. Biogen Entered Into BOG Rebate Contracts with PBMs to Impair Generic Competition After Losing Patent Exclusivity for Tecfidera ........ 50

2. The BOG Rebate Contracts Successfully Stymied Competition from Tecfidera's Lower-Cost Generic Alternatives ........ 56

VIII. BIOGEN PROPPED UP LEQEMBI AS THE NEXT GENERATION REPLACEMENT FOR ADUHELM ........ 58

A. Biogen Pivoted to Leqembi As Its Next AD Product Candidate After the Failure of Aduhelm ........ 58

B. Biogen Suppressed Evidence Showing Treatment-Related Deaths from ARIA ........ 64

1. Three Patients in OLE Died with Signs of Severe ARIA Shortly After Receiving Their Initial Courses of Leqembi ........ 64

2. Biogen and Eisai Took Active Steps to Downplay the Three Deaths and Discredit Any Asserted Connection to Leqembi ........ 70

C. Management Issued Bullish Forecasts for Leqembi's Launch in the United States Untethered to Commercial Circumstances ........ 75

IX. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 81

A. Competitive Environment ........ 81

B. Function of Managed Care Rebates ........ 88

C. Reasons for Biogen's Operating Results ........ 90

D. Leqembi's Safety Profile ........ 104

E. Commercial Prospects for Leqembi in the U.S. ........ 112

X. THE TRUTH EMERGES IN A SERIES OF PARTIAL DISCLOSURES ........ 119

A. June 7, 2022 ........ 119

B. June 16, 2022 ........ 120

C. January 8, 2024 ........ 120

D. February 13, 2024 ........ 121

E. July 23, 2024 ........ 123

F. July 26, 2024 ........ 124

G. September 20, 2024 ........ 126

H. September 23, 2024 ........ 126

I. October 16, 2024 ........ 127

J. October 23, 2024 ........ 128

K. November 8, 2024 ........ 128

L. November 14, 2024 ........ 130

XI. ADDITIONAL FACTS PROBATIVE OF SCIENTER ........ 131

A. Vounatsos Was Made Aware of How PBMs Used Their Drug Formularies to Impair Competition Through His Participation in the PhRMA Trade Group ........ 132

B. Vounatsos' Public Commentary Confirms He Stayed Informed on PBM Contracting for Biogen's MS Products, Including Tecfidera ........ 134

C. Defendants Were Aware That Biogen Was Subject to Several Investigations by the DOJ for Paying Illegal Kickbacks to Favor Its MS Drugs ........ 136

D. Eisai Has Admitted That It Promptly Receives and Reviews Information Associated with Fatal Adverse Events In Its Clinical Trial Subject .................. 137

E. Biogen Was on Constructive Notice That Members of the Scientific Community Concluded That Three Patients Had Died From Leqembi ............. 138

F. Eisai and Biogen Regularly Shared Important Information About Leqembi With Each Other Under a Joint Collaboration Agreement ................................ 138

G. Defendants Had Substantial Financial Incentive to Hide Biogen's Anticompetitive Practices and the Leqembi's Problems .................................... 143

H. Several Defendants Enriched Themselves Through the Sale of Inflated Stock .................................................................................................... 144

I. The Sale of Tecfidera and the Decision to Build a Market-Leading AD Franchise Were Admittedly at the Core of Biogen's Business.......................... 148

J. *Respondeat Superior* and Agency Principles Apply......................................... 150

XII. LOSS CAUSATION.................................................................................... 150

XIII. PRESUMPTION OF RELIANCE................................................................. 151

XIV. NO SAFE HARBOR .................................................................................. 153

XV. CLASS ACTION ALLEGATIONS ............................................................... 154

XVI. CLAIMS FOR RELIEF ............................................................................... 156

XVII. PRAYER FOR RELIEF ............................................................................. 160

XVIII. DEMAND FOR JURY TRIAL .................................................................. 160

Court-appointed lead plaintiffs Frances Clarity Stokes ("Lead Plaintiff") and additional plaintiff Thomas Allen Gray (collectively, with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, as for their First Amended Class Action Complaint against defendant Biogen Inc. ("Biogen" or the "Company"), and defendants Christopher A. Viehbacher, Michael Vounatsos, Michael R. McDonnell and Priya Singhal (collectively, the "Individual Defendants," and, together with Biogen, "Defendants"), allege the following on personal knowledge as to their own acts and on information and belief as to all else based upon the investigation by counsel, which has included, among other things, a review and analysis of regulatory filings made with the U.S. Securities and Exchange Commission ("SEC"), securities analyst research reports, press releases, news reports, documents and other information secured through government information requests, and other publicly available information issued by or about Biogen or the industry in which it operates, interviews with persons knowledgeable about relevant events, including former employees of Biogen, and expert consultation. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a class action against Biogen and its senior-most officials for violations of the anti-fraud provisions of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder on behalf of all persons and entities other than Defendants that purchased or otherwise acquired Biogen securities between September 14, 2020, and November 14, 2024, both dates inclusive (the "Class Period"), and were damaged thereby (the "Class").

2. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a). The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b), 78t(a), and the rules and regulations duly promulgated thereunder, including SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a). At all relevant times, Biogen has maintained its principal executive offices at 225 Binney Street in Cambridge, Massachusetts, located in this judicial district. Defendants therefore transact business in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted herein, including the dissemination of materially false and misleading statements to the investing public, occurred in this judicial district. Indeed, Defendants concede that "a substantial part of the events or omissions giving rise to the claim occurred in Massachusetts, which is the location of Biogen's corporate headquarters where each of the Defendants worked during the putative class period" and have submitted to venue in this judicial district by moving to have this matter transferred to this judicial district for all further proceedings. ECF No. 26.

5. In connection with the acts and omissions alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the facilities of a national securities market, and interstate telephonic and digital communications systems.

## III. PARTIES

6. Plaintiffs acquired Biogen securities at artificially inflated prices during the Class Period, as set forth in the Certifications they previously filed with the Court (ECF Nos. 1, 8-3), and were damaged thereby, as set forth herein.

7. Defendant Biogen is a corporation organized under the laws of the state of Delaware. Its principal executive offices are located at 225 Binney Street in Cambridge, Massachusetts. During the Class Period, Biogen's common stock traded on the Nasdaq Global Select Market under the ticker symbol BIIB.

8. Defendant Michel Vounatsos ("Vounatsos") served as Biogen's President and Chief Executive Officer ("CEO") as well as a member of Biogen's Board of Directors from January 2017 to November 2022. From April 2016 to December 2016, Vounatsos served as Chief Commercial Officer at Biogen. Before joining Biogen in April 2016, Vounatsos held a series of leadership positions at the pharmaceutical company Merck & Co., Inc., where he most recently served as the head of its global primary care business unit.

9. Defendant Christopher A. Viehbacher ("Viehbacher") has served as Biogen's President and CEO as well as a member of Biogen's Board of Directors since November 2022. From December 2008 to October 2014, he served as CEO of the French pharmaceutical giant Sanofi S.A. ("Sanofi"). Before taking that role, Viehbacher worked in a series of leadership positions for twenty years at the British pharmaceutical company GlaxoSmithKline plc, most recently serving as the head of its North America operations.

10. Defendant Michael R. McDonnell ("McDonnell") has served as Biogen's Executive Vice President and Chief Financial Officer ("CFO") since August 2020. From December 2015 to August 2020, he was CFO at IQVIA (formerly known as Quintiles), a global provider of advanced analytics, technology solutions and contract research services to the life

sciences industry. Before that role, he served as CFO of several other companies, including Intelsat, MCG Capital Corporation, and EchoStar Communications. Earlier in his career, he was a partner at accounting firm PricewaterhouseCoopers, LLP.

11. Defendant Priya Singhal ("Singhal") has formally served as Biogen's Executive Vice President and Head of Development since January 2023, but previously served as interim Head of Development from January 2022 to January 2023 after Biogen's previous Head of Research & Development left the company. In this position, Singhal was an officer of Biogen within the meaning of the Exchange Act and, accordingly, was identified as an "executive officer" in documents that Biogen filed with the SEC. From February 2020 to January 2022, Singhal served as Biogen's Senior Vice President and Head of Global Safety & Regulatory Sciences. Singhal previously worked at Biogen from late 2012 to 2018 in risk-benefit management, attaining the title of Global Head of Safety and Benefit-Risk (SABR). Before joining Biogen, Singhal held several positions at Vertex Pharmaceuticals in medical affairs.

## IV. NON-PARTY CONFIDENTIAL WITNESSES

12. CW1 was an Associate Director of U.S. Strategic Pricing and Contracting at Biogen from May 2020 to January 2022. In this role, CW1 worked on pricing and contract strategy for AD products and spoke with colleagues about pricing and contract strategy on other products, including Tecfidera. Prior to work at Biogen, CW1 consulted for pharmaceutical companies on pricing and contract strategy for their drugs.

13. CW2 held various positions related to market access at Biogen from October 2012 to January 2022. From May 2019 to January 2022, CW2 was Head of U.S. Market Access Strategy and Executive Director of U.S. Market Access Strategy. In these roles, CW2 reported to Brendan Manquin, Senior Vice President of U.S. Market Access and Reimbursement, and

primarily worked on ensuring market access for drugs, including Tecfidera. Among other things, CW2 was responsible for contract strategy for PBMs.

14. CW3 held various positions at Biogen from January 2013 to March 2022. From March 2018 to April 2021, CW3 worked as a Manager for Access and Reimbursement. In this role, CW3 interfaced with doctors, clinics, and hospitals on ordering drugs and obtaining reimbursements for Biogen's MS products. From April 2021 to March 2022, CW3 worked as an Associate Director, US Commercial Learning, Market Access and Reimbursement, where responsibilities shifted to Biogen's drug, Aduhelm.

15. CW4 was a Director of Global Public Policy and Government Affairs at Biogen from April 2018 to September 2019. In this position, CW4's responsibilities included outreach for the Centers for Medicare & Medicaid Services and was aware of the Company's policies regarding drug rebates.

16. CW5 was a Senior Director, Contracts and Pricing at Biogen from February 2020 to September 2023, within the Market Access division. In this role, CW5 worked on pricing and contracts for Tecfidera.

17. CW6 has been a Professor of Pathology at Northwestern University since 2021 and is a practicing neuropathologist at Northwestern Memorial Hospital. CW6's focus as a doctor in on Alzheimer's Disease, and, in this role, treated patients with AD, performed autopsies, and attended conference presentations by pharmaceutical companies, including Biogen.

18. CW7 has been a board-certified vascular neurologist at Vanderbilt University Medical Center since 2016. CW7 has clinical expertise in the overlap between vascular and cognitive neurological diseases and sees patients in the Stroke Division of the Department of

Neurology. CW7 is also a medical investigator in the Vanderbilt Alzheimer's Disease Research Center.

19. CW8 is a neurologist and was a Medical Director at Eisai from June 2022 to July 2023. In this role, CW8 was a member of the medical affairs team for Leqembi, which is tasked with educating doctors about the drug and its use for Alzheimer's disease.

20. CW9 held various positions at Biogen between November 2014 and October 2023. From June 2019 to May 2020, CW9 worked as a Manager, Neurosciences RU. From May 2020 to October 2023, CW9 worked as a Senior Business Operations Partner. As a Senior Business Operations Partner, CW9 was responsible for supporting drug development units, which were responsible for the early development and testing of new drugs. In supporting the development units, CW9 was responsible for managing the units' finances, including budgeting, spending, and vendor relationships.

21. CW10 was a Director, Clinical Pharmacology and Translational Medicine in Eisai's Neuroscience Business Group from June 2020 to July 2023. In this role, CW10 designed the biomarkers used to monitor, diagnose, access, and ensure clinical trials. This work included performing quality control on data submitted into the database for Leqembi's Clarity Phase 3 Study (as defined below).

22. CW11 held various positions at Biogen from August 2014 to December 2023. From May 2017 to June 2019, CW11 worked as an associate director of financial planning and analysis, in the R&D department. From June 2019 to June 2020, CW11 worked as a director of financial planning and analysis, in the R&D department. From June 2020 to December 2023, CW11 worked as director of US Commercial Financial Planning & Analysis for Rare Disease,

NeuroPsych, & Alzheimer's. In these roles, CW11 primarily worked on long-term planning, budgeting, and monthly forecasts for specific pharmaceutical assets, including on Aduhelm.

## V. RELEVANT BACKGROUND

### A. Overview of Biogen and Its Business

23. Founded in 1978 in Switzerland as Biotechnology Geneva, Biogen is a well-known biotechnology company headquartered in Cambridge, Massachusetts, primarily focused on the development and commercialization of drugs derived from living materials, also known as "biologics," to treat complex and rare disorders, especially neurological conditions, including multiple sclerosis ("MS"), Alzheimer's disease ("AD"), spinal muscular atrophy ("SMA"), amyotrophic lateral sclerosis ("ALS"), and Friedreich's ataxia ("FA"). Unlike other big pharmaceutical companies, Biogen maintains a relatively small portfolio of highly specialized products that it markets throughout the world. It operates in more than 40 countries, including Australia, Brazil, Canada, China, France, Germany, India, Italy, Japan, and Switzerland. By the end of 2020, the Company generated over $13.4 billion in annual revenue.

24. Since bringing its first product to market in 1996, Biogen has been a pioneer in the development of therapies to treat MS. Until 1993, there were no drugs approved by the FDA to directly treat MS. Biogen's first product to be approved by the FDA was Avonex, a relatively safe injectable therapy for the treatment of early stages of MS. When it was approved in May 1996, Avonex was only the second therapy approved by the FDA for the treatment of MS. In 2004, the FDA approved a novel "high efficacy" MS therapy developed by Biogen known as Tysabri, the first of its kind based on a monoclonal antibody. Biogen was also one of the first companies to introduce a MS medication in a pill form as demand grew for more convenient treatment options with the introduction of Tecfidera, approved by the FDA in 2013.

25. Because of their innovations over existing therapies, Avonex, Tysabri, and Tecfidera were highly successful products. When Avonex was approved by the FDA in 1996, the only existing therapy for MS had a range of serious side effects. Because Avonex had a much tamer safety profile, it took over as the most popular MS medication just six months after its launch in the United States. By the end of 2002, annual sales of Avonex exceeded $1 billion. Tysabri also became an attractive option for patients with more aggressive forms of MS because it was nearly twice as effective as existing therapies at slowing the progression of the disease. After overcoming an initial safety issue, Tysabri also surpassed $1 billion in annual sales in 2011. And because Tecfidera had most well-defined safety profile of the three oral agents approved for MS between 2010 and 2013, it soon became the most popular oral medication for the treatment of MS. It generated almost $3 billion in sales in 2014, its first full year of sales. By the end of 2018, these three products generated a total of approximately $8.5 billion in annual sales.

26. The success of Biogen's three core MS drugs contributed significantly to the Company's overall growth. Biogen's annual product sales consistently grew from approximately $760.3 in 2000 to approximately $10.8 billion in 2018. During that time, Avonex (and its long-lasting version, Plegridy), Tysabri, and Tecfidera were Biogen's top three products by revenue and accounted for anywhere between 78% to 100% of Biogen's overall product revenues. Indeed, Avonex and Tysabri alone comprised no less than 95% of Biogen's overall product revenues from 2004 through the end of 2014, the first full year of Tecfidera sales. As such, Biogen admitted in its SEC filings that it placed "significant reliance" on "sales of our MS products" as of the end of 2018.

27. Tecfidera was a blockbuster drug that quickly became the most significant product in Biogen's portfolio. Between 2014 and 2018, Tecfidera was by far Biogen's top product by revenue. Its annual sales consistently grew from approximately $2.9 billion in 2014 to $4.3 billion in 2018, representing more than 35% to 40% of Biogen's global product sales.

**B. New Drug Development and Approval**

28. Generally, drug developers do not have the resources to prepare and submit applications in every jurisdiction throughout the world where they would like to commercialize it at the same time. Accordingly, many sequence the filing of such applications beginning with the jurisdictions that provide access to the largest potential markets for the drug. The jurisdictions that provide access to the largest potential market for a drug depend on many factors, including, among other things, the anticipated patient population and their geographic distribution, but typically the United States and the European Union ("EU") are the largest markets due to their size and population densities. Consequently, the United States and the EU are often the first two jurisdictions where drug developers request approval for a new drug.

29. Before a new drug can be sold commercially in the United States or any EU member state, it must first be approved by the FDA or each such EU member state, respectively. However, EU legislation establishes a "centralised procedure" through which drug developers can secure an approval from the European Commission that is binding on all EU member states. In fact, the centralised procedure is mandatory for certain types of proposed drugs, including any containing a new active substance to treat a neurodegenerative disease, such as MS or AD.

30. To secure approval in the United States, or "centralised" approval in the EU, a drug developer must submit an application with the relevant authority. In the United States, FDA rules distinguish between chemically synthesized drugs, known as "small molecule" drugs, and therapies derived from living material, known as "biologics." The means used to request

approval of a small molecule drug, like Tecfidera, is a new drug application ("NDA"). In contrast, the means used to request FDA approval for a biologic, like Aduhelm or Leqembi, is a biologics license application ("BLA"). In the EU, developers who wish to use the centralised approval procedure are required to submit a single marketing authorisation application ("MAA") with the European Medicines Agency ("EMA"). The EMA's Committee for Medicinal Products for Human Use ("CHMP") will make a recommendation to the European Commission on whether to approve or reject the medicine. The European Commission, in turn, will then issue a decision granting or rejecting the MAA that is binding on EU member states.

31. The FDA and EMA technically have different standards for approval, but both generally require the proponent of the new drug to demonstrate that it is safe and effective in a specific population, often referred to as the "indication of use" or simply the "indication," based on preclinical laboratory tests and data collected in series of adequate and well-controlled studies in human subjects, known as clinical trials, including at least *two* adequately and well-controlled large scale studies. In practice, and as detailed more specifically in relevant legislation, regulations, and authoritative guidance, this means that a new drug will not be approved unless data submitted establishes that the benefits outweigh the risks.

32. To generate the evidence needed to support marketing approval, and ensure the safety of trial participants, drug developers are directed to carry out a series of successive clinical trials that are typically divided into three "phases." Phase 1 clinical trials involve the initial introduction of the investigational compound in a small number of healthy volunteers or patients to confirm the pharmacology of the drug in the body at different doses and aid in the design of proper Phase 2 and Phase 3 studies. Phase 2 clinical trials, often referred to as "exploratory" studies, are the first controlled studies that evaluate the effectiveness and side effects of a drug in

a larger group of patients with the targeted condition. Phase 3 clinical trials, often referred to as "confirmatory" or "pivotal" studies, are largescale controlled clinical trials designed to confirm the preliminary evidence accumulated in Phase 2 studies in a broader population of several hundred or several thousand subjects with the target condition and may include the investigation of subgroups with frequently occurring or potentially relevant comorbidities or biomarkers in the study population. All the data generated in connection with these clinical trials are required to be submitted in a BLA or MAA, as the case may be, together with various analyses of the data.

33. The design and conduct of clinical trials must meet strict standards promulgated by the FDA and EMA to ensure that the trials are carried out in an ethical manner and that the results are free from bias and scientifically sound, many of which have been harmonized or jointly adopted by both agencies to avoid conflicting standards. Among other things, many clinical trials randomize a portion of the participants to a control group that receives either placebo or an existing therapy for the target condition. The purpose of using a control group is to separate the effect of the treatment from the effects of other factors, such as the natural course of the disease. Clinical studies often blind study participants, their physicians, or both, to the treatment they are receiving to minimize the potential for bias. Finally, clinical trials will use predefined "endpoints" to assess the drug's efficacy in the study population using a preset measure or criteria.

34. To ensure patient safety for investigational drugs, FDA regulations require that sponsors conducting clinical trials promptly report certain "adverse events" that arise following treatment with an investigational compound. Under these rules, the sponsor of a clinical trial must report all fatal or life-threatening adverse events within seven days of receiving the information, and all "serious" adverse events within fifteen days of receiving the information,

*whether considered related to the study drug or not*. Such information must be reported on a standard form known as Form 3500A. Any additional information the sponsor receives about such an event must be submitted in a follow-up report within fifteen days of receiving the information. As such, clinical trial sponsors often design strict protocols that require the "investigator" at each trial site to promptly report any such adverse events to sponsor.

35. Because a significant number of study participants are typically randomized to a control arm, many clinical trial sponsors will elect to hold an unblinded, or "open-label," extension phase of the Phase 3 clinical trial in which the investigational drug is made available to all study participants, including those in the control arm, and the sponsor can continue to collect long-term safety data. The FDA and EMA will frequently require the submission of any data collected during an extension study while a MAA or BLA is under review, particularly if there are safety concerns.

**C. Generic Competition in the United States**

36. Once approved by the FDA, a new brand-name drug is by no means guaranteed to succeed commercially. As one of the largest markets by size, newly approved therapies in the United States face intense competition from other pharmaceutical products for sales to the same patient population. These other products compete across several dimensions, including product efficacy (real or perceived), product safety (real or perceived), brand recognition, patient convenience, mode of administration, availability, and price and reimbursement.

37. One of the most pernicious forms of competition comes from generic and biosimilar drugs. A generic drug is a copy of a brand name medication that uses the same active ingredient and otherwise performs in the body the same as the brand name medication. With limited exceptions, generic drugs are the same as the brand drug in dosage, form, route of administration, safety, effectiveness, strength, and labelling. A biosimilar, on the other hand, is

almost identical in structure to an approved biologic, known as the "reference product," but otherwise has no clinically meaningful differences from the reference product in terms of safety or efficacy.

38. Congress has created several "abbreviated" pathways for the FDA to approve generic and biosimilar drugs that makes them relatively inexpensive to bring to market. In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the Hatch-Waxman Act. *See* Pub. L. No. 98-417, 98 Stat. 1585 (1984). The Hatch-Waxman Act simplified the regulatory hurdles for generic manufacturers by eliminating the need for them to file lengthy NDAs. Instead, it permitted them to file an abbreviated NDA ("ANDA"), in which the manufacturer need only show that the generic drug is same as the brand name drug in terms of active ingredient, dose, route of administration, and strength ("pharmaceutically equivalent") and absorbed by the body in the same manner as the brand-name drug ("bioequivalent"). When both factors are present, the generic is considered "therapeutically equivalent" to the brand-name product and the ANDA may rely on the safety and efficacy data previously submitted by the brand-name manufacturer without conducting any additional clinical trials. Similarly, Congress eliminated the need for biosimilar manufacturers to file a traditional BLA in the Biologics Price Competition and Innovation Act of 2009 ("BPCI Act"), passed into law in March 2010 as part of the Patient Protection and Affordable Care Act. *See* Pub. L. No. 111-148, 124 Stat. 119, 804 (2010). Instead, it authorized the FDA to approve biosimilars on the basis of a BLA demonstrating that the medicine is highly similar to the reference product. When it does so, the BLA may rely in part on the safety and efficacy data of the reference product. This pathway, known as the section 351(k) pathway, is considered to be abbreviated because the evidence needed to demonstrate that a product is biosimilar typically

comes from data collected in nonclinical tests, animal studies, and comparative trials that assess the pharmacokinetics, pharmacodynamics, and immunogenicity of the biosimilar relative to the reference product which are usually much smaller and focused than full-scale clinical trials designed to assess safety and efficacy.

39. As their names suggest, the Acts of Congress establishing the abbreviated approval pathways for generics and biosimilars were designed to encourage price competition. The evidence on which Congress relied to enact the ANDA provisions of the Hatch-Waxman Act showed that the disinterest among manufacturers to bring generic drugs to market through the standard pathway was having "serious anti-competitive effects" by encouraging branded products to hold a "monopoly position." The express purpose of creating the ANDA pathway was to "make available more low-cost generic drugs." Similarly, the BPCI Act was established to further similar goals for biosimilars.

40. The Hatch Waxman Act and BPCI Act achieve these objectives by speeding the entry of generics and biosimilars to market. Permitting manufacturers of generics and biosimilars to bypass the costly and time-consuming process of conducting large-scale clinical trials on safety and efficacy enables them to bring such products to market quicker than usual and, thus, at a lower cost. On average, generics are at least 25% less expensive than their brand-name counterparts when there is a single generic competitor. This discount increases to 80% or more when multiple generic competitors are available for a name brand product.

41. State legislation also promotes the update of generic drugs once available on the market. Generic drugs considered to be therapeutically equivalent to their brand-name counterpart are assigned an "AB" rating by the FDA. Since the passage of the Hatch-Waxman Act, every state has adopted drug substitution laws that either require or permit pharmacies to

substitute AB-rated generic equivalents for branded prescriptions, unless the prescribing physician has specifically ordered otherwise.

42. These efforts—when not undermined by anticompetitive conduct—have largely been successful. In 1983, the year before the Hatch-Waxman Act was signed into law, only approximately 13% of prescriptions in the United States were filled with generic drugs. By 2013, generic drugs accounted for approximately 86% of all dispensed prescriptions. Today, generics or biosimilars account for 90% of all dispensed prescriptions and generics or biosimilars are dispensed 95% of the time when such versions are available. These prescriptions have saved patients approximately $445 billion in 2023 alone and over $3 trillion over the last decade.

43. Brand drug developers are not without recourse against generics and biosimilars. To reward innovation, Congress has established several important protections commonly used by brand drug manufacturers to temporarily stall the entry of generics and biosimilars for a set period of time.

44. The first form or protection is patent exclusivity. A patent is a form of intellectual property that grants its owner the right to exclude anyone else from making, using, or selling the patented invention for a limited period of time. In the United States, a utility patent can cover "any new and useful process, machine, manufacture or composition of matter, or any new and useful improvement thereof. 35 U.S.C. § 101. This type of patent provides protection for 20 years from the date the initial patent application was filed. 35 U.S.C. § 154(b). Drug developers will often seek to patent the chemical composition or active ingredient in the first instance whenever possible. Although the term of such a patent will expire after 20 years, pharmaceutical companies often obtain "secondary" patents for ancillary matters, such as its method of use, dosage, formulation, or manufacturing processes, which have the practical effect of extending

the exclusivity period well beyond 20 years. As a result of these "evergreen" activities, branded drugs often enjoy an additional 10 to 13 years on the market before the final patent expires.

45. Nevertheless, patent protection is not absolute. To facilitate generic competition, the Hatch-Waxman Act amended applicable law to require brand drug manufacturers to provide the FDA with a list of all patents covering the composition or method of use of any new drug, and the FDA to maintain a public list of all approved drugs and the patents claimed by the manufacturer. 21 U.S.C. §§ 355(c)(2), 355(j)(7)(A)(i)-(iv). The FDA maintains this registry in its publication *Approved Drug Products With Therapeutic Equivalence Evaluations*, commonly known as the "Orange Book" due to its orange cover. However, the FDA's role is purely ministerial. It relies entirely on the brand manufacturer's representations about patent validity and applicability because it does not have the resources or authority to verify their accuracy. As such, Congress encouraged generic manufacturers to challenge brand manufacturer's patents. Generic manufacturers may file an ANDA for a compound covered by a patent listed in the Orange Book by certifying that the patent is invalid. 21 U.S.C. § 355(j)(2)(A)(vii)(IV). A generic manufacturer who does so, subjects itself to an infringement suit with a limited set of defined remedies that expressly preclude monetary damages unless there have been commercial sales of the generic drug. *See* 35 U.S.C. § 271(e)(4). Congress also gave strong incentive for generic manufacturers to challenge the validity of patents in this manner by providing a 180-day window of marketing exclusivity to the first manufacturers to file such an ANDA. *See* 21 U.S.C. § 355(j)(5)(B)(iv).

46. The second form of protection is regulatory exclusivity. In exchange for providing generic manufacturers an abbreviated approval pathway, the Hatch-Waxman Act prohibited any ANDA from referring to any data in an approved NDA for a drug that contains a

new chemical entity, that is the active ingredient, for five years running from the date the NDA is approved. 21 U.S.C. §§ 355(c)(3)(E)(ii), 355(j)(5)(F)(ii). This is commonly referred to as the period of "data exclusivity." Similarly, the BPCI Act prohibited anyone from filing a biosimilar BLA under the section 351(k) pathway until four years after the date on which the reference product was licensed and, further, restricted the FDA from granting approval of any such biosimilar until 12 years after that date. 42 U.S.C. § 262(k)(7)(A)-(B). These protections are distinct for those provided by any applicable patents and they may not necessarily coincide with the term of any such patents.

47. These protections are very important to manufacturers of branded drugs. Once a generic drug enters the market, it rapidly takes sales from the branded drug. Generics are, by definition, considered to be therapeutically equivalent to the brand name drug. Accordingly, the FDA has advised that "products classified as therapeutically equivalent can be substituted [for the branded drug] with the full expectation that the substituted product can be expected to have the same clinical effect and safety profile as the prescribed product when administered to patients under the conditions specified in the labeling." Thus, the only meaningful competitive difference between a generic and a brand name drug is price. The FDA has found that the price of a drug drops by almost 40% when a single generic enters the market, 54% when two generics are available, and more than 95% when six or more are available. Because of this, generics often capture more than half of market share within the first year. As a result, brand drug companies, like Biogen, view competition from generic drugs as a grave threat to their bottom line, especially for highly profitable products.

48. The rapid erosion of brand sales brought about by the entry of generics is well known among those who work at brand manufacturers, like Biogen. Prior to, and throughout the

Class Period, Defendants signed SEC filings in which they warned "generics . . . are likely to be sold at substantially lower prices than branded products," which "may significantly reduce both the price that we are able to charge for our products and the volume of products we sell" in a short period of time. Indeed, CW1 explained that "anyone who works in the pharmaceutical industry understands that when a branded drug's patent expires and generics enter, the expected revenue will plummet within a year." CW2 also echoed that "when generics enter, there is a price drop and [product] shift," adding "it's natural market dynamics."

49. By impairing generic competition, however, a brand manufacturer can continue to charge supracompetitive prices and either maintain or minimize the impact on its sales. Brand manufacturers have therefore used variety of means to extend their monopoly for as long as possible, including some that are illegal.

## VI. BIOGEN'S ATTEMPTS TO OFFSET DECLINES IN ITS CORE BUSINESS FAIL

### A. Sales In Biogen's Flagship MS Franchise Begin to Decline

50. By 2017, Biogen's MS portfolio had grown into a nearly $9 billion franchise. Through the incremental success of Avonex, Tysabri, and Tecfidera, Biogen's MS product sales consistently grew every year from 2000 through 2016. As of 2017, the MS business included these three core products along with two newer MS drugs marketed under the trade names Zinbryta and Fampyra. But Avonex, Tysabri, and Tecfidera continued to generate the lion's share of sales, collectively representing 99% of the franchise's product sales.

51. At the time, Biogen's MS franchise was its flagship business. By focusing almost exclusively on the growing market for MS treatments over the past two decades, Biogen lacked meaningful product sales from other sources. As of the start of 2017, Biogen's MS franchise accounted for nearly 89% of its overall product sales. Indeed, Avonex, Tysabri, and Tecfidera were by orders of magnitude Biogen's three top products.

52. Tecfidera, in particular, contributed significantly to Biogen's results, especially its sales in the United States. By the end of 2016, Tecfidera generated nearly $4 billion in annual sales. These sales of Tecfidera represented over 40% of Biogen's overall product sales in 2016. What is more, over 75% of these Tecfidera sales were attributable to sales in the United States. Biogen was able to reap such sales, and was poised to continue to reap such sales, because it owned several patents that kept Tecfidera free from generic competition in the United States, including U.S. Patent No. 7,320,999 ("the '999 patent"), which protected the method of using the active ingredient in Tecfidera for treating MS through 2020, and U.S. Patent No. 8,399,514 ("the '514 patent"), which protected the method of using a specific dosing regimen of Tecfidera to treat MS through 2028.

53. However, by early 2017, Biogen's MS franchise was facing a confluence of competitive forces that threatened to inhibit its continued growth. Having been on the market for over 20 years, Avonex was a relatively mature product nearing the final phase of its product lifecycle. Its annual sales had been declining since 2013, as MS patients and their physicians began to increasingly use more convenient oral medicines as first-line treatments. In addition, in March 2017, the FDA approved a groundbreaking new MS drug made by Genentech, Inc. marked under the name Ocrevus that was shown to be more effective than any other available MS therapy and offered a much less burdensome dosing regimen, which Biogen specifically warned in its SEC filings could negatively impact its sales if approved.

54. These competitive forces gave way in 2018. In 2018, Biogen's MS product sales declined for the first time since it released Avonex in 1996. They have continued to decline every year since then.

55. Making matters worse, Biogen faced a cascade of legal disputes from generic manufacturers during this time who challenged the U.S. patents for Tecfidera. Beginning in March 2017, *i.e.*, as soon as legally permissible, dozens of generic manufacturers filed ANDAs certifying that the '514 patent was invalid or unenforceable. In January 2018, Banner Life Sciences LLC ("Banner") filed a "paper NDA" for a bioequivalent form of Tecfidera which relied on the safety and efficacy data that Biogen submitted to the FDA for Tecfidera and certified that the '001 patent was invalid or unenforceable. Between June 2017 and January 2019, Biogen initiated patent infringement suits under the Hatch-Waxman Act against more than 25 generic manufacturers in the United States District Court for the Northern District of West Virginia and the United States District Court for the District of Delaware for making such filings.

56. The outcome of the challenges described above seriously imperiled what remained of Biogen's MS franchise. By 2018, Tecfidera was still generating over $4.2 billion in sales for Biogen, with over 76% of those sales derived from sales in the United States. These sales were made possible by the collection of patents that protected Tecfidera from generics but all except the '001 patent and the '514 patent expired in 2018 or 2019. As CW1 recalled, "everyone was aware there was a cliff coming" and, as such, all groups at Biogen were scrambling to find ways to replace the anticipated revenue loss from Tecfidera.

