# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FRANCES CLARITY STOKES and THOMAS ALLEN GRAY, individually and on behalf of all others similarly situated,<br><br>                      Plaintiffs,<br><br>                v.<br><br>BIOGEN INC., CHRISTOPHER A. VIEHBACHER, MICHAEL VOUNATSOS, MICHAEL R. MCDONNELL, and PRIYA SINGHAL,<br><br>                    Defendants. | Case No. 1:24-cv-12691-IN<br><br>Leave to file excess pages granted on February 7, 2025 (ECF No. 46) |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF FACTS .....................................................................................................3

      A.      A Confluence of Events Threatened Biogen's Business Model..............................3

      B.      Biogen's Initial Strategies to Offset The Existential Threats Backfired.................3

      C.      Biogen Paid PBMs to Stifle Competition from Generic Versions of Tecfidera ...............................................................................................................4

      D.      Biogen Suppressed Important Information About Three Patient Deaths Suggesting a Link Between Leqembi and Severe ARIA ........................................5

      E.      Biogen Misled Investors About Leqembi's Commercial Prospects ......................7

      F.      Investors Were Harmed as the Truth Emerged......................................................7

STANDARD OF REVIEW ....................................................................................................8

ARGUMENT...........................................................................................................................8

I.      PLAINTIFFS STATE A SECTION 10(B) CLAIM............................................................8

      A.      The AC Adequately Alleges Misstatements and Omissions of Material Fact.......................................................................................................................8

            1.      Misstatements Concerning the Marketplace for Tecfidera and Vumerity .................................................................................................9

            2.      Misstatements Concerning Leqembi's Safety Profile...............................15

            3.      Misstatements Concerning Leqembi's Commercial Prospects..................20

      B.      The AC Raises a Strong Inference of Scienter .......................................................24

            1.      The Inference of Scienter Is Overwhelming.............................................25

            2.      The Importance of Tecfidera and Leqembi Seal the Inference of Scienter ....................................................................................................31

            3.      The AC Pleads Compelling Individualized Motives ................................32

II.      PLAINTIFFS STATE A CONTROL PERSON CLAIM..................................................35

CONCLUSION......................................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Fin. Guaranty Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008)................................................................................................33

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)......................................................................................9, 25, 33

*Amphastar Pharms., Inc. v. Momenta Pharms. Inc.*,
297 F. Supp. 3d 222 (D. Mass. 2018) .................................................................................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................................................8

*Bergeron v. Ridgewood Sec. Corp.*,
610 F. Supp. 2d 113 (D. Mass. 2009) .................................................................................14

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021) .................................................................................28

*Brennan v. Zafgen, Inc.*,
853 F.3d 606 (1st Cir. 2017).............................................................................................. 28

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) .................................................................................14

*Cambridge Ret. Sys. v. Jeld-Wen Holdings, Inc.*,
496 F. Supp. 3d 952 (E.D. Va. 2020) .................................................................................26

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523 (D.N.J. July 31, 2019)..........................................................................27

*City of Ft. Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*,
683 F. Supp. 3d 120 (D. Mass. 2023) .................................................................................18

*City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. Cerence Inc.*,
2024 WL 1258149 (D. Mass. Mar. 25, 2024).....................................................................31

*City of Miami Firefighters & Police Officers' Ret. Tr. v. CVS Health Corp.*,
46 F.4th 22 (1st Cir. 2022)..................................................................................................23

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021).............................................................................................. *passim*

*Cooperman v. Indiv., Inc.*,
   171 F.3d 43 (1st Cir. 1999).................................................................................................16

*Dahhan v. OvaScience, Inc.*,
   321 F. Supp. 3d 247 (D. Mass. 2018) (Talwani, J.)........................................................ *passim*

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023) ..............................................................................................27

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019) ...............................................................................31

*Gerneth v. Chiasma, Inc.*,
   2018 WL 935418 (D. Mass. Feb. 15, 2018) .......................................................................16

*Greebel v. FTP Software*,
   194 F.3d 185 (1st Cir. 1999)......................................................................................25, 33, 35

*Halman Albudi Provident & Pension Funds Ltd. v. Teva Indus. Ltd.*,
   2022 WL 889158 (E.D. Pa. Mar. 25, 2022).................................................................10, 32

*Holwill v. AbbVie Inc.*,
   2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ................................................................28, 35

*In Henry Schein, Inc. Sec. Litig.*,
   2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) .............................................................13, 14

*In re Allaire Corp. Sec. Litig.*,
   224 F. Supp. 2d 319 (D. Mass. 2002) .................................................................................14

*In re Ariad Pharms., Inc. Sec. Litig.*,
   98 F. Supp. 3d 147 (D. Mass. 2015), *aff'd*, 842 F.3d 744 (1st Cir. 2016)..............................34

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002)........................................................................................ *passim*

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   2018 WL 2382600 (S.D.N.Y. May 24, 2018) ....................................................................27

*In re Danimer Sci., Inc. Sec. Litig.*,
   2023 WL 6385642 (E.D.N.Y. Sept. 30, 2023) ...................................................................18

*In re Delcath Sys., Inc. Sec. Litig.*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014)...................................................................................17

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   665 F. Supp. 3d 255 (E.D.N.Y. 2023) ................................................................................15

*In re EpiPen Direct Purchaser Litig.*,
   2021 WL 147166 (D. Minn. 2021) ...................................................................................12

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015) .........................................................................................23

*In re Loestrin 24 Fe Antitrust Litig.*,
   433 F. Supp. 3d 274 (D.R.I. Dec. 17, 2019) ...................................................................11

*In re Merck & Co. Sec., Derivative & ERISA Litig.*,
   2015 WL 2250472 (D.N.J. May 13, 2015) ......................................................................20

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) .............................................................................30

*In re Mylan N.V. Sec. Litig.*,
   2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ....................................................13, 15, 26

*In re Number Nine Visual Tech. Corp. Sec. Litig.*,
   51 F. Supp. 2d 1 (D. Mass. 1999) ..................................................................................23

*In re PLC Sys., Inc. Sec. Litig.*,
   41 F. Supp. 2d 106 (D. Mass. 1999) ..............................................................................16

*In re Praecis Pharms., Inc. Sec. Litig.*,
   2007 WL 951695 (D. Mass. Mar. 28, 2007) ...................................................................24

*In re Psychemedics Corp. Securities Litigation*,
   2017 WL 5159212 (D. Mass. Nov. 7, 2017) ..............................................................30, 31

*In re Sepracor, Inc. Sec. Litig.*,
   308 F. Supp. 2d 20 (D. Mass. 2004) ...................................................................16, 24, 27

*In re Silverlake Grp., L.L.C. Sec. Litig.*,
   2022 WL 4485815 (N.D. Cal. Sept. 27, 2022) ...............................................................32

*In re Solodyn Antitrust Litig.*,
   2018 WL 563144 (D. Mass. Jan. 25, 2018) ....................................................................11

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) .................................................................26

*In re Stone & Webster, Inc. Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005) .............................................................................19, 21, 35

*In re Tecfidera Antitrust Litig.*,
   No. 24-cv-7387 (N.D. Ill.) ..............................................................................................11

*In re Warfarin Sodium Antitrust Litig.*,
   1998 WL 883469 (D. Del. Dec. 7, 1998), *rev'd in part on other grounds*, 214
   F.3d 395 (3d Cir. 2000).................................................................................................12

*KB Partners I, L.P. v. Barbier*,
   907 F. Supp. 2d 826 (W.D. Tex. 2012)..................................................................29, 31

*Levy v. Gutierrez*,
   2017 WL 2191592 (D.N.H. May 4, 2017)..............................................................21, 34

*Lucia v. Prospect St. High Income Portfolio, Inc.*,
   36 F.3d 170 (1st Cir. 1994)......................................................................................9, 13

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024).......................................................................................................9

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006), *rev'd on other grounds*, 551 U.S. 308 (2007)
   ..................................................................................................................2, 14, 25, 32

*Mart v. Tactile Sys. Tech., Inc.*,
   595 F. Supp. 3d 798 (D. Minn. 2022)...........................................................................10

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011).............................................................................................. *passim*

*Metzler Asset Mgmt. GmbH v. Kingsley*,
   928 F.3d 151 (1st Cir. 2019).........................................................................................32

*Moss v. Camp Pemigewassett, Inc.*,
   312 F.3d 503 (1st Cir. 2002)...........................................................................................8

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC*,
   537 F.3d 35 (1st Cir. 2008)...........................................................................................27

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018).......................................................................................................11

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
   58 F.4th 195 (5th Cir. 2023) .........................................................................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015).............................................................................................9, 18, 20

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus., Ltd.*,
   432 F. Supp. 3d 131 (D. Conn. 2019)............................................................................15

*Pizzuto v. Homology Medicines, Inc.*,
2024 WL 1436025 (D. Mass. Mar. 31, 2024)....................................................................17, 34

*Plumbers & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) ..............................................................................................10

*Plymouth Cty. Ret. Sys. v. Patterson Cos.*,
2019 WL 3336119 (D. Minn. July 25, 2019) ..................................................................26

*Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)..............................................................................34

*Ret. Sys. of Gov't of Virgin Is. v. Blanford*,
794 F. 3d 297 (2d Cir. 2015)............................................................................................27

*Ret. Sys. v. Bos. Sci. Corp.*,
523 F.3d 75 (1st Cir. 2008) (*BSC*) ..................................................................... *passim*

*Roeder v. Alpha Indus., Inc.*,
814 F.2d 22 (1st Cir. 1987)................................................................................................9

*Roman-Oliveras v. P.R. Elec. Power Auth.*,
655 F.3d 43 (1st Cir. 2011)................................................................................................8

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
351 F. Supp. 3d 874 (E.D. Pa. 2018) ...............................................................................30

*SEC v. Johnston*,
986 F.3d 63 (1st Cir. 2021)...........................................................................................9, 28

*Shash v. Biogen, Inc.*,
84 F.4th 1 (1st Cir. 2023)..................................................................................................17

*Shaw v. Digital Equip. Corp.*,
82 F.3d 1194 (1st Cir. 1996).............................................................................................14

*Slayton v. American Exp. Co.*,
604 F.3d 758 (2d Cir. 2010).............................................................................................24

*Stone v. Life Partners Holdings*,
26 F. Supp. 3d 575 (W.D. Tex. 2014)..............................................................................23

*Thant v. Karyopharm Therpeutics Inc.*,
43 F.4th 214 (1st Cir. 2022).......................................................................................16, 17

*Vázquez-Ramos v. Triple-S Salud, Inc.*,
55 F.4th 286 (1st Cir. 2022).............................................................................................11

*Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
    28 F. Supp. 93 (D. Mass. 2014) ......................................................................................27, 28

*Willis v. Big Lots, Inc.*,
    2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) .........................................................................23

*WNAC, LLC v. Verizon Corp. Servs. Grp., Inc.*,
    2024 WL 778794 (D. Mass. Feb. 26, 2024) ......................................................................8, 15

**Statutes**

15 U.S.C. § 13 .............................................................................................................................12

15 U.S.C. § 78u-4 ..........................................................................................................................8

15 U.S.C. § 78u-5(c) ..................................................................................................9, 21, 23, 25

