**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FRANCES CLARITY STOKES and THOMAS ALLEN GRAY, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 1:24-cv-12691 |
| Plaintiffs, | **ORAL ARGUMENT REQUESTED** |
| v. | Leave to file reply granted on October 30, 2024 (ECF No. 41) |
| BIOGEN INC., CHRISTOPHER A. VIEHBACHER, MICHEL VOUNATSOS, MICHAEL R. MCDONNELL, and PRIYA SINGHAL, | Leave to file excess pages granted on February 7, 2025 (ECF No. 46) |
| Defendants. | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................................ 1

I.    The Opposition Confirms That Plaintiffs Do Not Plead Falsity ............................................. 1

    A.    Tecfidera and Vumerity Statements Not False or Misleading ................................ 1

    B.    Leqembi Statements Not False or Misleading ........................................................ 3

        i.    Leqembi Safety Profile Statements............................................................. 3

        ii.    Leqembi Commercial Rollout Statements ................................................... 8

II.    The Opposition Confirms That Plaintiffs Do Not Plead Scienter ....................................... 12

    A.    No Scienter as to Tecfidera and Vumerity Statements ........................................ 12

    B.    No Scienter as to Leqembi Statements ................................................................. 13

        i.    Leqembi Safety Profile Statements........................................................... 13

        ii.    Leqembi Commercial Rollout Statements ................................................. 15

    C.    Stock Sale Allegations Do Not Support a Strong Inference of Scienter............... 16

    D.    General Corporate Incentives Do Not Support a Strong Inference of Scienter .... 17

CONCLUSION ........................................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008) ...................................................................................................10

*In re Analogic Corp. S'holder Litig.*,
   2019 WL 4804800 (D. Mass. Sept. 30, 2019) ........................................................................9

*Angelos v. Tokai Pharms., Inc.*,
   494 F. Supp. 3d 39 (D. Mass. 2020) .....................................................................................16

*In re Biogen Inc. Sec. Litig.*,
   193 F. Supp. 3d 5 (D. Mass. 2016) .......................................................................................17

*In re Bos. Sci. Corp. Sec. Litig.*,
   686 F.3d 21 (1st Cir. 2012) ..............................................................................................12, 14

*Brennan v. Zafgen, Inc.*,
   853 F.3d 606 (1st Cir. 2017) .................................................................................................14

*Brill v. Invivyd, Inc.*,
   2024 WL 4228832 (D. Mass. Sept. 18, 2024) ...............................................................3, 4, 5

*Brumbaugh v. Wave Sys. Corp.*,
   416 F. Supp. 2d 239 (D. Mass. 2006) ...................................................................................16

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002) ...................................................................................................17

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
   496 F. Supp. 3d 952 (E.D. Va. 2020) ...................................................................................13

*City of Ft. Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*,
   683 F. Supp. 3d 120 (D. Mass. 2023) .....................................................................................5

*Dahhan v. OvaScience, Inc.*,
   321 F. Supp. 3d 247 (D. Mass. 2018) ................................................................................9, 15

*Driscoll v. Simsbury Assocs., Inc.*,
   2018 WL 2139223 (D. Mass. May 9, 2018) .........................................................................14

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023) ..................................................................................................13

*Ganem v. InVivo Therapeutics Holdings Corp.*,
845 F.3d 447 (1st Cir. 2017)..................................................................................10

*Guerra v. Teradyne Inc.*,
2004 WL 1467065 (D. Mass. Jan. 16, 2004)............................................................7

*Hadian v. Fate Therapeutics*,
2024 WL 4246083 (S.D. Cal. Sept. 19, 2024)........................................................16

*In re iRobot Corp. Sec. Litig.*,
527 F. Supp. 3d 124 (D. Mass. 2021) ...............................................................13, 17

*U.S. ex. rel. Kelly v. Novartis Pharms. Corp.*,
827 F.3d 5 (1st Cir. 2016)........................................................................................2

*Lamontagne v. Tesla, Inc.*,
2024 WL 4353010 (N.D. Cal. September 30, 2024) ...............................................15

*Leavitt v. Alnylam Pharms., Inc.*,
525 F. Supp. 3d 259 (D. Mass. 2021) .....................................................................14

*Loc. No. 8 IBEW Ret. Plan & Tr. v.Vertex Pharms., Inc.*,
838 F.3d 76, (1st Cir. 2016)....................................................................................17

*Lopez v. Ctpartners Exec. Search Inc.*,
173 F. Supp. 3d 12 (S.D.N.Y. 2016).........................................................................3

*Luongo v. Desktop Metal, Inc.*,
2023 WL 6142715 (D. Mass. Sept. 20, 2023) ...................................................12, 15

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)..................................................................................................15

*Mehta v. Ocular Therapeutix, Inc.*,
955 F.3d 194 (1st Cir. 2020)..............................................................................15, 16

*In re Mylan N.V. Sec. Litig.*,
2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .....................................................2, 13

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
537 F.3d 35 (1st Cir. 2008)......................................................................................9

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)..................................................................................................8

*Oran v. Stafford*,
34 F. Supp. 2d 906 (D.N.J. 1999) ............................................................................6

*Pizzuto v. Homology Medicines, Inc.*,
    2024 WL 1436025 (D. Mass. Mar. 31, 2024)....................................................................7

*Plymouth Cty. Ret. Sys. v. Patterson Cos.*,
    2019 WL 3336119 (D. Minn. July 25, 2019) ...........................................................13

*Premca Extra Income Fund LP v. iRobot Corp.*,
    763 F. Supp. 3d 121 (D. Mass. 2025) ......................................................................13

*Quinones v. Frequency Therapeutics, Inc.*,
    106 F.4th 177 (1st Cir. 2024)...................................................................................13