**B. Biogen Devised Dual Strategies to Stave Off the Declines in Its MS Franchise**

57. As Biogen faced the looming cliff, the Company devised dual strategies to keep from collapse. First, to limit the damage to the MS franchise, Biogen would introduce a new biosimilar, Vumerity, which would enable Biogen to keep selling a patent-protected medication to its MS customers, so long as the patients were transitioned before generics began to eat at market share. Second, to offset any losses along the way and create a new future stream of revenue, Biogen would introduce a new blockbuster AD drug, Aduhelm. While the first strategy

protected the revenues of the past, the second strategy would open new revenues for the future. Both strategies were legitimate and would work together to protect the company – so long as they were successful.

### 1. Biogen Planned to Switch Patients from Tecfidera to a New Biosimilar Known as Vumerity Before Generic Tecfidera Became Available

58. As explained above (¶ 55), Biogen faced a series of challenges to the patent that it relied on to secure Tecfidera's record-setting revenue streams beginning in June 2017. Biogen knew from disclosures in SEC filings signed by Defendants Vounatsos and McDonnell that, if the patent challenges succeeded, the entry of generics in the United States would destroy the significant revenue streams generated by Tecfidera there. So Biogen decided to maintain those revenue streams even if the patent was invalidated by moving patients to a bioequivalent version of Tecfidera with ample patent protection before any generics became available on the market.

59. On November 27, 2017, Biogen announced that it entered into an agreement with Alkermes plc ("Alkermes"), a pharmaceutical firm based in Dublin, Ireland, to purchase the rights to a developmental drug that would later become known as Vumerity. Vumerity is a bioequivalent version of Tecfidera. The active ingredient in Tecfidera is dimethyl fumarate, whereas the active ingredient in Vumerity is diroximel fumarate. Although dimethyl fumarate and diroximel fumarate have different chemical structures and pharmacokinetic properties, they both rely on the same mechanism of action in the human body to produce their therapeutic effect. The body rapidly metabolizes both to monomethyl fumarate, which is believed to activate a pathway that inhibits inflammation associated with MS and protect nerve cells from damage.

60. Importantly, Vumerity provided separate market exclusivity protections that were free from the generic threats facing Tecfidera. Because diroximel fumarate has a different chemical structure than dimethyl fumarate, Vumerity was protected by three *separate* patents in

the United States, each of which carried terms running through 2033. In addition, none were subject to challenges by generic manufacturers in ANDA filings or otherwise. Thus, Vumerity had patent protections that were not subject to challenge and provided exclusivity far past the time any of the ongoing patent lawsuits about Tecfidera would reach their conclusion.

61. Industry insiders saw the obvious purpose of Biogen's acquisition of the rights to Vumerity. In an article published on November 27, 2017, by *BiopharmaDive* titled "Biogen, Alkeremes hook up on Tecfidera follow-on," outspoken industry analyst Umer Raffat said that "the deal takes pressure off the mid-2020s Tecfidera patent cliff for Biogen," noting that "there are already 25 or more generic versions of Tecfidera underway." The biotechnology outlet *Fierce Biotech* expressed a similar sentiment in an article published that same day, titled "Biogen inks Alkermes deal to defend multiple sclerosis turf."

62. Brand name manufacturers, like Biogen, know that if they can successfully "switch" patients to a different but clinically equivalent drug, like Vumerity, before generics of the original drug enter the market then they can effectively preserve the market share enjoyed by the original drug unencumbered by generic competition. Generic manufacturers do not have or use a massive sales force to market their drugs to physicians like brand manufacturers. Instead, they primarily rely on the automatic drug substitution laws described in ¶ 41 to compete against brand name drugs. However, generics of the original product are not AB rated for the switched product, which have a different formulation or chemical structure and, thus, cannot be substituted for it under state substitution laws. As such, if a brand manufacturer successfully cannibalizes the original drug's sales with a switched product before generics of the original drug enter the market, the generics are likely *never* able to compete effectively with the switched product.

63. However, the timing of the switch is critical. It is well known that if generic versions of the original brand product enter the market before the transition to the switch product is complete, the latter will make very few sales unless it offers substantial medical improvements over the original product. Conversely, once a market switch is complete, doctors are unlikely to prescribe *any* version of the original product. Having switched prescribing habits—and their patients' medical preferences—from the original to the reformulated product, most doctors will not have patients go back to the original product, even after a generic becomes available. Thus, it is critical to complete the switch before generics of the originator product hit the market.

64. Accordingly, Biogen and Alkermes worked to swiftly bring Vumerity to market. An NDA for Vumerity was submitted in December 2018. Biogen was able to submit the NDA for Vumerity so swiftly because it relied on the clinical trials showing that *Tecfidera* was safe and effective. In fact, Biogen was able to do so by submitting data from studies showing that Vumerity was bioequivalent to Tecfidera.

65. At this time, the legal disputes over the remaining patents for Tecfidera remained ongoing. The infringement action pending in the Northern District of West Virginia was scheduled for trial in February 2020. The other infringement actions other than the suit against Banner were consolidated in the District of Delaware and scheduled for trial in December 2019. The infringement action against Banner was not set for trial but Banner filed a motion for judgment on the pleadings in February 2019, which remained pending.

66. Amid the uncertainty created by these legal challenges, Biogen told investors that if the patents for Tecifdera were invalidated that it was prepared to switch patients to Vumerity. For example, on April 24, 2019, Defendant Vounatsos acknowledged that "there are many questions regarding our U.S. intellectual property for Tecfidera" due to the ongoing patent

litigation. However, he assured that "we are appropriately preparing for all possible outcomes" and "ahead of the outcome of . . . the litigations, we shall have the opportunity to launch Vumerity," which "has a composition of matter patent with a base expiration date in 2033." Later on the call, analyst Umer Raffat asked "Am I hearing it correct and also should we reasonably expect a meaningful switch [to Vumerity]?" Vounatsos responded, "So from day one, and this is reason why we did the—we deployed capital and acquired this asset [Vumerity], is that it was meaningful and strategically important for the company." A month later, Vounatsos told investors that "obviously, the patent situation will certainly have an entrance into the tactical plan of launching Vumerity" but stressed that the "important situation, again, is that Vumerity will be launched months or quarters before the court ruling on the [Tecfidera] IP."

67. The FDA approved the NDA for Vumerity in October 2019. To effect the "switch" from Tecfidera to Vumerity, Biogen directed sales associates in the United States to switch as many patients as possible from Tecifdera to Vumerity once they could market it. As CW3 reported, "our instruction was really to try to transfer as many patients as possible from Tecfidera to Vumerity" in the United States. CW3 explained that this strategy came from the "corporate level" at Biogen through the national brand team, and filtered down to divisional Vice Presidents, then passed down to regional directors, who made sure salespeople in the field understood and executed the strategy.

### 2. Biogen Planned to Replicate Its Success in MS By Entering the Nascent Market for Drugs to Treat AD

68. While the first prong of Biogen's dual strategy focused on slowing the collapse of Biogen's flagship and top-selling product, the second prong focused on searching for a new blockbuster drug around which to build a new franchise to sustain further growth.

69. That search led Biogen to focus on a prevalent and debilitating disease with few existing treatment options: AD. AD, like MS, is a serious neurodegenerative illness and, thus, fit Biogen's specialized identity. AD causes a progressive cognitive decline known as dementia, slowly destroying skills in memory, language, navigation, problem-solving, and physical function, and is, ultimately, fatal. As the illness progresses, patients may lose their sense of identity and ability to recognize loved ones, develop symptoms of aggression and paranoia, and other mood and behavior changes.

70. AD's cognitive decline occurs as the disease breaks down the ability of neurons to communicate with each other, however, the pathology of AD in the human body is not fully understood. One theory is that this occurs through the build-up of beta-amyloid amino acids ("amyloids"). Scientists lack consensus on the function amyloids perform in a healthy brain, but for patients with AD, these amyloids build up in clumps, or "plaques," which are believed to block the ability of neurons that transmit messages. This theory is not universally accepted and remains controversial between AD experts.

71. There is also no scientific consensus on the causes of AD, but certain risk factors have been identified, including genetic, lifestyle, and demographic factors. The most important genetic indicator, or "biomarker," for AD is a gene variant called apolipoprotein Eε4 ("ApoE4"). Patients can have zero, one, or two copies of ApoE4. Approximately 15-25% of all people have one copy, and 2-5% of all people have two copies. One study found that 60% of participants with two ApoE4 alleles had indications of AD by age 85.

72. The biggest risk factor for AD is age, and according to Alzheimer's Research UK, the risk of developing AD doubles every five years after age 65. Because of this, AD impacts millions around the world. In 2020, Alzheimer's Disease International estimated 55 million

people worldwide live with AD. Within the United States, AD affects an estimated 6.5 million Americans, or around 10% of the population aged 65 and older and one-third of people aged 85 and older. AD is the cause of 60-80% of all dementia diagnoses and is the sixth leading cause of death. Within Europe, another 8 million people are affected by AD.

73. On top of causing a steep decline in patients and a terrible burden on loved ones, AD causes significant burdens on the healthcare system. According to the Alzheimer's Association, direct and indirect costs were estimated to be $1.3 trillion globally in 2019, and around $360 billion in the United States in 2024.

74. Despite the huge societal impact represented by this debilitating disease, no proven effective treatment exists on the market. In 1996, the first medication to treat AD was approved by the FDA: donepezil. Donezepil works by inhibiting an enzyme, acetylcholinestrase, that breaks down nerve cells. Donezepil's phase 3 trial found qualitative improvements in some patients taking the drug but found no statistically significant improvement in their cognitive disability scores. Since its approval, little peer-reviewed evidence has found meaningful clinical improvement in patients taking donezepil. Donepezil also has serious side effects, including abnormal heart rhythms, urinary incontinence, nightmares, and seizures.

75. In the 15 years after donezepil became available, no new AD treatments were brought to market. Therefore, by 2020, AD was the ideal target for a breakthrough treatment: millions of patients who are desperate for treatment worldwide, little effective competition, and large financial incentives for healthcare organizations to find a better solution.

76. By 2014, Biogen was developing at least two of its own treatments for AD, including aducanumab, which was an antibody that worked by targeting the immune system against the amyloid plaques theorized to cause AD (an "anti-amyloid antibody"), and tau-

directed antibody that was in the nascent stages of development. At the time, aducanumab was close to completing Phase 1 trials. This drug would later become known as Aduhelm.

77. On March 4, 2014, Biogen and Japanese pharmaceutical company Eisai Co., Ltd. ("Eisai") entered into a Collaboration Agreement to jointly develop and commercialize two product candidates under development by Eisai for the treatment of AD, including a anti-amyloid antibody referred to as BAN2401, also known as lecanemab, and an oral medication referred to as E2609, also known as elenbecestat (the "Collaboration Agreement"). At the time, Eisai had recently initiated a Phase 2 trial for lecanemab, and elenbecestat was in the nascent stages of development. The Collaboration Agreement also provided Eisai with an option right to similarly collaborate on either of Biogen's AD product candidates, including Aduhelm.

78. By 2015, Aduhelm had completed Phase 1 trials for Aduhelm and, on September 8, 2015, Biogen began two Phase 3 trials. In August 2016, Aduhelm was accepted into the EMA's PRIME program, designed to enhance support for the development of medicines that treat unmet medical needs, and, in September 2016, the FDA accepted Aduhelm into its Fast Track program, designed to expedite the review of drugs used to treat serious conditions with unmet needs. Lecanemab was scheduled to remain under study in the Phase 2 trial through 2019.

79. In 2017, Eisai elected to exercise its option to co-develop and co-promote Aduhelm. On October 22, 2017, Biogen and Eisai entered into a new Collaboration Agreement governing the development and commercialization of Aduhelm (the "Aduhelm Collaboration Agreement") and amended and restated the original Collaboration Agreement in light of the Aduhelm Collaboration Agreement (the "Restated Collaboration Agreement"). Under the Restated Collaboration Agreement, remained the primary lead for the development of lecanemab, including clinical trial management and regulatory filings. In contrast, Biogen

remained the primary lead for the development of Aduhelm, including clinical trial management and regulatory filings, under the Aduhelm Collaboration Agreement.

80. By 2020, Aduhelm was approaching commercialization, and lecanemab, later known as Leqembi, was on track to arrive shortly thereafter. In late 2019, Eisai announced that it planned to submit a BLA for Aduhelm in 2020 based on the results of a recent Phase 3 study. Meanwhile, Eisai began enrolling patients in a Phase 3 study for Leqembi.

81. As early as July 22, 2020, Vounatsos began to signal that while there was "potential risk to Tecfidera, we believe we are well positioned as we continue to build a mutlifranchise portfolio," and that "we aim to build a broad franchise across multiple targets and modalities" in AD, beginning with Aduhelm. On October 21, 2020, Defendant Vounatsos expanded on this concept, observing that we believe we are in a transitional period with several upcoming inflection points" as "we manage through the erosion of Tecfidera in the U.S." but explained that "[w]e remain optimistic about the prospect of launching aducanumab as the first therapy to meaningfully change the course of Alzheimer's disease." Vounatsos stated that "this would be an important short-term and long-term growth driver for the company." Vounatos returned to this theme in a February 21, 2021 press release, saying, "[a]lthough we expect a financial reset in 2021 primarily due to the entry of Tecfidera generics, we believe that 2021 has the potential to be a transformative year for our pipeline with an anticipated regulatory decision in the U.S. on aducanumab for Alzheimer's disease in June." As Vounatsos bluntly put it on March 1, 2021, "we wanted to move this company from being mostly an MS company with an Alzheimer's bet."

82. Indeed, internal documents provided to Congress confirmed that Biogen viewed Aduhlem as an unprecedented financial opportunity. For example, a presentation made to

Biogen's Board of Directors on September 30, 2020, touted the potential of AD treatments to transform the Company, beginning with Aduhelm. The opening slide said, "Our ambition is to make history," and "establish Aduhelm as one of the top pharmaceutical launches of all time." The presentation declared that Aduhelm would be a "Blockbuster in 12 months" and reach roughly $8.7 billion by 2024, based on a launch year of February 2021 and a list-price of *$55,000 per year*. The Presentation also acknowledged that Medicare is anticipated to account for more than 85% of patients at the time of launch. Other internal documents estimated that Aduhelm was "potentially a $18B peak revenue product" if priced accordingly.

83. In short, Biogen's new strategic direction was clear: quickly pivot from a rapidly eroding MS market to a new AD franchise that could continue to sustain Biogen's growth.

### C. Biogen's Dual Strategies Backfire

#### 1. Generic Tecfidera Entered the Market Long Before Biogen Completed the Switch to Vumerity

84. As explained above (¶¶ 62-63), the timing of Biogen's market switch strategy was key. Biogen and its senior management knew that it was critical to switch the prescription base to Vumerity before generic Tecfidera entered the market otherwise (i) doctors and patients may be unwilling to change to higher-cost brand name therapy; and (ii) generic Tecfidera could be automatically substituted for Tecfidera prescriptions at the pharmacy under state law. However, the market switch devised by Biogen did not go as planned.

85. First, Biogen was unable to settle the patent lawsuits with generic manufacturers on acceptable terms. In July 2019, Biogen executives told its investors that "there was a lot of interest" in resolving the patent litigations before a decision on the merits. Biogen anticipated that it could settle the patent litigations with agreements that required the generic manufacturers to delay entering the market until a date certain years later—a so-called "pay-to-delay"

settlement—during which time it would complete the switch to Vumerity. But Biogen was unable to do so with the vast majority of generic manufacturers against whom it brought claims. As such, the motion for judgment on the pleadings in the action against Banner remained under consideration, the bench trial in the United States District Court for the District of Delaware went forward in December 2019, and the bench trial in the action in the United States District Court for the Northern District of West Virginia went forward in February 2020.

86. Next, the onset of the COVID-19 pandemic in March 2020 severely limited Biogen's ability to effectively market Vumerity to physicians and patients in the United States. Given the minimal clinical differences between Tecfidera and Vumerity (if any), Biogen's market switch strategy relied heavily on in-person sales pitches to prescribing doctors to convince them to make the switch. But those in-person meetings became exceedingly difficult with shelter at home and lockdown restrictions instituted across the country. For similar reasons, patients were not seeing their physicians as often as they had in the past. Biogen later report to investors that "it's important to note that the MS market in the US has been significantly impacted by lower new patent starts and switches due to COVID-19, as well as reduced engagement with physicians, which have both impacted the launch of Vumerity."

87. Further, Biogen's makeshift efforts to market Vumerity during this challenging time were met with skepticism. While Vumerity was not clinically different from Tecfidera, it was functionally different in one meaningful way. Both are packaged in the form of delayed-release oral capsules. But Vumerity *doubles* the patient's daily pill burden from one pill twice a day to two pills twice a day. A patient's pill burden significantly affects the likelihood that he or she will adhere to the therapy. This is especially true for patients who suffer from MS. More than 25% of people with MS take five or more prescription medications to treat a range of

conditions, which can lead to high pill burden. To distinguish Vumerity, Biogen sales associates marketed it on the asserted ground that it leads to fewer gastrointestinal problems compared to Tecfidera. However, as CW3 recalls, there was only a "small percentage" of patients on Tecfidera who experienced "GI issues," so the pitch did not compel many to switch.

88. As a result, Biogen did not even come close to switching its patient base from Tecfidera to Vumerity by mid-2020. As of June 2020, Vumerity had been on the market for more than eight months but it had achieved monthly unit sales of only 50,225 capsules (equal to only 419 thirty-day supplies at four capsules per day). That was a mere *two percent* of the total monthly unit sales for Tecfidera, which, at the time, amounted to 2,495,616 capsules (equal to 41,494 thirty-day supplies at two capsules per day).

89. Making matters worse, Biogen lost each patent litigation that remained pending. On January 7, 2020, the United States District Court for the District of Delaware issued a decision in the infringement action against Banner granting its motion for judgment on the pleadings. The court concluded that the legal mechanism that Biogen used to extend the '001 patent from April 2018 to June 2020 did not protect against the type of generic manufactured by Banner. On June 18, 2020, the United States District Court for the Northern District of West Virginia issued a decision in which it found, based on the totality of evidence presented at trial, that the '514 patent was invalid. Then, on September 16, 2020, the United States District Court for the District of Delaware adopted the same conclusion under principles of collateral estoppel.

90. Even after losing its patent cases, Biogen thought it still had time to switch the market to Vumerity before generic Tecfidera entered the market. When a brand drug has sales of the magnitude of Tecfidera—more than $4 billion annually—generic manufacturers will often wait to enter the market until any appeals are resolved. If they enter the market and the patent

victory is overturned on appeal, they are liable to the brand manufacturer for patent infringement. On a drug like Tecfidera, the infringement damages can be substantial and, as such, generic manufacturers are usually reluctant to take that risk. Accordingly, Biogen told investors in July 2020, after its initial trial loss, that it "assumed no generic entry for Tecifdera" in 2020.

91. Biogen was wrong again. Its patent was so weak that the generic manufacturers did not wait for an appellate decision before entering the market. On August 17, 2020, the FDA approved the first ANDA for generic Tecfidera, filed by Mylan Pharmaceuticals Inc. ("Mylan"). Mylan announced the launch of its generic version of Tecfidera just two days later, on August 19, 2020. By November 2020, there were at least eight generic versions of Tecfidera available.

92. In short, multiple generic versions of Tecfidera entered the market long before Biogen could adequately switch Tecfidera patients and their physicians to Vumerity. Instead of switching 100% of Tecfidera patients to Vumerity by this time, Biogen had converted about 1% of them. Biogen's market switch strategy was in shambles.

**2. Aduhelm Fails Commercially After Investigations Place Biogen at the Center of a Scandal Surrounding Its Approval by the FDA**

93. Aduhelm, the first AD medication brought to market by Biogen and Eisai, held incredible promise to transform AD treatment, but would instead become a disastrous failure, sparking public backlash and numerous government investigations. In accordance with the Restated Collaboration Agreement, Biogen took the lead in conducting clinical trials and submitting regulatory filings for Aduhelm.

94. To diagnose and monitor AD, clinicians use a measurement called Clinical Dementia Ratings ("CDR"). CDRs identify performance on a scale of 0-3 in categories ("boxes") of memory, orientation, judgment, community affairs, home and hobbies performance, and personal care. On the scale, a CDR of 0 is No Dementia, 0.5 is Questionable, 1 is Mild

Dementia, 2 is Moderate Dementia, and 3 is Severe Dementia. These CDRs allow physicians to track individual dementia symptoms as the disease progresses. The sum of the CDRs in each of these "boxes" provides an aggregate measure of dementia, known as the Clinical Dementia Rating – Sum of Boxes ("CDR-SB"). A CDR-SB of 0 indicates "normal," between 0.5 and 4.0 indicates mild cognitive impairment, between 4.5 and 9.0 suggests mild dementia, between 9.5 and 15.5 suggests moderate dementia, and between 16 to 18 suggests severe dementia.

95. In addition to CDR-SB, proponents of the theory that plaques are responsible for dementia caused by AD measure the impact of treatment through MRI brain scans tracking the amount of plaque build-up in the brain. Under this theory, removal of plaques is a proxy for improved brain function. However, the plaque theory is not the consensus, and others do not treat plaque removal as a sign of efficacy. Most notably, as of 2018, the FDA's guidance for the review of AD treatments explicitly rejected the use of plaque removal as a proxy for improved brain function, requiring a cognitive measure like CDR-SB instead.

96. Aduhelm began showing problems during its pivotal Phase 3 trials. In the Phase 3 trials, the primary endpoint was to show less cognitive decline (measured using CDR-SB) for patients on Aduhelm than those on placebo. Secondary endpoints included reduced markers of AD, including reduction of amyloid plaques on scans. However, on March 21, 2019, Biogen and Eisai announced that Biogen was forced to discontinue both Phase 3 trials after an independent data monitoring committee concluded that it would be futile to continue, as the trials would be "unlikely to meet their primary endpoint upon completion." The release claimed "[t]he recommendation to stop the studies was not based on safety concerns."

97. Nevertheless, Biogen took a closer look and determined that the data suggested there may well be a treatment effect. Two months later, at a neurology conference, Biogen's

then-head of Research and Development, Dr. Alfred Sandrock, discussed the post-hoc findings in an off-the-record meeting with a director at the FDA, Dr. Billy Dunn, who suggested a formal meeting between Biogen and the FDA to discuss the data. On June 14, 2019, the FDA and Biogen met and agreed that the two organizations should collaborate together "as part of a bilateral effort" to analyze the trial data and determine if clinical benefit could be shown.

98. On October 22, 2019, Biogen and Eisai publicly announced that they would plan to pursue approval for Aduhelm based on a "new analysis" of a larger dataset from Phase 3 studies. Citing discussions with the FDA, Biogen said it planned to submit a BLA in early 2020. Many industry publications said they were "stunned" by this news but also noted high skepticism, with one neuroscientists saying, "Why [Biogen] came back now and said they would pursue what before they themselves they [sic] tried to discard—it seems, to me, strange."

99. Over the next year, Biogen had an unusually high level of informal interaction with the FDA on the path forward. As Biogen worked with the FDA to rescue positive results from the two Phase 3 trials, it became clear that one trial had found a reduction in cognitive decline relative to placebo (measured using CDR-SB), but the other trial did not. Similarly, one trial found reduction in plaque build-up, but the other trial did not. After continuing to "collaborate" with the FDA, Biogen submitted a BLA for Aduhelm in July 2020, which the FDA accepted for "priority review" shortly thereafter.

100. The FDA elected to convene a meeting of its Peripheral and Central Nervous Advisory Commimttee (the "PCNS Advisory Commmitte") to provide input on the BLA for Aduhelm. An advisory committee is a body of independent medical professionals and subject matter experts that provide non-binding recommendations on pending applications. In a notable departure from standard procedure, ahead of the meeting, a briefing document was submitted in

support of the BLA authored *jointly* by Biogen and the FDA. This was highly unusual because the FDA almost always prepares its own briefing document and doing so jointly afforded Biogen advanced insight into FDA's responses and direct guidance from the FDA in drafting the Company's own sections. On November 6, 2020, all eleven members of the PCNS Advisory Committee *unanimously* declined to even consider approving Aduhelm because there was scant, and inconsistent, data from the drug's Phase 3 trails, and they "did not agree that it was reasonable to consider the clinical benefit of the one successful trial as primary evidence supporting approval." As noted earlier (¶ 31), most drugs require data from at least two trials.

101. While the BLA remained under review, controversy ignited. On December 9, 2020, and January 28, 2021, a non-profit consumer rights advocacy group, Public Citizen, wrote letters to the FDA, expressing concern over the close collaboration between the FDA and Biogen. On May 30, 2021, an FDA internal review (which was not made public) concluded that the collaboration between the FDA and Biogen had "exceeded the norms" – particularly the joint brief—and had failed to address scientific disputes "early enough in the process.

102. Despite the controversies in the approval process, on June 7, 2021, the FDA approved Aduhelm under its "accelerated approval" pathway based on the reduction in amyloid plaques in the brain as a "surrogate" endpoint reasonably likely to predict a clinical benefit (*i.e.*, a reduction the progression of symptoms), contrary to the FDA's own stated policy. Making matters worse, the FDA chose to approve the drug with an overbroad label covering a patient population beyond anything that had been tested in the two Phase 3 trials. Although the Phase III studies had only focused on those with mild cognitive impairment and verified plaques, the FDA's accelerated approval included an initial label indication for Aduhelm that was incredibly broad, simply saying it was "for the treatment of Alzheimer's disease."

103. Later that same day, Biogen announced that it decided to set the price for Aduhelm at the unjustifiably high price of $4,312 per infusion, or *$56,000 per year*. To place this price tag into perspective, an analysis by *CNN* reporter Tami Luhby concluded that if 500,000 of the six million Americans with Alzheimer's disease were prescribed Aduhelm and covered by Medicare, the cost would be ***$29 billion each year***, a price that would dwarf any other drug covered by the program in 2019, and nearly as much as the entire $37 billion it spent on drugs in that year. Internal documents produced to Congress indicate that Biogen set Aduhelm's price for purposes of "revenue maximization" even though it might spur "pushback" from payers and the public at large relative to lower-cost options.

104. For any drug, these heavy cost burdens would be controversial, but the outrage was deeper because the evidence of Aduhelm's efficacy was so thin. On June 7, 2021, the Institute for Clinical and Economic Review ("ICER"), a non-profit research institute that performs independent evidence-based reviews of medical treatments to measure value and suggest fair prices, released a statement stating that the FDA "has failed in its responsibility to protect patients and families from unproven treatments with known harms." On June 10, 2021, three members of the FDA advisory committee that reviewed the BLA for Aduhelm resigned in protest. One, Dr. Aaron Kesselheim, said, "this might be the worst approval decision that the F.D.A. has made that I can remember." Another David S. Knopman, a neurologist at the Mayo Clinic, told *The Washington Post* he did not "wish to be part of a sham process." For any drug, these heavy cost burdens would be controversial, but the outrage was deeper because the evidence of Aduhelm's efficacy was so thin.

105. A Congressional investigation later found that even leaders within Biogen's AD program were concerned about the breadth of the label—which it had proposed—but did not

communicate any of those concerns to the FDA. Instead, Biogen focused on developing "messaging" to address concerns about the broad label and developing a plan to mitigate risks to the Company's credibility in the event the broad label was approved.

106. Biogen's concerns were not misplaced: the approval of the broad label unleashed a wave of criticism. For example, on June 15, 2021, neurologist Sam Gandy wrote in *STAT+* that "[t]here is an inexplicable disconnect between the criteria Biogen employed for its Aduhelm trials and the . . . product labeling." Steve Miller, Chief Clinical Officer for Cigna told *The Washington Post* that "[i]nstead of a limited pool of eligible patients, you now have every patient and every family with Alzheimer's thinking maybe they should try this . . . The FDA has transferred its responsibility down to the payers, and making the payers out to be the bad guy."

107. Within a month, however, Biogen took the unusual step of requesting that the FDA narrow the label to match the population it had been tested on: patients with amyloid plaques and an early stage of AD, which the FDA made official on July 8, 2021.

108. Between the egregious pricing, dubious medical efficacy, and the overbroad approval, Biogen's botched roll-out of Aduhelm became national news, attracting serious negative attention. On June 25, 2021, two high-ranking members of the House Committee on Oversight and Reform announced that they would initiate an investigation into the FDA approval process, including "serious concerns about the steep price of Biogen's new Alzheimer's drug Aduhelm and the process that led to its approval despite questions about the drug's clinical benefit." On July 9, 2021, Acting FDA commissioner Janet Woodcock wrote a letter to the Department of Health and Human Services' ("HHS") Office of Inspector General ("OIG") requesting that they initiate an investigation into the FDA's approval of Aduhelm. On August 4, 2021, OIG initiated the requested investigation.

109. With the controversy over the approval and the price raging and government investigations mounting, Biogen made another disclosure that would finally spell the doom of Aduhelm: it wasn't safe. On November 9, 2021, *Reuters* reported that Biogen was investigating the death of a 75-year-old patient using Aduhelm. The patient had died of a side effect known as amyloid-related imaging abnormalities ("ARIA"). Despite the benign name, ARIA is a serious and sometimes fatal condition seen in AD patients involving transient legions in the brain that present as "abnormalities" on MRIs. ARIA can cause edema ("ARIA-E"), which involves a build up of fluid and swelling, or hemorrhage ("ARIA-H"), in which the swelling progresses into bleeding. Although minor cases of ARIA may escape initial detection, as ARIA becomes more serious, it can cause seizures, strokes, or death.

110. On November 22, 2021, clinical researchers associated with the Aduhelm trials published a peer-reviewed article in the *Journal of the American Medical Association* titled "Amyloid-Related Imaging Abnormalities in 2 Phase 3 Studies Evaluating Aducanumab in Patients with Early Alzheimer Disease." This article documented publicly for the first time that roughly 40% of participants in the two Phase 3 studies had suffered from ARIA, and one-quarter of those patients were symptomatic.

111. Only one month later, on December 20, 2021, Biogen announced that it would slash the price of Aduhelm by nearly half, charging $28,200 per year—still an expensive treatment, but a significant retreat from the lofty ambition to charge $56,000 per year. Later, on January 10, 2022, Defendant Vounatsos acknowledged that the initial price was "wrong" while boasting that the decision to adjust the price downwards was "courageous."

112. Aduhelm's failure had real, painful ramifications for Biogen. On February 3, 2022, Biogen released its Q4 and full year 2021 earnings, showing only $3 million in revenue for

Aduhelm in all of 2021. At the time, however, the Centers for Medicare & Medicaid Services ("CMS"), the federal agency that administers Medicare and Medicaid (which covers most adults over 65), had not yet reached a national coverage determination ("NCD") on whether, and to what extent, it would reimburse for Aduhelm.

113. On April 7, 2022, CMS finalized its NCD, which provided that Medicare would cover anti-amyloid antibodies, like Aduhelm, only to the extent they have received full approval from the FDA and would cover those that receive accelerated approval from FDA based on a surrogate endpoint for participants *in clinical studies*—a killer blow, which ensured that Aduhelm would remain inaccessible to the vast majority of AD patients covered by Medicare. In response to the determination, a Piper Sandler analyst wrote in a report, "one last glimmer for Aduhelm [is] snuffed out." Similarly, an RBC Capital Markets analyst report concluded that this decision "likely spells the end for Aduhelm."

114. Upon receipt of the unfavorable NCD, Biogen began winding down the development and commercialization of Aduhelm. On April 22, 2022, Biogen announced it would withdraw its application to market Aduhelm in the EU. On May 3, 2022, Biogen announced that Defendant Vounatsos would end his tenure, with no replacement chosen, and told investors that it was "[s]ubstantially eliminating commercial infrastructure" for the launch of Aduhelm following CMS' NCD, retaining only minimal resources to make the drug available to current patients, in an effort to cut $1 billion in costs.

115. Aduhelm, once hailed as the crown jewel in Biogen's strategy to enter new therapeutic areas to offset losses in its flagship MS franchise, was dead.

## VII. <u>BIOGEN PAID PBMs TO STIFLE TECFIDERA GENERIC COMPETITION</u>

116. With generic Tecfidera on the market by August 2020, Biogen could no longer directly impair generic manufacturers from gaining market share by completing a market switch

with an alternative product. Biogen therefore turned to other intermediaries in the complex prescription drug pricing and reimbursement supply chain that it used to distribute its drugs, including Tecfidera, to stifle generic competition and preserve Tecfidera's market share.

### A. Biogen Relied on a Complex Distribution and Payment Network to Sell OTC Prescription Drugs in the United States

117. Biogen did not sell its approved over-the-counter ("OTC") prescription drugs, like Tecfidera, directly to consumers in the United States. It relied on the same network of healthcare providers that all brand manufacturers use to sell such products to patients the United States.

#### 1. The Marketplace for Prescription Drugs in the United States

118. As displayed in the figure below, approved OTC prescription drugs—both generic and branded—are sold to patients through a complex supply chain involving wholesale distributors, retail pharmacies, patients, their payers, including private health insurers, self-insured employers, and public programs like Medicare Part D drug plans (collectively, "payers"), as well as middlemen who administer drug benefits on behalf those payers known as PBMs:

U.S. Distribution and Reimbursement System: Patient-Administered, Outpatient Drugs



119. In simple terms, the drug is sold to a wholesaler at a price known as the wholesale acquisition cost ("WAC"). The wholesaler, in turn, sells the drug to the pharmacy at a markup referred to as the average wholesaler price ("AWP") or "list price" for the drug. The markup included in the AWP is typically 20% of the WAC but it can vary by drug and package size. The drug is then paid for at the pharmacy through a copayment or coinsurance payment by the patient and money from the PBM, who, in turn, bills the payer at a predetermined amount. In addition, drug manufacturers, like Biogen, may pay rebates to the PBM, some or all of which is passed on to the payer, as detailed more fully below (¶¶ 124-127).