Private Securities Litigation Reform Act of 1995 ................................................................ *passim*

**Rules**

Fed. R. Civ. P. 9 ........................................................................................................................8, 9

Rule 10b-5 ..............................................................................................................................8, 9, 10

**Other Authorities**

17 C.R.F. § 240.10b-5 .........................................................................................................8, 10, 34

**TABLE OF DEFINED TERMS**

| Defined Term | Definition | Cross Reference |
|---|---|---|
| AC | First Amended Class Action Complaint For Violations of the Federal Securities Law | ECF No. 43 |
| AD | Alzheimer's disease | AC ¶ 23 |
| Aduhelm | AD drug candidate | AC ¶ 57 |
| ApoE4 | A gene variant called apolipoprotein Eε4 | AC ¶ 71 |
| ARIA | Amyloid-related imaging abnormalities | AC ¶ 109 |
| BLA | Biologics license application | AC ¶ 30 |
| Biogen | Biogen Inc. | AC preface |
| BOG | Brand-over-generics | AC ¶ 146 |
| CEO | Chief Executive Officer | AC ¶ 8 |
| CFO | Chief Financial Officer | AC ¶ 10 |
| Clarity Phase 3 Study | A Phase 3 study of Leqembi officially titled "A Placebo-Controlled, Double-Blind, Parallel-Group, 18-Month Study With an Open-Label Extension Phase to Confirm Safety and Efficacy of BAN2401 in Subjects With Early Alzheimer's Disease," frequently referred to as the Clarity AD study | AC ¶ 165 |
| CMS | Centers for Medicare & Medicaid Services | AC ¶ 112 |
| CW | Confidential witness | |
| Defendants | Biogen and the Individual Defendants | AC preface |
| Eisai | Eisai Co, Ltd. | AC ¶ 77 |
| EMA | European Medicines Agency | AC ¶ 30 |
| FDA | U.S. Food and Drug Administration | AC ¶ 24 |
| FTC | U.S. Federal Trade Commission | AC ¶ 126 |
| Individual Defendants | Vounatsos, Viehbacher, McDonnell and Singhal | AC preface |
| JSC | Joint Steering Committee | AC ¶ 377 |
| Lead Plaintiff | Francies Clarity Stokes | AC preface |
| Leqembi | AD drug candidate | AC ¶ 19 |
| McDonnell | Defendant Michael R. McDonnell | AC ¶ 10 |
| Mem. | Defendants' Memorandum in Support of Their Motion to Dismiss the Amended Complaint | ECF No. 50 |
| Motion | Defendants' Motion to Dismiss the Amended Complaint | ECF No. 48 |
| MS | Multiple sclerosis | AC ¶ 23 |
| NCD | National coverage determination | AC ¶ 112 |
| OLE | Open-label extension | AC ¶ 165 |
| Patient 1 | An eighty-eight year old man who died in June 2022 after starting Leqembi treatment in the OLE | AC ¶ 185 |
| Patient 2 | A sixty-five year old woman who died in September 2022 after starting Leqembi treatment in the OLE | AC ¶ 189 |
| Patient 3 | A seventy-nine year-old woman who died in September 2022 after starting Leqembi treatment in the OLE | AC ¶ 192 |

| PBM | Pharmacy benefit managers | AC ¶ 118 |
|---|---|---|
| Plaintiffs | Lead Plaintiff and additional plaintiff Thomas Allen Gray | AC preface |
| RCA | Restated Collaboration Agreement between Biogen and Eisai | AC ¶ 79 |
| SEC | U.S. Securities Exchange Commission | Mem. preface |
| Singhal | Defendant Priya Singhal | AC ¶ 11 |
| Tecfidera | MS drug | |
| Viehbacher | Defendant Christopher A. Viehbacher | AC ¶ 9 |
| Vounatsos | Defendant Michel Vounatsos | AC ¶ 8 |
| Vumerity | MS drug | |
| WAC | Wholesale acquisition cost | AC ¶ 119 |

Plaintiffs respectfully submit this memorandum in opposition to the motion to dismiss filed by Defendants on February 18, 2025 (ECF No. 48) (the "Motion"), and the memorandum of law submitted in support thereof (ECF No. 50) (the "Mem.").[1]

## PRELIMINARY STATEMENT

Biogen grew to become a very successful biotech company by developing several innovative drugs to treat MS. But by the mid-2017, it faced an existential crisis. Generic manufacturers came out in droves to challenge the remaining patents protecting Tecfidera, its top selling MS drug responsible for more than $4 billion in annual revenue. Compounding matters, sales of its other MS drugs were starting to decline for the first time as they aged out or faced competitive pressures.

To guard against these threats, Biogen devised dual strategies. First, it quickly introduced a "bioequivalent" version of Tecfidera with distinct patent protections as a new alternative for the same prescription base. Second, it partnered with Japanese pharmaceutical company Eisai to develop several new compounds to address AD, a widespread illness lacking meaningful treatment options. Both failed miserably. The patents for Tecfidera were invalidated and, by the time generics flooded the market in late 2020, Biogen only "switched" a mere 2% of the prescription base to the bioequivalent. The AD treatment it brought to market, Aduhelm, was mired in controversy and ultimately failed after reports emerged that a patient died from a serious side effect known as ARIA.

This sets the stage for the misconduct at the heart of this case. As soon as Biogen lost patent protection, it started paying kickbacks to PBMs—middlemen in the pharmaceutical supply chain—to favor Tecfidera over the deeply discounted generics and, thus, slow its demise. Investors were, of course, interested in Tecfidera's continued viability in this market. Defendants said it continued to

---

[1] All capitalized terms have the meaning set forth in the First Amended Class Action Complaint, filed December 31, 2024 [Doc. No. 43] (the "AC"), as reproduced in the Table of Abbreviations above. Citations to "Ex." refer to exhibits attached to the accompanying Declaration of Justin D. D'Aloia. Unless otherwise noted, all internal citations are omitted and emphasis added.

perform well by competing on the merits, not that they impaired generics from competing at all.

Further, once Aduhelm failed, Biogen pivoted to another AD drug under development with Eisai called Leqembi. But as three patients died with ARIA soon before the Phase 3 results were set to be released, it misrepresented the number of deaths—a verifiable fact—and consistently denied any *possibility* there was a link to Leqembi even though it received a steady drumbeat of conclusions to the contrary from doctors who reviewed the data. After gaining FDA approval, Defendants told investors to expect rapid uptake. But the metrics they touted were never indicative of true demand and known infrastructure barriers prevented Leqembi from reaching anything close to what they represented. After the FDA found out about the additional data, it severely restricted the approved patient population, which has prevented Leqembi from generating meaningful sales, much less becoming the blockbuster they suggested when investors like Plaintiffs made their purchase.

Faced with these facts, Defendants reflexively move to dismiss for a grab bag of reasons that misconstrue the AC's well-pled allegations or impose legal requirements that simply do not exist.

For example, Defendants primarily argue the AC fails to plead an actionable misstatement because it does not plead that the PBM payments were illegal or many of the statements were literally untrue. But Plaintiffs' claim do not hinge on the conduct being unlawful, as in the cases they rely. Further, it has long been the law that statements that are technically true can still mislead by omission, and the AC pleads ample evidence establishing that they were.

Similarly, Defendants insist that the AC fails to plead scienter because there is no smoking-gun allegation that Defendants personally confessed to making statements they disbelieved. But *Tellabs* expressly disavows the need to plead such evidence. When the allegations are viewed as a whole, as they must be, the inference of scienter is overwhelming. Further, Defendants' 10b5-1 defense is not viable on the pleadings before the Court under First Circuit precedent.

- 2 -

## STATEMENT OF FACTS

### A.    A Confluence of Events Threatened Biogen's Business Model

Biogen is a biotechnology company that rose to prominence by pioneering a series of highly successful drugs to treat MS, including Tecfidera.  AC ¶¶ 23-26.  Available in pill form, Tecfidera soon became the most popular oral treatment for MS after it was approved by the FDA in 2013.  *Id.* ¶¶ 24-25.  It generated up to $4.3 billion in annual sales and was, by far, Biogen's top selling product, responsible for more than 35-40% of its annual revenue.  *Id.* ¶ 27.  However, by focusing almost exclusively on MS drugs, Biogen lacked meaningful sales from other sources.  *Id.* ¶ 51.

By 2017, sales of Biogen's other MS drugs were beginning to decline as they matured or faced competitive threats.  *Id.* ¶ 53.  Worse still, generic manufacturers challenged Tecfidera's two remaining patents so they too could the enjoy the sales it generated.  *Id.* ¶¶ 52, 55-56.  These challenges imperiled what remained of Biogen's MS franchise.  *Id.*

### B.    Biogen's Initial Strategies to Offset The Existential Threats Backfired

To guard against these existential threats, Biogen (i) introduced a new "biosimilar" version of Tecfidera known as Vumerity with distinct patent protections; and (ii) entered a Joint Collaboration Agreement with Japanese pharmaceutical company Eisai (as amended and restated, the "RCA") to co-develop several drugs to treat AD, including Aduhelm and Leqembi.  AC ¶¶ 57-83.

However, both strategies backfired.  Generic manufacturers won the patent disputes in 2020 and numerous generic versions of Tecfidera soon entered the market.  *Id.* ¶¶ 89-92.  By then, Biogen had "switched" only 2% of the prescription base from Tecfidera to Vumerity.  *Id.* ¶ 88.  In addition, Biogen and Eisai gained FDA approval for Aduhelm but the approval process was mired by controversy and reports soon emerged that a patient died on Aduhelm from serious side effect known as ARIA. *Id.* ¶¶ 93-111.  Days after CMS refused to cover it for Medicare and Medicaid, Biogen announced that it decided to wind down the Aduhelm program—in which it invested billions—and

its CEO, Michel Vounatsos, was stepping down with no successor in place.  *Id.* ¶ 112-14.

**C.        Biogen Paid PBMs to Stifle Competition from Generic Versions of Tecfidera**

Prescription drugs, both branded and generic, are sold through a complex supply chain and payment system involving several intermediaries, including PBMs.  AC ¶ 118.  PBMs design drug formularies for the payers they represent, *e.g.*, public or private health plans, which specify the drugs the payer will cover along with the required co-pay.  *Id.* ¶¶ 120, 123.  In the past decade, PBMs have begun using formularies with "tiers" that stratify the co-pay to incentivize the use of drugs on higher tiers over those on lower tiers.  *Id.* ¶¶ 123-24.  PBMs have used this to negotiate "rebates" from drug manufacturers to gain placement, or preferred placement, on the list.  *Id.* ¶ 125. Free from collusion, this helps drive down the price of drugs by rewarding those who can provide the lowest cost.  *Id.*

PBMs typically retain part of the rebate as a "fee" for negotiating the discount that is based on the WAC price set by the manufacturer.  *Id.* ¶ 129.  Recognizing this, manufacturers of brand drugs have, in recent years, persuaded PBMs to skew formularies to favor *higher price* brand drugs (with higher fees) over *less expensive* generics.  *Id.* ¶ 130.  Indeed, Congressional investigations revealed that Teva was using BOG contracts for its top selling MS drug by 2018.  *Id.* ¶ 132.