*In re Sotheby's Holdings, Inc.*,
    2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)........................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................15

*Thant v. Karyopharm Therapeutics Inc.*,
    43 F.4th 214 (1st Cir. 2022)......................................................................................4

*Tran v. XBiotech, Inc.*,
    2016 WL 5408382 (W.D. Tex. Sept. 23, 2016)......................................................16

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .................................................................................15

*Zhou v. Desktop Metal, Inc.*,
    120 F.4th 278 (1st Cir. 2024)....................................................................................1

## STATUTES

15 U.S.C. § 13(c) ............................................................................................................2

## ARGUMENT

### I.      The Opposition Confirms That Plaintiffs Do Not Plead Falsity

#### A.      Tecfidera and Vumerity Statements Not False or Misleading[1]

Plaintiffs' challenges to statements describing the commercial performance of Tecfidera and Vumerity and corporate optimism about the products fail.  Br. 11-12.[2]

Plaintiffs contend that statements concerning Tecfidera and Vumerity's commercial performance—such as statements explaining that a "decrease" in revenue for the Company's multiple sclerosis product line was "primar[ily] due to a decrease in Tecfidera demand and price as a result of multiple Tecfidera generic entrants" but noting that "[t]his decrease was partially offset by an increase" in Vumerity sales—were false or misleading for failing to disclose Biogen's supposedly improper use of rebates or PBM contracts.  *E.g.*, AC ¶ 256; Br. 11-12.  Yet none of the challenged statements speaks to or implies anything about Biogen's use of rebates or PBM contracts.[3]  Br. 11-13.  As the court held in *Zhou v. Desktop Metal*—recent First Circuit precedent that Plaintiffs fail to address—issuers must disclose only those facts necessary to render a statement not "so incomplete as to mislead."  120 F.4th 278, 294 (1st Cir. 2024) (statement about "adding capacity" to meet "robust demand" not misleading for omitting that manufacturing facility was out of regulatory compliance because statement "leaves no impression about … regulatory

---

[1] The alleged misstatements appear at AC ¶¶ 225-26, 228, 230, 232, 234-35, 237-39, 241-42, 244, 247, 250-52, 254-56, 258-60, 262-64, 266-68, 270-72, 274, 276, 278, 280-81.

[2] Defined terms are the same as the opening brief (ECF No. 50).  "Br. _" refers to the opening brief.  "Opp. _" refers to the opposition brief.  Citations to "Ex." refer to exhibits to the Declaration of Jessica Lewis (ECF No. 49) or Supplemental Declaration of Jessica Lewis filed herewith.

[3] The only challenged statement that relates to rebates is an anodyne description of their general function—"Rebate accruals are recorded in the same period the related revenue is. . . . These rebates result from performance-based goals, formulary position and price increase limit allowances (price protection)"— which neither is alleged adequately to be false nor is alleged to have been made with scienter.  *See* AC ¶ 247.  Plaintiffs' contention that Defendants "failed to address" this statement is meritless.  Opp. 15.  The opening brief explicitly addressed the statement alongside others and there was no waiver.  Br. 12; *see also* Br. Appendix at A-3-4.

compliance"). Where, as here, Plaintiffs challenge only statements that "leave[] no impression" about rebates or contracts with PBMs, the challenged statements are not misleading. *See id.*

Plaintiffs' "omission" theory is otherwise flawed. In a blatant departure from their Complaint, Plaintiffs now argue that their falsity argument "do[es] not depend on a violation of law, much less the antitrust laws." Opp. 10.[4] Instead, Plaintiffs claim that Biogen "stifled competition" from generics through rebates or PBM contracts and failed to disclose such conduct (which, of course, still implies that Biogen violated antitrust law). *Id.* 14. In any event, none of the statements about Tecfidera or Vumerity's commercial performance required disclosure about Biogen's use of rebates or PBM contracts and certainly did not require Biogen to accuse itself of wrongdoing with respect to such practices. *See In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at \*5 (S.D.N.Y. Mar. 28, 2018). Here, Biogen disclosed its use of rebates, their general function, pressures from PBMs concerning rebates, and the effects of generic entry on Tecfidera sales. Br. 28. There was nothing more to disclose.[5]

Finally, statements that "as a company, [Biogen] always welcome[s] competition," are too vague to be actionable and are not supported by particularized allegations showing that they were false or misleading when made. *E.g.*, AC ¶ 241; Br. 13 n.15; *Lopez v. Ctpartners Exec. Search*

---

[4] Plaintiffs' assertion that they are not challenging the legality of Biogen's use of rebates is untenable; illegality is the Complaint's central tenet. *See* AC ¶¶ 123, 125, 132, 153-54, 158, 253, 257, 261, 265, 269, 273, 277, 279, 282 (referring to "illicit" and "collusive" contracts or conduct). But the Complaint does not plead an antitrust violation. Plaintiffs identify no relevant product market and argue that Biogen had a "*total monopoly*" of a Tecfidera-only market "before the entry of generics" (Opp. 11), but allege only conduct *after* generic entry, when Biogen's market share had eroded (AC ¶¶ 91, 398). Plaintiffs also fail to plead a violation of Section 2(c) of the Robinson-Patman Act by, among other things, alleging that PBMs provide "services," when Section 2(c) applies only to payments for goods. *See* 15 U.S.C. § 13(c); AC ¶ 123.

[5] Although in the Opposition Plaintiffs accuse Biogen of "manipulat[ing]" formulary placement or generic competition (Opp. 10), they fail to plead in the Complaint particularized allegations about how the PBM contracts were improper and thus do not plead fraud with particularity. *See U.S. ex. rel. Kelly v. Novartis Pharms. Corp.*, 827 F.3d 5, 15 (1st Cir. 2016).

*Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016).

    **B.**    **Leqembi Statements Not False or Misleading**[6]

        i.    *Leqembi Safety Profile Statements*

Plaintiffs argue that, when reporting the results from the Leqembi clinical trials, Defendants "glossed over" "critical information" about safety. Opp. 15. But Plaintiffs have not demonstrated, as they must, that Biogen or Eisai did not believe their interpretations of the clinical data or that the basis for their opinions was objectively wrong. *Brill v. Invivyd, Inc.*, 2024 WL 4228832, at *8 (D. Mass. Sept. 18, 2024). Nor do Plaintiffs demonstrate that any alleged "omissions" rendered statements about Leqembi's safety profile "so incomplete as to mislead." Br. 17. Accordingly, the safety profile statements fail to support a claim.

*__November 2022 Phase 3 Study Data Presentation (AC ¶ 283).__* Plaintiffs do not dispute that Biogen and Eisai accurately reported that the Phase 3 Study data showed both a reduction in amyloid plaques and improvements in cognitive decline. Nor do Plaintiffs dispute that Biogen accurately disclosed the incidence of ARIA. Rather, Plaintiffs challenge only Biogen's reporting that there were two deaths in the open-label extension study involving "concurrent cerebral macrohemorrhage" and that Eisai (which ran the trials) opined that "[b]oth cases had significant comorbidities and risk factors including anticoagulation contributing to macrohemorrhage or death" and "the deaths cannot be attributed to lecanemab." AC ¶ 283; Opp. 15-18. Plaintiffs do not allege that anyone at Biogen did not believe this interpretation of the trial data, including with respect to the causes of the deaths. Opp. 15-18. Rather, Plaintiffs assert that Biogen had "substantial" evidence "contrary" to these assessments, thus rendering them false or misleading.

---

[6] The alleged misstatements related to Leqembi's safety profile are identified in AC ¶¶ 283, 285-86, 288, 290, 292-93, 295-96, 298. The alleged misstatements related to the Leqembi rollout are identified in AC ¶¶ 300, 301, 303-04, 306, 308-09, 311, 314-15.

*Id.* But none of the so-called "evidence" undermines the factual bases for the statements.

*First*, Plaintiffs insist that Biogen should have disclosed anecdotal opinions from adverse event reports and statements from neurologists in media reports that the open-label extension patient deaths were "related" to Leqembi. *Id.* 17-18.[7] But even the cited articles highlight scientific disagreement as to the role Leqembi may have played in patient deaths. *See Stat+* Article (Ex. 27), Doc. No. 56-1 at 1 (noting Patient 1 experienced "multiple falls, a heart attack, a respiratory infection, and mini-stroke-like events" in months before death, which was still "under investigation"); Nov. 2022 *ScienceInsider* Article (Ex. 28), Doc. No. 56-2 at 2-6 (describing conflicting views about link between Patient 2's death and Leqembi).

Furthermore, that others allegedly disagreed with a defendant does not render a defendant's opinion actionable or create a duty to disclose those contrary opinions. *See Brill*, 2024 WL 4228832, at *9-10 (noting that "[a] legitimate disagreement over scientific data does not give rise to a securities fraud claim" and that opinion statements are not misleading due to "countervailing facts" or even "external facts showing defendants' opinion to be incorrect"). Instead, Plaintiffs must allege that the "factual bases" for defendants' opinion were "false," which they have not done. *See id.* at *8; Br. 16-17.

*Second*, Plaintiffs allege that Defendants concealed that Patient 3 died during the open-label extension and failed to disclose that Patient 3's death was attributable to Leqembi. *See* Opp. 16-18; AC ¶ 284. Per Plaintiffs, after doctors detected cerebral hemorrhages and prepared an adverse event report, Eisai and Biogen needed "no more information" in order to determine (and

---

[7] While investors may "wish[] to know more about the total landscape of [adverse events]…, that alone is not enough to render … disclosures materially misleading." *Thant v. Karyopharm Therapeutics Inc.*, 43 F.4th 214, 226 (1st Cir. 2022). That is particularly true where, as here, the patient cohort includes very ill people with significant comorbidities. *Id.* at 224-26; *see* Br. 17.

4

to announce publicly) that Leqembi played a role in Patient 3's death. Opp. 16. Such an assertion is baseless. As Plaintiffs' own allegations reveal, further evaluation was necessary before making such a determination: as of November 2022, "[Patient 3's] family ha[d] arranged for an autopsy, which could confirm that the woman had CAA [cerebral amyloid angiopathy] and *clarify the antibody's role in her death, but it ha[d] not been completed*[.]" Dec. 2022 *ScienceInsider* Article (Ex. 29), Doc. No. 56-3 at 5 (emphasis added); *see* AC ¶ 207. Furthermore, even if some individuals concluded that Leqembi had played a role in Patient 3's death, varying scientific opinions are insufficient to show that Defendants believed the death of Patient 3 could be attributed to Leqembi or that Defendants concealed any such belief. *See Brill*, 2024 WL 4228832, at *9.[8]

*Finally*, the Opposition fails to provide an adequate response as to how any omissions rendered Biogen's statements concerning clinical trial data "so incomplete as to mislead." Plaintiffs assert that Biogen misrepresented "an elevated risk of fatal ARIA in two significant subpopulations" (Opp. 15-16), but in the very Phase 3 Study presentations that underlie Plaintiffs' claims, Biogen addressed the risks to both subpopulations. *See* AC ¶ 283. Indeed, Biogen reported that, in the Phase 3 Study, ARIA was more common "in ApoE4 carriers" than non-carriers "with higher frequency in ApoE4 homozygous carriers vs ApoE4 heterozygous carriers" and that "risk factors" relevant to the fatalities in the open label extension included "anticoagulation contributing to macrohemorrhage or death." *Id.*; *see also id.* ¶ 285 (Jan. 2023 disclosure that "incidence of ARIA was higher in ApoE ε4 homozygotes"); Jan. 6, 2023 Press Release (Ex. 10), Doc. No. 49-10 at 4 (disclosure that "caution should be exercised when considering the administration of antithrombotics" with Leqembi); AC ¶ 286 (similar).