**2. The Unique Role of PBMs in the Drug Reimbursement System**

120. PBMs are not the buyer or payer in the prescription drug supply chain. They are service providers who act as agents on behalf of health plans and their insureds and, in doing so, act as middlemen between those payers and the other parties that form part of the prescription drug reimbursement system in the United States, including drug manufacturers, like Biogen.

121. PBMs have grown from providers of purely administrative services to powerful intermediaries in the prescription drug supply chain. PBMs were established in the 1960s to simply process claims for health plans. But over the last 20 years, PBMs have become increasingly concentrated through mergers and acquisitions. In 2004, the top three PBMs managed 52% of prescription drug claims in the United States. Today, they manage about 80%. Together, the top six PBMs now manage 94% of prescription drug claims in the United States. In addition, the top six PBMs have become vertically integrated with massive healthcare conglomerates who operate companies up and down the prescription drug supply chain:

| Parent/Owner | CVS Health Corporation | The Cigna Group | UnitedHealth Group Inc. | Humana Inc. | MedImpact Holdings Inc. | 19 BlueCross BlueShield plans |
|---|---|---|---|---|---|---|
| Drug Private Labeler | Cordavis Limited | Quallent Pharmaceuticals | NUVAILA | | | |
| Health Care Provider | MinuteClinic, Signify Health | Evernorth Care Group | Optum Health | CenterWell | | |
| Pharmacy Benefit Manager | CVS caremark 34% | Express Scripts 23% | Optum Rx 22% | Humana Pharmacy Solutions 7% | MedImpact 5% | Prime Therapeutics 3% |
| "PBM GPO"/ Rebate Aggregator | Zinc Health Services | Ascent Health Services | Emisar Pharma Services | Ascent (via contract) | Prescient Holdings Group LLC | Ascent (minority owner) |
| Pharmacy - Retail | CVS Pharmacy | | | | | |
| Pharmacy - Mail Order | CVS Caremark Mail Service Pharmacy | Express Scripts Pharmacy | Optum Rx Mail Service Pharmacy | CenterWell Pharmacy | Birdi, Inc. | Express Scripts Pharmacy (via contract) |
| Pharmacy - Specialty | CVS Specialty Pharmacy | Accredo | Optum Specialty Pharmacy | CenterWell Specialty Pharmacy | Specialty by Birdi | Accredo (via contract) |
| Health Insurer | Aetna | Cigna Healthcare | UnitedHealthcare | Humana | | 19 BlueCross BlueShield plans |

122. Through their horizontal and vertical integration, PBMs now have control over large segments of the patient population and have evolved to provide a range of important functions for the payers they serve. Today, PBMs not only process claims but develop formularies for healthcare plans, bargain with drug manufacturers to determine drug prices, decide how much the patient and payer will pay for a given drug, and establish pharmacy networks through which plan beneficiaries can get their prescriptions filled.

123. One of the most important services provided by PBMs is to create and maintain a drug formulary for their clients. A formulary is a list of specific prescription drugs that are covered by a health insurance plan and the copayment or coinsurance required for each. Drugs not on the formulary are not covered by insurance, meaning patients must pay the full list price. Formularies are typically divided into four or five "tiers," each with different copay or coinsurance costs. Generally, less expensive medications are placed on lower tiers, and lower tiers cost beneficiaries less than higher tiers. Similarly, when rival drugs are available to treat the

same condition, a PBM may create separate tiers in their formularies for "preferred" and "non-preferred" drugs. For example, the 10 largest Part D plans in 2019 used formularies with 5 tiers of cost-sharing involving copayments of $0 to $5 for preferred generic drugs, $1 to $13 for non-preferred generic drugs, $25 to $47 for preferred brand name drugs, various percentages of coinsurance for non-preferred brand name drugs and "specialty" drugs.




Free from collusion, structuring the formulary in this way encourages plan participants to use less expensive medications and, thus, saves the payer's money.

124. The vertical and horizontal integration within the PBM industry has led PBMs to change the design of their standard formularies. Prior to 2012, most health plans used an "open" formulary, giving patients the ability to access non-formulary drugs with a higher copayment. Since then, the three big PBMs—under the control of major health conglomerates—began using "closed" formularies that excluded approved drugs from any form of coverage. The drugs not included in the formulary are kept on an "exclusion list." Other PBMs have since followed suit.

125. PBMs have used this formulary structure, and their bargaining power, to secure "rebates" from manufacturers on the price of their drugs. PBMs have no say over the WAC at which manufacturers choose to price their products. But gaining a spot on PBM's national or regional formularies, especially a lower tier, is critically important for drug manufacturers.

PBMs use this fact to negotiate "rebate agreements" with manufacturers pursuant to which the manufacturers agree to provide a post-sale rebate payment to the PBM in exchange for favorable formulary placement. Once received, the PBM then passes along a negotiated amount to the payer. Free from collusion, this too allows PBMs to drive down the price of prescription drugs by rewarding those who can provide the lowest price and, thus, save payers even more money.

126. Due to these recent changes in market power and service offerings, PBMs have become powerful intermediaries at the center of the prescription drug system in the United States. Referring to PBMs as "powerful intermediaries" in the prescription drug supply chain, the FTC explained in June 2022 that "PBMs practically determine which medicines are prescribed, which pharmacies patients can use, and the amount patients will pay at the pharmacy counter."

### 3. PBMs Suffered from Conflicts of Interest that Brand Manufacturers Exploited to Suppress Generic Drug Competition

127. In theory, the PBM's bargaining power, and unique role in the prescription drug reimbursement system, should have put them in the best position to decrease the cost of prescription drugs for their clients and, ultimately, their insureds. Instead, PBMs have used their positions of power to permit brand drug manufacturers, like Biogen, to suppress the use of less expensive drugs for their collective financial gain.

128. By expanding their suite of services, PBMs can now, depending on their business model, make money at nearly every step in the process. PBMs can collect fees for designing formularies and managing drug benefits directly from their payer clients. Those clients may also permit PBMs to set the amount that that they will reimburse to pharmacies lower than the amount they collect from the insurer and pocket the difference, known as the "spread." In

addition, nearly all PBMs structured their contracts to allow them to keep part of the rebate they received from manufacturers as part of a "rebate sharing" arrangement with the health plan.

129. However, the rebate framework established by the PBMs has given rise to perverse conflicts of interest. Rebates paid to PBMs are typically expressed in the rebate agreement as a percentage of the bate received from the manufacturer or a percentage of the WAC for the drug itself. Similarly, the amount of the rebate retained by the PBM—whether denominated as a portion of the rebate or an administrative fee—is typically expressed as a percentage of the WAC for the drug itself. For example, the following language is from a standard rebate agreement for CVS Caremark, the country's largest PBM, from 2018:

G. **Administrative Fees.** Administrative Fees shall be calculated on a Plan by Plan basis as follows:

Number of Rebate eligible Units of the Product dispensed by Participating Pharmacies to Members covered by eligible Plans multiplied by WAC in effect as of the forty fifth (45th) day of the applicable Quarter multiplied by the Administrative Fee Percentage:

Administrative Fees will not be paid on utilization of non-eligible plans (Discount Card Plans, or for wholly owned, subsidiary or Plan or Plan sponsors which are an Affiliate of PBM).

| All Plan Types | Administrative Fee Percentage |
|---|---|
| Butrans | 4.00% |
| Hysingla™ ER | 4.00% |
| Intermezzo® | 4.00% |
| OxyContin® | 4.00% |

In other words, the "administrative fee" paid to the PBM is 4% of the WAC for every rebate-eligible unit sold. All else being equal, a PBM will make more money on drugs with the *highest WAC*. Thus, PBMs have incentive to give preferential treatment among several competing drugs to the one that provides the largest fee irrespective of whether it is the least expensive option.

130. Recognizing this conflict, brand drug manufacturers have used the rebates they offer as a bargaining chip to skew the formularies prepared by PBMs for their health plan clients to favor more expensive brand drugs over their far less expensive generic counterparts.

Specifically, the drug manufacturers will offer *additional* fee-generating rebates to the PBM to either place a branded drug on a better tier of the PBM's standard formularies than any generics of that drug or simply exclude the generics from those formularies altogether.

131. To be sure, this arrangement is in the economic interest of both the brand manufacturer and the PBM. As displayed in the illustration below, the brand manufacturer enjoys all sales associated with an active ingredient in a market free for any generic competition in exchange for a rebate payment to the PBM to be placed on its formularies. As noted earlier (¶ 47), generics will typically wipe out 90% to 95% of those profits once they enter the market. And because the generics are sold at dramatically reduced prices, this competition converts what were formerly profits into purchaser savings. But by paying the PBM additional fees to impair generic competition, the brand manufacturer and PBM can preserve the drug's market share and share in the ill-gotten gains.




132. PBMs have proven all too willing to partake in this illicit conduct to maximize their profit at the expense of their purported clients. In January 2019, the Committee on Oversight and Reform of the U.S. House of Representatives launched a comprehensive investigation into recent price increases for prescription drugs. A staff report released in September 2020 revealed that Teva Pharmaceuticals entered into "brand-over-generic" contracts

with PBMs after generic versions of its highly successful MS drug, Copaxone, became available in October 2017 under which it provided significant rebates to make brand name Copaxone the only version of the drug covered by their formularies. The documents the Committee received indicated that Teva entered into such agreements with "a number of PBMs for Medicare and commercial patients" by April 2018. Another report released the following day found that pharmaceutical company Novartis International AG entered into similar contracts for its drug Gleevec after it lost exclusivity in mid-2015. Similarly, a staff report released in January 2021 in connection with a Senate Finance Committee investigation into the price of insulin found that brand manufacturers of insulin increased the rebates they offered to PBMs to win preferred formulary placement and block a recently approved biosimilar product made by Eli Lilly.

133. The amount of money from drug manufacturers retained by PBMs is not well known because those amounts are set by confidential rebate agreements and not otherwise reported publicly by the PBMs, but it is a big part of their business. As the PBM market has consolidated over the past decade, privately negotiated rebates and fees paid by manufacturers to the PBM has risen sharply, and the amount that these fees contribute to PBM profits has risen three-fold from approximately 5% is 2012 to 22% in 2023. Recent research estimates that PBMs collected approximately $7.6 billion in fees from drug manufacturers in 2022, much less rebates.

134. These payments have been labeled and relabeled over time so PBMs could retain as much as possible for themselves. As more plan sponsors and public programs demanded that PBMs pass all rebates on to them, PBMs started renaming the payments. Payments once simply known as "rebates" soon became administrative fees. PBMs also created new fees that virtually did not exist five years ago labeled as volume discounts, service fees, data usage fees, inflation

coverage, credits, formulary placement fees, or other industry jargon terms designed to obfuscate and distract from the substantial sums being secretly exchanged to for favorable treatment.

135. However denominated, the money the PBM retains from the drug manufacturer is effectively a kickback. A kickback is a payment that is made to receive preferential treatment. In the case of PBMs, the only services performed by the PBM in connection with a rebate agreement are those it is already obligated and paid to perform by its plan sponsor clients. Thus, the money that a PBM keeps from the drug manufacturer is provided solely for giving preference to the brand name product over the generic product, even if the generic costs less.

136. As health plans began demanding that PBMs pass on all savings to them, PBMs created separate entities known as “rebate aggregators,” or group purchasing organizations (each, a “GPO”) to retain the “fees” they demanded from manufacturers, even if all rebates were, ultimately, passed along to their clients. Using these entities allows the PBMs to hide the fee payments they retain from both clients and regulators. Indeed, a former executive from OptumRX, one of the largest PBMs, admitted in 2024 that “the intention of the G.P.O. is to create a fee structure that can be retained and not passed on to a client.” Further reducing transparency, and making oversight more difficult, two of the three largest PBMs have located their GPOs abroad. Express Scripts, the PBM for the Cigna Group, located its rebate aggregator, Ascent Health, in Switzerland. OptumRx, the PBM for United Health Group Inc., located its rebate aggregator, Emisar Pharma Services, in Ireland.

137. This all has left health plans and insurers unable to defeat the PBM’s efforts to line their pockets by promoting more expensive drugs. Health plans can customize their own formulary, but information asymmetries hinder their ability to make fully informed decisions. So most simply accept one of the standard formularies offered by the PBMs “off the shelf” or

otherwise defer to their recommendations. Indeed, health plans hire PBMs, and pay them large sums of money, for their expertise in managing drug benefits, including formulary design.

138. As these opaque practices have come to light in recent years, regulators and lawmakers have correctly described them as anticompetitive. In February 2019, the Department of Health and Human Services, which oversees the agency in charge of Medicare, published a proposed rule change in which it explained that the fees paid to PBMs by drug manufacturers that are based on the list price of a drug "could function as a disguised kickback." 84 Fed. Reg. 2340 (2019). The House report on Copaxone from September 2020 characterized this practice as an "exclusionary tactic[] to limit generic competition and maintain profits." Similarly, the report from the Senate Finance Committee found that formulary-placement contracts were used to "block competitors" and the fees passed to them were "an area of concern for potential violations of the Anti-Kickback Statute." In December 2020, Congress granted the FTC additional funding to investigate various "unfair, deceptive, and fraudulent business practices," including the use of "rebate walls" by biopharmaceutical companies to "block competition from new branded therpaies, biosimilars, generics, and other innovative products." Congress described this as "an increasingly common anticompetitive behavior," and urged the FTC to prioritize its review.

139. The FTC soon adopted the same view. On May 28, 2021, the FTC released a report on "rebate walls." The FTC concluded that there can be antitrust violations when "a dominant pharmaceutical manufacturer uses rebate strategies in its contracts with third party payors to maintain market power, by giving is products preferred status in drug formularies, and to prevent the sales of competing products." After soliciting public comment on PBM business practices, on June 6, 2022, the FTC opened an investigation into PBMs that have drawn scrutiny in recent years, including their contracting practices, in which it sought internal documents from

the three largest PBMs and their GPOs. Ten days later, on June 16, 2022, the FTC published a "Policy Statement" on exclusionary contracts to "explain its enforcement policy with respect to these practices." In the Policy Statement, the FTC explained that "[e]xclusionary rebates that foreclose competition from less expensive alternatives may constitute unreasonable agreements in restraint of trade under Section 1 of the Sherman Act; unlawful monopolization under Section 2 of the Sherman Act; or exclusive dealing under Section 3 of the Clayton Act," as well as Section 2(c) of the Robinson-Patman Act and Section 5 of the Federal Trade Commission Act of 1914 (the "FTC Act").

140. On September 20, 2024, the FTC filed an administrative complaint against the three largest PBMs, Caremark Rx, LLC ("CVS Caremark"), Express Scripts, Inc. ("Express Scripts"), and Optum Rx, Inc. ("Optum Rx"), and their affiliated GPOs, for engaging in anticompetitive and unfair rebating practices in the market for insulin, a life-saving drug for the treatment of diabetes in violation of Section 5(b) of the FTC Act. Among other things, the FTC charged these parties with violations of Section 5(b) of the FTC Act for systemically excluding low WAC biosimilar versions of insulin from their formularies in favor of high WAC brand name insulin, with higher rebates and higher fees.

## B. Biogen Paid PBMs to Suppress Competition from Generic Tecfidera

141. Even through generic Tecfidera was *available for sale* by no later than August 2020, Biogen decided to pay PBMs to ensure that it was not in fact dispensed to patients.

### 1. Biogen Entered Into BOG Rebate Contracts with PBMs to Impair Generic Competition After Losing Patent Exclusivity for Tecfidera

142. As explained above (¶ 91), generic versions of Tecfidera became available for sale in the United States beginning in August 2020. As seasoned biotech executives, Defendants Vounatsos and McDonnell knew that this would severely hinder Tecfidera's market share and,

thus, the substantial revenue streams it generated for Biogen. Indeed, Vounatsos signed SEC filings prior to August 2020 in which he stated that generics are "likely to be sold at substantially lower prices than branded products, which may significantly reduce the price that we are able to charge for our products and the volume of products we can sell." On July 22, 2022, Biogen filed a quarterly report with the SEC, which acknowledged for the first time that "commercialization of a generic version of Tecfidera would have an adverse impact on our Tecfidera sales and our [overall] results of operations." Defendant Vounatsos signed a certification appended thereto which verified that "I have reviewed this quarterly report." Defendant McDonnell singed an SEC filing on October 21, 2020, that contained these same disclosures. In fact, that same SEC filing reported that "[m]ultiple Tecfidera generics entrants are now in the U.S. market" and stated that this "is expected to have a substantial negative impact on our Tecfidera revenues for as long as there is generic competition." Defendant Vounatsos certified that he reviewed that filing too.

143. By this time, Defendants Vounatsos and McDonnell were also fully aware of the unique role that PBMs played in the market for prescription drugs and the contractual arrangements they had with drug manufacturers. As explained below (¶¶ 358-364), Vounatsos understood that manufacturers, like Biogen, negotiated contracts with PBMs to secure favorable formulary placement no later than the time he was appointed to his role as CEO, in December 2016. In addition, McDonnell stated in the SEC filing he signed on October 21, 2020, that "[p]ayors, including . . .pharmacy benefit managers . . . increasingly seek price discounts or rebates in connection with the placement of our products on their formularies."

144. In fact, by mid-2020, Biogen already had rebate contracts with PBMs for their MS products, including Tecfidera. For example, in 2021, healthcare company and PBM operator Humana Inc. ("Humana") brought a civil lawsuit against Biogen for causing it to reimburse

prescriptions for Biogen's MS drugs that were the result of an illegal kickback scheme. In a proposed amended complaint filed on April 28, 2023, Humana claimed that it entered into several "rebate contracts" with Biogen between January 1, 2014, and December 31, 2017 which set the net price at which Humana would purchase Tecfidera by providing Humana with a rebate that was conditional on Humana agreeing to list Tecfidera on its formularies and certain other conditions, which, if granted, Humana proposed attaching as exhibits to the amended complaint.

145. Indeed, Vounatsos was already exploiting the PBMs conflicted incentives to secure favorable formulary placement for Biogen's MS products, including Tecfidera. During CW4's tenure with Biogen through September 2019, Vounatsos personally directed senior managers to consistently raise the price of Biogen's MS products, including Tecfidera, because he was aware that the PBMs earned fees from Biogen based on that price. In fact, CW4 was on calls where Vounatsos said "we're going to raise prices on every drug we've been doing R&D [research and development] on because we pay a fee to the PBMs." CW4 was also told by Amy Efantis, Vice President of Government Affairs, that she was on calls where Vounatsos said this strategy "would be acceptable (to public opinion)" if the drug was still in R&D and approved the strategy. The history of WAC changes for Tecfidera confirm as much. Between its approval in 2013 and 2020, Biogen raised the WAC for Tecfidera at least *ten times* to raise it from approximately $71.87 per pill in 2013 (or approximately $51,745 for an annual supply) to $137.93 per pill in 2020 (or approximately $99,309 for an annual supply)—a staggering increase of *91.9%*. During that same period, the Consumer Price Index increased by only 9.7%.

146. Armed with this knowledge, Vounatsos and McDonnell directed, authorized, or otherwise permitted Biogen to enter into brand-over-generic ("BOG") rebate contracts with PBMs to disadvantage or exclude generic Tecfidera from their formularies once the Tecfidera

patent was invalidated. According to CW2, "risk mitigation" planning was ongoing at Biogen while it fought generic manufacturers in court to devise strategies to preserve Tecfidera's market shfare "if the patent doesn't hold." CW2 recalled that once the court invalidated the patent, Biogen moved quickly to implement "BOG contracts—brand-over-generic—where the PBMs were paid to continue to dispense Tecfidera instead of generic." CW2 explained that the BOG contracts ensured that the PBMs would make more money from Biogen when Tecfidera was dispensed instead of generics. According to CW2, the prevailing view at the time was that it was better to receiving 50 percent of what was previously earned than nothing at all. CW2 confirmed that "most of the big PBMs" agreed to the BOG contracts.

147. CW5 confirmed that Biogen, like any major pharmaceutical company, had a Pricing Committee consisting of "senior" executives to review and approve drug prices and price changes. Indeed, both CW2 and CW1 reported that all changes needed to be approved by Biogen's Head of U.S. Market Access since September 2019, Brendan Manquin, and sometimes, depending on the terms of the price change, required sign off by other senior executives. CW2 noted, in particular, that the BOG contracts went "outside" Biogen's "pricing guidance," which meant they required approval from a cross-section of senior executives, including the President and Head of North America since October 2019, Alisha Alaimo, who reported directly to Defendant Vounatsos.

148. The implementation of a BOG strategy is confirmed by the sharp increase in rebates and fees that Biogen paid for Tecfidera once the practice went into effect. The average rebates/fees rose from 12% of the list price in 2019, when there were no generics, to 19% in 2020, and *45% in 2021*, before subsiding 28% in 2022. Thus, Biogen paid the highest

rebates/fees on Tecfidera in the key year 2021 as it worked feverishly to switch the market to Vumerity and find another therapeutic area in which to launch a new blockbuster product.

149. The use of BOG rebate contracts are also confirmed by a review of the formularies from the country's three largest PBMs. Between 2019 and 2022, the three largest PBMs in the United State were OptumRx, the PBM for United Health Group, Inc. ("UHG"), CVS Caremark, the PBM for CVS Health Corporation ("CVS"), and Express Scripts, the PBM for the Cigna Group ("Cigna"). As described more fully above (¶ 121), these three PBMs collectively control prescription benefits for 80% of all covered lives in the United States.

150. In exchange for the kickbacks from Biogen, OptumRx agreed to not advantage generic Tecfidera on a number of its formularies. In 2020, formularies governing 34% of OptumRx's covered lives did not give generic Tecfidera any better treatment than Tecfidera or Vumerity. The figure jumped to 49% in 2021. Then it subsided to 37% in 2022. Absent Biogen's kickbacks, generic Tecfidera would have been placed on the lowest tier for preferred generics like essentially all generic drugs that are not subject to anticompetitive pacts. Yet in 2020, formularies governing more than 41% of OptumRx's covered lives did not have generic Tecfidera on Tier 1. That figure jumped to 73% in 2021. Then it subsided to 54% in 2022. In fact, from 2020 through 2022, formularies governing at least 20% of OptumRx's covered lives designated generic Tecfidera as a "specialty" drug, which subject it to a high copayment or coinsurance payment and excessive "specialty" pricing at its affiliated specialty pharmacy.

151. In exchange for the kickbacks from Biogen, CVS Caremark agreed to not advantage generic Tecfidera on a number of its formularies. In 2020, formularies governing 21% of CVS Caremark's covered lives did not give generic Tecfidera any better treatment than Tecfidera or Vumerity. The figure jumped to 38% in 2021. Then it subsided to 36% in 2022.

Absent Biogen's kickbacks, generic Tecfidera would have been placed on the lowest tier for preferred generics like essentially all generic drugs that are not subject to anticompetitive pacts. But in 2020, formularies governing more than 41% of CVS Caremark's covered lives did not have generic Tecfidera on Tier 1. That figure jumped to 49% in 2021. Then it subsided to 47% in 2022. In fact, formularies governing 11% of CVS Caremark's covered lives designated generic Tecfidera as a "specialty" drug in 2020, which subject it to a high copayment or coinsurance payment and excessive "specialty" pricing at its affiliated specialty pharmacy. That figure jumped to 20% in 2021. It then subsided to 18% in 2022.

152. In exchange for the kickbacks from Biogen, Express Scripts agreed to not advantage generic Tecfidera on a number of its formularies. In 2020, formularies governing 24% of Express Scripts' covered lives did not give generic Tecfidera any better treatment than Tecfidera or Vumerity. The figure jumped to 34% in 2021. Then it subsided to 14% in 2022. Absent Biogen's kickbacks, generic Tecfidera would have been placed on the lowest tier for preferred generics like essentially all generic drugs that are not subject to anticompetitive pacts. But in 2020, formularies governing more than 29% of Express Scripts' covered lives did not have generic Tecfidera on Tier 1. That figure jumped to 36% in 2021. Then it subsided to 19% in 2022. In fact, formularies governing 5% of Express Scripts' covered lives designated generic Tecfidera as a "specialty" drug in 2020, which subject it to a high copayment or coinsurance payment and excessive "specialty" pricing at its affiliated specialty pharmacy. That figure jumped to 15% in 2021. It then subsided to 12% in 2022.

153. These illicit pacts were not limited to the three big PBMs. Biogen made the same corrupt bargain with other PBMs across the country. All told, in the key year of 2021, more than 45% of the 300 million Americans with pharmacy benefit coverage were subject to formularies

that did not give generic Tecfidera any better tier placement than Tecfidera or Vumerity. In fact, 54%, or 164 million Americans, were subject to formularies that did not place generic Tecfidera on Tier 1. Indeed, 17%, or 52 million Americans, were subject to formularies that designated generic Tecfidera as a high-Tier “specialty” drug.

154. To be sure, Biogen did not secure favorable formulary placement for Tecfidera by competing with generic Tecfidera on price. Free from collusion, a PBM will favor one drug over others that are therapeutically equivalent only if it offers a more attractive price. Here, however, the “net” price for Tecfidera, including all rebates and fees paid by Biogen, was approximately $112 per pill in 2020, $75 per pill in 2021, and $100 per pill in 2022. In contrast, the retail price for generic Tecfidera was substantially *less* than the “net” price for Tecfidera during this time. For example, the retail price for generic Tecfidera was approximately $25 per pill in 2022.

155. Instead, Biogen paid kickbacks to the PBMs to impair competition from generic versions of Tecfidera. The rebates and fees it paid were not discounts provided directly to the payers who ultimately foot the bill for Tecfidera; they were enormous payments to their faithless agents, the PBMs, which included substantial payoffs for them to retain in exchange for giving preference to Tecfidera over lower-cost alternatives.

### 2. The BOG Rebate Contracts Successfully Stymied Competition from Tecfidera’s Lower-Cost Generic Alternatives

156. As noted above (¶ 91), Mylan began selling its generic version of Tecfidera on August 19, 2020. At that time, brand Tecfidera had a WAC of $137.93 per pill, or $8,275.89 for a one-month (60 tablet) supply. Mylan set a WAC for its generic version of Tecfidera at $119.04 per pill, or $7,142.42 for a one-month (60 tablet) supply. By December 2020, there were eight generic versions of Tecfidera on the market, with a WAC ranging from $119.05 per pill to $5.83 per pill, and an average WAC of $30.85 per pill.

157. Subject to normal market forces, unimpaired by anticompetitive practices, these deeply discounted versions of Tecfidera should have captured 90% of the prescriptions enjoyed by Tecfidera by no later than June 2021. As described more fully above (¶ 47), that is the typical rate of market erosion within the first six to twelve months of generic entry.

158. Biogen's payoffs to the PBMs prevented generic Tecfidera from capturing anything close to 90% of the sales by then. Instead, by June 2021, generic Tecfidera accounted for *less than a third* of all sales. Thus, just as Biogen intended, its collusive conduct significantly slowed the erosion of Tecfidera sales and allowed it maintain a dominant market position.

159. Biogen's improper conduct also artificially inflated the prescription base available to switch to Vumerity. In June 2020, before Biogen began paying off the PBMs, Vumerity had been on the market for more than eight months but achieved monthly unit sales of only 50,225 capsules (equal to 419 thirty-day supplies at four capsules per day). That represented a mere 2% compared to 2,495,616 capsules of Tecfidera that were sold at that time (equal to 41,594 thirty-day supplies at two capsules per day). By June 2021, Vumerity's monthly unit sales had skyrocketed to more than approximately 423,000 (equal to approximately 10,400 thirty-day supplies at four capsules per day). In fact, Vumerity had monthly sales of more than 1,000,000 units per month as of May 2024.

160. This, in turn, substantially foreclosed generic competition by depriving generic manufacturers of a fair opportunity to compete using automatic drug substitution laws. Indeed, almost all current unit sales of Vumerity came from prescriptions that would have been fulfilled with generic Tecfidera under normal market conditions and, once switched to Vumerity, those prescriptions can no longer be substituted with generic Tecfidera.

161. Tecfidera's market position after the entry of numerous generics in the second half of 2020 is all the more remarkable because its price remained *flat* as the average price of generics decreased. From June 2020 through the end of 2022, Biogen maintained Tecfidera's WAC for a one-month (60 tablet) supply at $8,275.89. In fact, in 2023, Biogen *increased* the WAC for a one-month (60 tablet) supply to $8,950.36. In a properly functioning market, the vast price differential between brand Tecfidera and generic Tecfidera would decimate the market share of the more expensive commodity. But as explained above, that was not the case.

162. The lack of any change in Tecfidera's WAC is, of course, entirely consistent with Biogen's BOG strategy. If Biogen had decreased the WAC for Tecfidera, the PBMs would receive lower fees and lose the incentive to favor Tecfidera over the generics. Indeed, this is precisely why, according to CW4, Vounatsos previously raised the price of Tecfidera. Thus, Biogen kept the astronomical WAC for Tecfidera static to ensure the PBMs would continue to receive outsized fees and give Tecfidera preferred placement over generics.

163. In short, Biogen's corrupt conduct delayed and substantially diminished the sale of generic Tecfidera and enabled it to sell Tecfidera and Vumerity at supracompetitive prices and volumes in the United States. Thus, but for Biogen's unlawful conduct: (1) by June 2021 about 90% of prescriptions for Tecfidera would have been filled with the much less generic version; and (2) Biogen would have been able to switch few Tecfidera prescriptions to Vumerity.

## VIII. BIOGEN PROPPED UP LEQEMBI AS THE NEXT GENERATION REPLACEMENT FOR ADUHELM

### A. Biogen Pivoted to Leqembi As Its Next AD Product Candidate After the Failure of Aduhelm

164. Although the company used PBMs to attempt to slow the collapse of MS franchise, Biogen executives and market analysts agreed that Biogen needed to quickly bring a

major product to market and remained focused on the AD market, given the late-stage product candidate that it had under development with Eisai, known as Leqembi.

165. Just one day after Biogen announced that it decided to terminate the Phase 3 study of Aduhelm on March 21, 2019, Eisai decided to seize the opportunity and reported that it was beginning to enroll patients in a Phase 3 study of Leqembi officially titled "A Placebo-Controlled, Double-Blind, Parallel-Group, 18-Month Study With an Open-Label Extension Phase to Confirm Safety and Efficacy of BAN2401 in Subjects With Early Alzheimer's Disease," frequently referred to as the Clarity AD study (the "Clarity Phase 3 Study"). The Clarity Phase 3 Study randomized 1,795 people with early Alzheimer's to receive either Leqembi or a placebo. As is common, it was structured in phases: first, the double-blinded core study would run for 18 months, then a 30-month open-label extension ("OLE") would continue, permitting patients who were on placebo to switch to Leqembi if they chose to do so.

166. As the Clarity Phase 3 Study drew to a close in the second half of 2022, Defendants Vounatsos and McDonnell began to view Leqembi as the backup plan in the event Aduhelm was a commercial failure. For example, on March 7, 2022, at Cowen and Company's 42nd Annual Healthcare Conference, Vountasos answered about the NCD and Clarity Phase 3 Study data release, saying, "In case CMS refuses access for the first approved innovation that target a defined pathology of Alzheimer's, we will have no choice and to take some measures in terms of costs related to Adu[helm]. But hopefully, lecanemab will be positive, and then we will shift the focus behind lecanemab, together with a partner."

167. As noted above (¶ 113), CMS finalized its NCD on April 22, 2023. In the same release from May 3, 2022, in which Biogen announced that Vounatsos was departing the Company and it was dismantling the Aduhelm commercial team, Biogen stated that it and Eisai

would seek accelerated approval for Leqembi in the United States based on interim data from the Phase 2 study. Industry publication *Fierce Biotech* characterized the shift with the apt headline: "Biogen shoves Aduhelm to the side. It's time for lecanemab."

168. Just three days later, on May 6, 2022, Eisai filed a BLA with the FDA in which it requested "accelerated approval" for Leqembi, the same pathway used to approve Aduhelm. Notably, Eisai, with Biogen's input, decided to take this step *even before it had the results of the Clarity Phase 3 Study*. Eisai and Biogen decided to take this approach to secure traditional approval for Leqembi as quickly as possible. At Eisai's request, and with Biogen's blessing, the FDA agreed to review the existing data as a surrogate endpoint reasonably likely to predict a clinical benefit under the accelerated approval pathway and then use the results of the Clarity AD Study to verify the clinical benefits of that surrogate for traditional approval once available.

169. On September 27, 2022, Biogen and Eisai issued a joint press release announcing positive top line results from the recently completed Clarity Phase 3 Study. Specifically, the release reported that the study met the primary endpoint by reducing clinical decline on the CDR-SB scale by 27% compared with placebo, a change in score of -0.45. The release also announced that the full clinical results would be presented on November 28, 2022, at the Clinical Trials on Alzheimer's Congress ("CTAD") and thereafter published in a peer-reviewed journal, as is standard practice.

170. Industry insiders saw the Phase 3 results as a major success. On September 28, 2022, industry publication *Fierce Biotech* covered the release in an article titled: "It's a hit: Eisai springs 'major surprise' with phase 3 win for Biogen-partnered Alzheimer's drug." The phrase "major surprise" was a quote from an analyst report from Evercore ISI, and the article went on to

describe how the Clarity Phase 3 Study results would allow the two companies to "pick up accelerated approval and then quickly convert it to traditional authorization."

171. With this major victory in hand, Biogen emphasized even further how critical Leqembi was to its future. For example, on September 12, 2022, at the Morgan Stanley Global Healthcare Conference, Defendant McDonnell said that, despite already having embarked on $1 billion in cost cuts,

> I think the most important thing is, again, returning the growth. Lecanemab is an important element of that. . . . We would certainly, in the hopefully unlikely event of a lecanemab failure, need to step back and figure out what other cost measures need to be taken.