Biogen was no stranger to these rebates.  Before mid-2020, it had rebate contracts with PBMs for its MS drugs, including Tecfidera.  *Id.* ¶ 144.  Indeed, Vounatsos regularly spoke about rebates and negotiations with PBMs.  *Id.* ¶¶ 357-65.  In fact, he personally directed that Biogen raise the WAC for Tecfidera for the very reason it singularly determined the "fee" for the PBM.  *Id.* ¶ 145.

Generic versions of Tecfidera entered the market in August 2020.  *Id.* ¶ 91.  Biogen almost immediately entered new BOG rebate contracts with PBMs that provided increased rebates to favor Tecfidera over generic copies and, thus, slow the demise of its flagship drug.  *Id.* ¶¶ 146, 148-53.  As a result, Tecfidera retained far greater market share than it otherwise would even though  its price stayed the same and Biogen switched 25% of patients to Vumerity.  *Id.* ¶¶ 156-62.  Nevertheless, at

this critical inflection point, Biogen told investors that Biogen welcomed competition and reported that its MS products continued perform well despite the competition from generics. *Id.* ¶¶ 225-82.

By June 2022, the FTC opened an investigation into PBMs contracting practices. *Id.* ¶ 139. It asked the PBMs to produce documents on a range of topics, including the placement of Tecfidera on their formularies. *Id.* ¶ 318. The investigation remains ongoing. *Id.* ¶¶ 140, 320.

### D. Biogen Suppressed Important Information About Three Patient Deaths Suggesting a Link Between Leqembi and Severe ARIA

As soon as it abandoned Aduhelm, Biogen pivoted to Leqembi. AC ¶ 167. Within days, Eisai asked the FDA for an interim form of approval based on Leqembi's Phase 2 trials before it even knew the results of the ongoing Clarity AD Phase 3 Study. *Id.* ¶ 168. On September 27, 2022, Biogen announced that recently unblinded data from the Clarity Phase 3 Study showed positive "top line" results, with full results to follow in late November 2022. *Id.* ¶ 169. On this news, Defendants touted that Leqembi could "drive renewed growth" and offset continued losses in MS. *Id.* ¶ 171.

At the time, the safety profile of Leqembi was key to securing regulatory approval and Biogen knew from Aduhelm that treatment-related ARIA would be a heavy consideration. *Id.* ¶¶ 183-84. This took on great significance because carriers of the ApoE4 gene were at increased risk of developing ARIA on anti-amyloid medication like Leqembi, and that was the very gene that put patients at risk for developing AD. *Id.* ¶¶ 71, 183. Indeed, Eisai tested each patient in the Clarity Phase 3 Study for ApoE4 and agreed to perform relevant subgroup analysis for this very reason. *Id.*

Ahead of the release of the full results, three patients died soon after taking Leqembi in the OLE for the Clarity Phase 3 Study with severe ARIA. In May 2022, Patient 1 died after starting Leqembi in the OLE with severe ARIA while on blood thinners. *Id.* ¶ 185. The trial investigator designated the death as "*related*" to Leqembi, and Eisai initially agreed that there was "a reasonable possibility [Leqembi] may have contributed." *Id.* ¶ 186. In fact, Eisai was sufficiently worried that

- 5 -

it initiated an investigation into whether blood thinners increased the risk of developing ARIA. *Id.* ¶ 187. After concluding it did, Eisai updated the informed consent form all patients must sign to specify that "the risk is higher in people who are also taking blood clot prevention medications." *Id.* In September 2022, Patients 2 and 3—both of whom had two copies of ApoE4 and received blood thinners—also died after starting Leqembi in the OLE with signs of severe ARIA. *Id.* ¶¶ 189, 192. The trial investigator for each patient designated the death as "***related***" to Leqembi. *Id.* ¶¶ 191, 193. One even warned that the ARIA appeared to be "exacerbated" by the anticoagulant. *Id.*

Despite this, Eisai denied any link as news of several deaths emerged. On October 29, 2022, *Stat+* published an article describing Patient 1's death, which quoted researchers who "agreed a link was plausible." *Id.* ¶ 201. Then, on November 27, 2022, *Science* published a report on Patient 2's death, which also collected comments from physicians and neurologists who all agreed Leqembi was likely the cause. *Id.* ¶ 202. Eisai gave a statement in response to each article proclaiming that there was "no reason" to believe Leqembi contributed to any deaths and "[a]ll the available safety information" does not suggest otherwise. *Id.* ¶¶ 201-02. In fact, senior Eisai executives gave an interview for an article published on November 29, 2022, in which they denied a link. *Id.* ¶ 203.

On November 29, 2022, Biogen released the long-awaited results of the Phase 3 Clarity AD Study. *Id.* ¶¶ 204, 283-84. In the release, Biogen stated that there were two deaths in patients on Leqembi with concurrent ARIA—likely due to the news stories on Patient 1 and Patient 2—without *any mention* of Patient 3. *Id.* It further stated that the deaths "cannot" be linked to Leqembi. *Id.*

In late 2022, the physician who performed the autopsy on Patient 2 offered to share full details with a senior official from Eisai but he declined and no one else from Eisai asked to review the data. *Id.* ¶ 195. On January 6, 2023, the FDA granted interim approval and Eisai made a filing later that day for full approval based on the Clarity AD Phase 3 Study. *Id.* ¶ 176. However, the

FDA noted that Eisai did not furnish key details for Patient 3 and, as such, it was unable to fully assess the potential relationship of the death to Leqembi. *Id.* ¶ 208. No later than early April 2023, the physician who performed the autopsy on Patient 3 sent a copy of the report to Eisai and Biogen and offered to share tissue samples. *Id.* ¶ 197. Shockingly, Eisai did not provide this information to the FDA, which again hindered it from drawing firm conclusions about the death. *Id.* ¶ 209. During this time, Biogen also continued to issue statements describing Leqembi as safe. *Id.* ¶¶ 285-99.

The FDA granted full approval on July 6, 2023. *Id.* ¶ 180. In Europe, however, regulators refused to approve Leqembi due to the risk of ARIA. *Id.* ¶ 330-31. In response, Eisai submitted subgroup analyses showing that patients with two ApoE4 genes or on blood thinners were more likely to develop ARIA. *Id.* ¶ 346. The EMA later approved Leqembi for patients with one or no ApoE4 genes not on blood thinners. *Id.* ¶ 346. The FDA also imposed similar restrictions after learning of the same data. *Id.* ¶¶ 210, 346. This has severely limited Leqembi's sales. *Id.* ¶ 347.

### E.    Biogen Misled Investors About Leqembi's Commercial Prospects

Defendants knew from the failed launch of Aduhelm that there was insufficient infrastructure across the country to support widespread screening and treatment for an infusion drug like Leqembi. AC ¶¶ 213-14. Nevertheless, by September 2023, they endorsed an expectation announced by Eisai to treat 10,000 patients by March 31, 2024, which could not be done in light of these limitations. *Id.* ¶¶ 217, 219-22. Worse still, Defendants assured they were making "progress" on the goal based on registry information that was admittedly never indicative of true demand. *Id.* ¶¶ 218, 223.

### F.    Investors Were Harmed as the Truth Emerged

As the truth leaked out, Biogen's stock price fell, causing harm to investors like Plaintiffs who purchased before then. *Id.* ¶¶ 317-49, 406-07. Indeed, the stock chart Defendants attach shows that the misstatements propped up Biogen's stock price to over $300. *See* Doc. No. 49-23. But by the end of the Class Period, the stock shed over 50% of its value, sinking to $155.43. AC ¶ 349.

- 7 -

<u>**STANDARD OF REVIEW**</u>

To survive dismissal, a complaint need only plead facts sufficient to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In making this assessment, the Court must accept all well-pled facts as true and draw all reasonable inferences in Plaintiffs' favor. *Moss v. Camp Pemigewassett, Inc.*, 312 F.3d 503, 507 (1st Cir. 2002). The issue is not whether it is likely plaintiff will prove the facts alleged but whether those facts, accepted as true, state a plausible claim. *Roman-Oliveras v. P.R. Elec. Power Auth.*, 655 F.3d 43, 50 (1st Cir. 2011).

<u>**ARGUMENT**</u>

**I.    PLAINTIFFS STATE A SECTION 10(B) CLAIM**

To state a claim under Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must allege: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection to a security transaction; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). As with any averment of fraud, claims of this type must satisfy the heightened pleading requirements of Rule 9(b). *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 6 (1st Cir. 2021). In addition, the PSLRA requires that a plaintiff must specify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(1), (b)(2).

Defendants dispute only elements (1) and (2), and thus concede that Plaintiffs have adequately pled all other elements. *See, e.g.*, *WNAC, LLC v. Verizon Corp. Servs. Grp., Inc.*, 2024 WL 778794, at *7 (D. Mass. Feb. 26, 2024) (legal arguments not raised in opening brief are waived and collecting cases). As explained below, Defendants' challenges are meritless.

**A.    The AC Adequately Alleges Misstatements and Omissions of Material Fact**

Rule 10b-5 prohibits not only statements of material fact that are "untrue" on their face, but the omission of any material facts needed to make statements that are made "not misleading." 17

C.F.R. § 240.10b-5(b).  In other words, even statements that are "literally accurate" can still mislead. *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir. 1994); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").  Such statements will do so if they "paint[] a materially false picture" by virtue of what they omit.  *SEC v. Johnston*, 986 F.3d 63, 72 (1st Cir. 2021).  Thus, once a company *chooses* to speak on a topic, Rule 10b-5 imposes a duty to tell the "whole truth" about it. *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1st Cir. 1987); *see also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024) (Rule 10b-5 prohibits "half-truths").

The PSLRA was enacted to filter out "frivolous strike suits" but not "not make meritorious claims impossible to bring."  *In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002).  As such, a plaintiff need only specify the "time, place and content" of each alleged misstatement, and supply "factual support for the claim that the statements . . . were fraudulent" to satisfy 15 U.S.C. § 78u-4(b)(1) and Rule 9(b).  *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002).  The First Circuit has repeatedly held that this does not require a plaintiff to "plead evidence."  *Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) (*BSC*).  Rather, allegations will suffice even if "some questions remained unanswered," such as "the precise date of transactions . . . the identities of corporate personnel involved . . . the exact dollar amounts of individually fraudulent," or the like. *Cabletron*, 311 F.3d at 32-33.  Defendants do not dispute that the AC specifies the time, place, and content of the alleged misstatements but, instead, maintain that they are not adequately alleged to be false or misleading.  Properly viewed on a motion to dismiss, the facts pled demonstrate otherwise.

### 1.    Misstatements Concerning the Marketplace for Tecfidera and Vumerity

Defendants urge that none of the statements on Tecfidera or Vumerity are actionable because the AC fails to plead that Biogen's conduct was "illegal" or any other facts that render them false or

- 9 -

misleading.  These arguments misapprehend the law and misconstrue the AC's core allegations.

### a.     Defendants Misstate the Proper Pleading Standard

Defendants proceed from the flawed premise that Plaintiffs must plead Biogen's conduct was illegal or otherwise violated the antitrust laws to allege that any of their statements are actionable. Mem. at 13-15.  They need not do so.  To be sure, nothing in Rule 10b-5 says that.  As explained above, Rule 10b-5 only requires that a statement be *false* or *misleading*.  17 C.F.R. § 240.10b-5(b).