---

[8] *City of Ft. Lauderdale Pol. & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 683 F. Supp. 3d 120, 135 (D. Mass. 2023) is inapposite. Opp. 18. There, defendants told investors a legal claim was "without merit" when they allegedly knew of facts supporting liability.

***January 6, 2023 Accelerated Approval Announcement (AC ¶¶ 285-86, 288).***  Plaintiffs argue that Defendants' statements between January and June 2023 repeating safety information from Leqembi's FDA-approved label were misleading because they referred to "fatal events" without specifically referencing the three open-label extension deaths.  *See* Opp. 18-19.  These statements fail to state a claim for the reasons discussed above: Biogen was not required to disclose opinions different from its own scientific opinions and was not required to provide details of all adverse events.  *See supra* at 4; *Oran v. Stafford*, 34 F. Supp. 2d 906, 913, 915 (D.N.J. 1999) (statement about risk of heart disease associated with drug not false because "plaintiffs d[id] not allege … any conclusive finding" concerning link between drug and disease).[9]  And simply pointing to differing scientific opinions is not sufficient to demonstrate that Defendants believed the fatalities were attributed to Leqembi or concealed any such belief.  *See supra* at 4.

***Phase 3 Supplemental Analysis (AC ¶¶ 290, 292-93).***  In March 2023, Biogen and Eisai issued a press release stating that, in the Phase 3 Study, "ARIA rates were higher for patients receiving lecanemab" and announcing that Eisai had conducted a further analysis of Phase 3 data in order to "evaluate antiplatelet and anticoagulant [i.e. "blood thinner"] medication use in participants who experienced" ARIA during the study.  AC ¶ 290.  This analysis revealed that the incidence of ARIA in Leqembi-treated patients *not* on such medications was 21.8%, while the incidence was 17.9% and 13.3% for patients on antiplatelet or anticoagulation medications, respectively.  *Id.*  Put another way, based on the Phase 3 Study data, "ARIA did not occur more frequently in lecanemab-treated participants on antiplatelet or anticoagulant drugs compared to

---

[9] In the Opposition, Plaintiffs accuse Biogen of "misle[a]d[ing] the FDA into approving a label" with "vague language." Opp. 19.  This is baseless.  The FDA approved a label with warnings specific to ApoE4 carriers and blood thinners.  *See* Jan. 6, 2023 Label (Ex. 22), Doc. No. 49-22 at 2-4.  Those warnings—later repeated in press releases—explained that Leqembi could be fatal. *See, e.g.*, AC ¶¶ 285, 286, 288.  Biogen obviously did not "mislead" the FDA about anything.

lecanemab-treated participants that were not on either." *Id.*; *see* Br. 17-18; Opp. 19. Remarkably, Plaintiffs acknowledge that the statements about the results were accurate reflections of the data but insist that they were nonetheless misleading because they "impli[ed]" that patients on blood thinners and Leqembi were not at increased risk of ARIA (even though that is exactly what the data demonstrated). Opp. 19. In other words, Plaintiffs disagree with the data. But accurately conveying data is not actionable, so these claims fail. *See Pizzuto v. Homology Meds., Inc.*, 2024 WL 1436025, at *9 (D. Mass. Mar. 31, 2024); *Guerra v. Teradyne Inc.*, 2004 WL 1467065, at *9 (D. Mass. Jan. 16, 2004).[10]

    ***Post-FDA Approval (AC ¶¶ 295-96, 298).*** Plaintiffs assert that statements made after full FDA approval constituted "unqualified praise" for Leqembi's safety profile and did not align with certain additional data or facts. Opp. 20. Not so. The additional information at issue includes: (1) Patient 3's autopsy from March 2023, (2) clinical data from an undated "subgroup analysis" referenced in a November 2024 statement by a European agency showing that patients on blood thinners who are double ApoE4 carriers were at higher risk for ARIA, and (3) the FDA's November 2024 decision to "restrict[] the treatable patient population" to exclude patients on blood thinners and double ApoE4 carriers. *Id.* (citing AC ¶¶ 197-98, 346). These allegations make no sense from a timing perspective. Both the FDA and Eisai reviewed Patient 3's autopsy results *prior* to the FDA's July 2023 approval and thus both the FDA's approval and Biogen's post-approval assessment of Leqembi's safety-benefit profile necessarily took this information into account. AC ¶¶ 196-98; FDA Leqembi Approval Package (Ex. 31), Doc. No. 56-5 at 205-06. Conversely, the subgroup analysis and the FDA's decision to limit Leqembi for certain patients

---

[10] Plaintiffs do not respond to arguments concerning AC ¶ 293 (describing the prevalence of ApoE4 homozygotes carriers as a "rather small" data set). *See* Br. 20 & n.21.

were not alleged to have been known until *November 2024*, after the challenged statements, and therefore cannot have informed the challenged safety assessment. *See* Opp. 20 (citing AC ¶ 346).[11]