On October 25, 2022, Defendant Vounatsos stated that Leqembi was first on a list of "near-term opportunities" that "have the potential to drive renewed growth and position us to have 5 key franchises by 2025. The urgency of driving renewed growth was underscored when, on the same call, Defendant McDonnell presented on the stunning *32% decline* of global Tecfidera revenues, calling this a "continued erosion."

172. By the time Chris Viebacher started as CEO in late 2022 he shared the same vision. On one of his first calls as CEO of Biogen in early 2023, he divulged that "I see actually Alzheimer's is becoming a franchise for us." On February 15, 2023, Viehbacher made clear that Leqembi was an "obviously strategic" product for Biogen and confirmed that "[o]ur focus is on Leqembi," emphasizing "I just want to be clear that, from a strategic point of view, Leqembi is our absolute priority."

173. Thus, Biogen had shifted its full attention to Leqembi, aware that it had few other options for future revenue and the specter of more deep cost cuts if it failed.

174. Meanwhile, the full results from the Clarity Phase 3 Study were published. On November 29, 2022, the Clarity Phase 3 Study's detailed results were published in the *New*

*England Journal of Medicine*, the premier peer-reviewed journal of medical science, and presented at CTAD. The next day, on November 30, 2022, Biogen and Eisai published a joint press release touting the results.

175. On December 22, 2022, ICER published a report titled "Beta-Amyloid Antibodies for Early Alzheimer's Disease: Draft Evidence Report," examining the potential cost-benefit of Leqembi and similar treatments. Based on an analysis of two measures of quality of life, "quality-adjusted life years" and "equal value of life years gained," ICER concluded that its effectiveness could only justify a price between $9,000 and $21,000 per year. To compare, Aduhelm had been priced at $56,000 per year, sparking fierce controversy. Given the controversy over pricing with Aduhelm, the ICER report put pressure on Biogen and Eisai to spin the treatment positively to justify any price above that range.

176. On January 6, 2023, the FDA granted accelerated approval for Leqembi. However, due to the nature of accelerated approvals, Leqembi was subject to the same restrictive NCD determination by CMS. Later that day, consistent with its plan, Eisai filed a supplemental BLA with the FDA for traditional approval based on the data from the Clarity Phase 3 study.

177. Later on January 6, 2023, Eisai also took the unusual step of issuing a detailed press release that explained the basis for deciding to price the drug at $26,500. This justification was released one week after the Congressional Oversight and Reform Committee and Energy and Commerce Committee released a staff report blasting Biogen for "initially set[ting] an unjustifiably high price for Aduhelm" while pursuing "an unprecedented financial opportunity." Eager to avoid comparisons to Aduhelm, the release leaned into the "societal value of medicine," describing how the medication would not only deliver value to the patient, but the economy as a whole. Under this rubric, Eisai calculated the value of Leqembi to society as $37,600 per year

per patient. Eisai portrayed themselves as graciously *under*-pricing Leqembi "to promote broader patient access, reduce overall financial burden, and support health system sustainability."

178. Industry publication *BioPharmaDive* published an article describing the price as above ICER's valuation and noting "given the large number of people who might eventually receive treatment, is likely to draw its share of pushback, too." The article observed "Eisai appears to have taken great pains in attempting to thread the needle between cost concerns and its objectives as a for-profit company," noting the "lengthy press release" justifying the price.

179. On April 11, 2023, the FDA published notice in the Federal Register announcing that it decided to convene a meeting of the PCNS Advisory Committee on June 9, 2023, to consider the BLA for Leqembi. *See* 88 Fed. Reg. 21690 (2023).

180. On July 6, 2023, after holding the PCNS Advisory Committee meeting for Leqembi, the FDA granted full approval for Leqembi but included a "black box" warning—the most severe warning possible—due to an uncommon but potentially serious side effect of ARIA.

181. That same day, CMS issued a statement confirming that it would cover 80% of the cost of Leqembi, as is standard for Medicare, provided that the patient enrolls in a registry to monitor real world treatment with the drug. The nonprofit Alzheimer's Association issued a statement correctly describing the registry enrollment requirement as creating "unnecessary hurdles to coverage."

182. By the second half of 2023, it seemed that Biogen had exactly what it needed: a new blockbuster drug for a serious and common disease, ready to move quickly to market, to stand in the feet of Aduhelm. Yet, with the urgency to reach the much-anticipated return to profitability and growth, Defendants were determined to hide facts showing that there were significant risks to attaining that objective.

### B. Biogen Suppressed Evidence Showing Treatment-Related Deaths from ARIA

183. Biogen knew from prior experience with Aduhelm that treatment-related ARIA could weigh heavily against a favorable risk-benefit assessment, particularly with EU regulators. In fact, it knew that ApoE4 carriers—the same gene variant that put them at risk for developing AD—were at higher risk for developing ARIA on anti-amyloid medication. Indeed, the label for Aduhelm specifically stated that "[t]he incidence of ARIA-E was higher in apolipoprotein E ε4 (ApoE ε4) carriers than in apolipoprotein E ε4 (ApoE ε4) non-carriers (42% and 20%, respectively)," consistent with prevailing scientific literature. For this reason, Eisai tested each participant in the Clarity Phase 3 Study for a copy of the ApoE4 allele and specified in advance that it would perform various "subgroup" analyses on that population in the trial.

184. With some criticisms already aired about the price and efficacy of Leqembi, it was critical that the product be considered safe to lower the risk of rejection. After the Clarity Phase 3 Study completed the core study and transitioned to the OLE, a series of deaths occurred which clearly showed serious elevated risks of ARIA for ApoE4 carriers and those on blood thinners who receive Leqembi.

#### 1. Three Patients in OLE Died with Signs of Severe ARIA Shortly After Receiving Their Initial Courses of Leqembi

185. On May 18, 2022, an eighty-eight-year-old man in the Clarity Phase 3 Study who received placebo in the core phase and just started receiving Leqembi in the OLE ("Patient 1") reported that he suffered a fall recently when he came in for a scheduled infusion. Patient 1 was taken for MRI scans, which ultimately showed that he had ARIA-E and ARIA-H. Patient 1 died on June 12, 2022, after suffering both a heart attack and four mini-stroke-like events. During the trial, the man, who was not a carrier of ApoE4, had been taking apixaban, a generic form of the

commonly prescribed anticoagulant (blood thinner) known as Eliquis. Between May 18, 2022, and June 12, 2022, he also received the blood thinner heparin.

186. At the time, the trial investigator responsible for the patient concluded in the adverse event report filed with the FDA that the death as "***related***" to Leqembi. Eisai conceded in an initial response to the report that there was "at least a reasonable possibility lecanemab may have contributed to the" mini hemorrhages. But it later asserted that the death was unrelated and took the position that the case remains under investigation.

187. In response to Patient 1's death, Eisai asked the data and safety monitoring board ("DSMB") for the Clarity Phase 3 study to look into whether patients on anticoagulants were at heightened risk for ARIA. It found that they were: 3.1% of all patients in the study on anticoagulants developed significant bleeds called macrohemorrhages, compared to only 0.46% of patients not on anticoagulants. For fear of depriving patients access to a potentially important drug, the DSMB did not recommend excluding any patients from the study but asked Eisai to strengthen its consent forms to expressly warn patients about the risk. Unknown to investors, on July 14, 2022, Eisai updated the informed consent form to read as follows:

> While the overall risk of a major brain bleed is low with [lecanemab] treatment, the risk is higher in people who are also taking blood clot prevention medications. This risk is estimated to be more than 1 in 100 people, but less than 5 in 100 people . . . . Bleeding in the brain, especially when you are taking medications that prevent blood clots, can be serious and can even lead to death. It is important to consider the risk of bleeding in your brain with the investigator before deciding whether or not to continue your participation in this study.

188. A brain autopsy was subsequently performed on Patient 1, a copy of which Eisai provided to the FDA on November 18, 2022. The autopsy discovered that Patient 1 suffered an intracerebral hemorrhage and that there was extensive ARIA at the site of the hemorrhage.

189. On approximately September 3, 2022, a sixty-five-year-old woman in the Clarity Phase 3 Study with two copies of ApoE4 who received placebo in the core study and began

taking Leqembi in August 2022 in the OLE ("Patient 2") began to display garbled speech during dinner with her family and was taken to the emergency room, where she was diagnosed with an ischemic stroke. Although MRI scans from three months earlier showed no ARIA, upon arrival at the emergency room a CT scan found there was clear evidence of ARIA. CW6, a pathologist specializing in neurology who was treating Patient 2, communicated to the emergency room doctors that she was taking Leqembi, and those doctors pursued more information on proper treatment. After their research, the emergency room doctors began to administer tissue plasminogen activator ("t-PA"), a strong blood thinner, but hypertension suddenly developed. According to the husband, Patient 2 acted as though "she was on fire" as soon as she received t-PA. CW6 describes how Patient 2 began screaming and writhing in pain, requiring doctors to chain her to the gurney, induce a coma, and, eventually, administer a reversing treatment. CW6 advised that none of these reactions are side effects of t-PA. Patient 2 suffered extensive bleeding on the outer layer of her brain. As displayed in the images below, subsequent CT and MRI scans showed "innumerable" ARIA-H (image A) and ARIA-E (image B):




After several days of frequent seizures and intubation, Patient 2 passed away. Treating physicians informed Patient 2's husband that they had "never before seen such massive bleeding

under those circumstances." CW6 described the pain Patient 2 suffered in the final moments of her life as "an unimaginably horrifying death" worse than prisoners on "death row."

190. Patient 2's husband reported that the events surrounding Patient 2's death were fully disclosed to the contract research organization who administered Leqembi to Patient 2 and, ultimately, to Eisai. Specifically, Patient 2's husband attended a "postmortem meeting" with the principal trial investigator responsible for Patient 2, Jeffrey Ross of Great Lakes Clinical Trials, who told him during this meeting that he shared details of the case with Eisai.

191. At the time, the trial investigator concluded in the adverse event report filed with the FDA that the death was "***related***" to Leqembi. The trial investigator justified this opinion due to the close correlation between the death and administration of Leqembi and the lack of other medications that could cause these symptoms. The trial investigator also noted "[t]his is a highly unusual case" because the ARIA distortions found in autopsy "are not otherwise described in humans and suggest a host response to anti-amyloid beta therapy." Privately, Eisai filed an opposing opinion, blaming "the subject's elderly age" and concluding the death was "Not Related" to Leqembi. Later, Eisai would file an additional opposing opinion blaming the t-PA treatment, but the investigator responded that t-PA treatment "does not change the previous assessments," because the ARIA had been detected before the t-PA treatment and cautioned that the ARIA could have been "exacerbated by" the blood thinning agent.

192. On September 14, 2022, a seventy-nine-year-old woman in the Clarity Phase 3 Study who received placebo in the core study and just started receiving Leqembi in the OLE ("Patient 3") was at dinner and suddenly became stiff, gazing into space and slurring her words, and brought to a hospital for a potential seizure. Patient 3, who had two copies of ApoE4, previously reported headaches since she started taking Leqembi in August 2022. Arriving at the

hospital flaccid and comatose, she was intubated, sedated with fentanyl, and brought for brain scans, which confirmed multifocal swelling and 51 microhemorrhages, consistent with "severe" ARIA. During her time in the hospital, Patient 3 received the blood thinner heparin for atrial fibrillation. On September 19, 2022, began to suffer multiorgan failure and passed away.

193. At the time, the trial investigator responsible for the patient preliminarily classified the seizure in the adverse event report filed with the FDA was "***related***" to Leqembi in light of the extensive ARIA symptoms pending receipt of MRI scans and the autopsy report. Eisai, however, classified the event as "Not related" based on a series of "risk factors" for seizures, such as "old age" and "underlying Alzheimer's disease," attributes practically everyone in the Clarity Phase 3 study had. As new information came in, such as hospital records, and MRIs, Eisai continued to take the position that none "change the previous assessment."

194. Meanwhile, by no later than the end of 2022, CW6 was authorized to perform an autopsy on Patient 2 to better understand the harrowing sequence of events at the hospital. CW6 found brain swelling and frayed blood vessels and concluded that she did not in fact suffer from a stroke but, rather, stroke-like symptoms of brain damage. The autopsy concluded that the cause of death was multifocal intracerebral hemorrhage due to Leqembi infusion complicated by the fact that she appeared to have a stroke, leading to the use of tPA. CW6 said Patient 2's brain showed damage unlike anything CW6 had seen before, stating, "I have never seen anything quite like this case in thousands of examinations." Based on these findings, CW6 concluded that even if she had never been given t-PA, "[t]he Lecanemab alone would have left her with brain damage, and even if she survived, she would have had significant deficits."

195. The details of this autopsy left CW6 with deep concerns about the medicine, who said "[i]f this is given out on a massive scale, you are going to have people dying in pretty large

numbers." Given these concerns, CW6 approached Eisai's Senior Medical Science Liaison, Javier Sanchez, at a conference at Northwestern soon after performing the autopsy. CW6 said, "I invited him to just come down the hall because that's where the brain was, and I could show him what happened." CW6 also offered to share the full autopsy details and discuss in detail. According to CW6, Sanchez turned down the offer, but said he would speak to "senior people" on the Leqembi team and they would get back to him. Later, he sent an email attempting to rebut the link to Leqembi. CW6 said, "I fully expected to get a call from someone at Eisai or Biogen saying, 'We want to see the full autopsy results and the brain.' You'd think there would be some interest from them, but really it seems the opposite, like they don't want to know." CW6 added, "To this day no one [from Eisai] has asked me to go over the case with them."

196. In March 2023, the autopsy on Patient 3 was performed, which was coordinated by CW7, and included two separate neuropathology reports examining the circumstances of her death. The autopsy discovered more than 30 microbleeds in Patient 3's brain, including some that could not be seen in the MRIs taken at the time. CW7 also reviewed her medical records. According to CW7, the autopsy found widespread inflammation, *i.e.*, edema, with areas of dead or "necrotic" tissue, and blood vessels that appeared shredded and deformed—the same condition observed by CW6 in Patient 2— and concluded that Patient 3's death was caused by "necrotizing vasculitis" related to treatment with Leqembi.

197. Following the autopsy, in late March to early April 2023, CW7 sent the autopsy report to relevant parties at Biogen and Eisai. CW7 initially provided a copy of the autopsy report to a scientific journalist, who, in turn, sent a copy to Eisai's public relation department. Soon thereafter, CW7 then sent copies of the autopsy report to numerous scientists who work with Eisai and "senior executives" at Eisai. CW7 offered to share all materials, including tissue

slides, so Eisai and Biogen could review them. According to CW7, Eisai's response was "very slow, very limited, and did not occur in a timeframe when it might be helpful to the FDA approval process."

198. Internally, after receiving the autopsy results, Eisai could no longer maintain that Patient 3's death was "Not related" to Leqembi. Upon review, Eisai concluded as follows: "Given the findings of edema and microhemorrhages and considering the short latency to onset following the initiation of the open label extension and the subject's APO4 homozygous [two gene] status increasing the risk for ARIA events, the events of possible cerebral edema is classified as 'Related' to study medication" and, given the relationship between ARIA-E and seizures, classified the seizure as "Related" to Leqembi as well.

**2. Biogen and Eisai Took Active Steps to Downplay the Three Deaths and Discredit Any Asserted Connection to Leqembi**

199. The three deaths in the OLE of the Clarity Phase 3 Study raised the specter of severe, fatal safety issues with Leqembi. Yet, as the big unveiling of Clarity Phase 3 Trial results and the FDA approval process for accelerated approval continued, Biogen and Eisai sought to minimize and suppress information about these three deaths.

200. On September 28, 2022—days after Patients 3 and 3 passed away, and well after the death of Patient 1 was brought to the attention of the DSMB for the Clarity Phase 3 Study—Biogen and Eisai made their glowing announcement of the Clarity Phase 3 Study results, including the sub-headline announcement that ARIA "INCIDENCE WAS WITHIN EXPECTATIONS." It made no mention of any deaths, including the one that led them to change the informed consent form to expressly warn about the increased risk of ARIA for those on blood thinners.

201. On October 29, 2022, *Stat+*, an industry publication covering biopharma and life science, published an article titled "Death of patient in closely watched Alzheimer's trial raises concern about risk for some groups." The article disclosed Patient 1's death and the investigator's finding that it was related to Leqembi, based on a review of the adverse event report. Notably, the article quoted other researchers who "agreed a link was plausible.severfse" A spokesperson for Eisai acknowledged the death but said that "there's ***no reason*** to believe that lecanemab contributes to death overall in the study, or by any specific cause."

202. On November 27, 2022—only two days before Eisai's highly-anticipated presentation on the Clarity Phase 3 Trial results at CTAD—*Science* published a report describing the circumstances of Patient 2's death based on an unpublished case report on Patient 2's death. Several physicians and researchers, including several not involved in the trial, reviewed the case report and agreed that Leqembi likely contributed to her death. One neurologist was quoted as saying that "[t]here's zero doubt in my mind that this is a treatment-caused illness and death," adding "[i]f the patient hadn't been on lecanemab she would be alive today." Eisai declined to comment on Patient 2's death, including whether it knew about the death. Eisai further stated, "All the available safety information indicates that lecanemab therapy is not associated with an increased risk of death overall or from any specific cause."

203. Industry publication *Fierce Biotech* took note of the *Science* report and, within the next two days, also ran a story on the deaths of Patient 1 and Patient 2. Unlike *Science*, however, *Fierce Biotech* spoke to Eisai executives about the deaths, including Michael Irizarry, Senior Vice President of Clinical Research and Deputy Chief Clinical Officer for AD and Ivan Cheung, chairman and CEO of Eisai's U.S. operations and Global AD Officer. Both told *Fierce Biotech* that "they don't believe either death can be pinned on lecanemab." Indeed, Irizarry said during

the interview that "***Eisai has been watching closely for these events throughout the clinical program for lecanemab***." Cheung described the events as "two rather complex cases."

204. On November 29, 2022, Eisai presented the results of the Clarity Phase 3 trial at CTAD. At the time, the deaths of Patient 1 and Patient 2 had been reported in medical journals, but not Patient 3. After Eisai Senior VP of Clinical Research, Michael Irizzary, presented on the structure of the trial, clinical researcher Dr. Marwan Sabbagh presented on the "Safety Profile of Lecanemab in Clarity." While showing a slide discussing ARIA rates during the presentation, Dr. Sabbagh directly addressed safety considerations with regards to ApoE4. Asking rhetorically whether there was a higher risk of ARIA for those with ApoE4, he responded, "[t]he answer is no, we do not have differential concerns about safety." The OLE deaths were only discussed on one slide, titled "Cerebral Macrohemorrhage in Lecanemab Studies."


Cerebral Macrohemorrhage in Lecanemab Studies

*Data Cutoff October 22, 2022 for Open-Label Extension (OLE; Ongoing)*

| Study | Total | | Anticoagulant Use | |
|---|---|---|---|---|
| | Placebo n/N (%) | Lecanemab 10 mg/kg q2wk n/N (%) | Placebo n/N (%) | Lecanemab 10 mg/kg q2wk n/N (%) |
| 201 Core Phase | 0/245 (0%) | 1/161 (0.6%) | 0/20 (0%) | 0/11 (0%) |
| 201 OLE | N/A | 1/180 (0.6%) | N/A | 0/18 (0%) |
| 301 Core Phase | 2/897 (0.2%) [1] | 6/898 (0.7%) [2] | 0/74 (0%) | 2/83 (2.4%) [2] |
| 301 Core + OLE (includes cases in 301 Core above) | N/A | 10/1608 (0.6%) [2, 3] | N/A | 5/140 (3.6%) [2, 3] |
| 301 Core & OLE Deaths with concurrent macrohemorrhage | 1/897 (0.1%) [4] | 2/1608 (0.1%) [3] | 0/74 (0%) | 2/140 (1.4%) [3] |

[1] Includes one non-treatment emergent case in placebo (event > 30 days after discontinuing study medication)
[2] Includes one non-treatment emergent case on anticoagulation (event > 30 days after discontinuing study medication)
[3] 1 case of macrohemorrhage in 65F E4 homozygous after tPA for left MCA occlusion (OLE) and 1 case in 87M E4 non-carrier on apixaban (stopped) then received heparin for MI (OLE, cause of death cardiopulmonary)
[4] In core phase

AD, Alzheimer's disease; ApoE4, apolipoprotein E4; MRI, magnetic resonance imaging; NA, Not applicable; q2wk, every 2 weeks.

**Cerebral Macrohemorrhage in AD**

- Lobar macrohemorrhage in AD in the absence of arteriovenous malformation, hemorrhagic cerebral infarction, or tumor is usually caused by cerebral amyloid angiopathy (CAA)
- Risk factors for lobar macrohemorrhage include ApoE4 genotype, presence of microhemorrhages (which is evidence of CAA), and anticoagulant medications
- Background rates of macrohemorrhage in placebo arms of prior AD clinical trials is 0.4% (*JAMA Neurol*. 2022;79:13-21)

**Safety Assessment**

- There is a low rate of macrohemorrhage with lecanemab therapy (0.6-0.7%), which is higher than placebo (0.2%)
- Rate of macrohemorrhage for subjects on both anticoagulants and lecanemab was 2.4-3.6%. Background rate of macrohemorrhage in AD patients on anticoagulation is not known but is expected to be higher than in non-AD patients due to CAA; therefore, comparative risk is difficult to assess.
- No clear relationship of macrohemorrhage to ApoE4 status, baseline MRI, or timing of treatment
- Subjects allowed to continue on anticoagulation in OLE with informed consent language regarding increased risk of cerebral hemorrhage with concomitant anticoagulant use

46

In the tabulation of "301 CORE & OLE Deaths with concurrent macrohemorrhage," the slide noted "2/1608 patients" had died of ARIA while taking Leqembi as of October 22, 2022, and the

footnote provided sufficient identifying detail to confirm that these were references to Patient 1 and Patient 2, omitting any mention of Patient 3, who died on September 19, 2022.

205. Dr. Sabbagh also discussed the details of Patients 1 and Patient 2, blaming the death of Patient 2 on the t-PA administration and the death of Patient 1 on myocardial infarction. He summed up his interpretation of these facts by saying, "these cases show that the causality with lecanemab is a little difficult, and I understand that people want to say that there's some causality. These things are continuing to be explored."

206. The peer-reviewed paper on the Phase 3 Clarity Study published in the *New England Journal of Medicine* did not discuss any the deaths during the OLE period. Thus, the much-awaited publication of the detailed Clarity Phase 3 Trial data minimized the stories of deaths that had already been published publicly and continued to hide Patient 3's death.

207. On December 21, 2022, *ScienceInsider* reported Patient 3's death. The article cited "[m]ultiple neuroscientists who reviewed the records at *Science*'s request" who "believe her death was likely caused by the antibody, lecanemab." One such neurologist concluded that "[t]he patient had extensive swelling of her brain with some small areas of bleeding which caused her to have a seizure and ultimately to die." The neurologist continued, "I am confident this was a side effect from [Leqembi]" and further noted that "[t]he failure of Eisai and Biogen to disclose this case" during the recent CTAD presentation "is concerning and undermines my confidence that the reported safety data is complete." Eisai again declined to comment on the death other than to say that "***all serious events, including fatalities, are reported to Eisai*** and considered in our evaluation of the study." Notably, *Science* reported that the daughter of Patient 3 "provided the medical documents to *Science* ***and authorized their review by others***." The daughter of Patient 3 also reported that the family has arranged for an autopsy, which could

confirm Leqembi's role in her death. An Eisai spokesperson said in direct response that it is "thorough and proactive" in its efforts to obtain any safety information.

208. Prior to January 3, 2023, FDA noticed reference to a potential autopsy report in the adverse event reporting for Patient 3 and "requested that the applicant provide additional information on the case, including MRI images and the autopsy report." According to the FDA "[t]he applicant has not been able to obtain additional information as of January 3, 2023." As such, the FDA reviewers responsible for reviewing the clinical data submitted in the BLA for Leqembi were constrained to note in their clinical report, finalized on January 6, 2023, that "the review team has not been able to fully assess the potential relationship to study drug for that death due to lack of information."

209. Remarkably, Eisai had *still* not furnished a copy of the MRI scans and autopsy report for Patient 3—which it received no later than April 2023—in time for the PCNS Advisory Committee meeting for Leqembi, scheduled for June 9, 2023. Indeed, FDA confirmed in the briefing document it submitted ahead of that meeting that "[t]he Agency has not received the official autopsy report or MRI images from the hospitalization" from Eisai. As such, it cautioned that "firm conclusions cannot be made regarding the events." For its part, Eisai continued to deny that any of the three deaths in the OLE were related to Leqembi. In a table buried in an appendix at the end of the brief, Eisai indicated that it could not reach a conclusion regarding Patient 3 but has "requested" a copy of the autopsy report for additional details. As for Patient 2, Eisai maintained that "tPA treatment was administered in the setting of an acute stroke, which was considered the proximal cause of macrohemorrhage and death." CW6 reviewed the information submitted by Eisai to the FDA and was shocked. "This is not a case of hemmorrhagic conversion of a stroke due to t-PA," said CW6, adding "it is grotesque what they

told the FDA." Eisai also asserted in its briefing document that "[t]here was no increase in ARIA-E or ARIA-H in patients who were on lecanemab and antithrombotics relative to those who were on lecanemab alone."

210. After learning on its own about the severe risk of ARIA for those with two ApoE4 genes or on blood thinners, FDA soon took a different stance with Eisai. On August 22, 2023, the FDA's Deputy Director for Safety in the Division of Neurology, Sally Yasuda, sent a letter to Eisai's Director of Global Regulatory Strategy, Stacie P. O'Sullivan. The letter noted that, "***[s]ince Leqembi was approved on January 6, 2023, we have become aware of clinical trial data showing an increased risk of symptomatic, serious, and severe amyloid related imaging abnormalities (ARIA) in ApoE4 homozygotes [two copies]*** who are treated with Leqembi compared to heterozygotes [one copy] and noncarriers" as well as "data showing intracerebral hemorrhage that includes findings on neuroimaging suggestive of cerebral amyloid angiopathy (CAA) ***and use of anticoagulants***." The FDA "consider[ed] this information to be 'new safety information'" that was not furnished to it during the review period. As such, the FDA required Eisai to conduct additional clinical trial because standard post-approval adverse event reporting of such issues "will not be sufficient to assess the known risks."

### C. Management Issued Bullish Forecasts for Leqembi's Launch in the United States Untethered to Commercial Circumstances

211. With full approval and a favorable NCD coverage determination by no later than July 6, 2023, Biogen and Eisai could finally begin commercializing Leqembi in the United States. As the two partners worked to bring Leqembi to market, management at both companies touted an aggressive timeline of 10,000 patients on Leqembi by March 31, 2024. However, this number was baseless and completely divorced from facts on the ground, where the companies would be required to work with doctors, infusion centers, hospital systems, and insurers to get

patients diagnosed, prescribed, and begin receiving medical treatment, not to mention the undisclosed safety issues described in the preceding section.

212. Long before Leqembi received initial approval under the accelerated pathway in January 2023, Biogen already gained unique insight on the obstacles to commercializing a novel AD product from its ill-fated effort with Aduhelm and Defendants assured that it was sharing that knowledge with Eisa. For example, on September 12, 2022, McDonnel stated that "any learnings that we gathered going through the Aduhelm experience, be they development learnings or commercial learnings are absolutely being communicated to Eisai real time." McDonnel again emphasized on October 25, 2022, that "[t]hgere are learnings from the Aduhelm situation that obviously we all share openly." On December 1, 2022, Singhal also agreed that "we are sharing everything that we know with our—with Eisai" for launch planning. In fact, Viehbacher confirmed several times in 2023 that the two companies commissioned a study by a consultant to go back and capture all key learnings from the launch of Aduhelm.

213. During the initial roll out of Aduhelm, Biogen and its senior executives quickly learned that additional infrastructure was required across the United States to accommodate the all the steps needed to get patients on the treatment. As early as July 21, 2021, Vounatsos recognized that "most specialists will require confirmation of amyloid beta pathology, either via PET or CSF, which is also taking time to schedule." Commenting further on this issue, the President of Biogen's U.S. operations, continued "building this infrastructure for the appropriate use of Aduhelm will require time" and "each site will operationalize at different rates."

214. As such, Viehbacher consistently recognized since starting as CEO that *Leqembi* faced the same challenges. On January 9, 2023, in one of his first calls as CEO, Viehbacher explained as follows:

> To get diagnosed, you're going to need either a PET scan or a lumbar puncture. There's going to be 3 MRIs over the first 6 months. It's a bi-weekly every 2-week infusion. And you're talking about a huge number . . . tens of thousands, maybe hundreds of thousands of patients here. One day, you can be thinking about millions. And, of course, so there's a whole element of how the health care infrastructure has to evolve for this. . . . [T]his launch is not really a reach and frequency model—this isn't about just sending out reps. It's really around working with the system to make sure that we can expand it and make this new treatment available.

On February 15, 2023, he cautioned that Leqembi "is not a round-like pill that we're launching" and explained there will be "infusion capacity restrictions." Viehbacher again described the infrastructure challenges that needed to be addressed to drive uptake on March 6, 2023:

> So the neurologist is already busy. So we're going to have more Alzheimer's patients coming in. And the diagnosis is not simple. So we either need to have a PET scan or you need to have a lumbar puncture. And a PET scan costs about $7,000. Lumbar puncture is not necessarily an easy thing to organize, and there's a capacity constraint around that. . . . Then, in the first 14 weeks, you probably need 3 MRIs according to the label. So—and then you have biweekly infusions. So, one of the things that we have is a drug that walks and talks like a specialty drug, but we've got primary care-like volumes. So, the first thing we're really going to have to do is help think about how does the capacity expand. **And we all know that that doesn't happen overnight.**

Indeed, by April 25, 2023, Viehbacher knew that "the initial launch period is going to be really one that's constrained by capacity," adding "there's an awful lot of work working with the neurology community, educate how you diagnose the patients, the whole process and practice of when do you get the PET scan or the lumbar puncture, when are the—how do you schedule the MRIs, getting the reimbursement, understanding where the infusion centers are."

215. After Leqembi received initial approval in January 2023, CW8, who assisted with the launch of Leqembi at Eisai, received feedback that the logistical barriers, such as getting patients to approved infusion centers for treatment registering with CMS, were discouraging doctors from prescribing Leqembi. CW8 estimated half of the doctors that CW8 spoke to were unlikely to prescribe Leqembi. CW8 had regular phone calls with their manager, Elizabeth

Pappadopulos, Executive Director of Medical Affairs at Eisai, during which CW8 repeatedly reported this feedback. By March 2023, CW8 was communicating that a significant number of doctors were unikely to prescribe Leqembi.

216. Approximately around the time when Leqembi received initial FDA approval under the accelerated pathway in January 2023, CW8 was told by an executive director in the Medical Affairs group that Eisai expected to have no more than 5,000 patients on Leqembi by the end of its fiscal year, ending March 31, 2024. Even 5,000 was more than *double* what CW8 expected, based on the logistical constraints outlined above. CW8 continued to be told that the figure remained unchanged until leaving Eisai in July 2023.

217. Nevertheless, on May 15, 2023—four months after Leqembi's initial approval in the US—Eisai held a conference call, during which its U.S. CEO, Ivan Cheung, disclosed:

> [W]e are very confident with the FDA traditional approval by July 6th as well as the approval in Japan in second quarter. Europe and China at the end of [Eisai's] fiscal year. So will not contribute meaningful in terms of the sales numbers. Of course, with respect to the United States, we are also confident about the CMS granting broad and simple access by July 6th. And, so, ***in the United States, you'll see a rather rapid uptake of the prescriptions and new patients from July onwards. By the end of fiscal year 2023, we do expect about 10,000 patients to be on lecanemab by that time.*** Thank you. ***In the United States.*** Thank you.

Biogen expressly adopted this figure no later than September 11, 2023.

218. However, the 10,000 Patient Goal had no basis in fact because of the complex, uncertain, and imprecise data required to generate such a number. [INSERT HERE STATEMENTS FROM EISAI OR BIOGEN ON HOW THEY USED REGISTRY INFORMATION TO ESTIMATE PATIENT PROJECTIONS] CW9, who worked as a Senior Business Operations Partner supporting Leqembi, reported that patients taking Leqembi were recorded in patient registries, which can be filtered to show how many patients are on a certain drug. However, Biogen's claims about progress towards the 10,000 Patient Goal were based on

numbers of patients "about to be prescribed" the drug. CW9 explained that the registry's statistics of patients "about to be prescribed" the drug only reflects that patients have been screened and identified as a good candidate, but "[t]hat doesn't mean they will take it."

219. As CW10 explained, an accurate estimate requires, at the very least, a fact-based assessment of the number and geographic location of the MRI centers that have the specialized technology and requisite training to do the type of scan required for determining if the patient was eligible for Leqembi *and* the capacity of those sites to schedule new visits. Notably, CW10 recently contacted such centers and was told that there is a two-to-three month wait list. CW10 also described how, once a patient obtains a prescription, they must then travel to an infusion center, which are not presently available at all hospitals. CW10 described conversations in Eisai's clinical discussion as to whether the weak evidence of a benefit effect would be a sufficient incentive for patients to overcome the barriers to receiving treatment.

220. CW11, who had been responsible for patient forecasting during the Aduhelm roll-out, described Biogen's lack of interest in accurately forecasting patients. CW11 described how an effective analysis would require digging into structural problems like the need for diagnostic clinics, genetic testing and spinal tap capabilities, PET scans, and infusion centers. According to CW11, an effective forecast of patient adoption would require calculating, for example, how many patients had ready access to a PET scan, what are the capabilities at those facilities, how many infusion centers there are, etc.. However, while "[t]hey have groups within Biogen that have that data . . . when they do the financial analysis, the going assumption is 'We know where the restrictions are and we will do whatever we need to so that it's not an issue, and we will get it done before the launch. So the financial analysis recognizes none of these problems." CW11s

summed up the attitude as, "They look at issues like system constraints as a 'tomorrow problem,' and they never worry about anything other than what they think is a 'today problem.'"