Tellingly, Defendants offer no legal support for their sweeping assertion.  In fact, the only securities decision they cite held that a plaintiff must plead an underlying violation of law "[w]hen a securities fraud claim is *premised* on the defendant's predicate violations of law."  *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 798, 809 (D. Minn. 2022) (emphasis added).  That holding, in turn, relied on *Plumbers & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021), which required a showing of unlawful conduct to support the allegation that a bank improperly recorded revenue for contracts rendered "unenforceable" by money laundering.  *Id.*

Unlike those cases, however, Plaintiffs' claims do *not* depend on a violation of law, much less the antitrust laws.  Indeed, the AC does not challenge any statement claiming that Biogen *complied* with the law.  Rather, it focuses on statements about the marketplace for Tecfidera and Vumerity and the function of Biogen's PBM rebate contracts.  AC ¶¶ 225-82.  Further, none of those statements are alleged to be false or misleading because Biogen's undisclosed conduct was *illegal*. *Id.*[2]  As detailed in the following section, those statements are alleged to be false or misleading because Biogen manipulated the amount competition imposed by lower cost generic versions of Tecfidera, irrespective of whether that conduct technically violated federal law.  *See Halman Albudi*

---

[2] Plaintiffs acknowledge that a small subset of allegations describing why Defendants' statements were false or misleading refer to "unlawful conduct."  AC ¶¶ 231, 233, 236, 240, 243, 245.  However, the primary focus of those averments is that the statements gave the impression that Biogen was competing with Tecfidera generics "on the merits," rather than suppressing their ability to compete at all.  *Id.*  Plaintiffs are prepared to amend to make this clear to the extent necessary.

*Provident & Pension Funds Ltd. v. Teva Indus. Ltd.*, 2022 WL 889158, at *10 (E.D. Pa. Mar. 25, 2022) (it is "immaterial" if activity was unlawful because falsity allegations do not turn on legality).

To the extent Plaintiffs must plead the elements of an antitrust claim (and they do not), the AC does so in any event. The FTC has specified that exclusionary PBM rebate contracts can violate Sections 1 and 2 of the Sherman Act, codified at 15 U.S.C. §§ 1-2. AC ¶ 139. Indeed, Biogen is now facing antitrust litigation alleging that its BOG contracts for Tecfidera violated those very laws. *See In re Tecfidera Antitrust Litig.*, No. 24-cv-7387 (N.D. Ill.). Because such conduct is not "per se" illegal, and therefore subject to a standard "rule of reason" analysis, both Sherman Act claims require a threshold degree of "market power." *Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 296 (1st Cir. 2022); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 540-41 (2018) (explaining "rule of reason"). But the AC unquestionably states such facts. As alleged, Biogen enjoyed a *total monopoly* over the market for fumarate drugs in the United States before the entry of generics, during which time it consistently raised the price of Tecfidera. AC ¶¶ 49, 52, 56, 145. Biogen then used that power to skew PBM formularies to favor Tecfidera over those lower cost replacements as soon as they became available. *Id.* ¶¶ 146, 148-55. Importantly, unlike the summary judgment case relied on by Defendants (Mem. at 14), a motion to dismiss tests only if the market alleged is plausible. *Vázquez-Ramos*, 55 F.4th at 298. It is not the proper vehicle to question if another market is more suitable. *Id.*[3] And Biogen has admitted here that, due to the nature of the disease, "one product cannot be substituted by [an]other" in the MS market, "except the generic." AC ¶ 226.

In addition, the AC alleges that this scheme significantly hindered generic uptake and, thus, allowed branded Tecfidera to maintain far greater sales than it otherwise would and, in turn,

---

[3] In fact, Defendants' authority expressly cautioned that a different result was warranted on a motion to dismiss. *In re Solodyn Antitrust Litig.*, 2018 WL 563144, at *5 (D. Mass. Jan. 25, 2018). Other cases have also observed that *Solodyn* articulated an improper standard for market power. *See In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 300 n.2 (D.R.I. Dec. 17, 2019).

facilitate more switches to Vumerity.  Generics are therapeutically equivalent to the brand name drug but sell for a fraction of the cost.  AC ¶ 40.  As such, they usually capture 90% of brand drug sales within 10 months and severely limit any "switches" to a collateral product.  *Id.* ¶¶ 47-48, 63, 157.  But in that time, deeply discounted generic versions of Tecfidera captured *less than 33%* and Biogen switched *almost 25%* of the prescription base to Vumerity.  *Id.* ¶¶ 154, 158-60.  In other words, Biogen's BOG contracts led to *higher prices* than would prevail in their absence.  *Id.* ¶ 163.  That is more than enough to state a plausible Sherman Act claim.  *See In re EpiPen Direct Purchaser Litig.*, 2021 WL 147166, at *24-25 (D. Minn. 2021) (sustaining allegations that defendant paid PBMs for favorable formulary placement to stifle sale of competing products as a form of commercial bribery prohibited by Section 2); *Amphastar Pharms., Inc. v. Momenta Pharms. Inc.*, 297 F. Supp. 3d 222, 231 (D. Mass. 2018) (entry into agreement with "financial incentives . . . to exclude other producers of generic enoxaparin from the marketplace" sufficient to state a violation of Section 1).  Indeed, federal and state law encourage generic approval and substitution to *introduce* price competition.  AC ¶¶ 39-41.  Measures to impair their market access are, by definition, anticompetitive.

The FTC has also specified that exclusionary PBM rebate contracts can violate Section 2(c) of the Robinson-Patman Act ("RPA"), codified at 15 U.S.C. § 13.  AC ¶ 139.  In this regard, the AC alleges that Biogen paid PBMs large sums for no reason other than to favor Tecfidera over lower cost generics on their formularies, and the PBMs willingly did so to line their own pockets at the expense of the payers for whom they acted as agents.  *Id.* ¶¶ 120, 135, 146-55.  This too states a plausible claim.  *See In re Warfarin Sodium Antitrust Litig.*, 1998 WL 883469, at *16 (D. Del. Dec. 7, 1998) (paying rebates for PBMs to favor more expensive drugs on formularies states viable RPA claim), *rev'd in part on other grounds*, 214 F.3d 395 (3d Cir. 2000).

### b.    The Statements Were False or Misleading When Made

Defendants made a variety of statements on the selling environment after Tecfidera generics

- 12 -

entered the market in mid-2020.  AC ¶¶ 225-82.  All are adequately alleged to be actionable.

**Competitive Environment**.  After losing patent suits to stop generic copies Tecfidera from entering the market, Defendants were forced to explain the fallout from this sea change.  Defendants repeatedly misled investors by claiming that Biogen "began to experience the impact of multiple Tecfidera entrants" but continued to perform well in a "highly competitive market" with "increased competition" while omitting that it suppressed their ability to compete by paying PBMs to disfavor them.  AC ¶¶ 225-45.  Vounatsos even represented that "we . . . welcome competition" and there was "no reason to believe" that formularies will treat MS products differently any time soon.  *Id.* ¶¶ 225-26, 241.  Of course, by then, Biogen already entered BOG contracts to do just that.  *Id.* ¶ 227.

Defendants stress that the AC fails to allege that "Biogen did *not in fact* experience" competition from generic Tecfidera.  Mem. at 11.  But "the fact that a statement is literally accurate does not preclude liability" because it can still *mislead* by omission.  *Lucia*, 36 F.3d at 175.  As pled, these statements gave the false impression that that "Biogen was experiencing the impact of unimpaired competition" from generics or competing with them "on the merits."  AC ¶¶ 229, 231, 233, 236, 240, 243, 245.[4]  Indeed, describing a drug market as "highly competitive" is misleading if the company uses anticompetitive practices.  *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *8 (S.D.N.Y. Mar. 28, 2018).  This is so "regardless of whether the [market] was in fact competitive." *In Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *10 (E.D.N.Y. Sept. 27, 2019) (entry into agreements to block lower price groups from forming).

Recognizing this infirmity, Defendants claim there was no duty to disclose Biogen's practices because the statements have "no discernable connection" to rebates or PBMs.  Mem. at 11-

---

[4] This is reinforced by "context and manner of presentation."  *Lucia*, 45 F.4th at 175.  The statements were made in the context of Biogen adapting to a new market with generics that promote price competition, and alongside other comments assuring that "we compete . . . the right way" and Vumerity's performance was a result of its "strong product profile."  AC ¶¶ 39-40, 225, 235, 237.

12. Defendants must be reading another complaint.  The AC alleges that Biogen successfully stifled competition from generic versions of Tecfidera by entering BOG contracts with PBMs as soon as they hit the market in 2020.  AC ¶¶ 123, 142-63.  The connection is direct and airtight.

Equally flawed is Defendants' attempt to downplay various statements as inactionable "corporate optimism." Mem. at 13.  Such statements are so vague and loose they are "immaterial as a matter of law." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996).  But as a concept rooted in materiality, whether a statement qualifies as such depends heavily on context. *See Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 (D. Mass. 2006) (endorsing two-step context analysis).  Thus, what might be seen as innocuous puffery "standing alone" can be actionable "when used to emphasize and induce reliance." *Bergeron v. Ridgewood Sec. Corp.*, 610 F. Supp. 2d 113, 135 (D. Mass. 2009); *see also In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 334 (D. Mass. 2002) (statement that may be inactionable by itself was actionable "in context" of case).

Defendants label these statements as inactionable by improperly cherry-picking select words out of context.  Each is alleged to be false or misleading for emphasizing that Biogen's MS drugs continued to perform in the face of increased competition or, in the case of AC ¶ 226, that formularies would remain unchanged.  Here, no topic was more important to Biogen investors than the competitive environment for its most profitable product after the entry of low cost generics. *Id.* ¶¶ 27, 52.  That several of these statements (*id.* ¶¶ 225-26, 230, 239) were made "in direct response to an analyst's inquiry" confirms their materiality. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006), *rev'd on other grounds*, 551 U.S. 308 (2007); *see also Henry Schein*, 2019 WL 8638851, at *12 (same for answers describing market as "competitive").  Indeed, one such analyst advised that this was "obviously another key topic for investors."  AC ¶ 225.

**<u>Reasons for Sales Results</u>**.  Starting in October 2020, Defendants consistently reported that

Biogen's MS and fumarate sales decreased by a set amount due to the entrance of multiple Tecfidera generics. AC ¶¶ 250-82. Many of these disclosures included a statement that the decrease was "partially offset" by an increase in Vumerity sales. *Id.* ¶¶ 256, 260, 264, 268, 272, 276, 278, 281. But they failed to disclose that those results were truly the product of—or, at the very least, "partially offset" by—Biogen's entry into BOG contracts that suppressed generic sales. *Id.* ¶ 253.

Defendants reprise the argument that the AC fails to allege that there were "*not* increased sales of Vumerity." Mem. at 12. Here too literal accuracy affords no protection. Once a company chooses to speak about the sources of its income, it puts the topic in play and must provide investors a complete picture—both good and bad—including if "a material source" of the income is "improper or illegal business practices." *Mylan*, 2018 WL 1595985, at *6; *see also In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 285 (E.D.N.Y. 2023) (statements "attributing growth to factors that omit that a portion . . . is a result of anticompetitive conduct are actionable"); *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus., Ltd.*, 432 F. Supp. 3d 131, 165-66 (D. Conn. 2019) (statements "attributing the profit increases and decreases to things other than [collusive] pricing were half-truths . . . that gave rise to a duty to disclose the whole truth").