Moreover, though Plaintiffs grossly mischaracterize them, the statements at issue are consistent with the FDA's assessment that Leqembi's "benefits outweighed the risks." *See* Opp. 19-20; AC ¶ 295 (statements during July 25, 2023 earnings call that "safety will be a big issue" and "the safety[-]benefit of [Leqembi] will be quite important to physicians"); *id.* ¶ 296 (July 25, 2023 statement describing incidence of ARIA with Leqembi compared to other therapies and noting "the benefit[-]risk [of Leqembi]" was therefore "different"); *id.* ¶ 298 (August 1, 2024 earnings call statement about "belie[f] that the clinical data supports a clear favorable benefit-risk profile"). Contrary to Plaintiffs' assertions, none of these statements constitutes "unqualified praise" for Leqembi's safety profile and instead merely discusses Leqembi's "benefit-risk" profile consistent with FDA approval, Patient 3's autopsy results, and the other information allegedly known to Defendants at the time. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) ("opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion").

ii.     *Leqembi Commercial Rollout Statements*

Plaintiffs fail to rebut the application of the PSLRA safe harbor to statements about Leqembi's commercial rollout, offer no coherent theory of falsity concerning statements about the rollout's status, and ignore Defendants' arguments that certain positive statements about the rollout

---

[11] Even if the subgroup analysis was available prior to the challenged opinions, which is not alleged, Biogen had previously warned of a higher risk of ARIA for the patient populations identified by the subgroup analysis and corroborated by Patient 3's autopsy—namely double ApoE4 carriers and patients on blood thinners. *See supra* at 6.

are inactionable statements of corporate optimism.[12]  *See* Opp. 20-24; Br. 20-26.

 ***10,000 Patient Goal (AC ¶¶ 303-04, 306, 308-09).***  The Opposition does not refute that statements referencing the 10,000-patient goal are protected forward-looking "projections" about future goals" or "plans and objectives of management for future operations."  *See In re Analogic Corp. S'holder Litig.*, 2019 WL 4804800, at *8 (D. Mass. Sept. 30, 2019); *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 (1st Cir. 2008); s*ee also* AC ¶¶ 303-04, 306, 309; Opp. 21; Br. 21-22.  Instead, Plaintiffs recast excerpted language surrounding the goal estimates as "present facts."[13]  But these cherry-picked clauses are not separate statements; they are linked inextricably with, and give context to, projections about the 10,000-patient goal they appeared alongside.  Even if these fragments were present statements of fact, which they are not, Plaintiffs have not alleged adequately that the statements were false.  Plaintiffs do not allege, for example, that CMS' requirement that patients enroll in a registry to monitor real world treatment with Leqembi imposed any material "limitation" on prescribing Leqembi (AC ¶ 303; Opp. 21), or that Biogen was not "working [its] way" towards the goal (AC ¶ 309; Opp. 21; Br. 23 n.22).[14]

---

[12] Plaintiffs do not respond to Biogen's arguments that statements describing Biogen's "pioneering approach," "positive data," and "tremendous progress" are immaterial corporate optimism and thus concede they are inactionable.  Br. 25-26; Opp. 20-24; AC ¶¶ 306, 308, 314.

[13] *See* Opp. 20-24 (incorrectly characterizing as statements of "present fact" statement in which Mr. Viehbacher, *after* giving an update on the CMS registry, projected "now we can go. There's no limitation…the registry seems to be pretty easy to operate;" statement in which Mr. Viehbacher said of expected patient uptake, "we'll start to see that as we get through towards the end of the year" and "nothing that we're seeing says that the Eisai guidance can't be met, which is 10,000 patients by the end of their fiscal year…."; and statement that "we've probably got about a target of 10,000, and we're working our way through that"); AC ¶¶ 303, 309.

[14] *Dahhan v. OvaScience, Inc.*, does not change the outcome.  *See* 321 F. Supp. 3d 247, 254 (D. Mass. 2018); Opp. 22.  There, the court found that an "estimate that OvaScience would achieve 1,000 cycles" was "forward-looking" but indicated that statements about the *status* of achieving that goal should be treated separately.  *Dahhan*, 321 F. Supp. 3d at 254.  Here, Defendants have clearly delineated arguments addressing the goal statements themselves and statements concerning Biogen's progress toward the 10,000-patient goal.  *See* Section I.B.ii; Br. 20-24.

With respect to the projections that specifically reference the 10,000-patient goal, the safe harbor applies because Plaintiffs do not plead particularized allegations showing knowledge of falsity. Opp. 24; Br. 23; *see* AC ¶¶ 303-04, 306, 309. None of the CWs speaks to any Individual Defendant's state of mind, the Complaint does not allege that Defendants received specific lower projections, and Defendants' alleged general awareness of challenges with the rollout does not show they knew that the goal was unreachable. *See* Br. 23, 31-32; Opp. 24; *infra* at 15-16.

Further, as to the statements alleged at AC ¶ 306 concerning the "aim of getting to 10,000 patients" and "signs of progress" towards meeting that goal, Plaintiffs do not dispute that they are forward-looking and identified as such. Opp. 21, 23-24. Instead, Plaintiffs assert that they were not accompanied by meaningful cautionary language and therefore do not merit protection under the safe harbor's first prong. *See id.*; Br. 22. This argument is unavailing. Biogen cautioned that its "ability to successfully commercialize LEQEMBI may be adversely affected" by "requirements such as participation in a registry and the use of imaging or other diagnostics," and the Complaint does not allege that Leqembi was not in the process of being successfully commercialized at the time. *See, e.g.*, Br. 22; Biogen 2Q 2023 Form 10-Q (Ex. 3), Doc. No. 49-3 at 3.