221. As such, several CWs with knowledge of the existing constraints in the U.S. commercial system, found the 10,000 patient goal to be preposterous. CW9 was surprised that anyone at the Company would claim that the 10,000 Patient Goal was possible by April 2024: "Ten thousand in that short of time? I don't know if anybody would find that realistic. It's very suspicious." CW10 also recalled being "surprised" by the announcement due to the difficulties patients face securing treatment with Leqembi. Both CW9 and CW10 emphasized that the figure ignored the difficult steps required to get patients on treatment and, importantly, do so quickly. CW11, who had been involved with patient forecast during the Aduhelm roll-out, agreed that the 10,000 Patient Goal was "crazy."

222. Biogen and Eisai have not even come close to achieving the 10,000 Patients Goal. On November 8, 2024, Eisai released financial results for its fiscal quarter ended September 30, 2024, in which it updated on the number of patients in the US undergoing treatment: only 4,000 patients had been dosed, with another 6,000 "eligible" to start treatment. However, as noted by CW[Cotleur], it is unclear how many of those 6,000 "eligible" patients would ever take Leqembi. Indeed, on the same day, an investigation of pharmacy prescriptions by Wells Fargo analyst Mohit Bansal concluded that "October scripts point to a recent slowdown," observing that prescriptions "only grew by 6% which is down from 13% in Sept and average of 11% in 3Q." With prescriptions slowing and safety concerns throwing additional barriers to patient access, it is unclear when, if ever, the 10,000 Patients Goal would be achieved.

223. Admissions from Defendants after the goal was abandoned show that the Goal was baseless from the very start. In the conference call with investors on the same day,

Defendant Viehbacher implicitly admitted that the 10,000 Patient Goal had been baseless when made. Despite the previous unequivocal promises of a quick roll-out to 10,000 patients, he now claimed that "[t]his was always going to be a gradual launch. . . it has always been a difficult product to forecast." He attributed the difficulty in forecasting to the lack of accurate information about patients. He said that Biogen doesn't have "precise numbers" and "[w]e're relying on others to provide the data."

## IX. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

224. As provided more fully below, Defendants made materially false and misleading statements during the Class Period on the topics of: (i) the competitive environment in the United States for Tecfidera and Vumerity; (ii) the function of the managed care rebates that it pays; (iii) the reasons for Biogen's operating results; (iv) legal compliance; (v) Leqembi's safety profile; and (vi) Leqembi's commercial prospects in the United States. Plaintiffs assert that all statements set forth below in bold and italicized text are materially false and misleading for the reasons stated therein. Statements that are not bolded and italicized are included for context.

### A. Competitive Environment

225. On September 14, 2020, Defendants Vounatsos and McDonnell attended a session at the Morgan Stanley Global Healthcare Conference hosted by Morgan Stanley analyst Matthew Harrison. During the session, Matthew Harrison stated that "Tecfidera is obviously another key topic for investors," and asked what the thinking was for the oral MS franchise assuming that the court presiding over the consolidated patent litigation in Delaware agreed with the recent decision issued by the United States District Court for the Northern District of West Virginia in June. In his response, Defendant Vounatsos stated as follows:

> So it depends. The erosion profile will depend on the number of generics and the aggressivity, but ***we compete. We have opportunities and tactics to do things the right way—the Biogen way—to compete.***

226. Asked later during the conference about whether there were any shifts in the market regarding how payers are handling MS products on their formularies, Vounatsos stated:

> This is a recurrent question, and we've been always worried. ***As long as we can innovate, we continue to do well.*** And, for MS, it's a heterogeneous disease, and one product cannot be substituted by the other except the generic vis-a-via the originator potentially, but we don't see a class effect or a large impact across all the DMTs [disease modifying therapies] because, certainly, there is a generic or, certainly, there is something else. ***So this—there is no reason to believe that this will change the day after tomorrow.***

227. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Biogen failed to disclose that (i) beginning in mid-2020, it entered into rebate contracts with PBMs to incentivize them to favor brand name Tecfidera over lower-cost generic versions of Tecfidera on their formularies or otherwise exclude generic Tecfidera from their formularies; (ii) many PBMs elected to do so to maximize their financial gain on the fees associated with the rebates offered by Biogen in such contracts; (iii) this significantly impaired legitimate competition from generic versions of Tecfidera; and (iv) the diminished competition from generic versions of Tecfidera, in turn, enabled Biogen to continue selling Tecfidera at supracompetitive prices and volumes and switch patients from Tecfidera to Vumerity through the end of 2022. Indeed, Biogen was not competing with Tecfidera generics on the only ground it could—price—but, rather, using its dominant position to suppress their ability to compete at all. And far from having no reason to believe formularies would remain unchanged, Biogen took active steps to fundamentally restructure drug formularies to favor brand name Tecfidera over its generic counterparts.

228. Before market open on October 21, 2020, Biogen issued a press release announcing its financial results for the quarter ended September 30, 2020 (the "Q3 2020 Press Release"). The Q3 Press Release stated as follows:

> Biogen is providing an update to its full year 2020 financial guidance, which was last updated in July 2020 and assumed no generic entry for TECFIDERA. ***During the third quarter of 2020, the Company began to experience the impact of multiple TECFIDERA generic entrants in the U.S.***, and this financial guidance assumes significant erosion of TECFIDERA in the fourth quarter of 2020, the pace of which is difficult to predict.

229. The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 227 insofar as they speak about Biogen experiencing "the impact of multiple TECFIDERA generic entrants" in the United States. Indeed, far from experiencing the true impact of generic competition in the United States, Biogen entered into rebate contracts with PBMs that *impaired* competition from those generics. To the extent these statements are not technically untrue, they gave the false impression that Biogen was experiencing the impact of unimpaired competition from these Tecfidera generics.

230. Later that same morning, Biogen held a conference call with analysts to discuss its financial results for the quarter ended September 30, 2020 (the "Q3 2020 Earnings Call") attended by Defendants Vounatsos and McDonnell. During the call, an analyst asked about resource allocation for the MS portfolio following the loss of patent protection for Tecfidera in the United Sates. In his response to the question, Vounatsos stated:

> You need, obviously, to understand that ***we still have a $6 plus billion business with MS in a highly competitive environment*** where we need to absolutely resource in order to defend our leadership position. ***Vumerity*** is immaterial for now, but is signing—***is demonstrating some good signs*** and we'll come back to it. So we need to stay on and continue to resource the launch of Vumerity.

231. The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 227 insofar as they speak about the MS franchise generating revenues in a "highly competitive" market. Indeed, Biogen entered into

rebate contracts with PBMs that *impaired* competition from generic versions of its top-selling MS drug in the United States and was only in a position to switch patients to Vumerity because that competition was suppressed. To the extent these statements are not technically untrue, they gave the false impression that Biogen was competing with others in the market for its MS products on the merits and that Vumerity's growth was not the product of unlawful conduct.

232. Before market open on February 3, 2021, Biogen held a conference call with analysts to discuss its financial results for the quarter and full year ended December 31, 2020, after issuing a press release regarding the same (the "Q4 2020 Earnings Call") attended by Defendants Vounatsos and McDonnell. During his opening remarks, Vounatsos stated:

> Now let me review our progress against our strategic priorities. First, full year MS revenues, including Ocrevus royalties, were $8.7 billion, a decrease of 6% versus the prior year. Excluding Tecfidera in the U.S., our global MS revenue remained relatively stable for both Q4 and the full year versus 2019. Despite the challenges of launching a new product during COVID-19, we were pleased to see strong improvement in trends for Vumerity, which has become the #2 MS product and the #1 oral in terms of new prescriptions in the U.S. We believe ***these results demonstrate our ability to maintain leadership and execute well despite increased competition, the erosion of Tecfidera revenue in the U.S., and COVID-19***.

233. The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 227 insofar as they attribute Vumerity's growth to "execut[ing] well" and in a market with "increased competition." Indeed, Biogen entered into rebate contracts with PBMs that *impaired* competition from generic versions of its top-selling MS drug in the United States and was only in a position to switch patients to Vumerity because that competition was suppressed. To the extent these statements are not technically untrue, they gave the false impression that Biogen was competing with others in the

market for its MS products on the merits and that Vumerity's growth was not the product of unlawful conduct.

234. Before market open on April 22, 2021, Biogen issued a press release announcing its financial results for the quarter ended March 31, 2021 (the "Q1 2021 Press Release"). The Q1 2021 Press Release included several quotes from Defendant Vounatsos, including the following:

> "***Our first quarter 2021 results were consistent with our expectations across MS***, SMA, and biosimilars ***despite increased competition***," said Michel Vounatsos, Biogen's Chief Executive Officer.

235. Later in the morning on April 22, 2021, Biogen held a conference call with analysts to discuss its financial results for the quarter ended March 31, 2021 (the "Q1 2021 Earnings Call"), attended by Defendants Vounatsos and McDonnell. During his opening remarks, Vounatsos stated:

> Turning to our progress towards our strategic priorities. First, Q1 overall MS revenue, including Ocrevus royalties, was $1.7 billion. Putting aside the entry of Tecfidera in the U.S., our broader MS business continued to demonstrate resilience and progress. Excluding Tecfidera in the U.S., the number of patients on our MS products worldwide increased approximately 5% versus the prior year. . . . We were very pleased to see strong revenue growth for Vumerity, which is now the #1 oral MS product in terms of new prescription in the U.S. We believe ***this performance is a testament to a strong product profile and our team's ability to execute well, validating our plan announced mid last year to accelerate the launch of Vumerity***.

236. The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 227 insofar as they speak about "increased competition" and attribute Vumerity's uptake to its "strong product profile" and Biogen's "ability to execute well." Indeed, Biogen entered into rebate contracts with PBMs that *impaired* competition from generic versions of its top-selling MS drug in the United States and

was only in a position to switch patients to Vumerity because that competition was suppressed. To the extent these statements are not technically untrue, they gave the false impression that Biogen was competing with others in the market for its MS products on the merits and that Vumerity's growth was not the product of unlawful conduct.

237. On July 22, 2021, Biogen held a conference call with analysts to discuss its financial results for the quarter ended June 30, 2021, after issuing a press release regarding the same (the "Q2 2021 Earnings Call") attended by Defendants Vounatsos and McDonnell. During his opening remarks, Vounatsos stated:

> Q2 overall MS revenue, including Ocrevus royalties, was $1.8 billion. Putting aside the entry of Tecfidera generics in the U.S., our broader MS business continued to demonstrate resilience, with a 5% increase in patients worldwide. This performance underscore our ability to execute well. We were very pleased to see continued revenue growth for Vumerity, which remains the #1 oral MS product in terms of new prescriptions in the U.S. We believe ***this performance is a testament to Vumerity's strong product profile***.

238. Later on the same call, McDonnell reported that Biogen continued to face competition from generic Tecfidera in the United States:

> As Michel noted, we were very pleased with our second quarter results, as we continued to execute well. ***We continue to face competition from Tecfidera generics in the U.S.***, which impacted our year-over-year financial performance.

239. In response to an analyst question about a new AD treatment being developed by Eli Lilly, Defendant Vounatsos offered the following commentary about Biogen's overall approach to competition:

> And, as Biogen, ***we welcome new players***. And ***some of them being competition*** and some being partners. That's good for the clinician. That's good for the patient, by definition.

240. The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 227 insofar as they speak about

"welcoming" competition from generics and attributing the uptake of Vumerity to its "strong product profile." Indeed, Biogen entered into rebate contracts with PBMs that *impaired* competition from generic versions of its top-selling MS drug in the United States and was only in a position to switch patients to Vumerity because that competition was suppressed. To the extent these statements are not technically untrue, they gave the false impression that Biogen was competing with others in the market for its MS products on the merits and that Vumerity's growth was not the product of unlawful conduct.

241. On September 19, 2021, Defendant Vounatsos attended the Morgan Stanley Global Healthcare Conference, hosted by analyst Matthew Harrison. Asked again about the new AD treatment under development by Eli Lilly, Vounatsos reiterated that, "***[a]s a company, we always welcome competition, the way we did for MS*** or SMA."

242. Later on the call, Vounatsos also praised Biogen's work to drive uptake of Vumerity: "And while we are delighted to see also a delayed uptake of Vumerity—talking about delayed uptake—***this is another case which shows, basically, the ability for the company to implement operationally and implement well***."

243. The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 227 insofar as they speak about "welcoming" competition from other MS products and attributing the uptake of Vumerity to Biogen's ability to "implement" well. Indeed, Biogen entered into rebate contracts with PBMs that *impaired* competition from generic versions of its top-selling MS drug in the United States and was only in a position to switch patients to Vumerity because that competition was suppressed. To the extent these statements are not technically untrue, they gave the false

impression that Biogen was competing with others in the market for its MS products on the merits and that Vumerity's growth was not the product of unlawful conduct.

244. On October 20, 2021, Biogen held a conference call with analysts to discuss its financial results for the quarter ended September 30, 2021, after issuing a press release regarding the same (the "Q3 2021 Earnings Call") attended by Defendants Vounatsos and McDonnell. On the call, Vounatsos asserted that "***Biogen has continued to execute well and demonstrate resilience across MS***, SMA, and biosimilars, ***despite competition***" during the quarter.

245. The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 227 insofar as they speak about continued "competition" in the MS market and attribute Biogen's resilience to its ability to "execute well." Indeed, Biogen entered into rebate contracts with PBMs that *impaired* competition from generic versions of its top-selling MS drug in the United States and was only in a position to continue selling Tecfidera at the prices and volumes it did and switch patients to Vumerity because that competition was suppressed. To the extent these statements are not technically untrue, they gave the false impression that Biogen was competing with others in the market for its MS products on the merits and that Vumerity's growth was not the product of unlawful conduct.

### B. Function of Managed Care Rebates

246. After market close on February 3, 2021, Biogen filed an annual report with the SEC on Form 10-K for the quarter and year ended December 31, 2020 (the "2020 Form 10-K"). After market close on February 3, 2021, Biogen filed an annual report with the SEC on Form 10-K for the quarter and year ended December 31, 2021 (the "2021 Form 10-K"). After market close on February 15, 2023, Biogen filed an annual report with the SEC on Form 10-K for the

quarter and year ended December 31, 2022 (the "2022 Form 10-K"). The 2020 Form 10-K, 2021 Form 10-K, and 2022 Form 10-K were signed by Defendants Vounatsos and McDonnell.

247. According to Biogen, from 2020 to 2022, its product revenues were recorded net of any reserves for post-sale discounts and allowances offered in contracts with its customers, including the rebates that it paid to PBMs. Biogen's 2020 Form 10-K contained several disclosures on its reserves for discounts and allowances, including one that contained the following representation on the nature of the rebates it entered into with PBMs:

> Product revenue reserves, which are classified as a reduction in product revenues, are generally characterized in the following categories: discounts, contractual adjustments and returns.
>
> . . . .
>
> Contractual adjustments primarily relate to Medicaid and managed care rebates, pharmacy rebates, co-payment (copay) assistance, Veterans Administration (VA) and Public Health Service (PHS) discounts, specialty pharmacy program fees and other governmental rebates or applicable allowances. . . . . Managed care rebates represent our estimated obligations to third parties, primarily pharmacy benefit managers. Rebate accruals are recorded in the same period the related revenue is recognized, resulting in a reduction of product revenue and the establishment of a liability which is included in accrued expenses and other current liabilities. ***These rebates result from performance-based goals, formulary position and price increase limit allowances (price protection).*** The calculation of the accrual for these rebates is based on an estimate of the coverage patterns and the resulting applicable contractual rebate rate(s) to be earned over a contractual period.

248. The same or substantially similar statements to those quoted in the preceding paragraph were made in the 2021 Form 10-K and the 2022 Form 10-K.

249. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Biogen failed to disclose that (i) beginning in mid-2020, it entered into rebate contracts with PBMs to incentivize them to favor brand name Tecfidera over lower-cost generic versions of Tecfidera on their formularies or otherwise

exclude generic Tecfidera from their formularies; (ii) many PBMs elected to do so to maximize their financial gain on the fees associated with the rebates offered by Biogen in such contracts; (iii) this significantly impaired legitimate competition from generic versions of Tecfidera; and (iv) the diminished competition from generic versions of Tecfidera, in turn, enabled Biogen to continue selling Tecfidera at supracompetitive prices and volumes and switch patients from Tecfidera to Vumerity through the end of 2022. To the extent these statements were not technically untrue, they gave the false impression that such rebates were used to promote, rather than stifle, free and fair competition. Indeed, Biogen stated elsewhere in the same SEC filings that "payors, including . . . pharmacy benefit managers . . . seek price discounts or rebates in connection with the placement of our products on their formularies and, in some cases, may impose restrictions on access, coverage or pricing of particular drugs *based on perceived value*."

### C. Reasons for Biogen's Operating Results

250. During his opening remarks on the Q3 2020 Earnings Call, Defendant McDonnell attributed the performance of Biogen's MS franchise to the recent commercialization of Tecfidera generics in the United States:

> Biogen had another solid quarter despite the recent entrance of generic Tecfidera and the continued impacts of COVID-19, as we continue to execute well. . . . Total revenue for Q3 was $3.4 billion, a decline of 6% versus the prior year. ***This decline was mostly driven by Tecfidera generic entry*** and is inclusive of a 1% unfavorable currency impact. Total MS revenue, including Ocrevus royalties, was $2.3 billion, a decrease of 4% versus the prior year. ***MS revenue during the third quarter began to experience the impact of the entrance of multiple generics of Tecfidera in the U.S.*** while Q3 Tecfidera revenue outside the U.S. was $283 million, representing an increase of 1% versus the prior year with continued patient growth.

251. After market close on October 21, 2020, Biogen filed a quarterly report with the SEC on Form 10-Q for the quarter ended September 30, 2020 (the "Q3 2020 Form 10-Q"). The

Q3 2020 Form 10-Q was signed by Defendant McDonnell. The Q3 2020 Form 10-Q offered the following statements on the impact of generics on Biogen's product revenues:

> Our products continue to face increasing competition in many markets from generic versions, prodrugs and biosimilars of existing products as well as products approved under abbreviated regulatory pathways. Such products are likely to be sold at substantially lower prices than branded products. Accordingly, the introduction of such products as well as other lower-priced competing products may significantly reduce both the price that we are able to charge for our products and the volume of products we sell, which will negatively impact our revenues. In addition, when a generic version of one of our products is commercialized, it may, in some instances, be automatically substituted for our product and reduce our revenues in a short period of time.
>
> Multiple TECFIDERA generic entrants are now in the U.S. market, some of which have deeply discounted prices compared to TECFIDERA. ***The generic competition for TECFIDERA significantly reduced our TECFIDERA revenues during the third quarter of 2020*** and is expected to have a substantial negative impact on our TECFIDERA revenues for as long as there is generic competition.

252. The Q3 2020 Form 10-Q also described the impact of Tecfidera generics on Biogen's product sales as follows:

> - Product revenues, net totaled $2,690.3 million for the third quarter of 2020, representing a $204.4 million, or 7.1%, decrease compared to $2,894.7 million in the same period in 2019. This decrease was primarily due to a $52.7 million, or 9.6%, decrease in SPINRAZA and a $175.3 million, or 8.1%, decrease in MS product revenues, partially offset by a $24.3 million, or 13.2%, increase in revenues from our biosimilar products.
>
> - ***The decrease in MS product revenues was primary due to a decrease in TECFIDERA demand and pricing as a result of multiple generic entrants entering the U.S. markets during the third quarter of 2020.***
>
> * * *
>
> Fumarate revenues include sales from TECFIDERA and VUMERITY. . . . For the three and nine months ended September 30, 2020, compared to the same periods in 2019, ***the decreases of 18.7% and 1.9%, respectively, in U.S. Fumarate revenues were primarily due to a decrease in TECFIDERA demand and pricing as a result of multiple TECFIDERA generic entrants entering the U.S. market during the third quarter of 2020***. Decreases were also due to unfavorable pricing, driven by discounts and allowances.

253. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Biogen failed to disclose that (i) beginning in mid-2020, it entered into rebate contracts with PBMs to incentivize them to favor brand name Tecfidera over lower-cost generic versions of Tecfidera on their formularies or otherwise exclude generic Tecfidera from their formularies; (ii) many PBMs elected to do so to maximize their financial gain on the fees associated with the rebates offered by Biogen in such contracts; (iii) this significantly impaired legitimate competition from generic versions of Tecfidera; and (iv) the diminished competition from generic versions of Tecfidera, in turn, enabled Biogen to continue selling Tecfidera at supracompetitive prices and volumes and switch patients from Tecfidera to Vumerity through the end of 2022. Thus, the level of Tecfidera revenues and the resulting impact on Biogen's overall MS revenues were not "driven" or "primarily due" to the entry of generic versions of Tecfidera but, rather, Biogen's entry into illicit rebate contracts with supply chain middlemen that suppressed sales from those generics and enabled Biogen to continue selling Tecfidera at supracompetitive volumes and prices. To the extent these statements are not technically untrue, they gave the false impression that Biogen was experiencing the impact of unimpaired competition from Tecfidera generics.

254. On the Q4 2020 Earnings Call, Defendant McDonnell described Biogen's operating results as follows:

> Biogen had another solid quarter despite the challenges from COVID-19 and Tecfidera U.S. generics, as we continue to execute well and maintain global leadership across our core businesses. . . . Total revenue for the fourth quarter of $2.9 billion declined 22% versus the prior year in both actual and constant currency. Total revenue for the full year of $13.4 billion declined 6% versus the prior year at both actual and constant currency. ***This decline was mostly driven by Tecfidera generic entry in the U.S.*** Total MS revenue for the fourth quarter, including Ocrevus royalties of $1.8 billion, decreased 24% versus the prior year at

> both actual and constant currency. Total MS revenue for the full year, including OCREVUS royalties of $8.7 billion, decreased 6% versus the prior year at actual currency and 5% at constant currency. ***This decline was also driven by the entrance of multiple generics of Tecfidera in the U.S.***

255. Biogen's 2020 Form 10-K, filed after the Q4 2020 Earnings Call, offered the following statements on the impact of generics on Biogen's product revenues:

> Our products continue to face increasing competition in many markets from new originator therapies, generics, prodrugs and biosimilars of existing products and products approved under abbreviated regulatory pathways. Such products are likely to be sold at substantially lower prices than branded products. Accordingly, the introduction of such products, as well as other lower-priced competing products, may significantly reduce both the price that we are able to charge for our products and the volume of products we sell, which will negatively impact our revenues. In addition, in some markets, when a generic or biosimilar version of one of our products is commercialized, it may be automatically substituted for our product and significantly reduce our revenues in a short period of time.
>
> Multiple TECFIDERA generic entrants are now in the U.S. market and have deeply discounted prices compared to TECFIDERA. ***The generic competition for TECFIDERA significantly reduced our TECFIDERA revenues during the year ended December 31, 2020***, and is expected to have a substantial negative impact on our TECFIDERA revenues for as long as there is generic competition.

256. The 2020 Form 10-K also described the impact of Tecfidera generics on Biogen's product sales as follows:

> - Product revenues, net totaled $10,692.2 million for 2020, representing a decrease of 6.0% as compared to $11,379.8 million in 2019. This decrease was primarily due to a $697.2 million, or 8.2%, decrease in MS product revenues and a $44.9 million, or 2.1%, decrease in revenues from SPINRAZA, partially offset by a $57.5 million, or 7.8%, increase in revenues from our biosimilar business. Product revenues, net, compared to the same period in 2019, further reflects the unfavorable impact of foreign currency exchange of $111.6 million.
>     - ***The decrease in MS product revenues was primary due to a decrease in TECFIDERA demand and price as a result of multiple TECFIDERA generic entrants entering the U.S. market during the year ended December 31, 2020.***

* * *

> Fumarate revenues include sales from TECFIDERA and VUMERITY. . . . . For 2020 compared to 2019, ***the 17.2% decrease in U.S. Fumarate revenues was primarily due to a decrease in TECFIDERA demand and price as a result of multiple TECFIDERA generic entrants entering the U.S. market during the year ended December 31, 2020***. ***This decrease was partially offset by an increase of approximately $60.0 million in VUMERITY sales,*** which became commercially available in the U.S. in November 2019.

257. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 253. Indeed, the decrease in fumarate revenue was not "partially offset" by an increase in Vumerity sales, but, rather, Biogen's entry into illicit rebate contracts with supply chain middlemen that suppressed sales from generic versions of Tecfidera, which, in turn, enabled Biogen to continue selling Tecfidera at supracompetitive volumes and prices and switch patients to Vumerity.

258. On the Q1 2021 Earnings Call, Defendant McDonnell continued to link Biogen's operating results to the recent entry of Tecfidera generics in the United States:

> Biogen had another solid quarter despite the challenges from Tecfidera U.S. generics and COVID-19, as we continue to execute well across our core businesses. . . . Total revenue for the first quarter of $2.7 billion declined 24% versus the prior year at actual currency and 25% at constant currency. ***This decline was mostly driven by the continued impact of Tecfidera generics in the United States.*** Total MS revenue for the first quarter, including Ocrevus royalties of $1.7 billion, decreased 26% versus the prior year at both actual and at constant currency. ***This decline was also driven by the continued impact of Tecfidera generics in the U.S.***

259. After market close on April 22, 2021, Biogen filed a quarterly report with the SEC on Form 10-Q for the quarter ended March 31, 2021 (the "Q1 2021 Form 10-Q"). The Q1 2021 Form 10-Q was signed by Defendant McDonnell. The Q1 2021 Form 10-Q offered the following statements on the impact of generics on Biogen's product revenues:

> Our products continue to face increasing competition in many markets from new originator therapies, generics, prodrugs and biosimilars of existing products and products approved under abbreviated regulatory pathways. Such products are

> likely to be sold at substantially lower prices than branded products. Accordingly, the introduction of such products as well as other lower-priced competing products may significantly reduce both the price that we are able to charge for our products and the volume of products we sell, which will negatively impact our revenue. In addition, in some markets, when a generic or biosimilar version of one of our products is commercialized, it may be automatically substituted for our product and significantly reduce our revenue in a short period of time.
>
> Multiple TECFIDERA generic entrants are now in the U.S. market and have deeply discounted prices compared to TECFIDERA. ***The generic competition for TECFIDERA has significantly reduced our TECFIDERA revenue*** and is expected to have a substantial negative impact on our TECFIDERA revenue for as long as there is generic competition.

260. The Q1 2021 Form 10-Q also described the impact of Tecfidera generics on Biogen's product sales as follows:

> - Product revenue, net totaled $2,211.7 million for the first quarter of 2021, representing a $692.9 million, or 23.9%, decrease compared to $2,904.6 million in the same period in 2020. This decrease was primarily due to a $634.2 million, or 30.0%, decrease in MS product revenue and a $44.5 million, or 7.9%, decrease in SPINRAZA product revenue.
>     - ***The decrease in MS product revenue was primarily due to a decrease in U.S. TECFIDERA demand as well as higher discounts and allowances as a result of multiple TECFIDERA generic entrants in the U.S. market.***
>
> * * *
>
> Fumarate revenues include sales from TECFIDERA and VUMERITY. . . . . For the three months ended March 31, 2021, compared to the same period in 2020, ***the decrease of 69.6% in U.S. Fumarate revenue was primarily due to a decrease in TECFIDERA demand as well as higher discounts and allowances as a result of multiple TECFIDERA generic entrants in the U.S. market***. Additionally, revenue in the first quarter of 2020 reflected higher volume associated with additional shipping days. ***The decrease was partially offset by an increase in VUMERITY sales volume.***

261. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 253. Indeed, the decrease in fumarate revenue was not "partially offset" by an increase in Vumerity sales, but, rather, Biogen's entry into illicit

rebate contracts with supply chain middlemen that suppressed sales from generic versions of Tecfidera, which, in turn, enabled Biogen to continue selling Tecfidera at supracompetitive volumes and prices and switch patients to Vumerity.

262. On the Q2 2021 Earnings Call, Defendant McDonnell continued to link Biogen's operating results to recent competition from Tecfidera generics:

> Total revenue for the second quarter of $2.8 billion declined 25% versus the prior year at actual currency and 26% at constant currency. ***This decline reflects the impact of Tecfidera generics***, in addition to approximately $330 million in revenue that was recorded in Q2 2020 related to the onetime license of certain manufacturing-related intellectual property.

263. After market close on July 22, 2021, Biogen filed a quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2021 (the "Q2 2021 Form 10-Q"). The Q2 2021 Form 10-Q was signed by Defendant McDonnell. The Q2 2021 Form 10-Q offered the following statements on the impact of generics on Biogen's product revenues:

> Our products continue to face increasing competition in many markets from new originator therapies, generics, prodrugs and biosimilars of existing products and products approved under abbreviated regulatory pathways. Such products are likely to be sold at substantially lower prices than branded products. Accordingly, the introduction of such products as well as other lower-priced competing products may significantly reduce both the price that we are able to charge for our products and the volume of products we sell, which will negatively impact our revenue. In addition, in some markets, when a generic or biosimilar version of one of our products is commercialized, it may be automatically substituted for our product and significantly reduce our revenue in a short period of time.
>
> Multiple TECFIDERA generic entrants are now in the U.S. market and have deeply discounted prices compared to TECFIDERA. ***The generic competition for ECFIDERA has significantly reduced our TECFIDERA revenue*** and is expected to have a substantial negative impact on our TECFIDERA revenue for as long as there is generic competition.

264. The Q2 2021 Form 10-Q also described the impact of Tecfidera generics on Biogen's product sales as follows:

> - Product revenue, net totaled $2,236.0 million for the second quarter of 2021, representing a $559.7 million, or 20.0%, decrease compared to $2,795.7

million in the same period in 2020. This decrease was primarily due to a $597.5 million, or 28.1%, decrease in MS product revenue, partially offset by a $5.1 million, or 1.0%, increase in SPINRAZA product revenue.

- ***The decrease in MS product revenue was primarily due to a decrease in U.S. TECFIDERA demand as well as higher discounts and allowances as a result of multiple TECFIDERA generic entrants in the U.S. market.***

* * *

> Fumarate revenues include sales from TECFIDERA and VUMERITY. . . . . For the three and six months ended June 30, 2021, compared to the same periods in 2020, ***the decreases of 70.8% and 70.3%, respectively, in U.S. Fumarate revenue were primarily due to a decrease in TECFIDERA demand as well as higher discounts and allowances as a result of multiple TECFIDERA generic entrants in the U.S. market. The decrease was partially offset by an increase in VUMERITY sales volume.***

265. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 253. Indeed, the decrease in fumarate revenue was not "partially offset" by an increase in Vumerity sales, but, rather, Biogen's entry into illicit rebate contracts with supply chain middlemen that suppressed sales from generic versions of Tecfidera, which, in turn, enabled Biogen to continue selling Tecfidera at supracompetitive volumes and prices and switch patients to Vumerity.

266. On the Q3 2021 Earnings Call, Defendant McDonnell continued to link Biogen's operating results to recent competition from Tecfidera generics:

> Total revenue for the third quarter of $2.8 billion declined 18% versus the prior year at both actual and constant currency and ***reflects the impact of Tecfidera generics***.

267. After market close on October 20, 2021, Biogen filed a quarterly report with the SEC on Form 10-Q for the quarter ended September 30, 2021 (the "Q3 2021 Form 10-Q"). The Q3 2021 Form 10-Q was signed by Defendant McDonnell. The Q3 2021 Form 10-Q offered the following statements on the impact of generics on Biogen's product revenues:

> Our products continue to face increasing competition in many markets from new originator therapies, generics, prodrugs and biosimilars of existing products and products approved under abbreviated regulatory pathways. Such products are likely to be sold at substantially lower prices than branded products. Accordingly, the introduction of such products as well as other lower-priced competing products may significantly reduce both the price that we are able to charge for our products and the volume of products we sell, which will negatively impact our revenue. In addition, in some markets, when a generic or biosimilar version of one of our products is commercialized, it may be automatically substituted for our product and significantly reduce our revenue in a short period of time.
>
> Multiple TECFIDERA generic entrants are now in the U.S. market and have deeply discounted prices compared to TECFIDERA. ***The generic competition for TECFIDERA has significantly reduced our TECFIDERA revenue*** and is expected to have a substantial negative impact on our TECFIDERA revenue for as long as there is generic competition.

268. The Q3 2021 Form 10-Q also described the impact of Tecfidera generics on Biogen's product sales as follows:

> - Product revenue, net totaled $2,205.7 million for the third quarter of 2021, representing a $484.6 million, or 18.0%, decrease compared to $2,690.3 million in the same period in 2020. This decrease was primarily due to a $428.9 million, or 21.6%, decrease in MS product revenue as well as a $50.3 million, or 10.2%, decrease in SPINRAZA product revenue.
>     - ***The decrease in MS product revenue was primarily due to a decrease in U.S. TECFIDERA demand as a result of multiple TECFIDERA generic entrants in the U.S. market.***
>
> * * *
>
> Fumarate revenues include sales from TECFIDERA and VUMERITY. . . . . For the three and nine months ended September 30, 2021, compared to the same periods in 2020, ***the decreases of 56% and 66%, respectively, in U.S. Fumarate revenue were primarily due to a decrease in TECFIDERA demand as a result of multiple TECFIDERA generic entrants in the U.S. market. The decrease was partially offset by an increase in VUMERITY sales volume.***

269. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 253. Indeed, the decrease in fumarate revenue was not "partially offset" by an increase in Vumerity sales, but, rather, Biogen's entry into illicit

rebate contracts with supply chain middlemen that suppressed sales from generic versions of Tecfidera, which, in turn, enabled Biogen to continue selling Tecfidera at supracompetitive volumes and prices and switch patients to Vumerity.