**Function of PBM Rebates**. Making matters worse, Defendants misled investors about the nature of Biogen's PBM rebates by suggesting they stimulated, rather than suppressed, competition. AC ¶¶ 246-49. Even though Defendants acknowledge this misstatement (Mem. at 11), they fail to address it and have thus waived any argument on it. *WNAC*, 2024 WL 778794, at *7, *supra* p. 8.

### 2.    Misstatements Concerning Leqembi's Safety Profile

After Aduhelm failed commercially and Biogen refocused its AD efforts on Leqembi, the drug's safety profile became highly important. AC ¶¶ 166-73, 183-84. As Biogen and Eisai reported the results of the Clarity AD Phase 3 Study and the approval process unfolded, Defendants, in lockstep with development partner Eisa, consistently glossed over critical information about three

deaths in the OLE suggesting an elevated risk of fatal ARIA in two significant subpopulations.

*First*, Biogen failed to report in its highly anticipated readout for the Clarity AD Phase 3 Study in November 2022 that three patients in the OLE died with severe hemorrhages—the telltale sign of ARIA—after taking Leqembi.  AC ¶ 284.  Instead, it reflexively (and incorrectly) reported that there were only two such deaths across the "core study" and "open-label extension study" after those two deaths were brought to light in industry publications in the days before that release.  *Id.*  ¶¶ 201-02, 283.  Defendants attempt to paper over this inconsistency by highlighting that the results Biogen reported had a "data cutoff" of October 22, 2022.  Mem. at 16 n.18.  But Patient 3 died on *September 19, 2022*.  AC ¶ 192.  Defendants also protest that "full" information on Patient 3's death, including the autopsy report, was not yet available.  Mem. at 16.  The use of qualifiers is telling.  Cerebral hemorrhages were detected *before* Patient 3 died and reported to Eisai in the adverse event report *at the time of death*.  AC ¶¶ 192-93.  No more information was needed.  *See In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 28 (D. Mass. 2004) (incidence of cardiac events in animal study was a "matter of fact" not "conjecture"); *see also In re PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d 106, 118 (D. Mass. 1999) (undercounting mortality in treatment arm is an actionable false statement).

Unable to refute these facts, Defendants claim Patient 3's death was immaterial as a matter of law because Biogen disclosed the other two.  Mem. at 17.  Not so.  Materiality turns on whether there is a "substantial likelihood" the facts would be "important" to a reasonable investor.  *Matrixx*, 563 U.S. at 38.  As a mixed question of law and fact, it is improper to dismiss on this ground unless the facts are "so obviously unimportant . . . that reasonable minds cannot differ."  *Cooperman v. Indiv., Inc.*, 171 F.3d 43, 49 (1st Cir. 1999); *see also Gerneth v. Chiasma, Inc.*, 2018 WL 935418, at *3 (D. Mass. Feb. 15, 2018) (same).  In *Thant v. Karyopharm Therpeutics Inc.*, 43 F.4th 214 (1st Cir. 2022), cited by Defendants, the failure to disclose a more detailed breakdown of adverse events

was immaterial because the issuer *accurately reported* the "most common" ones, including death, and the patient population already suffered from a host of ailments. *Id.* Here, Biogen admittedly did not, and ARIA is a condition that uniquely manifests with anti-amyloid drugs. AC ¶¶ 183, 191.[5]

Here, it was known that ARIA, especially fatal cases, would weigh heavily on Leqembi's approval and commercial prospects after the Aduhelm debacle (AC ¶¶ 183-84). *See Shash v. Biogen, Inc.*, 84 F.4th 1, 12 (1st Cir. 2023) (data pertinent to FDA approval is material); *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 332 (S.D.N.Y. 2014) (same when "relative toxicity of product" was "critical" to FDA review). Even Viehbacher confessed "safety will be a big issue" for physicians (AC ¶ 295). *See Carbonite*, 22 F.4th at 8 (CEO admission topic was important shows materiality). Biogen also promoted Leqembi as a breakthrough therapy to "drive renewed growth" and offset losses in MS (AC ¶ 171). *Id.* at 8 (materiality confirmed by fact new product promoted as "shoring up" weakness in other segments); *see also Matrixx*, 563 U.S. at 47 (facts bearing on commercial prospects of "leading" product are material). That each death generated headlines and Eisai felt compelled to issue a "statement" after news of the third death broke confirms it was material. AC ¶¶ 201-03, 207, 288, 373. The November 2022 disclosure formed the market's initial impression of whether Leqembi was safe and effective. It cannot be said that a third death with concurrent signs of ARIA would be "obviously unimportant" to investors on this record.

*Second*, Biogen denied the *possibility* that Leqembi was responsible for the deaths referenced in the November 2022 release, stating "it is Eisai's assessment that the deaths *cannot* be attributed to [Leqembi]" because the patients had "significant comorbidities or risk factors." AC ¶ 283.[6] Here

---

[5] Defendants' other authority is similarly inapposite. *Pizzuto v. Homology Medicines, Inc.*, 2024 WL 1436025, at *9 (D. Mass. Mar. 31, 2024) (temporally limited statements not "contradicted" by undisclosed facts); *Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 68 (D. Mass. 2022) (similar).

[6] Biogen also endorsed a "statement" issued by Eisai in January 2023 after news of Patient 3's death broke urging all to consider that AD patients usually suffer from many comorbidities. AC ¶ 288. Defendants' effort to distance Biogen from this statement is meritless. Mem. at 19 n.20. As

- 17 -

too it is inapposite that "all relevant information" was not yet available.  Mem. at 16.  Biogen chose

to offer an unequivocal "assessment" from the information that *was* available.  As such, *Omnicare*

and its progeny control.  Contrary to the invented standard that Defendants cobble together (Mem. at

16), such statements are actionable if they are *either* (i) not honestly held; or (ii) do not "fairly

align[] with the information in the issuer's possession."  *Omnicare*, 575 U.S. at 185-89; *see also*

*Carbonite*, 22 F.4th at 7 (discussing *Omnicare* standard for opinion statements).

Biogen possessed substantial evidence to the contrary by then.  The trial investigator for each

patient determined that the death was "***related***" to Leqembi and referred Eisai to evidence negating

the "comorbidities" it raised.  AC ¶¶ 186, 191.  Eisai *itself* conceded there was "a reasonable

possibility" Leqembi contributed to one death.  *Id.*  Eisai also provided a comment for the report on

each death, both of which included statements from neurologists who unanimously agreed that a link

was likely, if not certain.  *Id.* ¶¶ 201-02.  Eisai executives even gave an interview in direct response

to the article on Patient 2.  *Id.* ¶ 203.  Further, Biogen knew from the unblinded data these patients

died shortly after beginning treatment on Leqembi.  *Id.* ¶¶ 185, 189.  Thus, Biogen had no basis to

tell investors that the deaths "cannot" be attributed to Leqembi.  *See City of Ft. Lauderdale Police &*

*Firefighters' Ret. Sys. v. Pegasystems Inc.*, 683 F. Supp. 3d 120, 135 (D. Mass. 2023) (opinion that

legal claims against issuer were "without merit" did not align with executive involvement in

misconduct); *cf. Matrixx*, 563 U.S. at 34, 47 (statement expressing belief that reports suggesting

causal relationship were "unfounded" misleading when company received reports from multiple

physicians raising concerns and on notice of "temporal relationship" between use and side effects).

*Third*, Biogen issued disclosures between January 2023 and June 2023 after receiving an

---

alleged (AC ¶ 288), Biogen directly incorporated the statement into its *own* press release.  *See*
*Cabletron*, 311 F.3d at 37-38 (liability attaches for third-party statements if issuer "expressly or
implied adopt[s]" them); *In re Danimer Sci., Inc. Sec. Litig.*, 2023 WL 6385642, at *5-6 (E.D.N.Y.
Sept. 30, 2023) (company that "links" to press release by another issuer is liable for it under *Janus*).

interim form of FDA approval based on the results of the Phase 2 study that vaguely referred to reports of "fatal events" of intracerebral hemorrhage in "other studies" without disclosing that there were three such events in the OLE under review by the FDA for full approval. AC ¶¶ 285-89. Defendants posit that these statements could not mislead because Biogen already disclosed the "fatal events" in November 2022. Mem. at 19. But that is Plaintiffs' point: the November 2022 release did not report that there was a third death and these disclosures failed to cure that inaccuracy. *See In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 210 (1st Cir. 2005) (rejecting "total mix" argument when "new disclosures, read in the context of previous statements" were still misleading). Defendants also maintain that these disclosures simply reiterated language from the label approved by the FDA in January 2023. Mem. at 19. Defendants overlook that the FDA later told Biogen that it was unaware of clinical trial data showing an increased risk of severe ARIA at the time it approved that label. AC ¶ 210. That Biogen misled FDA into approving a label with this vague language does not provide it with a license to peddle the same misstatements to investors.

*Fourth*, Defendants broadcast that ARIA was less frequent in patients in the Clarity AD Phase 3 Study who received Leqembi on blood thinners than those not on blood thinners based on a new analysis performed in March 2023. AC ¶¶ 290, 292. But by then, Biogen was aware that the three patients who died after taking Leqembi were on blood thinners at the time, and the physician for one warned that the case of ARIA was apparently made *worse* by the blood thinner. *Id.* ¶ 291. Defendants insist that these findings are not alleged to be inaccurate. Mem. at 18. Again, however, that is irrelevant. As alleged, the clear implication of these statements is that patients who took blood thinners while on Leqembi were not at increased risk for developing ARIA. AC ¶ 291.

*Fifth*, Defendants made several statements praising Leqembi's safety after the FDA granted full approval in July 2023. AC ¶¶ 295-96, 298. According to Defendants, these statements are not

actionable because they simply mirror the FDA's assessment that the drug was safe and effective. Mem. at 20. That logic is flawed on many levels. The FDA did not decide the drug was safe per se but, rather, that the benefits outweighed the risks, and several statements spoke solely to Leqembi's safety irrespective of efficacy. AC ¶¶ 31, 295, 298. Further, Eisai actively refrained from obtaining or providing to the FDA additional data about the fatal ARIA events while the BLA was still under review, and when the FDA ultimately analyzed that data post-approval, it retroactively restricted the treatable patient population to remove those with two ApoE4 alleles or on blood thinners. *Id.* ¶¶ 195-97, 208-10, 346. Moreover, by July 2023, Defendants had the benefit of additional data not available in November 2022, including the autopsy reports, which led Eisai to conclude that Patient 3's death was *related* to Leqembi and run sub-group analyses which showed that patients with two copies of ApoE4 and on blood thinners were at *higher risk* for fatal ARIA. *Id.* ¶¶ 197-98, 346. Defendants' unqualified praise hardly, much less fairly, aligns with these facts. *See In re Merck & Co. Sec., Derivative & ERISA Litig.*, 2015 WL 2250472 (D.N.J. May 13, 2015) ("receipt of contrary advice from consultants" and "possession of data discrediting [alternative explanation]" supported liability under *Omnicare* for post-approval statements touting "safety" of drug).