Even setting the safe harbor aside, Plaintiffs fail to plead falsity as to the 10,000-patient goal. Plaintiffs "may not simply contrast a defendant's past optimism with less favorable actual results." *See ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008). Instead, in addition to alleging that Biogen did not achieve the 10,000-patient goal, Plaintiffs also must allege particularized facts showing that the defendants knew that the purported goal was "impossible to achieve." *See Ganem v. InVivo Therapeutics Holdings Corp.*, 845 F.3d 447, 456-57 (1st Cir. 2017) ("fraud by hindsight" cannot state claim as to goal statements). Plaintiffs make no such showing.

***Status of Leqembi Commercial Launch (AC ¶¶ 300-01, 311, 314-15).*** The Opposition

10

underscores that the Complaint contains no particularized allegations of falsity about statements describing the rollout's status (including, for example, statements that "the launch is going to plan," that Biogen was deploying resources to the AD franchise, and that Biogen was making "very solid progress" in "validat[ing] the go-to market model"). *See* Opp. 20-23; AC ¶¶ 300-01, 311, 314-15. Plaintiffs do not dispute that these statements were true but argue that they were misleading because: (1) CW8 heard a different estimate while at Eisai (which pre-dated any challenged goal statement); (2) patient estimates relied on registry information that allegedly was not "precise;" and (3) Biogen experienced "on-the-ground barriers" despite its resources. Opp. 21-23. These arguments fail.

First, CW8, who claims an unnamed director told him that Eisai had an internal goal of treating 5,000 patients, left Eisai before the challenged goal statements and cannot show contemporaneous falsity or knowledge by Defendants. *Id*. 22; AC ¶¶ 19, 216, 300. Similarly, with respect to the registry data, the Complaint states that patient participation in the registry helped "monitor real world treatment with the drug," and CW9 concedes that the registry "show[ed] how many patients [we]re on" Leqembi and provided statistics about "good candidate[s]" for Leqembi. *See* AC ¶¶ 181, 218. That the registry could not predict patient enrollment with certainty does not mean it was not "a reasonably accurate source of data," as Plaintiffs suggest. Opp. 22. Finally, with respect to resources, Plaintiffs do not argue that Biogen did *not* deploy resources to the rollout. Instead, Plaintiffs assert that Biogen falsely "advised" it was "deploying *adequate* resources." *Id.*; AC ¶ 301. But the challenged statements merely represented that Biogen was "actually deploying [its] resources" to treatment sites, that the "field force" was busy and "geared up" for the rollout, and that Biogen would be "redeploy[ing]" to the AD franchise resources previously allocated to Aduhelm. AC ¶¶ 300-01, 304, 311. The Complaint

11

does not allege particularized allegations showing any of these statements were false.

## II.    The Opposition Confirms That Plaintiffs Do Not Plead Scienter

### A.    No Scienter as to Tecfidera and Vumerity Statements

Plaintiffs do not dispute that their CWs were "non-leadership" and did not interact with the Individual Defendants or that there are no "internal records" that support scienter as to the Tecfidera or Vumerity statements.  Opp. 27; *In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 31 (1st Cir. 2012).  Instead, they claim that "an array of circumstantial evidence," such as awareness of PBM practices or involvement in a trade association, supports scienter.  Opp. 25-28.  It does not.

That Mr. Vounatsos "learned" about PBM practices through a trade association does not show "firsthand knowledge" of specific PBM contracts or any alleged improper purpose.  Opp. 26, 28; AC ¶¶ 353-65; *Luongo v. Desktop Metal, Inc.*, 2023 WL 6142715, at *14 (D. Mass. Sept. 20, 2023).  Plaintiffs speculate that the rebate contracts' timing is "strong evidence they were intended to hinder generic competition," but the more cogent inference is that generic entry gave PBMs leverage in "new" contracts to demand higher rebates as a condition of favorable formulary placement, not that Biogen paid "kickbacks" to PBMs.  Opp. 26, 28.  While the Opposition argues that the contracts were to "*favor Tecfidera* over generic[s]," the Complaint actually alleges that PBMs "agreed to *not advantage generic* Tecfidera."  *Id.* 4, 12, 26; AC ¶¶ 150-52 (emphasis added).

Further, Plaintiffs argue that unrelated "government investigations and lawsuits" are "one more piece of the puzzle."  Opp. 28.  Yet Plaintiffs fail to explain how being generally aware of these matters—or being generally aware of what a "kickback" entails (when the Complaint does not allege adequately a kickback)—could establish scienter for the statements at issue here.

Plaintiffs also suggest that rebate contracts were "outside pricing guidance" and needed "approval by Biogen's senior executives."  *Id*. 26.  But "senior executives" is a large category and does not say anything about any Individual Defendant.  Indeed, the Complaint identifies only one

12

executive in the approval structure who *reported* to Mr. Vounatsos. AC ¶ 147. Plaintiffs' theory boils down to nothing more than "scienter by status," which courts have "uniformly rejected." *Premca Extra Income Fund LP v. iRobot Corp.*, 763 F. Supp. 3d 121, 159 (D. Mass. 2025).[15] Further, CW4's speculation, based on one call with Mr. Vounatsos before the alleged class period, that Mr. Vounatsos "almost certainly remained involved during the class period" on pricing issues is insufficient. Opp. 27 (citing AC ¶ 145). *See In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 142 (D. Mass. 2021).[16] In any event, because Biogen allegedly had increased Tecfidera prices "at least *ten times*" since 2013 (AC ¶ 145), Mr. Vounatsos' statement about raising prices a year before generic entry cannot show that he knew that Biogen would pay alleged "kickbacks" to PBMs a year later to blunt the effect of generics.

Finally, Plaintiffs' attempt to invoke the "core operations" theory fails. Even if "Tecfidera was Biogen's top product" (Opp. 32), Plaintiffs must allege "when and what senior management were told" to support an inference of scienter, which they fail to do. *Quinones v. Frequency Therapeutics, Inc*., 106 F.4th 177, 184 (1st Cir. 2024).