270. On the morning of February 3, 2022, Biogen held a conference call with analysts to discuss its financial results for the quarter and year ended December 31, 2021, after issuing a press release regarding the same (the "Q4 2021 Earnings Call") attended by Defendants Vounatsos and McDonnell. On the Q4 2021 Earnings Call, Defendant McDonnell continued to link Biogen's operating results to recent competition from Tecfidera generics:

> Total revenue for the fourth quarter of $2.7 billion declined 4% versus the prior year at both actual and constant currency. Total revenue for the full year of $11 billion declined 18% versus the prior year at actual currency and 19% at constant currency. ***This decline was mostly driven by Tecfidera generic entry in the United States.***

271. In the 2021 Form 10-K, Biogen made the following statements on the impact of generics on Biogen's product revenues:

> We also face increased competitive pressures from the introduction of generic versions, prodrugs and biosimilars of existing products and products approved under abbreviated regulatory pathways. Such products are likely to be sold at substantially lower prices than branded products, which may significantly reduce both the price that we are able to charge for our products and the volume of products we sell. In addition, in some markets, when a generic or biosimilar version of one of our products is commercialized, it may be automatically substituted for our product and significantly reduce our revenue in a short period of time.
>
> . . .
>
> Multiple TECFIDERA generic entrants are now in the U.S. market and have deeply discounted prices compared to TECFIDERA. ***The generic competition for TECFIDERA has significantly reduced our TECFIDERA revenue*** and is expected to continue to have a substantial and increasing negative impact on our U.S. TECFIDERA revenue in the future.

272. The 2021 Form 10-K also described the impact of Tecfidera generics on Biogen's product sales as follows:

- Product revenue, net totaled $8,846.9 million for 2021, representing a $1,845.3 million, or 17.3%, decrease compared to $10,692.2 million in 2020. This decrease was primarily due to a $1,735.4 million, or 22.2%, decrease in MS product revenue and a $147.0 million, or 7.2%, decrease in SPINRAZA product revenue, partially offset by a $35.3 million, or 4.4%, increase in revenue from our biosimilar business.

    - ***The decrease in MS product revenue was primarily due to a decrease in U.S. TECFIDERA demand as a result of multiple TECFIDERA generic entrants in the U.S. market.***

* * *

Fumarate revenue includes sales from TECFIDERA and VUMERITY. . . . . For 2021 compared to 2020, ***the 60.3% decrease in U.S. Fumarate revenue was primarily due to a decrease in TECFIDERA demand as a result of multiple TECFIDERA generic entrants entering the U.S. market. The decrease was partially offset by an increase in VUMERITY sales volumes in the U.S.***

273. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 253. Indeed, the decrease in fumarate revenue was not "partially offset" by an increase in Vumerity sales, but, rather, Biogen's entry into illicit rebate contracts with supply chain middlemen that suppressed sales from generic versions of Tecfidera, which, in turn, enabled Biogen to continue selling Tecfidera at supracompetitive volumes and prices and switch patients to Vumerity.

274. After market close on May 3, 2022, Biogen filed a quarterly report with the SEC on Form 10-Q for the quarter ended March 31, 2021 (the "Q1 2022 Form 10-Q"). The Q1 2022 Form 10-Q was signed by Defendant McDonnell. The Q1 2022 Form 10-Q described the impact of Tecfidera generics on Biogen's product sales as follows:

- Product revenue, net totaled $2,066.3 million for the first quarter of 2022, representing a $145.4 million, or 6.6%, decrease compared to $2,211.7 million in the same period in 2021. This decrease was primarily due to an $88.8 million, or 6.0%, decrease in MS product revenue and a $48.0 million, or 9.2%, decrease in SPINRAZA product revenue.

- The decrease in MS product revenue was primarily due to a decrease in rest of world Interferon demand due to increasing competition from our other MS products as well as other treatments for MS, including biosimilars. ***The decrease was also due to a decrease in U.S. TECFIDERA demand as a result of multiple TECFIDERA generic entrants in the U.S. market.***

* * *

Fumarate revenue includes sales from TECFIDERA and VUMERITY. . . . . For the three months ended March 31, 2022, compared to the same period in 2021, the 2.7% increase in U.S. Fumarate revenue was primarily due to a favorable adjustment of prior year estimates on Medicaid-related sales of VUMERITY. ***The increase was also*** due to an increase in VUMERITY sales volumes in the U.S., ***partially offset by a decrease in TECFIDERA demand as a result of multiple TECFIDERA generic entrants in the U.S. market***.

275. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 253.

276. After market close on July 20, 2022, Biogen filed a quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2022 (the "Q2 2022 Form 10-Q"). The Q2 2022 Form 10-Q was signed by Defendant McDonnell. The Q2 2022 Form 10-Q described the impact of Tecfidera generics on Biogen's product sales as follows:

- Product revenue, net totaled $2,054.9 million for the second quarter of 2022, representing a $181.1 million, or 8.1%, decrease compared to $2,236.0 million in the same period in 2021. This decrease was primarily due to a $102.6 million, or 6.7%, decrease in MS product revenue and a $68.6 million, or 13.7%, decrease in SPINRAZA product revenue.
    - ***The decrease in MS product revenue was primarily due to a decrease in U.S. TECFIDERA demand as a result of multiple TECFIDERA generic entrants in the U.S. market*** and a decrease in Interferon demand due to competition.

* * *

Fumarate revenue includes sales from TECFIDERA and VUMERITY. . . . . For the three and six months ended June 30, 2022, compared to the same periods in 2021, ***the decreases of 6.9% and 2.4%, respectively, in U.S. Fumarate revenue***

> ***were primarily due to decreases in TECFIDERA demand as a result of multiple TECFIDERA generic entrants in the U.S. market, partially offset by favorable pricing for TECFIDERA driven by discounts and allowances and increases in VUMERITY sales volumes.***

277. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 253. Indeed, the decrease in fumarate revenue was not "partially offset" by favorable pricing for Tecfidera, but, rather, Biogen's entry into illicit rebate contracts with supply chain middlemen that suppressed sales from generic versions of Tecfidera, which, in turn, enabled Biogen to continue selling Tecfidera at supracompetitive volumes and prices and switch patients to Vumerity.

278. After market close on October 25, 2022, Biogen filed a quarterly report with the SEC on Form 10-Q for the quarter ended September 30, 2022 (the "Q3 2022 Form 10-Q"). The Q3 2022 Form 10-Q was signed by Defendant McDonnell. The Q3 2022 Form 10-Q described the impact of Tecfidera generics on Biogen's product sales as follows:

> - Product revenue, net totaled $1,962.1 million for the third quarter of 2022, representing a $243.6 million, or 11.0%, decrease compared to $2,205.7 million in the same period in 2021. This decrease was primarily due to a $215.7 million, or 13.9%, decrease in MS product revenue and a $13.0 million, or 2.9%, decrease in SPINRAZA product revenue.
>     - ***The decrease in MS product revenue was primarily due to a decrease in U.S. TECFIDERA demand as a result of multiple TECFIDERA generic entrants in the U.S. market*** and a decrease in Interferon demand due to competition.
>
> * * *
>
> Fumarate revenue includes sales from TECFIDERA and VUMERITY. . . . . For the three and nine months ended September 30, 2022, compared to the same periods in 2021, ***the decreases of 26.5% and 11.4%, respectively, in U.S. Fumarate revenue were primarily due to decreases in TECFIDERA demand as a result of multiple TECFIDERA generic entrants in the U.S. market, partially offset by increases in VUMERITY sales volumes.***

279. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 253. Indeed, the decrease in fumarate revenue was not "partially offset" by an increase in Vumerity sales, but, rather, Biogen's entry into illicit rebate contracts with supply chain middlemen that suppressed sales from generic versions of Tecfidera, which, in turn, enabled Biogen to continue selling Tecfidera at supracompetitive volumes and prices and switch patients to Vumerity.

280. In the 2022 Form 10-K, Biogen made the following statements on the impact of generics on Biogen's product revenues:

> Our products and revenue streams continue to face increasing competition in many markets from the introduction of generic versions, prodrugs and biosimilars of existing products and products approved under abbreviated regulatory pathways. Such products are likely to be sold at substantially lower prices than branded products. Accordingly, the introduction of such products as well as other lower-priced competing products may significantly reduce both the price that we are able to charge for our products and the volume of products we sell, which will negatively impact our revenue. In addition, in some markets, when a generic or biosimilar version of one of our products is commercialized, it may be automatically substituted for our product and significantly reduce our revenue in a short period of time.
>
> . . .
>
> Multiple TECFIDERA generic entrants are now in North America, Brazil and certain E.U. countries and have deeply discounted prices compared to TECFIDERA. ***The generic competition for TECFIDERA has significantly reduced our TECFIDERA revenue*** and we expect that TECFIDERA revenue will continue to decline in the future.

281. The 2022 Form 10-K also described the impact of Tecfidera generics on Biogen's product sales as follows:

- Product revenue, net totaled $7,987.8 million for 2022, representing an $859.1 million, or 9.7%, decrease compared to $8,846.9 million in 2021. This decrease was primarily due to a $666.5 million, or 10.9%, decrease in MS product revenue, a $111.6 million, or 5.9%, decrease in SPINRAZA product

revenue and an $80.0 million, or 9.6%, decrease in revenue from our biosimilar business.

- ***The decrease in MS product revenue of $666.5 million, or 10.9%, from $6,096.7 million in 2021 to $5,430.2 million in 2022, was primarily due to a decrease in TECFIDERA demand as a result of multiple TECFIDERA generic entrants in North America***, Brazil and certain E.U. countries, and a decrease in Interferon demand due to competition as patients transition to higher efficacy and oral MS therapies.

* * *

Fumarate revenue includes sales from TECFIDERA and VUMERITY. . . . . For 2022 compared to 2021, ***the 13.8% decrease in U.S. Fumarate revenue was primarily due to a decrease in TECFIDERA demand as a result of multiple TECFIDERA generic entrants in the U.S. market, partially offset by net price increases in TECFIDERA driven by lower pharmacy rebates, managed care rebates and co-pay assistance as well as an increase in VUMERITY sales volumes.***

282. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 253. Indeed, the decrease in fumarate revenue was not "partially offset" by net price increases in Tecfidera and an increase in Vumerity sales, but, rather, Biogen's entry into illicit rebate contracts with supply chain middlemen that suppressed sales from generic versions of Tecfidera, which, in turn, enabled Biogen to continue selling Tecfidera at supracompetitive volumes and prices and switch patients to Vumerity.

### D. Leqembi's Safety Profile

283. On November 29, 2022, Biogen and Eisai jointly published a press release titled, "Eisai Presents Full Results of Lecanemab Phase 3 Confirmatory Clarity AD Study for Early Alzheimer's Disease At Clinical Trials On Alzheimer's Disease (CTAD) Conference." In a section titled "Safety Results of Clarity AD," the press release stated:

> Overall, lecanemab's ARIA incidence profile was within expectations based on the Phase 2 trial results. ARIA-E events were largely mild-to-moderate radiographically (91% of those who had ARIA-E), asymptomatic (78% of those

who had ARIA-E), occurred within the first 3 months of treatment (71% of those who had ARIA-E) and resolved within 4 months of detection (81% of those who had ARIA-E). Among the 2.8% of lecanemab-treated subjects with symptomatic ARIA-E, the most commonly reported symptoms were headache, visual disturbance, and confusion. The incidence of symptomatic ARIA-H was 0.7% in the lecanemab group and 0.2% in the placebo group. No imbalance was observed in isolated ARIA-H (i.e., ARIA-H in participants who did not also experience ARIA-E) between lecanemab (8.9%) and placebo (7.8%). ARIA-E and ARIA-H were less common in ApoE4 non-carriers versus carriers, with higher frequency in ApoE4 homozygous carriers vs ApoE4 heterozygous carriers. ***In the core study and subsequent open-label extension study, rates of deaths with concurrent cerebral macrohemorrhage were 0.1%*** in both the placebo group (1/897) ***and the lecanemab group (2/1608).*** The two cases on lecanemab occurred in the open-label extension study. ***Both cases had significant comorbidities and risk factors including anticoagulation contributing to macrohemorrhage or death. Therefore, it is Eisai's assessment that the deaths cannot be attributed to lecanemab.***

284. The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Biogen failed to disclose that (i) three patients in the OLE phase of the Clarity Phase 3 Study with biomarkers that put them at high risk for developing ARIA on an anti-amyloid medication, like Leqembi, died soon after they began taking Leqembi; (ii) medical examinations of the foregoing patients, including autopsies, confirmed that they suffered severe ARIA at or around the time of death; (iii) neuropathologists who performed an autopsy on the brain of the foregoing patients concluded that they died from Leqembi or that the role of Leqembi could not be ruled out; (iv) the trial investigator responsible for each of the foregoing patients concluded from their review of the medical records associated with the death was "related" to Leqembi or that the role of Leqembi could not be ruled out; and (v) external neurologists and researchers who reviewed the medical records and/or autopsy report associated with each death agreed that Leqembi played a role in the death. Thus, Biogen's assertion that the death "cannot" be attributed to Leqembi is simply not true and unsupported by the facts. Furthermore, the disclosure makes no mention of Patient 3, who died after receiving

Leqembi with 51 microhemorrhages consistent with severe ARIA. To the extent these statements were not technically untrue, they gave the false impression that there were only two deaths in the OLE with concurrent symptoms of ARIA-H when, in fact, there were three.

285. On January 6, 2023, Biogen and Eisai jointly published a press release titled, "FDA Approves LEQEMBI™ (lecanemab-irmb) Under the Accelerated Approval Pathway for the Treatment of Alzheimer's Disease," which announced the FDA's initial approval of Leqembi under the accelerated approval pathway based on the data from the Phase 2 study for Leqembi. The press releases provided in relevant part as follows:

Incidence of ARIA

- In Study 1 (Study 201), symptomatic ARIA occurred in 3% (5/161) of LEQEMBI-treated patients. Clinical symptoms associated with ARIA resolved in 80% of patients during the period of observation.

- Including asymptomatic cases, ARIA was observed in LEQEMBI: 12% (20/161); placebo: 5% (13/245). ARIA-E was observed in LEQEMBI: 10% (16/161); placebo: 1% (2/245). ARIA-H was observed in LEQEMBI: 6% (10/161); placebo: 5% (12/245). There was no increase in isolated ARIA-H for LEQEMBI compared to placebo.

- Intracerebral hemorrhage >1 cm in diameter was reported after one treatment in LEQEMBI: 1 patient; placebo: zero patients. ***Events of intracerebral hemorrhage, including fatal events, in patients taking LEQEMBI have also been reported in other studies.***

Apolipoprotein E ε4 (ApoE ε4) Carrier Status and Risk of ARIA

- In Study 1, 6% (10/161) of patients in the LEQEMBI group were ApoE ε4 homozygotes, 24% (39/161) were heterozygotes, and 70% (112/161) were noncarriers.

- The incidence of ARIA was higher in ApoE ε4 homozygotes than in heterozygotes and noncarriers among patients treated with LEQEMBI. Of the 5 LEQEMBI-treated patients who had symptomatic ARIA, 4 were ApoE ε4 homozygotes, 2 of whom experienced severe symptoms. ***An increased incidence of symptomatic and overall ARIA in ApoE ε4 homozygotes compared to heterozygotes and noncarriers in LEQEMBI-treated patients has been reported in other studies.***

286. The same or substantially similar statements to those in the preceding paragraph were also made by Biogen in press releases issued on January 10, 2023, March 5, 2023, and June 9, 2023.

287. The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Biogen failed to disclose that (i) the events of fatal intracerebral hemorrhage took place in patients who recently started receiving Leqembi in the OLE phase of the pivotal Clarity Phase 3 Study for Leqembi; (ii) several patients with two ApoE4 alleles died in the OLE phase of the pivotal Phase 3 Study for Leqembi after suffering severe ARIA. Indeed, the events described in these statements did not take place in earlier stages of clinical development or in other programs exploring Leqembi for different uses, but the pivotal Phase 3 clinical trial for Leqembi that *under review by the FDA* for purposes of gaining traditional, full approval. To the extent these statements were not technically untrue, they gave the false impression that were no such events in the recently completed Phase 3 study.

288. Also on January 6, 2023, Biogen issued a press release titled, "A statement from Biogen on LEQEMBI™ pricing." The press release directed investors to consult "[a]n additional news release from Eisai on patient safety," available via a hyperlink. The hyperlinked press release from Eisai, titled "EISAI'S COMMITMENT TO SCIENTIFIC EVIDENCE AND PATIENT SAFETY," declared it would be "inappropriate" to comment on any specific patients for all the reasons provided in a statement it issued in response to the publication of Patient 3's death in a scientific journal but otherwise provided as follows:

> **Important Considerations in the Study of Alzheimer's Disease**
>
> Part of Eisai's commitment to patient safety is studying the frequency, pattern, causes and risk factors of diseases and health-related events in different populations. According to the World Health Organization (WHO), dementia is

the seventh leading cause of death among all diseases and the Centers for Disease Control and Prevention (CDC) reports that AD is the leading cause of dementia and the fifth leading cause of death for those 65 years and older. According to the Alzheimer's Association, the average survival after diagnosis is typically three to eleven years (median survival time: eight years). ***The patients who participate in trials for AD treatments have a relatively high rate of mortality due to the physical effects resulting from the natural progression of AD and the variety of medical conditions that develop as people continue to age.*** For example, comprehensive reviews of the scientific literature have found that patients with AD have a significantly higher incidence of hemorrhagic strokes (strokes associated with bleeding in the brain). ***When evaluating suspected serious adverse reactions, including death, of any clinical trial participants or patients prescribed medications outside clinical trials, one must consider factors like age, clinical history, concomitant medications, temporal correlation, biologic plausibility, and effects of dechallenge/rechallenge of the suspected drug.***

. . . .

ARIA-H can occur spontaneously in patients with AD. ARIA-H associated with monoclonal antibodies directed against aggregated forms of beta amyloid generally occurs in association with an occurrence of ARIA-E. ARIA-H of any cause and ARIA-E can occur together. ARIA is usually asymptomatic, although serious and life-threatening events, including seizure and status epilepticus, rarely can occur. When present, reported symptoms associated with ARIA may include headache, confusion, visual changes, dizziness, nausea and gait difficulty, and focal neurologic deficits may also occur. These symptoms usually resolve over time. Intracerebral hemorrhage greater than 1 cm in diameter has been reported. ***Events of intracerebral hemorrhage, including fatal events, in patients taking LEQEMBI have also been reported.***

289. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶¶ 284, 287. Indeed, Biogen failed to correct these statements, and, in fact, promoted them to investors.

290. On March 30, 2023, Biogen and Eisai released a press release titled "Eisai Presented New Analyses of ARIA and QOL on Lecanemab in Clarity AD at the AD/PD™ 2023 Annual Meeting." The press release stated:

In the Clarity AD study, ARIA rates were higher for patients receiving lecanemab compared to those on placebo. The objective of this analysis was to evaluate antiplatelet and anticoagulant medication use in participants who

> experienced either ARIA-E (edema) or ARIA-H (combined cerebral microhemorrhages, superficial siderosis, and intracerebral hemorrhages >1 cm in diameter).
>
> The risks of ARIA appear slightly higher in the placebo group with antiplatelet or with anticoagulants relative to placebo subjects not on anticoagulants (no antiplatelet or anticoagulation: 8.9%, antiplatelet: 9.7%, anticoagulation (anticoagulation alone or with antiplatelet): 10.8%). ***ARIA rates may be slightly lower in those on lecanemab treated with antiplatelet or with anticoagulation, relative to lecanemab treated subjects not with antiplatelet or with anticoagulation (no antiplatelet or anticoagulation: 21.8%, antiplatelet: 17.9%, anticoagulation: 13.3%)***.
>
> The incidence of ARIA-E was 13.1% in the lecanemab group and 1.5% in the placebo group when no antiplatelet or anticoagulant medication was used, 10.4% in the lecanemab group and 0.84% in the placebo group when antiplatelet medication was used, and 4.8% in the lecanemab group and 2.7% in the placebo group when anticoagulant medication was used.
>
> . . .
>
> ***In Clarity AD, ARIA did not occur more frequently in lecanemab-treated participants on antiplatelet or anticoagulant drugs compared to lecanemab-treated participants that were not on either.***

291. The statements identified in bold and italicized text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Biogen failed to disclose that (i) three patients in the OLE phase of the Clarity Phase 3 Study with biomarkers that put them at high risk for developing ARIA on an anti-amyloid medication, like Leqembi, died soon after they began taking Leqembi; (ii) medical examinations of the foregoing patients, including autopsies, confirmed that they suffered severe ARIA at or around the time of death; (iii) all three patients were either on or administered anticoagulant medication at the time of death; and (iv) the trial investigator responsible for at least one of the foregoing patients notified Eisai that the ARIA suffered by the patient appeared to be "exacerbated" by the administration of a blood thinner. To the extent these statements were not technically untrue, they gave the false impression that

patients who received Leqembi while on a blood thinning medication were not at higher risk for developing ARIA than those who were not on a blood thinning medication when, in fact, it appeared to be a lethal combination in patients who had two copies of the ApoE4 allele.

292. On the morning of April 25, 2023, Biogen held a conference call with analysts to discuss its financial results for the quarter ended March 31, 2023 (the "Q1 2023 Earnings Call"), attended by Defendants Viehbacher, McDonnell, and Singhal. During her opening remarks, Singhal stated:

> I will now share highlights of additional analyses Eisai recently presented or published, consistent with both companies' commitment to transparency. . . . In addition, was also presented [sic] an updated analysis of ARIA from the CLARITY AD study to evaluate ARIA incidents in LEQEMBI-treated participants on antiplatelet or anticoagulant drugs as compared to LEQEMBI-treated participants that were not on either. ***The results*** were encouraging and ***showed that ARIA incidents were similar in the 2 groups.***

293. Later on the call, UBS Investment Bank analyst Colin Bristow whether a recent decision by the U.S. Veteran's Health Administration to exclude double ApoE4 carriers from coverage for Leqembi created a commercial "risk." Singhal responded as follows:

> I'll move to the next aspect. I think that you asked was about the ApoE4 homozygotes. So, Eisai presented some of these data at ADPD and also made comments on this topic. And ***they believe that really the data set was rather small. The number of ApoE4 homozygotes was quite small. They don't believe that the overall conclusions are different in terms of CLARITY AD and confidence in the data.***

294. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶¶ 284, 291. Indeed, Singhal failed to correct Eisa's statements, and, in fact, promoted them to investors.

295. On July 25, 2023, Biogen held a conference call with analysts to discuss its financial results for the quarter ended June 30, 2023, with Defendants Viehbacher, McDonnell,

and Singhal in attendance. In response to an analyst question about Leqembi's "overall . . . efficacy and safety profiles," Defendant Viehbacher stated:

> And then, of course, safety will be a big issue. When the most neurologists, if they've seen ARIA before, it's been pretty rare. I mean we do know that ARIA can occur even in the placebo group, but it's not something that'll have seen very often. And, so, this is going to be a different thing for them first to think about monitoring for safety with the MRIs. But it's one thing to be at a conference and look at safety from a data point of view. It's another thing I think to actually be looking at MRIs and seeing ARIA. ***And I think the safety benefit of lecanemab will be quite important to physicians as we go forward.***

296. In response to an analyst question about "the mechanism underpinning ARIA" Defendant Singhal responded as follows:

> So, overall, I think we don't fully understand the mechanism of ARIA, but the data have been replicated for Leqembi in terms of a low incidence of ARIA, in the sense that ***when you compare it with some of the other anti-amyloid/anti-beta amyloid antibodies, it is significantly lower and replicated twice***.
>
> ***So, for example, in the Clarity AD study, we had an ARIA-E rate of about 12.6%, but with donanemab, we see an ARIA-E rate of 24%, a very similar sort of proportions with ARIA-H. So, I think that it also depends on the population that has been recruited. And as Chris mentioned, these populations have been slightly different*** with MCI being -- and the early population because we really believe that patients need to be treated earlier. So that could be playing a role. . . . ***What I think we can say is that the observation that the incidence is significantly different. And therefore, I believe that the benefit risk is also different.*** And that, I think, is what doctors should be looking at.

297. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading to the extent they speak about the safety "benefit" of Leqembi relative to other AD therapies for all the reasons set forth in ¶¶ 284, 291. Indeed, by this time, Eisai acknowledged that severe ARIA in one of the patients who died after receiving Leqembi was "related" to Leqembi. To the extent these statements were not technically untrue, they gave the false impression that the risk of ARIA was lower with Leqembi than competing AD therapies for *all*

patients when, in fact, those with two ApoE4 alleles and/or on anticoagulant medication were subject to a higher risk of ARIA, including fatal ARIA, after receiving Leqembi.

298. On August 1, 2024, Biogen held a conference call with analysts to discuss its financial results for the quarter ended June 30, 2024, attended by Defendants Viehbacher, McDonnell, and Singhal. During her opening remarks, Defendant Singhal stated:

> Lastly, while we were disappointed to learn that lecanemab received a negative opinion from the CHMP, we believe that the clinical data supports a clear favorable benefit-risk profile with a meaningful clinical benefit to patients.
>
> Furthermore, ***thousands of patients have now been treated with lecanemab globally, providing further real-world evidence on the efficacy and manageable safety profile***. We are continuing to work with Eisai as they plan to request a reexamination of the EU filing as we work to enable access for people suffering from Alzheimer's globally.

299. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading to the extent they speak about the safety "benefit" of Leqembi relative to other AD therapies for all the reasons set forth in ¶¶ 284, 291. Indeed, several real-world patients not only suffered from ARIA but died after receiving Leqembi since it was approved by the FDA.

### E. Commercial Prospects for Leqembi in the U.S.

300. On July 25, 2023, Biogen held a conference call with analysts to discuss its financial results for the quarter ended June 30, 2023, with Defendants Viehbacher, McDonnell, and Singhal in attendance. In response to an analyst question about barriers to uptake of Leqembi, Defendant Viehbacher responded:

> **I will say that the whole field organization is geared up for this.** This is a much more complex field organization than what you would have with a typical launch with the care navigators, with MSLs, with field reps, with regional thought leader professionals**. So there are going to be a lot of people actually holding hands with patients, with physician practices**, trying to help make sure that this is as seamless as possible.

301. On the same call, in response to an analyst question asking about "the biggest kind of positives or negatives on the rollout so far," Defendant Viehbacher responded:

> One of the things that we have been doing is -- is really trying to figure out where are the sites that are really ready and **actually deploying our resources to those sites with** -- then a secondary type of approach to sites that aren't quite ready and **helping them.** So it all depends on really how advanced the sites are, how ready they are that it's really going to define the uptake. And that's how we have to target our resources to that and really assess the site activation, if you like.
>
> But so far, we're getting a lot of positive feedback. Physicians are getting a lot of inquiries from patients. I think they will have to figure out exactly what's the right patient for this, and that's where we have to do a lot of education. And we have these online programs and other programs to help educate physicians.
>
> There's a significant amount. . . .**But so far, everything is -- as far as we're concerned, the launch is going to plan.**

302. The statements identified in bold text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because they spoke of Biogen's preparedness to meet the aggressive 10,000 Patient Goal, without disclosing that: (i) Biogen had no infrastructure in place to effectively sell Leqembi; (ii) infrastructure such as infusion centers would flexibly adapt to demand as needed and not impede the roll-out of Leqembi; (iii) Biogen had no visibility to determine whether progress was being made on the aggressive 10,000 Patient Goal; (iv) the 10,000 Patient Goal was adopted with no basis; (v) internal projections were significantly lower than the 10,000 Patient Goal; and, thus, (vi) Biogen had no realistic ability to meet the 10,000 Patient Goal by March 2024, and indeed through the rest of the year. Defendants McDonnell and Singhal failed to correct these statements.

303. On September 11, 2023, Defendant Viehbacher attended the Morgan Stanley 21st Annual Global Healthcare Conference. In response to an analyst question, Defendant Viehbacher stated:

> There certainly seems to be demand there. I don't -- I think we're confident in the demand. I think we're confident in the fact that physicians actually want to treat these patients. The CMS has moved quickly actually. And that in some ways, it shouldn't have been but kind of caught everybody off guard because **now we can go. There's no limitation**. I mean the registry seems to be pretty easy to operate.
>
> So this is now a question of filling the pipeline and pulling the patients through. And ultimately, we will see that. And ultimately, all of these physician practices will get good at this and understand this. But it is a heavy lift at the start. And I think we'll start to see that as we get through towards the end of the year. **I think nothing that we're seeing says that the Eisai guidance can't be met, which is 10,000 patients by the end of their fiscal year, which is the end of March.**

304. In response to a follow-up question about the required infrastructure, Viehbacher stated:

> Well, **I mean the key metric really is the site activation and the site readiness.** And we've gone out to see 700 centers today going through the P&T committees. So they're getting the reimbursement and weighing through all of that. **I think the field force is just really busy on all of the logistics and getting that through.**
>
> So I think it gets more and more. **And that's why I think in some ways, having the target of 10,000 at the end of the first quarter is more of a relevant benchmark** because we know it's going to be choppy up before that and there'll be some centers that are off to the races and some that will take longer and it's kind of hard to predict, to be honest, how fast it's going to go.

305. The statements identified in bold text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because they spoke of Biogen's preparedness to meet the aggressive 10,000 Patient Goal, without disclosing that: (i) Biogen had no infrastructure in place to effectively sell Leqembi; (ii) infrastructure such as infusion centers would flexibly adapt to demand as needed and not impede the roll-out of Leqembi; (iii) Biogen had no visibility to determine whether progress was being made on the aggressive 10,000 Patient Goal; (iv) the 10,000 Patient Goal was adopted with no basis; (v) internal projections were significantly lower than the 10,000 Patient Goal; and, thus, (vi) Biogen had no realistic ability to meet the 10,000 Patient Goal by March 2024, and indeed through the rest of the year.

306. On November 8, 2023, Biogen held a conference call with analysts to discuss its financial results for the quarter September June 30, 2023, with Defendants Viehbacher, McDonnell, and Singhal in attendance. In response to an analyst question about barriers to uptake of Leqembi, Defendant Viehbacher responded:

> And in a lot of ways, we not only are pioneering science, **we're pioneering this commercial approach.** So of course, **we have an aim of getting to 10,000 patients by the end of March.** We're at 800 now.
>
> What gives us the confidence that we think we can get there? **Well, I think we have a number of green shoots here, signs of progress. The first is, as we look at our internal metrics of intent to treat and patient demand, we are seeing all of those things progress extremely nicely.**

307. The statements identified in bold text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because they spoke of Biogen's preparedness to meet the aggressive 10,000 Patient Goal, without disclosing that: (i) Biogen had no infrastructure in place to effectively sell Leqembi; (ii) the 10,000 Patient Goal was adopted with no basis; (iii) internal projections were significantly lower than the 10,000 Patient Goal; and, thus, (iv) Biogen had no realistic ability to meet the 10,000 Patient Goal by March 2024, and indeed through the rest of the year. Defendants McDonnell and Singhal failed to correct these statements.

308. On January 8, 2024, Defendant Viehbacher attended 42nd Annual Healthcare Conference. In response to an analyst question about uptake on Leqembi, Viehbacher stated:

> But of course, up until now, there hasn't really been any disease-modifying treatments for Alzheimer's patients. And most of them are actually being seen by primary care physicians. **So now there's kind of a rush.**
>
> . . .
>
> **And so what we try to do is look upstream and see what kind of indicators we have for progress. So numbers of PET scans are going up. When we talk to people who are providing the PET scans, they're seeing lots of activity. People who are providing the blood-based biomarkers and diagnostics are**

> **seeing increased activity. We're seeing a significant increase in the numbers of new patient starts on the registry.** And in terms of reimbursement, CMS said, okay, we're now changing and clarifying the reimbursement for PET scans, but that has to be pulled through by the dozen or so MACs that are out there. And they typically don't move that quickly, but they have moved faster than anybody has ever seen before.
>
> A lot of the IDNs were on formulary, and they have done out-of-cycle P&T committee meetings because they see it as an urgency. We certainly have patients waiting for treatment. So the real job is just establishing the care pathways, getting the policies in place and the blocking and tackling of being able to process the patients.
>
> **So I think we're feeling pretty good. I'm looking forward to seeing how the January sales play out. A lot of positive data in December**, but December is kind of a funny month with the holiday schedule. But I think **we're certainly seeing an awful of tremendous progress on LEQEMBI.**

309. In response to a direct follow-up question regarding the Leqembi roll-out, Viehbacher stated:

> The next thing is a lot of physicians saying, well, okay, there's -- we can't obviously expand the number of neurologists quickly. But not everything has to be done by the neurologists. And so some of them are hiring nurse practitioners to do some of the work. **We're not seeing any capacity constraints on PET scans, nor on MRIs, nor on infusion centers for the moment**. So I think that will flex.
>
> So largely, it is really around the care pathways and just establishing those. **And that increases every day, when -- the number of centers ordering from -- when we did Q3 earnings to now was up 37%, for example.**
>
> . . .
>
> There's still -- **we've probably got about a target of 10,000, and we're working our way through that.**

310. The statements identified in bold text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because they spoke of Biogen’s preparedness to meet the aggressive 10,000 Patient Goal, without disclosing that: (i) Biogen had no infrastructure in place to effectively sell Leqembi; (ii) infrastructure such as infusion centers would flexibly adapt to demand as needed and not impede

the roll-out of Leqembi; (iii) Biogen had no visibility to determine whether progress was being made on the aggressive 10,000 Patient Goal; (iv) the 10,000 Patient Goal was adopted with no basis; (v) internal projections were significantly lower than the 10,000 Patient Goal; and, thus, (vi) Biogen had no realistic ability to meet the 10,000 Patient Goal by March 2024, and indeed through the rest of the year. Defendants McDonnell and Singhal failed to correct these statements.

311. On January 31, 2024, Biogen published a press release titled "Biogen to Realign Resources for Alzheimer's Disease Franchise." The press release stated: "**A large portion of the resources released resulting from termination of the ADUHELM program will be redeployed in Biogen's AD franchise**."