### 3.    Misstatements Concerning Leqembi's Commercial Prospects

After gaining full FDA approval for Leqembi in July 2023, investors were keenly interested in understanding the market potential for this transformational new therapy and how quickly it could bring about the "renewed growth" that Biogen promised. By May 2023, Eisai primed the market to expect 10,000 treated patients by April 2024. AC ¶¶ 216-217. Between July 2023 and February 2024, Defendants endorsed that goal and repeatedly assured that the launch was on track. *Id.* ¶¶ 300-16. Unknown to investors, those assurances were drawn from whole cloth and the launch suffered a series of foreseeable bottlenecks that prevented uptake anywhere close to 10,000 patients. *Id.*

Defendants stumble out of the gate. They argue all statements referring to the 10,000 patient

goal from AC ¶¶ 303-04, 306, and 309 are protected by the PSLRA safe harbor. Mem. at 21-23. By its terms, the safe harbor is limited to "forward-looking statement[s]," 15 U.S.C. § 78u-5(c), and, thus, does not protect any part of a mixed statement that contains a "representation of present fact." *Stone & Webster*, 414 F.3d at 213. But several of the statements self-evidently refer to *present* facts, such as "nothing that we're seeing says that the Eisai guidance can't be met" and "we're working our way through that" 10,000 patient goal. AC ¶¶ 303, 309. Defendants also puzzlingly submit that Viehbacher was describing future expectations when he said "[t]here's no limitation." Mem. at 21. Surrounding text confirms that he was referring to the recent NCD by CMS, as evidenced by his preceding statement "*now* we can go." AC ¶ 303 (emphasis added). None of these statements are forward-looking. *See Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 254 (D. Mass. 2018) (Talwani, J.) (parts of a statement about "*current* expectations or status" are "not forward-looking"); *Levy v. Gutierrez*, 2017 WL 2191592, at *15 (D.N.H. May 4, 2017) (same for statement that contract exclusivity "does not really restrain us from continuing to grow" and strategy is "progressing well").

Defendants assert none of these statements—or the others that they do not deny are assertions of present fact—are alleged to be false or misleading. Mem. at 22, 24-25. Defendants are mistaken.

For example, Defendants repeatedly assured that the launch was "going to plan" and that Biogen was making meaningful "progress" on the 10,000 patient goal. AC ¶¶ 301, 304, 306, 308, 314-15. Again, Defendants insist that none are alleged to be literally false. Mem. at 24-25. But once a company *chooses* to discuss its "progress" on a plan, it has "opened the door" and must disclose any material "delays or overruns" that would impact its ability to achieve the plan. *In re Raytheon Sec. Litig.*, 157. F. Supp. 2d 131, 151 (D. Mass. 2001); *see also Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 217–18 (5th Cir. 2023) (statement that project is "still progressing" misleading even though there was "literal 'progress'"). Here, CWs confirmed

that Eisai internally planned to treat no more than *5,000* patients when it announced the 10,000 patient goal in May 2023, and consistent therewith, patients and doctors lacked local infrastructure to support Leqembi treatment making half unlikely to pursue it, as Eisai confirmed in field surveys, and those who found a willing treatment center faced a two-to-three month bottleneck. AC ¶¶ 215-16, 219. Similarly unpersuasive is the argument that Defendants accurately reported the number of patients who had received Leqembi so far. Mem. at 25 (citing AC ¶¶ 306, 308, 315). Far from "conflicting" with Plaintiffs' allegations, this does not somehow negate Defendants' accompanying misstatements expressing "confidence" that the 10,000 patient goal was still achievable (AC ¶ 306).

Similarly, Defendants touted their visibility into patient demand and capacity, claiming, for example, that "nothing we're seeing says that the Eisai guidance can't be met" and "our internal metrics of intent to treat and patient demand" support the 10,000 patient goal. AC ¶¶ 303, 306, 308-09, 315. As CW9 reported, the data Biogen relied on for this came from a third-party patient registry. *Id.* ¶ 218. Yet, as CW9 explained, the registry was not, in fact, an accurate measure of how many patients would ultimately take the drug because it only listed patients who were *eligible* to receive it. *See OvaScience*, 321 F. Supp. 3d at 254 (statements that company was "on track" to have 1,000 patients by year end misleading because free treatments used for the estimate were not "reliable indicators of demand"). Indeed, Defendants' statements implied they had a reasonably accurate source of data. *Id.* But the registry data was never "precise." AC ¶ 223.

In addition, Defendants advised that Biogen was deploying adequate resources to achieve Eisai's aggressive goal, specifying that "the whole field organization is geared up for this" and it was "deploying our resources to . . . sites" as needed. *Id.* ¶¶ 300-01, 304. Biogen also reported that it redeployed a "large portion" of the Aduhelm team it disbanded to Leqembi. *Id.* ¶ 311. Yet, CWs confirm that Biogen's resources couldn't address the on-the-ground barriers for patients, with few

sites available, and months-long waiting lists for the few sites that existed.  *Id.* ¶¶ 215, 219, 221.

Finally, Defendants maintain that the remaining references to the 10,000 patient goal itself on three investor calls (AC ¶¶ 303-04, 306, 309) are protected by the first and final prong of the PSLRA safe harbor.  Mem. 21-23.  Those provisions exempt forward-looking statements from liability solely to the extent the statement is (i) identified as forward-looking and accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ; or (ii) not made with actual knowledge that the statement was false or misleading.  15 U.S.C. § 78u-5(c)(1).  As alleged (AC ¶¶ 412-15), Defendants' reliance on these provisions is misplaced.

Defendants do not directly argue that any of these statements are protected by the first prong except one from November 2023 (AC ¶ 306).  Mem. at 22.  There is good reason why:  transcripts attached to the Motion confirm that the other calls from September 2023 and January 2024 (AC ¶¶ 303-04, 309) included *no PSLRA warning* identifying any statement as "forward-looking," much less any cautionary language.  *See* Defs.' Ex. 18, 20.[7]  In contrast, the call from November 2023, as Defendants note, contained such a warning and referred to the risk factors in Biogen's SEC filings.  But that does not end the inquiry.  Cautionary language cannot be "meaningful" if it is "misleading in light of historical facts."  *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015).  And cautionary language that frames a risk as a "hypothetical" can mislead if the risk "had already begun to materialize."  *City of Miami Firefighters & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 35 (1st Cir. 2022); *see also In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51

---

[7] Curiously, Defendants cite buzzwords from these two calls in an apparent attempt to show that they too were not "guarantees."  Mem. at 22-23.  To the extent they are suggesting that doing so qualified them for protection under safe harbor, they are wrong.  The safe harbor specifies that oral statements like these qualify for protection if the speaker *says* that the statement is forward-looking and *identifies* a written document containing the factors that could cause actual results to differ.  15 U.S.C. § § 78u-5(c)(2).  The failure to observe either requirement is dispositive.  *See Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *23 (S.D. Ohio Jan. 21, 2016) (paragraph (c)(2) not satisfied when "no oral warning statement was given" on call); *Stone v. Life Partners Holdings*, 26 F. Supp. 3d 575, 598-99 (W.D. Tex. 2014) (same when call lacked any statement that "actual results may differ").

F. Supp. 2d 1, 24-25 (D. Mass. 1999) ("To warn that the untoward may occur when the event is contingent is prudent" but "to caution that it is only possible . . . when [it] already occurred is deceit"). The SEC filings Defendants cite warn that the need for "imaging and other diagnostics" "may" adversely impact the launch of Leqembi in the future. Defs.' Ex. 3, 4. But by posing this in hypothetical terms, Biogen falsely portrayed that risk as a theoretical possibility when the lack of such infrastructure was *already* undermining its launch plan. *See Sepracor*, 308 F. Supp. 2d at 28 (generic warnings not "meaningful" when cardiac side effects jeopardized drug approval).

Equally meritless is Defendants' attempt to shield all references to the 10,000 patient goal under the "actual knowledge" prong. Mem. at 23. While actual knowledge is of course not the same as scienter, Defendants overstate the required showing. The SEC has long interpreted this provision to mean knowledge that the speaker (1) did not genuinely believe the statement; (2) knew there was no reasonable basis for it; or (3) was aware of undisclosed facts that seriously undermined its accuracy. *See Slayton v. American Exp. Co.*, 604 F.3d 758, 774-75 (2d Cir. 2010) (citing SEC *amicus* brief). In addition, even Defendants' authority recognizes this can be established by "inference." *In re Praecis Pharms., Inc. Sec. Litig.*, 2007 WL 951695, at *9 (D. Mass. Mar. 28, 2007). As explained in Point I.B, the AC pleads numerous facts from which it can be inferred that Defendants knew facts that seriously undermined the accuracy of the 10,000 patient goal. Indeed, Viehbacher recently admitted that the data on which it was based was *never* "precise." AC ¶ 223.

### B.      The AC Raises a Strong Inference of Scienter

Scienter is a state of mind embracing "intent to deceive, manipulate, or defraud" as well as "a high degree of recklessness." *Boston Sci.*, 523 F.3d at 85. This form of recklessness arises when there is "a danger of misleading buyers or sellers that is either known . . . or is so obvious that the actor must have been aware of it." *Carbonite*, 22 F.4th at 8-9. Thus, publishing statements with knowledge of "facts suggesting the statements were inaccurate or misleadingly incomplete" is

"classic evidence of scienter." *Aldridge*, 284 F.3d at 83.

To qualify as "strong" under 15 U.S.C. § 78u-4(b)(2), the inference of scienter must be "cogent and at least as compelling as any opposing inference" drawn from the facts alleged. *Tellabs*, 551 U.S. at 324. The test is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference . . . not whether any individual allegation, scrutinized in isolation" does so. *Id.* at 323. Notably, the inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible.'" *Id.* at 324. Rather, a "draw" among competing inferences is "awarded to the plaintiff." *OvaScience*, 321 F. Supp. 3d at 255. Here, the AC pleads a host of facts that, individually and in concert, raise an overwhelming inference of scienter for each Defendant.

### 1.    The Inference of Scienter Is Overwhelming

"The PSLRA neither mandated nor prohibited any particular method of establishing a strong inference of scienter." *Greebel v. FTP Software*, 194 F.3d 185, 195 (1st Cir. 1999). To the contrary, "Congress plainly contemplated that scienter could be proven by inference, thus acknowledging the role of indirect and circumstantial evidence." *Id.* As such, the First Circuit has "rejected any rigid formula for pleading scienter," *Cabletron*, 311 F.3d at 39, and, instead, repeatedly stated that "the plaintiff may combine various facts and circumstances indicating fraudulent intent" to satisfy that showing. *Aldridge*, 284 F. 3d at 82. The AC pleads such facts and circumstances in spades.