### B.    No Scienter as to Leqembi Statements

i.    *Leqembi Safety Profile Statements*

Plaintiffs cannot plead scienter based on allegations that the Individual Defendants were on "notice" that Patient 3 died and that some commentators suggested a link between open-label extension fatalities and Leqembi. Scienter requires more than "notice" of omitted matters;

---

[15] Plaintiffs' cases are inapposite because each discusses specific allegations of individuals' direct involvement with alleged anticompetitive conduct. *See In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *2, 8 (S.D.N.Y. Aug. 31, 2000); *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 967 (E.D. Va. 2020); *Mylan*, 2018 WL 1595985, at *17; *Plymouth Cty. Ret. Sys. v. Patterson Cos.*, 2019 WL 3336119, at *19 (D. Minn. July 25, 2019).

[16] *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir. 2023) is inapposite. There, a CW described information "specifically concern[ing] what [the defendant] knew about the issue at the heart of th[e] case." *Id.* at 939.

13

plaintiffs must allege that "defendants deliberately or recklessly risked misleading investors" by nondisclosure. *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 614 (1st Cir. 2017). Here, Plaintiffs cannot point to any "admission, internal record or witnessed discussion" suggesting that *any* Individual Defendants believed that the patient deaths were caused by Leqembi, recklessly disregarded facts, or spoke with an intent to deceive. *See* Opp. 28-31; *In re Bos. Sci.*, 686 F.3d at 31. Nor do Plaintiffs allege that any Individual Defendant received "warnings by subordinates or expressions of concern by executives" regarding the challenged disclosures. *Brennan*, 853 F.3d at 615. Indeed, Plaintiffs all but abandon their CWs, providing no answers to the inadequacies Defendants raised. *See* Br. 29-30; Opp. 28-31. General assertions concerning Defendants' awareness of questions about a link between Leqembi and patient deaths are not enough. *See* Opp. 29-30; *Brennan*, 853 F.3d at 614 (scientific journals with divergent positions concerning drug's effects do not raise strong inference of scienter regarding failure to disclose adverse clinical trial events).

The Opposition also invents a new scienter argument—that Eisai, "with Biogen's blessing," hid details about Patient 3's death from the FDA. Opp. 30. But the Complaint nowhere mentions any alleged "cover up" (let alone with the required particularity) (*see* AC ¶¶ 371-83), and Plaintiffs cannot rely on unpled theories advanced for the first time in briefing. *See Driscoll v. Simsbury Assocs., Inc.*, 2018 WL 2139223, at *5 n.3 (D. Mass. May 9, 2018). In any event, Plaintiffs' theory is demonstrably false: the FDA received a copy of the MRI and autopsy for Patient 3 on May 26, 2023 and considered the materials in its July 2023 approval. FDA Leqembi Approval Package (Ex. 31), Doc. No. 56-5 at 205-06.[17]

Ultimately, the more compelling inference is that Defendants believed that the open-label

---

[17] The FDA approval package is a publicly available government agency determination that appears on the FDA's website and is therefore appropriate for judicial notice. *See Leavitt v. Alnylam Pharms., Inc.*, 525 F. Supp. 3d 259, 266 n.1 (D. Mass. 2021).

extension deaths could not be attributed to Leqembi, but out of an abundance of caution warned that certain subpopulations faced increased risks.[18]  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007); *Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194, 208 (1st Cir. 2020) (informative disclosures made inference of nonfraudulent intent more compelling).[19]

### ii.  *Leqembi Commercial Rollout Statements*

The Opposition fails to show that Defendants did not genuinely believe their statements concerning the commercial rollout of Leqembi or knew any stated goals were unachievable.  *See* Opp. 31.  The Complaint does not allege any interaction between a CW and any Defendant on this topic, let alone show that any Defendant "shared," "adopted," or "accepted" "views that the [10,000-patient] goal was impossible." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021).  CW9, CW10, and CW11 allegedly describe personal reactions to the 10,000-patient goal but do not speak to any Individual Defendant's state of mind on this topic.  *See* AC ¶¶ 221; *see also id.* ¶¶ 218-20.  The Complaint alleges that CW8 claims to have learned from an unnamed Eisai employee *in January 2023* that "Eisai expected to have no more than 5,000 patients on Leqembi" by March 31, 2024, but this alleged "internal" projection preceded any challenged goal statement by six months, and there is no basis to infer that anyone at Eisai shared the expectation with any of the Individual Defendants (or *anyone* at Biogen), much less when.  *See id.* ¶¶ 216, 300.[20]

Further, Biogen executives' alleged awareness of "barriers" in infrastructure from

---

[18] Allegations that Leqembi was a "core operation" also fail because Plaintiffs do not allege Leqembi was "central" to Biogen's "survival."  Opp. 31-32; *Luongo*, 2023 WL 6142715, at *13.

[19] Plaintiffs' cases only underscore the inadequacy of their pleading.  *See* Opp. 30; *see, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 49 (2011) (inference of scienter supported by press release describing studies not conducted); *Dahhan*, 321 F. Supp. 3d at 256 (inference of scienter supported by defendants' halt in disclosures of sales data as business deteriorated).