312. The statements identified in bold text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because they spoke of Biogen's preparedness to meet the aggressive 10,000 Patient Goal, without disclosing that: (i) Biogen had no infrastructure in place to effectively sell Leqembi; (ii) Biogen could not benefit from infrastructure implemented during the Aduhelm roll-out; and, thus, (iii) Biogen had no realistic ability to meet the 10,000 Patient Goal by March 2024, and indeed through the rest of the year.

313. On February 13, 2024, Biogen held a conference call with analysts to discuss its financial results for the quarter and year ended December 31, 2024, with Defendants Viehbacher, McDonnell, and Singhal in attendance. Despite disclosures showing that Biogen would miss the 10,000 Patient Goal, Defendants continued misrepresenting the ability of Biogen to understand and meet Leqembi demand.

314. In opening remarks, Defendant Viehbacher stated, "**Now as we look at what does drive growth, clearly, we have LEQEMBI. And I'll remind everybody that, again, we are not just pioneering in science but pioneering in commercial.**"

315. Also in the opening remarks, Defendant Viehbacher stated:

> So we've got approximately 2,000 patients on therapy at the moment.
>
> Now we don't have as companies direct access to the patient registries. You all know about the CMS registry. But there are a few other registries out there like Altinet, for example. And we have seen some analysts have been able to access that data. **There was one analyst report of 3,300 patients on the registry, latest information that we have, and again, this is not perfect information, but we have an indication that there are about 3,800 patients as of last week on the registry.**
>
> When you look at that, that suggests we're getting about 260, 265 patients per week in the month of January. And as far as we can tell, that's about a 56% increase over what we were seeing in December. So we are clearly seeing that there is demand for the product. We're clearly seeing that IDNs are moving to put in place the care pathways and the treatment protocols to improve access. 70 out of the top 100 IDNs have had positive P&T committee decisions. 80% of those have now actually ordered LEQEMBI.
>
> But if we talk to the people who are doing the PET scans, the MRIs, the people who sell the blood diagnostics, everybody is reporting increased activity and volume. And so -- and as you saw with Eisai's results, their belief is that for all the patients on treatment, **they [sic] are at least three or fourfold of those who are actually in waiting rooms. So we do believe we're making a very solid progress. And we believe that we have validated the go-to-market model.**

316. The statements identified in bold text in the preceding paragraphs were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because they spoke of Biogen's preparedness to meet the aggressive 10,000 Patient Goal, without disclosing that: (i) Biogen had no infrastructure in place to effectively sell Leqembi; (ii) infrastructure such as infusion centers would flexibly adapt to demand as needed and not impede the roll-out of Leqembi; (iii) Biogen had no visibility to determine whether progress was being made on the aggressive 10,000 Patient Goal; and, thus, (vii) Biogen had no realistic ability to

meet the 10,000 Patient Goal through the rest of the year. Defendants Viehbacher, McDonnell, and Singhal failed to correct these statements.

## X. THE TRUTH EMERGES IN A SERIES OF PARTIAL DISCLOSURES

317. As detailed more fully below, investors learned through a series of partial disclosures that Biogen conspired with PBMs to suppress competition from generic versions of Tecfidera and that Leqembi would not be the blockbuster drug Biogen needed to stem the losses caused by its cratering MS franchise. Each of these disclosures revealed, for the first time, new facts about Biogen's business practices and Leqembi's commercial viability. Investors had been in the dark about these facts and, thus, as the news was released and investors were able to consider the ramifications for Biogen, the price of Biogen's stock dropped.

### A. June 7, 2022

318. On the afternoon of June 7, 2022, the FTC announced that that it opened an inquiry into PBM business practices under Section 6(b) of the FTC Act, including "the impact of rebates and fees from drug manufacturers on formulary design," further to which it had issued compulsory orders to the largest six PBMs in the United States for documents and information, a model copy of which was attached to the release. The model order sought an extensive array of documents from each PBM, including a documents relating to formulary design for "Rebated Drug Products," defined to include "dimethyl fumarate (Tecfidera)."

319. Biogen investors did not immediately react to this news because it was not released by Biogen, did not refer to Biogen or any of its products in the body of the release, and the reference to Tecfidera was buried in dense text of an accompanying document demand. However, after the market had an opportunity to review the text of the accompanying order and connect it to Biogen, they did. Between the close of trading on June 8, 2022, and the close of trading on June 13, 2022, Biogen's stock slid from $206.73 to $192.16, a drop of more than 7%.

### B. June 16, 2022

320. As noted earlier (¶ 139), on June 16, 2022, the FTC held a public hearing during which its Commissioners unanimously voted to adopt a Policy Statement on exclusionary rebates in which it said such practices by PBMs may constitute violations of Section 1 of the Sherman Act, Section 2 of the Sherman Act, Section 3 of the Clayton Act, Section 2(c) of the Robinson-Patman Act, and Section 5 of the FTC Act. Before market close, the FTC issued a press release in which it announced that it will "ramp up enforcement against any illegal bribes and rebate schemes that block patients' access to competing lower-cost drugs" and appended a copy of the Policy Statement. FTC Chair Lina Khan was quoted in the release as stating that "[t]oday's action should put the entire prescription drug industry on notice." An accompanying statement by Commissioner Alvaro Bedoya, which was read aloud during the meeting, made clear that "[t]oday's statement may appear to focus on pharmacy middlemen—PBMs—but the statement very much focuses on PBMs *and manufacturers*."

321. On this news, Biogen's stock tumbled from $197.26 at the close of trading on June 15, 2022, to close at $191.53 on June 16, 2022, damaging investors.

### C. January 8, 2024

322. On January 8, 2024, Defendant Viehbacher attended the J.P. Morgan Conference. Defendant Viehbacher discussed challenges associated with the launch of Leqembi and walked back prior expectations of having 10,000 patients on the drug by the end of March 2024, stating, in relevant part:

> Remember, the 10,000 was really designed to try to give people some sort of milestone, because there are no real analogues for this launch. I haven't found a decent analog anywhere. So, what I think we were trying to say is, this isn't going to be 100,000 patients, but it is not going to be 1,000 either. So that is a trajectory. And I think, where we are right now, there is nothing that we are going to do that's going to change us on the trajectory. We will get there. We don't get there—I think, everything we are seeing, there is no reason to say, that,

> we can't get there. But again, the data were kind of choppy in December. So, for me, I am really looking for the January data. But where we are right now is, 10,000 isn't really what we are interested anymore. It's how do we now get to the 100,000?

323. As the market and investors digested this news, Biogen's stock price fell $10.77 per share, or 4.17%, over three consecutive trading days to close at $247.21 per share on January 11, 2024.

**D. February 13, 2024**

324. On February 6, 2024, during a call with analysts to discuss Eisai's financial results for the fiscal quarter ended December 31, 2023, Eisai's Global Alzheimer's Disease Officer, Keisuke Naito, admitted that meeting the goal of 10,000 patients by the end of March 2024 would be "challenging." Analyst on the calls asked *four times* for clarification but Eisai refused to give an updated timeline. Instead, Eisai executives attempted to mask the disappointing disclosure with other positive statements. For example, Tatsuyuki Yasuno said "I don't think there will be much delay from that plan," and that "the patient number has increased by a few hundred so the steepness of [the trend] line will become even steeper." Keisuke Naito also stated that "we know that there are approximately 4x greater number of patients on the waiting list than the current number of patients receiving the treatment," which Mr. Yasuno later confirmed meant 8,000 patients. Given the conflicting information, analysts covering Biogen noted that, with respect to the impact on Biogen, more substantial information would be provided by the Company in its upcoming fourth quarter earnings call. For example, an analyst report from Goldman Sachs on February 6, 2024, noted "we look for additional color from BIIB on its 4Q EPS (Feb. 13)." Similarly, another analyst report from Barclays that same day noted that they would "look for more color on the BIIB earnings call."

325. During pre-market hours on February 13, 2024, Biogen issued a press release announcing its financial results for the quarter and year ended December 31, 2023 (the "Q4 2023 Press Release"), in which it reported that the Company generated only $2.4 billion in revenue during the quarter, a 6% decline from the previous year, and expected revenue in 2024 to decline by a "low- to mid-single digit percentage vs. 2023." On the ensuing call to discuss the results later that morning (the "Q4 2023 Earnings Call"), Defendant Viehbacher reported that there were only 2,000 patients on Leqembi, and another 3,800 on a patient registry—significantly less than the 8,000 patients on the "waiting list" touted by Eisai. Defendant Viebacher also admitted that there still remained substantial "bottlenecks" that limited patient access:

> The bottlenecks, I still—if you think about it, if the data from the patient registries are accurate, and again, we don't have direct access to that, but it suggests that we've got almost twice as many people on the registry as we do on treatment. And, so, that says that, in addition to the bottleneck of getting into the neurologist, that there's—when you get to the registry, you've got a clear intent to prescribe, because on the registry, at least for CMS, you have to describe how you actually validated the diagnosis. So, by then, you've triaged the patient, you've done either the PET scan or the CSF markers, and you're looking for reimbursement. And what we're hearing a little bit is, is that there is some challenge in just scheduling the first MRI, because when we initiate the infusion, you have to have the first MRI within the first two weeks. So people don't want to initiate the infusion until they've got that MRI scheduled. And the MRI—there isn't an MRI capacity constraint per se, but you are looking for a specific date, and then you have to back up the infusion. So there's just, I think, until people get the hang of this, getting all that coordination, I think that seems to be where the—where one of the bottlenecks is.

326. Following the Q4 2023 Press Release and Q4 2023 Earnings Call, multiple analysts downgraded or else cut their price target on Biogen's stock due to the gloomy outlook for Leqembi. As reported by *Bloomberg*, ***fourteen*** analysts cut their price targets on Biogen stock by an average of 5.7%. Notably, CFRA reduced Biogen's price target by $67, from $305 to $238, noting "we were underwhelmed by the flat core pharmaceutical revenue growth guidance (product revenue and Leqembi.)." Wells Fargo also downgraded Biogen from

Overweight to Equal Weight" because "Leqembi uptake is still slow," noting "there is too much uncertainty." As William Blair analyst Myles Minter put it, "the debate is all about: is Leqembi that massive $6 billion plus product, or is it something that's going to remain niche?"

327. On this news, Biogen stock fell by $18.09, or 7.39%, on high volume, trading from $244.74 at the close of trading on February 12, 2024, to close at $226.65 on February 13, 2024, damaging investors. Analysts and news organizations linked the stock decline to Leqembi's poor progress. For example, an article published by *Bloomberg* on February 13, 2024, stated that "Biongen Inc. fell the most in two years as its latest foray into [AD] got off to a slow start, suggesting a long road to growth." Also on February 13, 2024, MarketWatch wrote, describing Biogen's "slow launch of Alzheimer's treatment," "Biogen on Tuesday reported fourth-quarter results that fell short of Wall Street expectations as uptake of its newer drugs failed to offset declining multiple-sclerosis product sales." On the same day, Bank of America wrote in an analyst report that "BIIB shares are under pressure today . . . on underwhelming 2024 guidance and weaker 4Q performance from . . . Leqembi," and that "[w]hile there are a few bright spots, . . . sentiment is more anchored on Leqembi."

**E. July 23, 2024**

328. On the morning of July 23, 2024, the House Committee on Oversight and Accountability Chairman, James Comer, released a report "The Role of Pharmacy Benefit Managers in Prescription Drug Markets" based on an extensive probe into PBM contracting practices ahead of a hearing with PBM executives scheduled for later that morning. The Chairman released a statement with the report which indicated that these entities engaged in "anticompetitive pricing tactics" and "colluded to line their own pockets." The report stated that "evidence suggests that decisions were often made based on the economics of a medication,

rather than its benefit to patients or affordability" and cited as support "Express Scripts First Production" from April 6, 2023, which included documents addressing "Tecfidera."

329. On this news, Biogen's stock price slid from $226.63 at the close of trading on July 22, 2024, to close at $224.29 on July 23, 2024.

**F. July 26, 2024**

330. Despite Leqembi's setbacks in the United States, investors had no reason to doubt that it would be approved in the European Union. Indeed, one analyst from RBC Capital put out a report on July 11, 2024, estimating that EMA approval was "90% likely" given that there had been no negative disclosure by Biogen or Eisai following the CHMP's "Oral Explanation" set for June 25, 2024. As the note explained, "drugmakers usually disclose negative trend votes shortly after meetings" and "Biogen and Eisai had previously disclosed a negative trend vote for Aduhelm within eight days." Accordingly, it continued, "we believe it is increasingly likely that the vote trended positively and that Leqembi will be recommended for approval in Europe."

331. However, on July 26, 2024, the EMA released meeting highlights from meetings of the CHMP held earlier that week, including a recommendation to deny the MAA for Leqembi. The EMA also posted a question-and-answer document titled "Refusal of the market authorization for Leqembi (lecanemab)." Under the question "What were the main reasons for refusing the marketing authorization?" the article stated, in pertinent part:

> The main study showed that after 18 months of treatment, the CDR-SB score in patients treated with Leqembi increased by 1.21 compared with 1.66 in those who received placebo. Although patients given Leqembi had lower CDR-SB scores than those given placebo, the difference between the two groups was small. EMA's human medicines committee, the CHMP, considered that ***the observed effect of Leqembi on delaying cognitive decline does not counterbalance the risk of serious adverse events associated with the medicine.***
>
> ***The most important safety concern with Leqembi is the frequent occurrence of amyloid-related imaging abnormalities (ARIA), a side effect,*** seen in brain imaging, that involves swelling and potential bleedings in the brain. Although

> most cases of ARIA in the main study were not serious and did not involve symptoms, some patients had serious events, including large bleeds in the brain which required hospitalisation. The seriousness of this side effect should be considered in the context of the small effect seen with the medicine.
>
> ***In addition, the CHMP was concerned by the fact that the risk of ARIA is more pronounced in people who have a certain form of the gene for the protein apolipoprotein E called ApoE4. The risk is highest in people with 2 copies of the ApoE4 gene, who are known to be at risk of developing Alzheimer's disease and would therefore be likely to become eligible for treatment with Leqembi.***
>
> In reaching its opinion, the CHMP also considered the views of a scientific advisory group on neurology, which included experts such as neurologists and people living with the disease.

332. Analysts promptly changed their forecasts for Leqembi based on the news. For example, on July 26, 2024, Wells Fargo published an analyst note stating that the decision is "a major setback," and that significant delays could depress share value by $5 per share. The report also noted that the decision was "a worrying indicator that the physician community may not view benefits of Leqembi as large enough to prescribe to broad patient base." That same day, William Blair & Company published an analyst report which stated that "this does put our $1.33 billion EU peak sales in 2035 assumptions for Leqembi at risk." Jeffries also published a report highlighting that only 39-40% of negative opinions are fully reversed after a request for reconsideration, and concluding that any such request "could result in a narrow label." Likewise, RBC Capital observed that Biogen could increase the chance of success by "narrowing the proposed indication" to exclude patients with two copies of ApoE4, which "represents 15-17% of [patients]." Thus, the decision signaled to the market that, at best, the patient population would likely be narrower than initially proposed, and exclude those at high risk for AD.

333. On this news, the price of Biogen's stock declined by $16.27, or 7.15%, to close at $211.17 on July 26, 2024, damaging investors. Analysts and news organizations linked the stock decline to the EMA's decision. For example, on July 26, 2024, MarketWatch published an

article noting that the stock "fell more than 6% premarket on Friday after European regulators gave a thumbs down to the company's Alzheimer's treatment." Early on the same day, MT Newswires issued a report with the headline "Biogen Shares Down Pre-Bell After European Committee Adopts Negative Opinion on Alzheimer's Treatment." Likewise, Investor's Business Daily covered the news under the headline, "Biogen Stock Tumbles After European Regulators Unexpectedly Reject Alzheimer's Drug."

**G. September 20, 2024**

334. As noted above (¶ 140), mid-day on September 20, 2024, the FTC announced that it filed an administrative complaint against the three largest PBMs, CVS Caremark, Express Scripts, and Optum Rx, and their GPOs, for systemically excluding lower-cost versions of insulin from their formularies in favor of higher list price insulin products in violation of Section 5(b) of the FTC Act (the "PBM Complaint"). The FTC has authority to issue an administrative complaint when it has "reason to believe" that the antitrust laws are being violated. The release specifically stated that it was "deeply troubled" by the role of the drug manufacturers in this case and warned that "all drug manufacturers should be on notice that their participation in the type of conduct challenged here raises serious concerns, ana that the Bureau of Competition may recommend suit drug manufacturers in any future enforcement actions," consistent with an accompanying statement issued by FTC Bureau of Competition Deputy Director Rahul Rao.

335. On this news, Biogen's stock price sank from $201.44 at the close of trading on September 19, 2024, to close at $199.36 on September 20, 2024.

**H. September 23, 2024**

336. By no later than Monday, September 23, 2024, the FTC released a public version of the PBM Complaint on its website. In the PBM Complaint, the FTC alleged that "Respondents' demand for larger rebates has also inflated list prices for other critical drugs

including treatments for autoimmune diseases and inflammatory conditions." Multiple sclerosis, the disease that Tecfidera treats, is both an autoimmune and inflammatory condition.

337. On this news, Biogen's dropped from $199.36 on September 20, 2024, to close at $195.81 on September 23, 2024, and continued to tumble until reaching $189.07 as of the close of trading on September 25, 2024.

### I. October 16, 2024

338. Before the market opened on October 16, 2024, Australia's new drug regulator, the Therapeutic Goods Administration ("TGA"), announced that it decided to deny the application to approve Leqembi in Australia for reasons similar to the EMA. Under the heading "What were the main reasons for the decision to refuse registration?" the TGA wrote:

> The TGA delegate decided not to register LEQEMBI on the basis that the demonstrated efficacy did not outweigh the safety risks associated with the use of this medicine.
>
> In particular, clinical study data demonstrated that patients treated with LEQEMBI experienced a reduction in disease progression compared to those given a placebo, however ***this difference was not deemed significant enough*** to provide a meaningful clinical benefit or ***to outweigh the associated safety risks***. ***In particular, the TGA delegate considered the frequent occurrence of amyloid-related imaging abnormalities (ARIA) in patients treated with LEQEMBI.***
>
> This decision was supported by independent expert advice from the TGA's Advisory Committee on Medicines (ACM).

Industry observers took notice of the new market access setback. For example, on October 17, 2024, industry publication *PharmaPhorum* reported that "Australia joins EU in turning down Alzheimer's drug Leqembi . . . saying its efficacy does not outweigh the risks."

339. On this news, the price of Biogen stock declined by $2.72 to close at $189.28 at the close of trading on October 16, 2024.

**J. October 23, 2024**

340. On October 23, 2024, *The New York Times* published an exposé titled "What Drugmakers Did Not Tell Volunteers in Alzheimer's Trials," which reported that Eisai never informed patients who had the ApoE4 gene that they were at higher risk for developing ARIA even though it tested them for it upon enrolling in the Clarity Phase 3 Study. The story provided lurid details about the death of Patient 3 and Patient 2 and also revealed that others have died from severe ARIA shortly after taking Leqembi since it has entered the stream of commerce, including a 74 year-old retiree with two copies of the ApoE4 gene who was found on her couch unconscious and drooling after a recent treatment course. An MRI showed that she had seven microhemorrhages. The story also revealed that several participants in the Clarity Phase 3 study *dropped out* because of severe ARIA soon after receiving Leqembi, which Eisai confirmed were "related" to Leqembi, according to adverse event reports reviewed by *The Times*. Industry publication *Fierce Biotech* aptly called the story a "new bombshell" in the "scandal-plagued world of Alzheimer's disease drug development."

341. On this news, Biogen's stock sank from $185.90 at the close of trading the day prior to $182.98, damaging investors.

**K. November 8, 2024**

342. On November 8, 2024, Eisai released financial results for its fiscal quarter ended September 30, 2024, in which it revised the forecast for Leqembi. The accompanying presentation reported that Leqembi's full-year revenue forecast is now expected to be $280 million for fiscal 2024, down from previous guidance of approximately $370 million, a revision of nearly 25%. The report also updated on the number of patients in the US undergoing treatment: only 4,000 patients had been dosed, with another 6,000 eligible to start treatment. During a conference call announcing the results, JPMorgan analyst Seiji Wakao confronted Eisai

CEO Haruo Naito about the reduced outlook for Leqembi, asking for clarification about future revenues. In response, Haruo advised that it was not expected to be profitable until 2026:

> Globally, Leqembi will start to contribute to profitability from fiscal 2026 . . . and the U.S. will be turning profitable in fiscal 2025. But, unfortunately, there is not a certainty. There has been a delay, as I described. So, in the U.S., we believe that will be turning into profitability in fiscal 26. . . . And, in the U.S., unfortunately, one year later, but profitability should be improving. And, in fiscal '26, we expect to turn profitable.

343. Industry publications and analysts covering Biogen quickly took note. On November 8, 2024, industry publication *Biospace* headlined an article covering the results, "Eisai Cuts Fiscal 2024 Guidance for Biogen-Partnered Leqembi as Sales Disappoint Analysts." In the article, it noted that "[t]he downward adjustment to Leqembi's sales forecast . . . comes as the antibody continues to struggle," and quoted Truist Securities analyst Srikipa Devarakonda saying the "is still 'underwheming' overall." On the same day, Stifel wrote in an analyst report, "[i]nvestors have grown impatient and skeptical, in light of how long it's been taking for the launch of the first ever disease modifying AD drug to really take off."

344. Also on November 8, 2024, Wells Fargo analyst Mohit Bansal published an analyst note that included primary research on monthly prescription numbers for Leqembi, concluding "October scripts point to recent slowdown." The report indicated that prescriptions "only grew by 6% which is down from 13% in Sept *and* average of 11% in 3Q." Based on this, Wells Fargo concluded that "sales would miss slightly in 4Q ($50M vs. $52M) despite cons[ensus sales] having come down again after 3Q earnings (from $57M)." This report was the first analysis showing that Leqembi sales would not continue accelerating over time, as Defendants insisted, much less grow into a blockbuster to replace Tecfidera.

345. On the news of the reduced forecast and slowing sales, Biogen shares began a multi-day slide, closing lower every trading day between November 8, 2024, and November 13,

2024, crashing from $173.92 on the close of trading on November 7, 2024, to settle at $165.79 on November 13, 2024, damaging investors.

**L. November 14, 2024**

346. Mid-day on November 14, 2024, the EMA announced that, on re-examination, opinion, the CHMP recommended granting the MAA for Leqembi in narrower patient population consisting of "patients who have only one or no copy of *ApoE4*" because those patients "are less likely to experience amyloid-related imaging abnormalities (ARIA) than people with two [APOE] copies" based on a subgroup analysis provided by Eisai. But the EMA also warned that "Leqembi must not be used by people receiving anticoagulant treatment as this could increase the risk of developing ARIA-H and bleedings in the brain." That sam day, the FDA revised the label for Leqembi to limit the population to only those with one or no copy of ApoE4, mirroring the limitations adopted by the EMA. First, the new label added the prominent warning: "**ARIA can be fatal.**" In the section describing risks to patients on blood thinners, the label added the following language:

> **Fatal cerebral hemorrhage has occurred in a patient taking an anti-amyloid monoclonal antibody in the setting of focal neurologic symptoms of ARIA and the use of a thrombolytic agent.** Additional caution should be exercised when considering the administration of antithrombotics or a thrombolytic agent (e.g., tissue plasminogen activator) to a patient already being treated with LEQEMBI. Because ARIA-E can cause focal neurologic deficits that can mimic an ischemic stroke, treating clinicians should consider whether such symptoms could be due to ARIA-E before giving thrombolytic therapy in a patient being treated with LEQEMBI. Caution should be exercised when considering the use of LEQEMBI in patients with factors that indicate an increased risk for intracerebral hemorrhage and in particular for patients who need to be on anticoagulant therapy, or patients with findings on MRI that are suggestive of cerebral amyloid angiopathy.

These details, clearly describing the death of Patient 2 and linking it to Leqembi, demonstrated that the FDA took individual reports of death seriously in determining safety recommendations.

347. Although the EMA granted a more limited form of approval in lockstep with the FDA, analysts noted that the restrictions imposed seriously hindered Leqembi's commercial prospects in the United States and the EU. For example, Jeffries analyst Michael Yee observed on November 14, 2024, that only approximately 60% the AD population in the EU fit the genetic profile outlined in the EMA's revised decision. That same day, Raymond James Research published a report in which it highlighted that, because of the "more restrictive" label, "we believe uptake in general will be more modest that what we've seen in the U.S." so far. Then, on Monday, November 18, 2024, Needham analyst downgraded Biogen from BUY to HOLD in a note which said it did not see a "meaningful source of upside" until at least 2026.

348. In addition, introducing additional safety warnings in patients on blood thinners risked a significant population of patients: a peer-reviewed article published in BMC Geriatrics estimated that oral blood-thinners were used by an estimated 20-23% of AD patients at the time of their diagnosis, which did not capture blood-thinners administered in other ways.

349. On this news, Biogen shares suffered another multi-day slide, closing lower every trading day between November 14, 2024, and November 19, 2024, dropping from $165.61 on November 13, 2024, to $155.43 as of November 19, 2024, damaging investors.

## XI. <u>ADDITIONAL FACTS PROBATIVE OF SCIENTER</u>

350. As detailed more fully above, the Individual Defendants received information reflecting the true facts regarding Biogen and its operations and business practices and had control over and/or received the Company's materially misleading statements before they were issued to the investing public. Accordingly, the Individual Defendants acted with scienter because at the time they issued public documents and other statements in Biogen's name, they knew, or were severely reckless in not knowing, that such statements were materially false and misleading.

351. Indeed, the ongoing fraud described herein could not have been perpetrated without the knowledge and/or severe recklessness and complicity of personnel at the highest level of Biogen, including the Individual Defendants. The Individual Defendants knew such statements would be disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly or recklessly participated in the dissemination of such statements and documents to the investing public. Thus, the Individual Defendants were active and culpable participants in the fraudulent schemes alleged herein.

352. These facts, in conjunction with the additional indicia of scienter alleged below, collectively support a strong inference that, throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded, that their statements were materially false and misleading.

### A. Vounatsos Was Made Aware of How PBMs Used Their Drug Formularies to Impair Competition Through His Participation in the PhRMA Trade Group

353. Founded in 1958, Pharmaceutical Research and Manufacturers of American ("PhRMA") is the preeminent trade group that represents biopharmaceutical research companies in the United States. Its member companies include all major biopharmaceutical firms, including Biogen. PhRMA engages in advocacy on behalf of its member companies. Among other things, PhRMA has lobbied fiercely against measures to limit or decrease drug prices.

354. At all times from December 2017 to November 2022, PhRMA stated that its executive team "works closely with the board of directors to advance policies that ensure continued investment in biopharmaceutical innovation." PhRMA's board of directors consists of "senior leaders" from its member companies, including many of their CEOs. From the time he was appointed to his role as CEO of Biogen in December 2016 until his departure in November 2022, Defendant Michel Vounatsos sat on PhRMA's board of directors.

355. In August 2017, the Committee on Oversight and Government Reform of the U.S. House of Representatives launched an in-depth investigation into why the price of drugs to treat MS has dramatically increased in recent years. The Committee sent letters requesting information to seven pharmaceutical companies that manufacture MS drugs, including a letter to Biogen that was addressed to Defendant Michel Vounatsos. The letter observed that "your company's MS drugs have seen at least double-digit percent price increases since they were approved, and one drug has increased in price by nearly 1,000%" and sought a variety of documents on the pricing of Biogen's MS drugs. The Committee sent similar letters to Bayer Healthcare Pharmaceuticals Inc., EMD Serono, Novartis Pharmaceuticals Corporation, Sanofi Genzyme, and Teva Pharmaceutical Industries, all of whom were either members of, or owned by a parent company that was a member of, PhRMA.

356. In direct response to the Congressional investigation described in the previous paragraph, PhRMA released a report in November 2017 titled *Follow the Dollar*, which shifted blame for the dramatic increase in the price of prescription drugs in the United States to other parties in the distribution and payments system, including PBMs. Indeed, the report began by stating observing that "increased media and policymaker focus on the price of medicines has led to anger and frustration" and suggested that "[a] better understanding of the players involved in the pharmaceutical supply chain, and the role each plays in determining what patients ultimately pay for their prescribed medicines, can help consumers and policymakers find answers." In the report, PhRMA revealed that the use of private-negotiated post-sale rebates on brand medicines has increased dramatically in recent years among PBMs and asserted that the fees they collect for doing so "creates incentives for PBMs to prefer medicines with higher list prices and higher rebates" rather than medicines with "the lowest possible costs and best outcomes for patients."

### B. Vounatsos' Public Commentary Confirms He Stayed Informed on PBM Contracting for Biogen's MS Products, Including Tecfidera

357. Defendant Vounatsos spoke publicly, confirming that he stayed informed on PBM contracting for Biogne's MS products, including Tecfidera.

358. In response to a question about the pricing of MS drugs on his very first call after being appointed CEO in December 2016, Vounatsos volunteered that "we are confident in terms of access and our contracting with the PBMs." On another call in March 2017, Vounatsos responded to a question about generic versions of competing MS products by observing that "PBMs may try to use that as an opportunity" but added "all actors are watching that very, very carefully."

359. Biogen hosted a call to discuss its operating results for the second quarter of 2017 on July 25, 2017, soon after Vounatsos began in his role as CEO. On the call, Vounatsos volunteered that Biogen had entered into four "value-based" contracts with payers in July for its MS products that "expand formulary access for patients."

360. Biogen hosted a call to discuss its operating results for the third quarter of 2017 on October 24, 2017. On the call, Vounatsos reported that "[w]e have also improved our overall position on U.S. formularies," adding that "just last month, Aetna placed Tecfidera . . . on their preferred list." Later on the call, in response to a question from an analyst on the size of rebates for Biogen's MS products now that the contracting negotiations concluded, Vounatsos stated that "the net impact is similar to prior years and the typical contracting arrangement."

361. On May 30, 2018, Vounatsos spoke at the Bernstein Strategic Decisions Conference, hosted by Bernstein analyst Aaron Gal. During the call, Gal asked about dynamics with payers in the "early contracting cycle" for 2019. Vounatsos responded that there was "continuity on the way PBMs are engaging in 2019" versus 2018, and noted that "we have

launched some value-based contracts in the U.S. with small regional payers, medium-size payers and large national [payers].”

362. On June 12, 2018, Biogen hosted its annual shareholder meeting. Commenting more on the “value-based” contracts referenced in ¶ 360, Vounatsos observed that “we have 5 or 6 pilots in the U.S. within the MS field . . . . We locked the door with the team. We worked very hard. And the PBMs were very positive on this engagement.”

363. On January 13, 2020, Vounatsos spoke at the JPMorgan Healthcare Conference, hosted by analyst Cory Kasimov. Asked about recent proposals by the U.S. government to restrict the pricing of prescription medications, Vounatsos commented that “it’s a very complex situation” because “the industry is giving out tremendous rebates that do not fall to the patient’s benefit but toward other places.”

364. On July 22, 2020, Biogen hosted a call to discuss its operating results for the second quarter of 2020 on July 22, 2020, less than a month after it lost the case infringement suit over the patent for Tecfidera. On the call, Vounatsos stated as follows: “Since the focus now is on Vumerity, not on the fumarates [Tecfidera], I can tell you that all levers are aligned, at the payer level, at the patient services level, at the sales force level—including incentive schemes to shape their behavior—[and] at the medical affairs level.”

365. At a conference hosted by Morgan Stanley on September 9, 2021, Vounatsos was asked about the status of an appeal over the Tecfidera patent. Commenting on the effect of a positive decision, Vounatsos stated “we need to see the implications in terms of the PBMs and other partners.”

### C. Defendants Were Aware That Biogen Was Subject to Several Investigations by the DOJ for Paying Illegal Kickbacks to Favor Its MS Drugs

366. In July 2015, a qui tam "whistleblower" action filed against Biogen by former sales representative Michael Bawduniak was unsealed in the United District Court for the District of Massachusetts. In his amended complaint, Bawduniak alleged that Biogen paid illegal kickbacks to physicians to prescribe its MS products, including Tecfidera, over competing products in violation of the False Claims Act and state law counterparts and sought single and treble damages, civil penalties, and various costs. By mid-2020, the United States Department of Justice ("DOJ") had not formally intervened in the suit. At the same time, it had not waived its right to intervene either. In fact, the DOJ filed a notice in July 2015 expressly stating that it had not yet reached a decision because its investigation into the allegations remained *ongoing*.

367. In March 2017, another whistleblower suit was brought against Biogen by relator Paul Nee, which alleged that Biogen paid illegal kickbacks to cover the copay of Medicare patients taking its MS drugs in violation of the False Claims Act.

368. Defendants Vounatsos and McDonnell were fully aware of the *Bawduniak* action, which remained pending as of mid-2020. Indeed, both signed SEC filings, or certification attached thereto verifying they "reviewed" the accompanying SEC filing, which expressly identified the qui tam action and stated that "[t]he U.S. has not made an intervention decision," including the Q3 2020 Form 10-Q and the 2020 Form 10-K.

369. On December 17, 2020, the DOJ formally intervened in the *Nee* action to notify the Court that it struck with it a deal to settle the case for $22 million. It therefore had not waived its right to intervene and was in discussions with Biogen prior to December 17, 2020, regarding the case.

370. On July 20, 2022, on the eve of trial, Biogen announced that it reached an agreement to settle the *Bawduniak* action for $900 million, the largest recovery secured by a whistleblower without intervention by the United States government. The amount was so material for Biogen that it was forced to disclose the amount in its SEC filings and address it on calls with analysts and investors.