**PBM Kickbacks**. It is helpful to begin with what is not in dispute. Defendants do not deny that Tecfidera was a blockbuster multibillion-dollar product responsible for 35-40% of Biogen's overall sales. AC ¶ 27. Nor do they deny that Vounatsos and McDonnell were both aware that those substantial revenue streams would quickly dissipate if Tecfidera lost patent protection, and generics competed for the same sales. *Id.* ¶ 142. Indeed, that is the very reason Vounatsos gave for switching patients to Vumerity. *Id.* ¶ 66. But that gamble failed to yield meaningful results by mid-2020, when the Tecfidera patent was invalidated, and generics began to enter the market. *Id.* ¶¶ 84-92.

By then, Vounatsos and McDonnell also knew Biogen was paying large sums to influence PBM formulary placement. *Id.* ¶¶ 143, 357-63. This presented another means for Biogen to disrupt generic interference. Notably, Vounatsos previously learned through his trade association—if he did not know already—that PBMs were giving preference to higher price drugs over those with lower prices to maximize their fees. *Id.* ¶¶ 353-56. Thereafter, as CW4 reported, Vounatsos personally directed Biogen to raise the price of Tecfidera due to the "fee" paid to PBMs. *Id.* ¶ 145.

As soon as Tecfidera's patent was invalidated, Vounatsos and, later, McDonnell directed, authorized, or permitted Biogen to enter new BOG contracts with PBMs that gave financial incentive to favor branded Tecfidera over—if not exclude—lower cost generics. *Id.* ¶ 146. Because they were "directly involved" in conduct to reduce competition they knew their statements to the contrary were misleading. *In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000); *see also Cambridge Ret. Sys. v. Jeld-Wen Holdings, Inc.*, 496 F. Supp. 3d 952, 967 (E.D. Va. 2020) (same for officers who "implemented and oversaw the anticompetitive scheme"); *Plymouth Cty. Ret. Sys. v. Patterson Cos.*, 2019 WL 3336119, at *19 (D. Minn. July 25, 2019) (same for CEO who was "aware of the collusive agreement" and "supervised" those involved). If that were not enough, CWs confirmed that the BOG contracts required approval by Biogen's senior executives because they fell outside pricing guidance for Tecfidera. AC ¶ 147. This too supports an inference of scienter. *See Mylan*, 2018 WL 1595985, at *17 (inference that CEO and CFO acted with scienter supported by CW testimony that pricing decisions "involved all of Mylan's top executives").

In response, Defendants claim that this merely confirms that Biogen gave rebates for favorable formulary placement, as reported in its SEC filings. Mem. at 28. Far from it. The use of such rebates can be legitimate when used properly and Biogen stated in the same filings that its PBMs designed formularies "based on perceived *value*." AC ¶¶ 125, 249. To be clear: none of

those filings said Biogen paid rebates to PBMs to *block generic competition*.

Defendants do not otherwise directly confront these allegations. Instead, they attack all CWs for holding "non-leadership" positions and failing to "interact" with Defendants. Mem. 26. But that "does not render their statements immaterial to the scienter analysis." *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *14 (D.N.J. July 31, 2019). Indeed, that imposes a requirement that does not exist. *See N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC*, 537 F.3d 35, 52 (1st Cir. 2008) (refusing to "exclude" consideration of CW testimony from "low-level employees" in scienter analysis provided "the information has the earmarks of credibility"); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018) (lack of contact does not "undermine" credible CW testimony that information was "made available to senior executives").[8] In any case, CW4 was on a call *with Vounatsos*. AC ¶ 145. Similarly, it is of no moment that CW4 left in September 2019, before the start of the Class Period. Mem. at 27 n.24. If Vounatsos "directed" changes to PBM rebate arrangements soon before the Class Period, he almost certainly remained involved during the Class Period. *See E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 939 (9th Cir. 2023) (statements by CW who left before class period are "probative" of "how [defendant] behaved and what he knew" during the class period); *Emps.' Ret. Sys. of Gov't of Virgin Is. v. Blanford*, 794 F. 3d 297, 307 (2d Cir. 2015) (similar).

As a fallback, Defendants insist there must be "admissions, internal records or witnessed discussions" to plead scienter. Mem. at 27. But that flouts the settled rule that there is no "rigid formula" for doing so. *Sepracor*, 308 F. Supp. 2d at 30; *see also OvaScience*, 321 F. Supp. 3d at 256

---

[8] CW allegations will be credited if "they are described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Cabletron*, 311 F.3d at 29. And Defendants do not argue that any CW was not in a position to possess the information alleged. Unlike the CWs referenced in AC ¶¶ 145-47, the CWs in the cases Defendants rely on (Mem. at 26-27) never suggested that defendants had access to the information they observed, which made the lack of any "contact" key.

("[N]o particular types of indicia of scienter are required."). In fact, the case Defendants cite relied on a First Circuit case, which, in turn, stated that a plaintiff may also "combine various other facts and circumstances" to plead scienter. *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 614 (1st Cir. 2017).

Here, the AC pleads an array of circumstantial evidence that further bolsters the inference of scienter. Vounatsos' frequent and detailed discussion of PBM rebates for Biogen's MS drugs—including Tecfidera—before and during the Class Period (AC ¶¶ 357-65) is "strong circumstantial evidence" that he stayed informed on the topic. *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 133-34 (D. Conn. 2021); *see also Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *5 (N.D. Ill. Sept. 1, 2020) (same for kickback scheme). Perhaps the strongest support of all is the timing of the BOG contracts. That Biogen began entering them as soon as it lost patent protection for Tecfidera (AC ¶ 146) is strong evidence they were intended to hinder generic competition. In addition, the fact that, by then, Biogen faced several government investigations and lawsuits arising from illegal kickbacks, including one that resulted in $900 million recovery (AC ¶¶ 366-70), is "one more piece of the puzzle." *Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 93, 115 (D. Mass. 2014). Defendants stress that these were "unrelated" cases involving payments to physicians. Mem. at 28. That misses the point. Vounatsos and McDonnell were aware of these matters and, thus, on notice of the nature of a kickback, *i.e.*, a payment to receive preferential treatment. AC ¶ 135.

**Leqembi Safety**. As an initial matter, Defendants insist that they cannot act with scienter unless they *disbelieved* their own statements. Mem. at 29. That is a transparent ploy to raise the standard for pleading scienter far beyond the PSLRA. Scienter exists when a defendant "knew facts suggesting the statements were . . . misleadingly incomplete." *Johnston*, 986 F.3d at 72. As set forth in Point I.A.2, such exacting facts are not needed to show *any* misstatement is misleading.

As detailed in the AC, Eisai indisputably received detailed information about the three deaths

in the OLE, including real time notice from the responsible physician and adverse event reporting with details surrounding the event and the physician's conclusions.  AC ¶¶ 186, 190-91, 193.  In fact, Eisai admitted it had a team "responsible for collecting and analyzing adverse events (including any fatalities)" and was "watching closely" for deaths throughout the clinical program.  *Id.* ¶¶ 203, 371.

As such, Defendants labor to distance Biogen from Eisai (Mem. at 29) but those efforts fail. The RCA for Leqembi established a JSC to oversee the development of Leqembi, chaired by Singhal, and required Eisai to: (i) provide Biogen with a draft of any FDA submission for review and comment; (ii) share all safety reporting with Biogen; and (iii) receive Biogen's consent before making any public statement about Leqembi.  *Id.* ¶¶ 378-78, 380.  Beyond that, Vounatsos and Viehbacher frequently spoke with the CEO of Eisai about the program.  Vounatsos spoke to his counterpart every other day as of 2022 and continued to speak on a "very regular basis" until he left in 2023.  *Id.* ¶ 382.  Viehbacher already had a close relationship with the CEO and confirmed he spoke with him "multiple times a month" and had "an awful lot of interaction."  *Id.*

Thus, Biogen *received* the adverse event report for each death and *approved* the statements that Eisai and its senior executives gave in direct response to the news reports revealing each death. This is significant because the initial adverse event report for each death specified that the physician designated the death as "***related***" to Leqembi, and each news report included quotes from numerous doctors who all agreed Leqembi was the likely cause of death.  *Id.* ¶¶ 186, 191, 193, 201, 203, 207.

Similarly, the Individual Defendants demonstrated that they knew of material developments through these close ties.  Indeed, Vounatsos, McDonnell, and Singhal repeatedly reported that they were aware of recent clinical and regulatory developments as a direct result of their discussions with Eisai under the RCA (AC ¶ 381).  *See KB Partners I, L.P. v. Barbier*, 907 F. Supp. 2d 826, 831 (W.D. Tex. 2012) (allegations that defendants "had frequent conversations" and "participated in

meetings" with partner company regarding drug approval process "make the inference of scienter in this case more compelling"); *see also SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) (inference that executives "had access to detailed information" warranted when "public comments regarding the clinical data . . . confirm they had intimate knowledge of the data").

In any event, Defendants were on notice that multiple members of the scientific community concluded that Leqembi caused Patient 3's death by no later than January 6, 2023, when Biogen issued a press release incorporating a "statement" by Eisai responding to the news story with those conclusions. AC ¶¶ 372-74. Defendants resist scienter on the ground that Eisai said it disagreed with the doctors. Mem. at 30-31. That is beside the point. The fact remains they knew about the growing scientific consensus. *See BSC*, 523 F.3d at 87-88 (scienter pled where "defendants knew of adverse reports from doctors" contrary to public statements and "minimized" them). Indeed, the fact that Biogen decided to join in this statement—and permit Eisai senior executives to give interviews in response to news of Patient 2's death in November 2022 (AC ¶ 203)—shows that Defendants were "sufficiently concerned" by the conclusions to take action. *Matrixx*, 563 U.S. at 49.

Perhaps most telling of all, Eisai—with Biogen's blessing—took great pains to avoid pertinent details on Patient 3's death and, in turn, provide it to the FDA while the Leqembi BLA was under review. *Id.* ¶¶ 195, 197, 208-10. These "attempts at covering-up the truth . . .further tip the balance of inferences regarding the Defendants' states of mind in favor of scienter." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 641 (E.D. Va. 2000); *see also OvaScience*, 321 F. Supp. 3d at 256 (efforts to "conceal poor sales figures" support inference of scienter).

Accordingly, this case is a far cry from *In re Psychemedics Corp. Securities Litigation*, 2017 WL 5159212, at *5 (D. Mass. Nov. 7, 2017) (cited in Mem. at 30), where the court refused to impute the scienter of an independent distributor in Brazil to the defendant based purely on their commercial

- 30 -

relationship when the complaint was "devoid" of any allegations that the defendant learned of the misconduct from the distributor. *Id.* at \*4-5. As set forth above, that is simply not the case here.

**Leqembi Launch**. Defendants attack strawmen by focusing primarily on CW statements. Mem. at 31-32. As alleged, Biogen's executives already understood the barriers limiting uptake for a new AD infusion therapy from Aduhelm's failed launch, including a lack of sufficient sites for screening and infusion. AC ¶ 213. Viehbacher admittedly knew too. *Id.* ¶ 214. Thus, McDonnell confirmed that "commercial infrastructure" was a topic of great focus in his discussions with Eisai as they planned for the launch of Leqembi. *Id.* ¶ 381. Singhal also said that the JSC "constantly" discussed the 10,000 patient goal and, as one might expect, Viehbacher spoke about it with the CEO of Eisai. *Id.* ¶ 383. These allegations support the inference that Defendants were keenly aware of the structural barriers that would stymie uptake from interested patients, even if Biogen and Eisai used a reasonably accurate measure of demand, and that was why Eisai was projecting only *5,000* patients by March 2023 internally. *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019) (touting "knowledge" on topic supports inference executives had "intimate knowledge" about it); *KB Partners*, 907 F. Supp. 2d at 831, *supra* pp. 29-30.