[20] Plaintiffs cite vague statements about Biogen communications with Eisai (Opp. 31), but they "fail to connect" them "with any information … allegedly learned rendering [the] statements false or misleading." *Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at *14 (N.D. Cal. Sept. 30, 2024).

experience with Aduhelm do not show they knew that the 10,000-patient goal was "impossible." *Hadian v. Fate Therapeutics*, 2024 WL 4246083, at \*35 (S.D. Cal. Sept. 19, 2024); *see Angelos v. Tokai Pharms., Inc.*, 494 F. Supp. 3d 39, 58 (D. Mass. 2020) (knowledge of low enrollment did not show company "must have known … the trial was not going to meet its goals").[21]  Indeed, Defendants candidly disclosed challenges and warned that developing infrastructure "doesn't happen overnight," which undermines any inference of scienter.  Br. 22-23 (citing AC ¶¶ 304, 306, 309), 32 (citing AC ¶ 214); AC ¶¶ 381, 383; *see Mehta*, 955 F.3d at 208.[22]  Finally, Plaintiffs' allegation that Mr. Viehbacher "admitted" on November 8, 2024 that Biogen's data for Leqembi was not "precise" is not supported by the Complaint.[23]  *See* Opp. 31; AC ¶ 223.

### C.    Stock Sale Allegations Do Not Support a Strong Inference of Scienter

Courts in the First Circuit have found that allegations of stock sales by insiders bolster an inference of scienter in extreme cases, such as where executives "caught the spike in [a] stock" and sold 20% or more of their holdings after making positive announcements that increased the company's stock price by 400%.  *See, e.g.*, *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 246-47, 253-54 (D. Mass. 2006).  Plaintiffs allege nothing of the sort.  *See* Br. 32-34; Opp. 33-35.  Plaintiffs at most plead that three Individual Defendants sold stock over a four-year period,[24]

---

[21] Alleged statements by Alisha Alaimo (not a defendant) and Mr. Vounatsos (departed Biogen before these challenged statements) do not support scienter.  *See* Opp. 31 (citing AC ¶¶ 213, 381).

[22] The accurate enrollment reports and disclaimers of registry statistics also undermine scienter. *See Tran v. XBiotech, Inc.*, 2016 WL 5408382, at \*10 (W.D. Tex. Sept. 23, 2016) (accurate reports cut against scienter inference); *Mehta*, 955 F.3d at 208 (disclaimers weaken scienter inference).

[23] Mr. Viehbacher did not make this statement about Leqembi or even speak to investors on November 8, 2024.  Opp. 31; AC ¶ 223.  Rather, on *February 13, 2024*, he said of market size for a different drug, "it's hard to get the numbers precisely."  Feb. 13, 2024 Investor Call Tr. (Ex. 30), Doc. No. 56-4 at 17.  He also did not "admit" on November 8, 2024 that "[t]his was always going to be a gradual launch … it has always been a difficult product to forecast"—he said that November 8, *2023*.  Nov. 8, 2023 Investor Call Tr. (Ex. 19), Doc. No. 49-19 at 2.  This was a warning that success was uncertain, which undermines scienter.  *See* Opp. 31; *Mehta*, 955 F.3d at 208.

[24] Plaintiffs argue that Mr. Viehbacher lacked "fully vested shares to sell."  Opp. 33 n.9.  That is wrong.  *See* Viehbacher Forms 3 and 4, Doc. No. 54-2 at 2 (common stock), 5 (stock options).

generally at predictable intervals, in connection with tax sales triggered by stock option vesting,[25] not tied to any challenged statements or corrective disclosures, and not calculated to maximize returns. *See* AC ¶¶ 393-97. Such pleading is insufficient to raise a strong inference of scienter. *Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76, 84-86 (1st Cir. 2016).

### D.    General Corporate Incentives Do Not Support a Strong Inference of Scienter

Plaintiffs advance a new scienter theory that Mr. Vounatsos was motivated to hide secret agreements with PBMs because his "career was 'on the line'" after he "mishandl[ed] the litigation over the Tecfidera patents." Opp. 33 (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002)).[26] Neither these accusations nor *any* facts supporting them appear in the Complaint and thus they do not support scienter. *Id.*

The remaining motive allegations fare no better. Allegations concerning Mr. Vounatsos' decision to step down in 2022 after the withdrawal of Aduhelm have no connection to any challenged statements. *See In re iRobot*, 527 F. Supp. 3d at 140-41. Plaintiffs' assertions that executive compensation was based on "MS or AD metrics" and could be affected by the "patent cliff and looming FDA decision" merely recite unremarkable business circumstances and nothing "unusual" that supports scienter. *See* Opp. 35; *In re iRobot*, 527 F. Supp. 3d at 143.

### CONCLUSION

The Complaint should be dismissed with prejudice and without leave to amend.

---

[25] While other circuits may use tax sales to bolster scienter, that is not the law here. *See* Opp. 33; *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 49-50 & n.21 (D. Mass. 2016). The Court may consider Biogen's Equity Plan (Br. 33), but it need only look to the Form 4s labeling transactions "F," or "Payment of exercise price or tax liability…." incident to vesting. Biogen labeled two of these "F" transactions as tax sales when associated vesting was on a different Form 4. *See* Vounatsos Form 4s (Ex. 24) Doc. No. 49-24 at 7; Singhal Form 4s (Ex. 25) Doc. No. 49-25 at 4.

[26] This case is not *Cabletron*, where the court inferred motive from $180 million in stock sales when defendants' careers and the company's survival were in jeopardy. *See* 311 F.3d at 39.

Dated:  May 21, 2025

Respectfully submitted,

*/s/ Michael G. Bongiorno*
Michael G. Bongiorno (BBO # 558748)
Timothy J. Perla (BBO # 660447)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Telephone: 617-526-6000
E-mail: michael.bongiorno@wilmerhale.com
E-mail: timothy.perla@wilmerhale.com

Jessica Lewis (BBO # 685549)
Wilmer Cutler Pickering Hale and Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: 650-858-6000
E-mail: jessica.lewis@wilmerhale.com

*Counsel for Defendants*