### D. Eisai Has Admitted That It Promptly Receives and Reviews Information Associated with Fatal Adverse Events In Its Clinical Trial Subject

371. Eisai has admitted that it promptly receives and reviews all medical information associated with any fatal adverse events in clinical trial subjects—and did so shortly after the deaths of Patient 2 and Patient 3 were published in scientific journals. In a press release issued by Eisai ***about Leqembi*** on January 6, 2023, the day it received initial approval from the FDA, Eisai made the following representations:

> Eisai has an experienced team responsible for collecting and analyzing adverse events (including any fatalities) possibly related to its investigational drugs or commercially available medicines. These adverse events and other safety information from any source undergo continuous review to fully inform our knowledge of the safety profile of Eisai's products. This information is provided to the FDA and other regulatory authorities consistent with their requirements and guidelines. Eisai promptly communicates important safety information to regulatory agencies, clinical trial sites, clinical trial investigators and patients through the established notification methods, including clinical trial site communications, Independent Review Board (IRB) communications and patient Informed Consent Forms (ICF) as required by the various health authorities.

372. Biogen was on notice that Eisai received and reviewed the information described in the previous paragraph as a matter of standard practice no later January 6, 2023, if not much earlier, because it issued a press release on January 6, 2023 titled "A statement from Biogen on LEQEMBI™ pricing," in which it provided a hyperlink to the Eisai press release containing the statements quoted in the preceding paragraph and directed investors to it for further information.

**E. Biogen Was on Constructive Notice That Members of the Scientific Community Concluded That Three Patients Had Died From Leqembi**

373. In the same Eisai press release from January 6, 2023, described above (¶ 371), Esai provided a hyperlink to a "statement" that it made on December 23, 2022, about recent reports of a patient death. That statement, in turn, began by stating that "[o]n December 21, SCIENCEINSIDER published an article on the safety of lecanemab, 'Scientists tie third clinical trial death to experimental Alzheimer's drug" but declined to provide any details on the case by claiming that "outside of scientific papers in peer-reviewed journals or scientific conferences, it would be inappropriate to provide additional information about specific patients."

374. Biogen was therefore on notice that members of the scientific community had concluded that at least three patient deaths were associated with the use of Leqembi because, as noted above (¶ 372), Biogen incorporated Eisai's January 6, 2023 press release in one of its own press releases by reference and, indeed, by hyperlink.

**F. Eisai and Biogen Regularly Shared Important Information About Leqembi With Each Other Under a Joint Collaboration Agreement**

375. As noted above (¶¶ 77, 79), Biogen and Eisai entered into a Collaboration Agreement on March 4, 2014, to jointly develop and commercialize two product candidates under development by Eisai for the treatment of AD, including the monoclonal antibody used in Leqembi, then known as BAN2401. Biogen and Eisai subsequently amended and restated the Collaboration Agreement on October 22, 2017 (the "Restated Collaboration Agreement"). The Restated Collaboration Agreement was signed by Defendant Michel Vounatsos, in his capacity as CEO of Biogen, and Haruo Natio, CEO of Eisai. The terms of the Restated Collaboration Agreement and public comments by senior officers of Biogen demonstrate that they were kept fully informed about the progress of Leqembi's development.

376. The Restated Collaboration Agreement governed the roles, rights, and responsibilities of Biogen and Eisai with respect to the "Development" and "Commercialization" of BAN2401. Development was defined to refer to a range of pre-Commercialization activities, including all clinical trials and regulatory filings. Commercialization was defined to refer to a range of activities relating to the sale of BAN2401 after regulatory approval, including activities required to prepare for the potential sale of BAN2401 and pre-launch activities to prepare a market for the potential sale of BAN2401. Importantly, Biogen and Eisai shared the costs and profits associated with the Development and Commercialization of BAN2401 equally.

377. In terms of governance, the Restated Collaboration Agreement granted Eisai final decision-making authority over all matters relating to the Development and Commercialization of BAN2401, but Biogen did not lack visibility or input on those matters. Given its financial interest in Leqembi, the Restated Collaboration Agreement established a Joint Steering Committee ("JSC"), along with several subcommittees, including a Joint Development Committee ("JDC") and Joint Commercialization Committee ("JCC"), to provide joint oversight and control over those matters. The JSC is comprised of 3 representatives from Biogen and 3 representatives from Eisai, including "at least one member of senior management." Defendant Singhal served as Chair of the JSC. Like the JSC, the JDC and JCC are also comprised of 3 representatives from Biogen and 3 representatives from Eisai. The JSC along with the JDC and JCC must meet at least once every four months.

378. With respect to Development, Eisai was generally responsible for interfacing, corresponding, and meeting with the FDA for Leqembi. However, Eisai was required to provide Biogen with a copy of any material correspondence from the FDA as well as drafts of any material submissions to the FDA sufficiently far in advance to allow Biogen an opportunity to

review and provide comment. Eisai was also required to share all safety reporting associated with Leqembi at each JDC meeting. In addition, Eisai had to present certain Development information at each JSC meeting, including "[r]egulary matters relating to significant interactions with . . . FDA . . . and discussions in advance of any filing for [Leqembi]."

379. With respect to Commercialization, at least ten months before the first anticipated commercial sale of Leqembi in the United States, Biogen must prepare a comprehensive rolling, 3-year commercialization plan for Leqembi in the United States that, among other things, describes in detail the parties' "overall goals" and the tactics and strategies to achieve those goals for review and approval by the JCC. The JSC must then review and approve the commercialization plan for Leqembi in the United States. Both parties are responsible for co-promoting Leqembi and the commercialization plan must allocate the responsibilities of the parties in an equitable fashion taking into account their respective capabilities. Eisai and Biogen, in turn, must "keep the JCC fully informed regarding the progress and results of such Party's Commercialization activities" for Leqembi.

380. In addition, the Restated Collaboration Agreement prohibited either party from issuing any press release or other public statement concerning "the Collaboration" without the prior written consent of the other party and providing a draft of any such disclosure to the other party in advance. "Collaboration" is defined in the Restated Collaboration Agreement to include all activities relating to the Development and Commercialization of Leqembi.

381. Beyond the above, statements by Biogen's most senior officers demonstrate that they were consistently kept apprised of joint discussions regarding Leqembi. For example, on July 24, 2018, after topline results from the Phase 2 study for Leqembi were released, Vounatsos declined to comment on whether Biogen was committing to a Phase 3 study but added that "[w]e

are engaging very closely with our partners at Eisai" on the topic. On September 9, 2021, Vounatsos volunteered that "I know Eisai is engaging with the FDA" to get Leqembi to market as quick as possible after receiving "breakthrough therapy" status. On February 3, 2022, Vounatsos told an analyst who asked about launch readiness for Leqembi that "we are working very closely with Eisai at finding synergies in terms of capabilities of both organizations." Similarly, on July 20, 2022, Defendant McDonnell also confirmed that "the commercial infrastructure" for Leqembi was a "key item[] that we're working very closely with . . . Eisai on, particularly as it relates to planning for 2023 and beyond." Later on the same call, Vounatsos added that "we work in full and close collaboration with our partners at Eisai" to prepare for the global launch of Leqembi. On September 12, 2022, McDonnell volunteered that "any learnings that we gathered going through the Aduhelm experience . . . are absolutely being communicated to Eisai real time so that we can just absolutely maximize the probability of success for [Leqembi]." Similarly, Singhal stated on April 25, 2023, reported that "Eisai is lead this discussion and engagement with CMS" on reimbursement, but added "[w]e are working very closely" with Eisa and "they're sharing the data."

382. Indeed, Defendants Vounatsos and Viehbacher admitted that they frequently interfaced with the CEO of Eisai about Leqembi. On January 13, 2022, Vounatsos was asked during an analyst day presentation whether Biogen will "pivot" to Leqembi if the Phase 3 data is positive. Vounatsos stated "we will certainly be agile, together with Eisai," adding ""[w]e are very close" and "[w]e talk every second day with my opposite number" at Eisai. During a call hosted by Biogen on October 25, 2022, Evercore analyst Umer Raffat observed that there was "a lot of investor questions" on "the status of your relationship with Eisai" for Leqembi and asked if there has been "any sort of contractual disputes or anything like that?" Vounatsos responded that

"I can tell you that the relationship is very solid since many years," adding that "I have the opportunity to meet and to align with our—my counterpart on a very regular basis" and "I will do that once more in the coming days." Similarly, Defendant Viehbacher responded to a question from an analyst on a call from January 9, 2023, shortly after he started as CEO, whether he had any "engagement with your counterpart in Eisai." Viehbacher responded as follows:

> So Haruo Naito and I have known each other for many years. My first trip as CEO of Biogen was to Japan. We spent most of the Sunday together, thinking about how we wanted to work together. I talked to them at least three times this week. So we have an awful lot of interaction.

Viehbacher subsequently confirmed that at that meeting "[the] CEO of Eisai and I talked about the launch of Leqembi, and for the U.S." specifically, including "the complexity of the launch." Viehbacher verified four months later, on April 25, 2023, that "in terms of relationship, I was in Japan last week and the CEO of Eisai and I had dinner." Asked again about the relationship with Eisai on September 11, 2023, Viehbacher noted that "I've known the CEO of Eisai for many, many years," and added "[w]e have our governance teams but we talk regularly, multiple times a month" about the partnership between the two companies.

383. In fact, Defendant Singhal, who was the Chair of the JSC, confirmed that Biogen stayed in close touch with Eisai about the estimate that 10,000 patients would be treated with Leqembi within the first year and that it was discussed by their CEOs. During a call on November 28, 2023, Evercore analyst Umer Raffat specifically asked if Biogen had been in touch with Eisai on the development of the 10,000 patient estimate. In response, Singhal confirmed "[w]e are definitely very close in our discussions with them," noting "I'm on the Joint Steering Committee and the Chair of that and collaborate with my counterpart who's in Japan." She also added "[w]e had a CEO-to-CEO meeting so we're talking to them constantly."

### G. Defendants Had Substantial Financial Incentive to Hide Biogen's Anticompetitive Practices and the Leqembi's Problems

384. During the Class Period, Individual Defendants stood to gain enormously from hiding anticompetitive practices and difficulties launching Leqembi. Biogen compensation had three main components: base salary, stock and option incentives, and performance-based cash incentives. These incentive components far outweighed the salary component, often between *five and ten times* salary, and in one case as high as ***124 times***.

385. The performance-based cash incentives in part based on financial metrics measuring the company's success, and in part based on the Board's assessment of progress on the Company's key priorities. The overall incentive was broken down by company goal, with each goal assigned a weight representing how much of the overall incentive is determined by that goal.

386. In 2020, these performance-based cash incentives were weighted 20% based on revenue, 20% based on non-GAAP diluted earnings-per-share, 7.5% on achieving MS global market share, 7.5% on leading MS in customer trust and value surveys, 2.5% on achieving anti-TNF biosimilar market share, and 15% in preparing for AD leadership.

387. In 2021, these performance-based cash incentives were weighted 25% based on revenue, 25% based on non-GAAP diluted earnings-per-share, 5% on leading MS in customer trust and value surveys, 5% in unlocking potential of biosimilars, and 15% in preparing for AD leadership.

388. In 2022, these performance-based cash incentives were weighted 33% based on revenue, 33% based on non-GAAP diluted earnings-per-share, and 10% executing on Critical Alzheimer's Disease Initiatives.

389. In 2023, these performance-based cash incentives were weighted 33% based on revenue, 33% based on non-GAAP diluted earnings-per-share and 5% on launch readiness and execution of Leqembi.

390. During the Class Period, Defendants Vounatsos and McDonnell's compensation was overwhelmingly composed of incentive compensation tied to Biogen's results. The following table shows the amount of salary each Individual Defendant received, the amounts of stock and non-stock incentives, and the incentive compensation as a percent of the Individual Defendant's salary for that year:

| Year | Defendant | Base Salary | Stock Incentives | Non-Stock Incentives | Incentive as % of Base Salary |
|---|---|---|---|---|---|
| 2020 | Vounatsos | $1,488,462.00 | $13,887,064.00 | $2,565,064.00 | 1,105% |
| 2021 | Vounatsos | $1,533,173.00 | $14,084,314.00 | $1,153,125.00 | 994% |
| 2022 | Viehbacher | $153,846.00 | $18,811,855.00 | $315,616.00 | 12,433% |
| 2023 | Viehbacher | $1,600,000.00 | -- | $2,376,000.00 | 149% |
| 2020 | McDonnell | $294,231.00 | $5,012,308.00 | $263,322.00 | 1,793% |
| 2021 | McDonnell | $868,789.00 | $4,062,291.00 | $836,400.00 | 564% |
| 2022 | McDonnell | $901,308.00 | $5,083,295.00 | $1,107,683.00 | 687% |
| 2023 | McDonnell | $945,268.00 | $4,960,629.00 | $1,129,183.00 | 644% |

391. By artificially inflating the value of Biogen stock, Individual Defendants stood to inflate the Stock Incentives component of their compensation. In addition, the non-stock incentives were aligned with performance goals including leadership in AD and MS markets.

**H. Several Defendants Enriched Themselves Through the Sale of Inflated Stock**

392. Defendants Vounatsos, McDonnell, and Singhal were motivated to engage in a fraudulent course of conduct so that they could sell their share at artificially inflated prices throughout the Class Period.

393. Defendant Vounatsos capitalized on his insider knowledge by engaging in multiple stock sales when Biogen's shares were trading at artificially inflated prices. As

reflected in gray shading in the chart below, during the Class Period, Vounatsos sold 32,830 shares and reaped proceeds ***of nearly $6.44 million***:

| Class Period Transactions | | | |
|---|---|---|---|
| **Date** | **Shares Acquired (Sold)** | **Price** | **Proceeds (Cost)** |
| 2/12/2020 | (4,895) | $ 331.76 | $ 1,623,965.20 |
| 2/12/2020 | 11,994 | -- | -- |
| 2/15/2020 | 4,847 | -- | -- |
| 2/15/2020 | (2,150) | $ 333.00 | $ 715,950.00 |
| 11/30/2020 | 3,100 | $ 241.31 | $ (748,046.70) |
| 1/27/2021 | 16,343 | -- | -- |
| 2/12/2021 | (14,473) | $ 278.03 | $ 4,023,928.20 |
| 2/12/2021 | 16,289 | -- | -- |
| 1/19/2022 | 10,594 | -- | -- |
| 2/12/2022 | (8,566) | $ 214.59 | $ 1,838,177.90 |
| 2/12/2022 | 8,716 | -- | -- |
| 2/18/2022 | 6,191 | -- | -- |
| 2/18/2022 | (2,746) | $ 209.79 | $ 576,083.30 |

None of the acquisitions set forth above negate the size or amount of the dispositions described above. All acquisitions were stock automatically awarded to Vounatsos for no cost, except a November 30, 2020, purchase of 3,100 shares at 85% of market rate pursuant to an Employee Stock Purchase Program. This purchase, early in the Class Period, enabled Vounatsos to purchase below the artificially inflated price and benefit from the inflation

.

394. These transactions are a departure from Defendant Vounatsos' transactions in the comparable period leading up to the Class Period:

| Pre-Class Period Transactions | | | |
|---|---|---|---|
| **Date** | **Shares Acquired (Sold)** | **Price** | **Proceeds (Cost)** |
| 2/27/2017 | 1,333 | $ 285.00 | $ (380,424.90) |
| 5/1/2017 | 1,402 | $ 271.35 | $ (380,432.70) |
| 5/2/2017 | (564) | $ 271.34 | $ 153,053.80 |
| 5/2/2017 | 1,736 | -- | |
| 12/29/2017 | 780 | $ 320.55 | $ (250,029.00) |
| 2/15/2018 | (1,877) | $ 299.38 | $ 561,936.30 |
| 2/15/2018 | 5,354 | -- | |

| | | | |
|---|---|---|---|
| 5/2/2018 | 1,687 | -- | |
| 5/2/2018 | (750) | $ 274.13 | $ 205,597.50 |
| 2/12/2019 | 6,899 | -- | -- |
| 2/12/2019 | (2,622) | $ 319.43 | $ 837,545.50 |
| 2/15/2019 | (2,340) | $ 332.87 | $ 778,915.80 |
| 2/15/2019 | 5,269 | -- | -- |
| 5/1/2019 | 4,351 | $ 231.48 | $ (1,007,169.50) |
| 5/2/2019 | 1,480 | -- | -- |
| 5/2/2019 | (658) | $ 230.52 | $ 151,682.20 |

In the four-year period leading up to the approximately four-year Class Period, Vounatsos only sold 8,061 shares, for proceeds of $2,483,115.60 – less than a *quarter* of the shares sold during the Class Period. Furthermore, Vounatsos frequently purchased shares for cash, in addition to automatically granted shares. Over the four-year pre-Class Period he purchased 1,333 shares on February 27, 2017 (of which 1,252 were purchased at market rate), 1,402 shares on May 1, 2017 (all at market rate), and 4,351 shares (4,250 at market rate) on May 1, 2019 – for a total of *7,086 shares*, ***6,904*** at market rate. Vounatsos made *no purchases at market rate* during the Class Period, and the ***$ 1,768,027.10*** he invested in shares during the four-year pre-Class Period dwarfs the $ 748,046.70 he invested at the beginning of the Class Period.

395. Defendant McDonnell also capitalized on his insider knowledge by engaging in multiple stock sales when Biogen's shares were trading at artificially inflated prices. As reflected in gray shading in the chart below, McDonnell sold 16,740 shares and reaped proceeds of ***nearly $4.25 million***:

| **Class Period Transactions** | | | |
|---|---|---|---|
| **Date** | **Shares Acquired (Sold)** | **Price** | **Proceeds (Cost)** |
| 2/17/2023 | 2,561 | -- | |
| 9/1/2023 | 5,285 | -- | |
| 9/1/2023 | (2,704) | $ 267.17 | $ 722,427.70 |
| 2/8/2024 | 2,335 | -- | |
| 2/8/2024 | (765) | $ 240.30 | $ 183,829.50 |
| 2/9/2024 | (1,431) | $ 240.98 | $ 344,842.40 |
| 2/9/2024 | 3,257 | -- | |

| | | | |
|---|---|---|---|
| 2/16/2024 | (3,438) | $ 219.08 | $ 753,197.00 |
| 2/16/2024 | 6,720 | -- | |

None of the acquisitions set forth above negate the size or amount of the dispositions described above. All acquisitions represent stock automatically awarded to McDonnell for no cost.

396. Defendant Singhal also capitalized on her insider knowledge by engaging in multiple stock sales when Biogen's shares were trading at artificially inflated prices. As reflected in gray shading in the chart below, Singhal sold 7,814 shares and reaped proceeds of nearly $1.92 million.

| Class Period Transactions | | | |
|---|---|---|---|
| **Date** | **Shares Acquired (Sold)** | **Price** | **Proceeds (Cost)** |
| 1/25/2023 | 1,123 | -- | -- |
| 2/10/2023 | 1,211 | -- | -- |
| 2/10/2023 | (372) | $286.30 | $106,503.60 |
| 2/17/2023 | (151) | $278.38 | $42,035.40 |
| 2/17/2023 | 460 | -- | -- |
| 3/2/2023 | (687) | $268.75 | $184,631.30 |
| 3/2/2023 | 297 | -- | -- |
| 3/28/2023 | (568) | $270.06 | $153,394.10 |
| 4/4/2023 | (91) | $277.11 | $25,217.00 |
| 6/30/2023 | (153) | $284.85 | $43,582.10 |
| 6/30/2023 | 315 | -- | -- |
| 7/3/2023 | (81) | $282.87 | $22,912.50 |
| 9/1/2023 | (807) | $267.17 | $215,606.20 |
| 9/1/2023 | 1,668 | -- | -- |
| 9/5/2023 | (431) | $269.43 | $116,124.30 |
| 12/8/2023 | (206) | $239.29 | $49,293.70 |
| 12/8/2023 | 426 | -- | -- |
| 12/11/2023 | (110) | $248.00 | $27,280.00 |
| 2/1/2024 | 1,828 | -- | -- |
| 2/1/2024 | (561) | $247.83 | $139,032.60 |
| 2/2/2024 | (634) | $245.93 | $155,919.60 |
| 2/9/2024 | (374) | $240.98 | $90,126.50 |
| 2/9/2024 | 1,212 | -- | -- |
| 2/12/2024 | (419) | $239.45 | $100,329.60 |
| 2/16/2024 | (108) | $221.49 | $23,920.90 |
| 2/16/2024 | (468) | $219.08 | $102,529.40 |
| 2/16/2024 | 1,208 | -- | -- |
| 2/22/2024 | (262) | $221.23 | $57,962.30 |

| | | | |
|---|---|---|---|
| 4/2/2024 | (93) | $213.09 | $19,817.40 |
| 8/30/2024 | (807) | $204.76 | $165,241.30 |
| 8/30/2024 | 1,668 | -- | -- |
| 9/3/2024 | (431) | $204.22 | $88,018.80 |

397. None of the acquisitions set forth in the foregoing chart negate the size or amount of the dispositions described above. All acquisitions represent stock automatically awarded to Singhal for no cost.

**I. The Sale of Tecfidera and the Decision to Build a Market-Leading AD Franchise Were Admittedly at the Core of Biogen's Business**

398. Throughout the Class Period, the core of Biogen's business was its MS and AD franchises. As alleged above, at the start of the Class Period, Biogen was nearly entirely dependent on revenues from its MS drugs, particularly Tecfidera. However, as Tecfidera lost IP protection in the United STates and its revenues began a steady decline—dragging the Company's revenues with it—Biogen's core focus shifted to building a new AD business on the back of Leqembi. Because of this, Defendants were focused on Tecfidera and the launch of a new AD franchise throughout the Class Period.

399. MS drugs were the largest driver of revenue for Biogen. As of the start of 2017, Biogen's MS franchise accounted for ***nearly 89%*** of overall product sales. Avonex, Tsybari, and Tecfidera were Biogen's top three products. In particular, Tecfidera contributed significantly to Biogen's results, especially its sales in the United States. By the end of 2016, Tecfidera generated nearly $4 billion in annual sales. These sales of Tecfidera represented over 40% of Biogen's overall product sales in 2016. What is more, over 75% of these Tecfidera sales were attributable to sales in the United States.

400. However, as Tecfidera revenues began declining, the Individual Defendants spoke about the Company's shift in focus from MS to AD. In 2021, Defendant Vounatsos described

Biogen's desire to move "from being mostly an MS company with an Alzheimer's bet" that would drive a "financial reset."

401. Although Leqembi revenues were only beginning during the Class Period, forecasts of potential future revenue were large enough to alter the future of the company. For example, on March 10, 2023, shortly after FDA approval, Eisai briefed investors on future revenue projections for Leqembi, estimating that by Eisai's FY2032, Leqembi revenues would be ***1 trillion yen*** (approximately ***$8.8 billion***). Given Biogen's 50-50 revenue split with Eisai, that means Leqembi would contribute approximately $4.4 billion in revenues, eclipsing Tecfidera the primary driver of Biogen's revenue. Indeed, by 2024, the Company started reporting a new non-GAAP metric, "Core Pharmaceutical Revenue," defined as product revenue plus Biogen's share of Leqembi revenues, so that it could demonstrate Leqembi's role as part of the new core of the company, rather than as a royalty.

402. Given this incredible opportunity, Biogen's "Alzheimer's bet" was a big one. Viehbacher admitted during a call on February 15, 2023, that "there's hundreds of millions of dollars going between Eisai, Sage and Biogen behind the prelaunch activities this year for Leqembi and zuranolone—and those are obviously strategic products for all of the companies." As McDonnell admitted, the costs for failure could be steep: at the Morgan Stanley Healthcare Conference on September 12, 2022, McDonnell noted that Aduhelm's failure had triggered $1 billion in cost-cutting measures, and that a Leqembi failure could trigger the same or worse:

> I think the most important thing is, again, returning the growth. [Leqembi] is an important element of that. . . . We would certainly, in the hopefully unlikely event of a [Leqembi] failure need to step back and figure out what other cost measures need to be taken. . . . [W]e've announced the $1 billion. That's all we've said publicly. We will execute on that. And to the extent that we don't have a good outcome on lecanemab, we'll have to step back and say, is there more that we have to take.

403. Analysts frequently commented on Leqembi's role as Biogen's primary hope for future revenues. On December 22, 2022, shortly after Biogen's triumphant presentation of Leqembi's positive Clarity Phase 3 Study results, the Motley Fool noted, "Without [Leqembi], Biogen's near-term revenue drivers seem very limited." On November 18, 2024, after the truth had emerged about Leqembi's slow launch and limited patient reach, Needham downgraded Biogen because the Leqembi revealed that there was now no "meaningful source of upside" for the Company. Given analyst awareness of the criticality of the AD franchise, analysts asked questions about Biogen's progress on developing and commercializing AD treatments on every single investor earnings call throughout the Class Period.

### J. *Respondeat Superior* and Agency Principles Apply

404. Biogen is liable for the acts of Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all wrongful acts alleged herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so. The scienter of Defendants and other Company officers, employees, and agents is imputed to Biogen under such principles.

## XII. LOSS CAUSATION

405. At all relevant times, Biogen securities traded in an open, well-developed, and efficient market which promptly digested new information about the Company from all reasonably accessible public sources and reflected such information in the price of its securities. As described above, Defendants made false and misleading statements throughout the Class Period which misrepresented and/or failed to disclose the adverse facts detailed herein. Defendants' false and misleading statements caused Biogen securities to trade at artificially inflated prices throughout the Class Period and, thus, operated as a fraud or deceit on Plaintiffs and other members of the Class who purchased or otherwise acquired such securities before such

the inflation was removed. As detailed herein, the price of Biogen securities fell precipitously in response to disclosures made on June 7, 2022, June 16, 2022, January 8, 2024, February 13, 2024, July 23, 2024, July 26, 2024, September 20, 2024, September 23, 2024, October 16, 2024, October 23, 2024, November 8, 2024, and November 14, 2024. Each such disclosure revealed new information that removed part of the inflation introduced by Defendants' previous misstatements and omissions, causing real economic loss to Plaintiffs and other members of the Class who purchased such securities during the Class Period at inflated prices.

406. Each decline in the price of Biogen securities referenced above was a direct and proximate result of Defendants' misstatements or omissions being revealed to the market and/or the materialization of risks concealed by the fraud. The timing and magnitude of each such price decline negates any inference that the losses suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to the fraud alleged herein.

407. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages. Accordingly, Defendants' wrongful conduct directly and proximately caused Plaintiffs and other members of the Class to suffer economic losses, *i.e.*, damages under the federal securities laws.

## XIII. PRESUMPTION OF RELIANCE

408. Plaintiffs and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine because, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts necessary to make the statements that were made not misleading during the Class Period;

(b) the misrepresentations and/or omissions were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiffs and other members of the Class purchased Biogen securities between the time that Defendants misrepresented or failed to disclose material facts necessary to make the statements that they made not misleading and the time the true facts were disclosed, without knowledge of the misrepresented and/or omitted facts.

409. At all relevant times, the market for Biogen securities was efficient for the following reasons, among others:

(a) Biogen's securities met the requirements for listing on the NYSE, a highly efficient and automated market;

(b) as a regulated issuer, Biogen filed periodic public reports with the SEC;

(c) throughout the Class Period, Biogen's common stock was highly liquid, with an average daily trading volume over 1.25 million shares;

(d) Biogen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e) Biogen was followed by numerous securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and, thus, entered the public marketplace; and

(f) new, company-specific information was reflected and incorporated into the stock price for Biogen's securities.

410. As a result of the foregoing, the market for Biogen securities promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of Biogen's securities. Under these circumstances, all purchasers of Biogen securities during the Class Period suffered similar injury through their purchase of Biogen securities at artificially inflated prices and the presumption of reliance applies.

411. In addition, a presumption of reliance is also appropriate under *Affiliate Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated on the omission of material facts for which there was a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Biogen's operations, forecasts, and business prospects—information that Defendants were obligated to disclose in light of the statements they made on these very topics and/or applicable SEC rules and regulations—positive proof of reliance is not a prerequisite to recovery.

## XIV. NO SAFE HARBOR

412. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged herein to be false or misleading.

413. None of the statements alleged herein to be false or misleading are forward-looking statements. Rather, the statements alleged herein to be false or misleading all relate to facts and conditions existing at the time the statements were made or prior to the time the statements were made. Furthermore, none of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when

made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

414. To the extent certain of the statements alleged to be false may be characterized as forward-looking, they were neither identified as such when made nor accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent Defendants issued any statements designed to "warn" or "caution" investors of certain risks, those statements were not meaningful because they warned only of theoretical future risks at times when such risks were not merely hypothetical and/or identified risks that already began to materialize. Thus, the boilerplate and abstract cautionary statements made by Defendants were themselves false and misleading and insufficient to insulate Defendants from liability.

415. In addition, Defendants are liable for any forward-looking statements because, at the time each such statement was made, the speaker knew that the forward-looking statement was false or misleading or had actual knowledge of material facts undermining the statement, and/or the forward-looking statement was authorized or approved by an executive officer of Biogen who knew that the statement was materially false or misleading when made or had actual knowledge of material facts undermining the statement.

## XV. <u>CLASS ACTION ALLEGATIONS</u>

416. Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class. Excluded from the Class are Defendants, members of the immediate families of the Individual Defendants, the Company's subsidiaries and affiliates, any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period, any entity in which such

excluded party has or had a controlling interest, and the legal representatives, heirs, successors, or assigns of any such excluded party.

417. The members of the Class are so numerous and geographically dispersed that joinder is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, Biogen's securities were actively traded on the NYSE. As of October 29, 2024, there were approximately 145,719,340 shares of Biogen's common stock outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are many thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in class actions arising under the federal securities laws.

418. Plaintiffs' claims are typical of the claims of members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act, as complained of herein.

419. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

420. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

(a) whether the acts described herein violated the Exchange Act and/or SEC rules promulgated thereunder;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts or omitted material facts necessary to make the statements made, in the circumstances under which they were made, not misleading;

(c) whether Defendants acted with the requisite level of scienter;

(d) whether the material misstatements and omissions alleged herein artificially inflated the market price of Biogen securities during the Class Period;

(e) whether the Individual Defendants were controlling persons; and

(f) whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

421. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other reasons, joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to redress the wrongs done to them individually. There will be no difficulty in the management of this action as a class action.

## XVI. <u>CLAIMS FOR RELIEF</u>

### COUNT I
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

422. Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein. This Count is brought pursuant to Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, codified at 17 C.F.R. § 240.10b-5, on behalf of the Class against all Defendants.

423. Throughout the Class Period, Defendants, individually and in concert, directly or indirectly, by means or instrumentalities of interstate commerce, including but not limited to the

mails and the internet, and/or the facilities of a national securities exchange, carried out a plan, scheme, or course of conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Biogen securities during the Class Period.

424. Specifically, throughout the Class Period, Defendants made or caused Biogen to issue untrue statements of material fact and/or omit material facts from its public disclosures that were necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading, including those specified above, which were intended to, and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially inflate and maintain the price of Biogen securities; and (iii) cause Plaintiffs and members of the Class to purchase Biogen securities at artificially inflated prices. Defendants are individually and collectively responsible for making such statements by virtue of having made the public statements or otherwise prepared, approved, signed, and/or disseminated documents that contained those statements to the investing public.

425. The Individual Defendants made the false and misleading statements and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Biogen securities during the Class Period.

426. As a result of disseminating the materially false and misleading statements specified above, the market price for Biogen securities was artificially inflated during the Class Period. Relying directly or indirectly on those statements or upon the integrity of the market price for Biogen securities, Plaintiffs and other members of the Class purchased Biogen securities at prices that were artificially inflated by the fraud described herein. As set forth herein, Plaintiffs and other members of the Class suffered damages as a direct and proximate result of Defendants' wrongful conduct when the true facts were subsequently disclosed or the risks concealed by the misstatements materialized and the inflation was removed from the price of such securities.

427. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of the fact that they were materially false or omitted material facts necessary to make them not misleading, and believed them to be true. Plaintiffs and the other members of the Class would not have purchased Biogen securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and/or the material adverse facts which the Defendants did not disclose.

428. By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

429. Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein. This Count is brought pursuant to Section 20(a) of the

Exchange Act, codified at 15 U.S.C. § 78t(a), on behalf of the Class against the Individual Defendants.

430. As alleged herein, the Individual Defendants, and each of them, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material facts necessary to make the statements that were made not misleading in connection with the purchase or sale of the Company's securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.

431. Throughout the Class Period, the Individual Defendants, as Biogen's most senior executives, had direct involvement in the day-to-day operations of the Company, and conducted and participated, directly and indirectly, in the conduct of Biogen's business affairs.

432. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Biogen's business operations, financial condition, and prospects. In this capacity, the Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be false or misleading prior to and/or shortly after those statements were made, and had the ability to prevent the issuance of the statements or cause the statements to be corrected. The Individual Defendants, therefore, were "controlling persons" of Biogen within the meaning of Section 20(a) of the Exchange Act. In this capacity, they actively participated in the unlawful conduct alleged.

433. Because of their senior positions, the Individual Defendants knew of or recklessly disregarded the adverse, non-public information about Biogen's business practices, financial condition, and prospects. The Individual Defendants acted knowingly and intentionally, or in

such a deliberately reckless manner as to constitute culpable participation in the primary violation.

434. By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and members of the Class for violations of Section 20(a) of the Exchange Act.

## XVII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Declaring that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives and Plaintiffs' counsel as lead counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D. Granting such other and further relief as the Court may deem just and proper.

## XVIII. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: December 20, 2024

POMERANTZ LLP

*/s/ Justin D. D'Aloia*
Jeremy A. Lieberman (admission pending)
Justin D. D'Aloia
Guy Yedwab (admission pending)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jdaloia@pomlaw.com
guyyedwab@pomlaw.com

*Counsel for Plaintiffs and Lead Counsel for the Class*

THE SCHALL LAW FIRM

Brian Schall
(pro hac vice application forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964

brian@schallfirm.com