Further, Viehbacher admitted after abandoning the 10,000 patient goal that the demand metrics he used to substantiate the baseless target were never "precise" and, as such, there was no basis to give a reliable forecast *all along*, consistent with the testimony of CW9, CW10, and CW11. AC ¶¶ 218-20, 223. This candid admission adds further weight to the inference of scienter. *See City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. Cerence Inc.*, 2024 WL 1258149, at \*17 (D. Mass. Mar. 25, 2024) (post-hoc "admissions" about previous guidance support scienter inference).

### 2. The Importance of Tecfidera and Leqembi Seal the Inference of Scienter

"The importance of a particular item . . . can support an inference that the defendant is paying close attention to [it]," and thus an inference of scienter, "if that close attention would have revealed

an incongruity so glaring as to make the need for further inquiry obvious." *Carbonite*, 22 F.4th at 9. Tecfidera was Biogen's top product, responsible for billions in revenue, and Leqembi was hailed as its next major growth platform. AC ¶¶ 56, 171, 402. It is absurd to suggest Defendants were unaware of new pricing terms for Tecfidera triggered by the entry of generics or a series of deaths in the OLE for Leqembi (and the chorus of conclusions that it was the cause). *See Carbonite*, 22 F.4th at 9 (inference proper for new product promoted as important to future success even before it had revenue); *Teva*, 2022 WL 889158, at *13 (same for MS drug that "made up such a large share [20%] of Teva's overall revenue"); *see also OvaScience*, 321 F. Supp. 3d at 255 (similar).

Relying on *In re Silverlake Grp., L.L.C. Sec. Litig.*, 2022 WL 4485815 (N.D. Cal. Sept. 27, 2022), Defendants counter that the AC does not specify the "the percentage" of sales attributable to Tecfidera during the Class Period. Mem. at 28. But there, "none of the Defendants were *members of Intelsat's management* during the Class Period." *Id.* at *9. Defendants lodge no such accusations here. Further, the AC alleges that Biogen remained "dependent" on revenues from Tecfidera at the start of the Class Period and it continued to be its "top-selling" drug at the time of the misstatements. AC ¶¶ 231, 233, 236, 240, 243, 245, 398. Indeed, the 2020 Form 10-K that Defendants attach to the Motion confirms that Tecfidera was responsible for 38.9% of Biogen's sales in 2019 and $36.5% of its sales in 2020, by far the most of any. *See* Biogen 2020 Form 10-K (Ex. 1), Doc. No. 54-1, at 4.

Defendants stray even further afield by arguing that core operation allegations require a "plus factor" to carry any weight. Mem. at 28-29. The First Circuit did not endorse that rule in the appeal of the decision they cite, *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 165 (1st Cir. 2019), and has never required such a showing, including in its later decision in *Carbonite*. In any case, the Court need not look any further than the preceding section for a litany of "plus" factors.

### 3.    The AC Pleads Compelling Individualized Motives

While a motive to defraud is not required to raise a strong inference of scienter, *Tellabs*, 551

U.S. at 325, it can provide "additional ballast" for such an inference when "combine[d]" with other allegations. *Cabletron*, 311 F.3d at 40. In addition to the already strong inference of scienter raised by its other allegations, the AC pleads that Defendants had ample motive to hide adverse facts.

*First*, Vounatsos had substantial motive to hide the secret pacts he struck with PBMs. As alleged, nearly 40% of the $10.8 billion in global sales that Biogen generated in 2018 came from sales of Tecfidera, primarily in the United States. AC ¶¶ 26-27, 56. After mishandling the litigation over the Tecfidera patents, Vounatsos faced enormous pressure to replace the loss of such a significant part of Biogen's revenue. *Id.* ¶¶ 56, 66, 81. It is no exaggeration to say his career was "on the line." *Cabletron*, 311 F.3d at 39. As the First Circuit explained, this goes beyond the "usual concern by executives to improve financial results" that has been found insufficient. *Id.*; *see also ACA Fin. Guaranty Corp. v. Advest, Inc.*, 512 F.3d 46, 67 (1st Cir. 2008) ("self-interested motivation of defendants" to save "salaries or jobs" can support scienter). That Vounatsos was abruptly removed without a successor after Aduhelm failed (AC ¶ 114) "confirm[s]" that these "motivating fears" were real. *Cabletron*, 311 F.3d at 39; *see also Aldrige*, 284 F.3d at 84 (similar).

*Second*, the AC pleads motive through insider stock sales, which "has long been recognized as probative of scienter." *Greebel*, 194 F.3d at 197. This is a fact-specific inquiry, and the weight it adds "can range from marginal to strong." *Cabletron*, 311 F.3d at 40; *see also BSC*, 523 F.3d at 90 (even "weak[]" stock sale allegations offer "some support"). During the Class Period, Vounatsos sold $6.44 million, McDonnell sold $4.25 million, and Singhal sold $1.92 million, in unusual amounts compared to their acquisitions and prior trading history. AC ¶¶394-97.[9] Indeed, Vounatsos previously bought shares at market rates before the Class Period, but abruptly stopped doing so and

---

[9] Incredibly, Defendants suggest the inference of scienter is undercut because the AC does not allege that Viehbacher sold any shares. Mem. at 32. That is because he did not have any fully vested shares to sell, having started at Biogen in 2022. *See* Viehbacher Forms 3 and 4 (Ex. 2), Doc. No. 54-2.

sold *four times* as much during the Class Period, and McDonnell did not have *any* trading activity before the start of the Class Period (*id.*). *See Levy*, 2017 WL 2191592, at *14 ("stark contrast" between class period sales and earlier activity suggests scienter); *In re Ariad Pharms., Inc. Sec. Litig.*, 98 F. Supp. 3d 147, 165 (D. Mass. 2015) (same), *aff'd*, 842 F.3d 744 (1st Cir. 2016).

Defendants urge that all sales were "automatic" to cover taxes on vesting shares or, in the case of Singhal, "non-discretionary" under a Rule 10b5-1 plan. Mem. at 33. But none of the Form 4 filings they cite say any sales were to cover taxes except *one* by Vounatsos and *one* by Singhal, much less *automatic*. *See* Defs.' Ex. 24, 25. Instead, Defendants ask the Court to *notice* this from a 2024 "Equity Plan," which does not even govern the grants at issue (*e.g.*, those received by Vounatsos long *before* 2024). Defs.' Ex. 5. That cannot stand. On a motion to dismiss, the Court may only consider an extrinsic document for the fact it exists, not "the truth of any matters asserted therein," *Pizzuto*, 2024 WL 1436025, at *1, especially since those matters directly conflict with the statements in the Form 4 filings. In any case, "there is little principled reason to exclude in-kind sales" for taxes because fewer shares need to be sold if the price is inflated. *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017). Further, a 10b5-1 plan is "not a cognizable defense to scienter" if "adopted during the Class Period." *Ariad*, 98 F. Supp. 3d at 165. Defendants fault Plaintiffs—who do not have a copy—for failing to allege when it went into effect. Mem. at 33 n.32. But the use of a 10b5-1 plan is an *affirmative defense* and this, at best, confirms it is an issue of fact that cannot be resolved now. *See BSC*, 523 F.3d at 92 (rejecting 10b5-1 defense when date it went into effect not apparent from face of complaint).

Defendants also insist that sales cannot be unusual unless they take place at the apex of a stock's price. Mem. at 33-34. The First Circuit has never imposed such a rigid and demanding rule. In the case they cite, none of the sales were made "at the high point" and, instead, took place *after* a

- 34 -

disclosure that caused a large stock drop. *Greebel*, 194 F.3d at 206. Even where the First Circuit has considered such timing, it was sufficient to allege "a significant amount of insider trading *in the months before the announcement*," which raises the question "why they would have sold so much at a time when the company appeared to be soaring." *BSC*, 523 F.3d at 92-93. So too here.[10]

*Third*, Vounatsos, Viehbacher, and McDonnell had executive compensation arrangements heavily tied to Biogen's overall performance and, thus, its MS drugs and Leqembi. AC ¶¶ 384-90. As shown in Exhibit 4 (Doc. No. 54-4), up to **99%** of their compensation depended on the success of those products. Defendants accept this can weigh on scienter when coupled with "additional" allegations that make it unusual. Mem. at 35. Here, a substantial part was based *directly* on MS or AD metrics, and the patent cliff and looming FDA decision gave further incentive to cash in. *See Holwill*, 2020 WL 5235005, at *5 (need to "maximize sales of Humira before competitors entered the market" provided motive for kickback scheme where compensation tied to Humira sales).

## II.    PLAINTIFFS STATE A CONTROL PERSON CLAIM

A claim under Section 20(a) of the Exchange Act requires a primary violation and control over the primary violator. *Stone & Webster*, 414 F.3d at 194. Conceding control, Defendants move to dismiss for failure to plead a primary violation. Mem. at 35. Plaintiffs do so as set forth above.

**CONCLUSION**

For all the foregoing reasons, the Court should deny Defendants' Motion in its entirety.[11]

---

[10] Contrary to Defendants' suggestion (Mem. 34), Form 4 filings made by McDonnell that they chose not to include in their exhibit confirm that he made numerous sales in 2021 and 2022, once his initial grants vested. *See* Ex. McDonnell Forms 4 (Ex. 3), Doc. No. 54-3. These sales were inadvertently omitted from the chart in AC ¶ 395 but contribute to the total proceeds alleged therein.

[11] While Plaintiffs respectfully submit that dismissal is not warranted for all the reasons above, the majority of arguments that Defendants raise—tenuous as they are—seek dismissal on the ground that the AC fails to plead *sufficient facts*. As such, any dismissal should be without prejudice.

Dated:  April 21, 2025                              Respectfully submitted,

                                                    */s/ Justin D. D'Aloia*
                                                    Jeremy A. Lieberman (*pro hac vice*)
                                                    Justin D. D'Aloia (*pro hac vice*)
                                                    Emily C. Finestone (BBO # 693684)
                                                    Guy Yedwab
                                                    POMERANTZ LLP
                                                    600 Third Avenue, 20th Floor
                                                    New York, New York 10016
                                                    Telephone: (212) 661-1100
                                                    jalieberman@pomlaw.com
                                                    jdaloia@pomlaw.com
                                                    efinestone@pomlaw.com
                                                    guyyedwab@pomlaw.com

                                                    Brian Schall
                                                    THE SCHALL LAW FIRM
                                                    2049 Century Park East, Suite 2460
                                                    Los Angeles, California 90067
                                                    Telephone: (424) 303-1964
                                                    brian@schallfirm.com

                                                    *Counsel for Plaintiffs and Lead Counsel*
                                                    *for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2025, a true and correct copy of the foregoing

*PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO*

*DISMISS THE AMENDED COMPLAINT* was served by CM/ECF to the parties registered to the

Court's CM/ECF system.

*/s/ Justin D'Aloia*