UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

FRANCES CLARITY STOKES and THOMAS    )
ALLEN GRAY, individually and on      )
behalf of all others similarly       )
situated,                            )
                                     )
          Plaintiffs,                )
                                     )
      v.                             )      Civil Action No.
                                     )      1:24-cv-12691-IT
BIOGEN INC., CHRISTOPHER A.          )
VIEHBACHER, MICHAEL VOUNATSOS,       )
MICHAEL R. MCDONNELL, and PRIYA      )
SINGHAL,                             )
                                     )
          Defendants.                )
                                     )
_____


BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE


MOTION HEARING


Friday, January 30, 2026
10:08 a.m.


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts


Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiffs:

    POMERANTZ LLP
    BY:  JUSTIN DAVID D'ALOIA
        EMILY C. FIRESTONE
        GUY YEDWAB
    600 Third Avenue
    New York, NY  10016
    (212) 661-1100
    jdaloia@pomlaw.com
    efinestone@pomlaw.com
    gyedwab@pomlaw.com


On behalf of the Defendants:

    WILMER CUTLER PICKERING HALE AND DORR LLP
    BY:  MICHAEL G. BONGIORNO
    7 World Trade Center
    250 Greenwich Street
    New York, NY  10007
    (212) 230-8800
    michael.bongiorno@wilmerhale.com


    WILMER CUTLER PICKERING HALE AND DORR LLP
    BY:  JESSICA L. LEWIS
    2600 El Camino Real
    Suite 400
    Palo Alto, CA  94306
    (650) 858-6000
    jessica.lewis@wilmerhale.com


    WILMER CUTLER PICKERING HALE AND DORR LLP
    BY:  ERIKA SCHUTZMAN
    60 State Street
    Boston, MA  02109
    (617) 526-6000
    erika.schutzman@wilmerhale.com

**P R O C E E D I N G S**

(In open court at 10:08 a.m.)

THE DEPUTY CLERK:  United States District Court is now in session, the Honorable Judge Indira Talwani presiding.

This is Case Number 24-cv-12691, Gray v. Biogen Inc., et al.  Will counsel please identify themselves for the record.

MS. FINESTONE:  Good morning, Your Honor.  Emily Finestone from Pomerantz on behalf of the plaintiffs.

THE COURT:  Good morning.

MR. YEDWAB:  Good morning.  Guy Yedwab with Pomerantz on behalf of the plaintiffs.

THE COURT:  Good morning.

MR. D'ALOIA:  Good morning, Your Honor.  Justin D'Aloia on behalf of the plaintiffs in the case, with Pomerantz.

THE COURT:  Good morning.

MR. BONGIORNO:  Good morning, Your Honor.  Mike Bongiorno from WilmerHale for the defendants.

THE COURT:  Good morning.

MS. LEWIS:  Good morning, Your Honor.  Jessica Lewis, also from WilmerHale, also for the defendants.

THE COURT:  Good morning.

MS. SCHUTZMAN:  Good morning, Your Honor.  Erika Schutzman from WilmerHale for the defendants.

THE COURT:  Good morning.

So I've finally gotten you in here for the pending motion to dismiss.  And usually I start with the moving party and go back and forth.  But I do have just sort of a big-picture question for the plaintiffs.

There -- it's a long class period, and there are a number of different events going on or development of drugs or marketing strategies, et cetera.  And I have, I think, 50 different statements.  Am I correct that, during this period, the price of the stock is -- the shares are going up and down, right?

MR. D'ALOIA:  To directly answer your question, all stocks, you know, go up and down to a certain extent, but I believe that, from the start of the class period to the end of the class period, the stock itself shed 50 percent of its value.

And, you know, I understand that there are three distinct forms of misconduct that we allege in the complaint. But they're all unified by a common theme, which is the loss of -- the sudden loss of market exclusivity for Biogen blockbuster, top-selling product called Tecfidera, and all those forms of misconduct are related to that and arise out of it.

THE COURT:  Well, to say it's a theme simply says we -- there's -- things happening with a business overall

that is the backdrop to what's happening.  That's not a theme.  That's, I think, a backdrop.

And I guess what's startling to me, in just sort of trying to piece together, is that usually I can sort of take a step back and say, "Is this the thing that investors are thinking about, and how is it -- you know, this news came out, and then two days later this happened.  And then maybe something else happened 15 days later.  And is that too long to connect?" and, you know, all of those types of questions.

But here you have this four-year period, and you're saying, essentially, over four years, the value of the stock dropped.  You've kind of given me a reason why, which is that they had competition that they didn't have before on their flagship thing; so, not surprisingly, they're no longer holding this particular position.

And -- but I have to -- ultimately, you have to prove, but I have to figure out here how these particular statements that you're saying, how they impacted this picture.  And I'm just -- I mean, I guess it's just -- sort of to give you an opportunity to try to explain to me sort of writ large how you can bring a suit in that manner, to sort of say, well, there's kind of four years of misconduct, rather than there's four years of difficulty in the business.

MR. D'ALOIA:  Yeah.  Absolutely, Your Honor.  And that's an excellent question.  I think there's a few things

to say in response to that.

You know, first of all, all of the statements that we've alleged are false and misleading are all within the statute of limitations and the statute of repose period.  So there's no legal bar to bringing, you know, a claim of the type that we bring during the time period that we've alleged.

But more to your point, we don't allege that all 50 percent of the value that was lost from the start of the class period till the end of the last period was attributable to the misstatements.  I just responded to your initial question of whether it dropped, you know, from start to finish.

But we do allege in the complaint that, after each corrective disclosure, there was a drop in the stock price.  Now, I don't know the exact quantification of that amount, but there were drops after each disclosure, which revealed that previous statements were not true.

And to the other point that you referenced before, there could not have been topics that were more important to Biogen investors than the continued viability of Tecfidera after generics entered the market and the new product that Biogen was positioning as its replacement to keep sales steady in its business as Tecfidera was floundering.

THE COURT:  Okay.  Well, I was just -- that was sort of the high-level view of it.

I will turn now to -- and as some of you may know, I tend to go back and forth between counsel as I work my way through this, but I will start with the defendants here.

MR. BONGIORNO:  Thank you, Your Honor.

As the Court has noted, this is a very long class period, and it's really three different cases.  There's a case about Tecfidera and increased competition for the MS drug and the Vumerity drug that was Biogen was introducing. There's the Leqembi arguments and claims with regard to the safety and the disclosures about the clinical trials, which we see here in this courthouse every day, cases like that.

And then we have sort of an old-fashioned pre-PSLRA projections case about the 10,000 patients and, you know, the goal of reaching 10,000 patients for this Alzheimer's drug by March.

So there's a lot here.  I thought I would start with the Tecfidera allegations and address those first because I think those are the ones the complaint starts with -- well, not the original complaint.  The original complaint had nothing to do with any of this, but the amended complaint.

So that claim focuses, as I know the Court knows, on Biogen's relationships with PBMs and the claim that Biogen, whenever they spoke about what was going on with Tecfidera and the introduction of generics into the market,

they needed to somehow say that they were doing something, I guess, illegal.  At least that's what the complaint said.

The opposition says, no, we're not trying to establish illegality.  We're just saying they were doing things that were anticompetitive.  And they sort of walk away from the notion that they need to establish illegality and say they'll amend their complaint if need be.

But regardless of what exactly their theory is now and regardless of what they are trying to allege with regard to anticompetitive behavior, they still haven't pled a securities fraud claim.

We understand there's litigation out there.  You may have seen -- the Court may have seen a supplemental authority that got filed, not in accordance with the rules of this Court, but got filed yesterday.  And that's fine.  It's before the Court, and that's totally fine with us.

It doesn't affect their ability to plead a securities fraud claim, because as this Court well knows, there are many more requirements to plead such a claim, particular in this jurisdiction, than there are to plead an antitrust violation on a notice pleading standard somewhere else.

So, in particular, the requirement that in an omissions case -- which is what this is -- there needs to be a few things.  One, there has to be, of course, a statement

that creates a duty to disclose; and then, of course, there has to be scienter, which requires, in this circuit, under *Abiomed*, and the Second Circuit, under *Kalnit*, that the speaker not just omits something, but know that or believe that the statement would be misleading as a result of the omission.  The First Circuit itself said that in *Abiomed*.

So here all we have are these attempts to claim that the individual defendants to whom they can tie nothing with regard to these contracts, that these individual defendants had knowledge of whatever it is they're claiming, whether it's unlawful or anticompetitive or kickback or whatever words they're using, that these individual defendants had knowledge of that; and that they believed when they were talking generally about the introduction of competition into the market, which indisputably happened and indisputably was disclosed, that they somehow knew that whatever they were saying was going to mislead the market with regard to these supposed omissions.

Now, of course, you have to start with the notion that there was actually a duty to disclose and an omission, which is a tough hill for them to climb in the first place before we even get to scienter because the duty to disclose only arises in certain circumstances going all the way back to the pre-PSLRA, which I -- I personally do go back that far, to *Backman v. Polaroid*, and going back all the way to a

case I argued in the First Circuit not that long ago, *Karyopharm*.

The duty to disclose -- and another case that this Court is familiar with, the *Desktop Metal* case.  All three of those cases, *Backman v. Polaroid*, *Thant v. Karyopharm*, and the *Desktop Metal*'s First Circuit case all stand -- they stand for a number of propositions, but most -- very importantly, in this context with regard to Tecfidera, duty to disclose what was said and is what was said somehow made misleading by what wasn't said, which may or may not be interesting to the market, which is not good enough under *Backman v. Polaroid*, but makes what was said misleading somehow.

And here, we just don't have that.  They weren't talking about PBMs.  They weren't talking about contracts. They weren't talking about illegality.  They weren't making these grandiose claims.

And in *Desktop Metal*, you had a company that was talking about increasing market share and production and things like that.  And they were producing some of these medical devices on these 3D printers on non-FDA-complaint facilities, labeling them as being made, I think, in Germany, or something like that, and they were really being made somewhere else that wasn't FDA certified.

They had statements in their public filings that

they were -- that the product they were making was FDA compliant.  And this Court and the First Circuit said that's not enough because the statement isn't made false by the -- by what was disclosed.  You have to have a duty to disclose.

And here we -- that's not what we were talking about.  We weren't talking about compliance with the antitrust laws.

THE COURT:  Okay.  Let me let you respond to that.  First of all, we are in the world of omissions for this group of statements, correct, rather than a misstatement?

MR. D'ALOIA:  Yes, Your Honor.  I believe that would be an accurate description for the PBM-related statements, except for the statement describing the function of rebate contracts.  There is one statement that we allege was false and misleading, which was that Biogen entered into rebate contracts for favorable formulary placement based on, quote/unquote, "perceived value."

THE COURT:  And which paragraph was that?

MR. D'ALOIA:  That would be 247.

THE COURT:  Okay.  So putting aside for a minute 247, the broader -- the question posed by defense counsel is whether -- why would there be any obligation to talk about what may have been activities that could have had some problems under other laws or may be illegal or may be bad behavior on the market, et cetera?  Why was there any

obligation to bring those forward?

Simply -- I think your argument is -- if I understand it, your argument is, look, they're talking about how they're trying to deal with the market, but they're not disclosing that maybe they're doing some bad things in the market.

MR. D'ALOIA:  Yes.  I'd be happy to address that, Your Honor.

You know, I think defense counsel mentions the holding in *Desktop Metal* and just kind of, you know, the general law saying that, you know, a statement -- there's no duty to disclose unless the statement is rendered misleading and gives a false impression.  Those are generalized principles of law that we all know well.

But what was absent from defense counsel's argument was reference to any cases involving statements describing competition in a market or --

THE COURT:  But I think you can translate a general statement -- I mean, obviously, we never -- every case in front of me, I have to deal with the specific facts and not the general principle, but I have to apply that general principle.

And I have to -- I mean, what I hear -- what I see in your general argument is Biogen is doing things out in the world that's bringing litigation upon them or investigation

or whatever.  There's some -- there's some questionable practices here, from your point of view.  And if they're talking about how they're trying to build up their company and compete, et cetera, they're obligated somehow to talk about that.  And I don't see how you get that under the case law.

MR. D'ALOIA:  Yeah, so the reason why I reference the general nature of the legal principle was because we've cited in our briefing a substantial body of case law that says when a company speaks about the competition, quote/unquote, competition in a marketplace, and it's engaged in conduct that manipulates the level of competition, that itself triggers a duty to disclose the practices that it's engaged in.  And we cited a number of cases in that regard in our brief.

In addition to that, there were also statements here describing the reasons for the changes in Biogen's financial results, especially with regard to Tecfidera and Vumerity, which was the product that it was trying to shift the patients to as generics entered the market.

We've also cited a substantial body of case law in our briefing which specifically says that, you know, just releasing your financial results doesn't trigger a duty to disclose.  But when you start describing the reasons for it, if a material reason for the changes in your financial

results are some form of undisclosed conduct, that triggers a duty to disclose that conduct.

THE COURT:  So I think your argument is they were competing in some bad way; therefore, they had to disclose that they were competing in this bad way.  Is that --

MR. D'ALOIA:  I think that we would find that outcome acceptable, but I think that they -- the disclosure obligation required them to inform the market that they were using brand-over-generic rebate contracts with PBMs.  And what that does is it forces the formularies to adv- -- to not disadvantage Tecfidera relative to the generics and not --

THE COURT:  Why do they have to tell them?  Why do they have to disclose that?  I'm not understanding, and I --

MR. D'ALOIA:  So I think the reason that all the cases that we cited come out the way they did is because when a company tells investors, "We're being competitive.  The market is very competitive," they believe that they are competing on the merits in proper means of commerce.

THE COURT:  They're saying they're competing exclusively on the merits?  Because I didn't see a statement saying that.

MR. D'ALOIA:  They said, you know, "We welcome competition," when reality, behind the scenes, they were engaged in practices to reduce competition.

THE COURT:  I'm sympathetic to this notion that if

companies are doing things out there, let's -- you know, let's do and figure out how we're going to go and make them behave properly however they may be -- should be behaving if that's -- if there's wrongdoing going on.  Very sympathetic to that.

But that's not this lawsuit.  That's your whistleblower lawsuit.  That's your qui tam lawsuit.  That's other things.

This is shareholders are saying, "I don't know. They're doing some things.  They're keeping it up, and it's looking good."

MR. D'ALOIA:  I mean --

THE COURT:  I mean, if they get away with this -- and it may be completely legal -- if they get away with this, the shareholders are ahead of the game, not behind the game.

MR. D'ALOIA:  Well, look, I think the other gloss here that is maybe getting lost in our discussion is that Tecfidera was the single most important product to this company, responsible for over $4 billion in sales.  Investors were laser focused on how it competed once generics entered the market and it lost its market exclusivity.

So when they kept on saying, "We welcome competition" --

THE COURT:  Okay.

MR. D'ALOIA:  -- "we're ready to compete with these

new generics," there was no other way to interpret those statements other than, "We're competing with them the right way."

THE COURT:  What if they said, "We are -- we're going to have a very successful campaign about this not because we have a better product, but because we've hired a better advertising company," do you want to know that, that it's a better advertising company or a less good advertising company?

MR. D'ALOIA:  No, because that doesn't influence or manipulate the level of competition in the market.

THE COURT:  It sure does.

MR. D'ALOIA:  Well, I guess -- let me take that back.  That would be a legitimate form of competition that reasonable investors would expect a company to engage in when it says that they're welcoming competition and competing with the generics.

THE COURT:  Okay.  So if they think that what they're doing in having the -- these PBMs the way that they're setting them up, if they think that is lawful and will prove their market situation, how is it any different than hiring the best advertising company?

MR. D'ALOIA:  Well, because when the truth came out that that's what they were doing, the stock price dropped; and what that means is that investors bought the stock at a

higher price than it would have been if the truth was disclosed when it should have been disclosed.

THE COURT: Okay. For defense counsel, what's your response to it being material? Am I -- is he right that it's material, it just wasn't misleading, or is it -- or do you disagree that it's material that they were using pricing through the PBM?

MR. BONGIORNO: Certainly, Your Honor. That -- that needs to be viewed through the lens, I think, of scienter because of the timing of it. You know, plaintiffs' counsel is going to say, "Oh, it's material because when the truth came out." I'm not sure exactly to what he's referring when he says that because there's been no adjudication whatsoever as to whether or not it's --

THE COURT: So let me just take a pause here.

MR. BONGIORNO: Sure.

THE COURT: What is it you're saying that came out that caused -- what's the thing that came out and caused the stock to drop?

MR. D'ALOIA: Yeah, so if the Court takes a closer look at our loss causation allegations, you'll see that there were several disclosures which revealed that that were congressional investigations into these contracting practices with PBMs that specifically referenced Tecfidera.

THE COURT: Okay. So you're saying a congressional

investigation was the trigger?

MR. D'ALOIA:  That was one of several others.  I was giving that as one example.

THE COURT:  Okay.

MR. BONGIORNO:  So certainly no duty to disclose a congressional investigation we didn't know about, and there's no allegation that we knew about it before it was made public.  So I don't think that works.  I think the Court's question was probably broader than that, maybe even a little different, so I will try to address that.

Tecfidera was undoubtedly an important product for Biogen for a long period of time.  Obviously, Biogen pivoted to other things and is still around and doing just fine, despite generic competition and with the efforts to convert to Vumerity and also to focus more on Alzheimer's and other things.

So in terms of, was it a material portion of our revenue for a period of time?  Of course it was.  Absolutely.  Not trying to distance myself from that at all.  But the question, I think, the Court was getting to is:  Was there something material that wasn't disclosed that needed to be disclosed when those statements were made?  And the answer to that is absolutely not.

The only statement to which plaintiffs' counsel pointed was a very, very -- and I hate to use the word

"generic" a different context -- but a very generic statement.  Paragraph -- I think it was 247.  He said we address it at footnote 3 of our reply brief, specifically that -- that one particular statement.

The notion that that statement that talks about sort of the blocking and tackling of how rebates are accrued by the company and how they function, the notion that that creates some duty to say, "And, oh, by the way, somebody might someday accuse of us violating the law when we're doing this," is a stretch that I don't think the courts in this circuit have ever reached to anything close to that.

It's a very plain statement and certainly doesn't require, you know, some obligation to say, "And here's what we think," calling balls and strikes on the law of antitrust claims.  I mean, of course, there's no dispute that there was competition entering the market, and that's what we said. The market was being competitive.  Generics were entering the market.

The notion that we have to say, "And we're going to try to fight that off, and somebody might someday accuse us of doing it in a way that" -- and, again, I don't know whether they're saying it violates the law or is anticompetitive or what because they go back and forth on that.  But whatever it is, we certainly had no duty to state that under these circumstances.

THE COURT: And I think we're talking specifically about 247, which I had asked you to put aside and come back to, so --

MR. D'ALOIA: Yes. Thank you, Your Honor.

You know, defense counsel has now mentioned several times and has raised in their brief that, you know, this -- our theory somehow requires them to accuse themselves of wrongdoing, and that is simply not the case.

THE COURT: What is it then?

MR. D'ALOIA: Our allegation is that they failed to disclose the facts, the facts being that they entered into BOG, brand-over-generic contracts, which stifled the ability of generics to compete with Tecfidera, and that's why they were doing so well.

THE COURT: But help me here. I gave you this example of what's the difference between that they're competing -- instead of on the merits of the product, they're competing by hiring the best advertising company; and you said that's -- well, that's sort of legitimate.

And now you're saying it doesn't matter whether this is or isn't illegitimate on the PBMs, but they have to disclose it. So what's the difference between disclosing the PBMs and disclosing that we hired the best advertising company?

MR. D'ALOIA: So when a company says that it's

competing, investors reasonably understand that to mean that they're engaged in legitimate forms of competition.

THE COURT:  But you're using -- you keep coming back to this.  That's the problem here for me, is that you're differentiating between legitimate and not legitimate.  And so defendants are saying that you're asking us to disclose something illegitimate.  And you're saying, well, it doesn't -- I don't have to show whether it's illegitimate in this way or this way or this way.

But how is it -- what is it that you're differentiating by saying, well, investors are expecting one set of things, but they're not expecting another?

MR. D'ALOIA:  Yeah, so, look, when -- generics, by design, under federal law are supposed to introduce competition into a market.  They drive down the price to 90 percent -- or, sorry -- they drive down, yeah, the price to 90 percent of what it previously was by the brand-name drug.

And what -- the types of contracts that Biogen was entering prevented the generics from doing that, so when Biogen --

THE COURT:  But isn't that what the shareholders would want?

MR. D'ALOIA:  Of course they would, but once the truth comes out and the stock price drops --

THE COURT:  Why?  So far, you haven't given me that the truth came out other than you've told me there's an investigation about it.  And it may turn out that there's something unlawful.  I don't know.

But I'm not sure how -- I'm not sure -- as they're going, and particularly since you do have to get ultimately to scienter on it, I don't see how you go to say they have to disclose this thing because it may turn out that they pushed across the line instead of getting right up to it.

MR. D'ALOIA:  Okay.  Well --

THE COURT:  Right?  Isn't every shareholder wanting their company to go as close to the line as they can get away but not go a little bit further?

MR. D'ALOIA:  Well, I think all shareholders would like to see their company maximize value.

THE COURT:  Yes.

MR. D'ALOIA:  I don't know that they necessarily want to see them go right to the line, depending on their risk appetite.

But I think, on a certain level, you know, this whole discussion might be somewhat academic because we do feel very strongly that we do, in fact, plead that there were antitrust violations; and that's validated by the recent decision that we submitted to the Court yesterday.

THE COURT:  Okay.  So that was a decision saying

that a complaint stated a -- it denied a motion to dismiss?

MR. D'ALOIA:  Correct, a motion filed by Biogen.

THE COURT:  But a motion to dismiss isn't a finding of any facts, is it?

MR. D'ALOIA:  Absolutely, Your Honor.  But what it shows is that the very conduct that we allege here states an antitrust violation.

THE COURT:  If it's -- if -- it's not a summary judgment that you have.

MR. D'ALOIA:  Agreed.

THE COURT:  You have a motion to dismiss.

MR. D'ALOIA:  But our allegations have to be accepted as true at this stage, just as they had to be in the other case.

THE COURT:  So you're saying that your allegations are sufficient to state a claim for an antitrust violation here?

MR. D'ALOIA:  Yes.  Section 1 of the Sherman Act, Section 2 of the Sherman Act, and Section 2(c) of the Robinson-Patman Act.

THE COURT:  Okay.  And do you also need to show, or do you think that that's not part of this, this scienter side of this, that they would know there is an antitrust violation here?

MR. D'ALOIA:  So our understanding of the case law,

Your Honor, is that when the executives have knowledge of the facts that render their statements misleading, that is enough to plead scienter. And I think that there have been --

THE COURT: And --

MR. D'ALOIA: -- ample --

THE COURT: -- the facts being here that there's conduct that could violate antitrust law? That's --

MR. D'ALOIA: Well, the conduct here being that they entered into BOG contracts to stifle generic competition.

THE COURT: In violation of antitrust law?

MR. D'ALOIA: I think that that did violate antitrust laws, but I think that it would be enough that they knew that they entered into the BOG contracts. I mean, by nature --

THE COURT: But doesn't that get me back to where I am with the advertising example, unless you're going to get this all the way over to saying that there's a knowing violation of a law?

MR. D'ALOIA: Well, I think, look, by design, generics are meant to introduce competition into a market. And any activity that prevents them from doing that is something that investors would like to know when they say that they're competing with them legitimately, or otherwise, when they're just competing with them.

THE COURT:  Your response?

MR. BONGIORNO:  Well, a couple of things, Your Honor.  First of all, this complaint doesn't bear much resemblance to the complaint that -- where the motion to dismiss was denied.  The allegations here are much, much, much thinner than what's there.  Not that I'm saying what's there was necessarily substantial, but that's notice pleading; and the Court asked that question about scienter, and the answer you got was a misstatement of the law in the First Circuit and a significant one.

It's -- what plaintiffs' counsel said, and I'm sure wasn't intentionally -- I'm not suggesting that at all -- he said if the executives have knowledge of facts that would render a statement misleading, that's enough for scienter in an omissions case.  It is not.  And I'm not suggesting they had that knowledge.  I'm not suggesting that the underlying allegation is even close to accurate.

But putting all that aside, they have to believe that what they were saying created an omission in the market that was misleading and, therefore, would mislead the market. It's not just you knew something, you said something and you knew something else and you didn't say that something else, and then later somebody said, oh, you should have said that something else.  That's not enough in an omissions case.

You have to have a belief that what you were saying

was misleading.  And, again, it's *Abiomed* in this circuit. It's *Kalnit* in the Second Circuit.  And I can give you the quote:

"The key question is not whether defendants had knowledge of certain undisclosed facts, but whether defendants knew or should have known that their failure to disclose those facts presented a danger of misleading buyers or sellers."  And that is a very clear statement of the law from this courthouse and the First Circuit.

MR. D'ALOIA:  Needless to say, you know, we disagree with that, you know, sweeping conclusion about the state of the law.  As far as we can tell, there have never been any distinctions drawn in First Circuit decisions between omissions cases and misrepresentation cases.  And we've cited several cases in our brief and --

THE COURT:  Are any of them from the First Circuit that you want me to rely on?

MR. D'ALOIA:  Absolutely, Your Honor.  So the first is *Aldridge*.  It says that publishing statements with knowledge of facts suggesting that statements were inaccurate or misleading complete is, quote/unquote, "classic evidence of scienter."  That's the definition of recklessness across the entire country.  Other courts have adopted the same standard.

And the First Circuit reiterated that most recently

in the *SEC v. Johnston* case, which I think was in 2021.  So this is not something that we're cited to an antiquated case for.  This has been the standard in the First Circuit for decades.

THE COURT:  Okay.  We do not have probably as much time here today as I might need, but let's move on from the Tecfidera issues to the next set of issues.  And, again, I'll start with the defendant.

MR. BONGIORNO:  Certainly, Your Honor.

So with regard to Leqembi, Your Honor, we have safety statements, and we have the projection statements.  And I'll try to be brief, because I know we're short on time.

So plaintiffs, of course, allege that the defendants somehow misrepresented the drug safety profile when it -- when it spoke about two deaths in the extension study.  And the statement that -- at the time, and to this day, the defendants' view is that those deaths were not caused by the drug.

It's beyond debate that here in this circuit and everywhere else scientific disagreement is not securities fraud.  And, you know, the Court probably doesn't need cites for that, but I'll just say from recent cites *Invivyd* and *Apellis*, both in this court, from Judge Kobick -- one of them, *Apellis*, up on appeal to the First Circuit; the other one, *Invivyd*, there was no appeal taken from.  I'm familiar

with both of those cases from my firm, but they're both significant cases in that context.

And that's what we had here. And to this day, we have here a scientific agreement disagreement about what caused the death of patients 1 and 2. But nonetheless, those deaths were disclosed. They were disclosed publicly.

THE COURT: Right. They're concerned about death 3.

MR. BONGIORNO: With regard to death 3, Your Honor, certainly; death 3, their complaint about patient 3, is that it wasn't disclosed at the time of the reporting of the results of the Phase 3 study. Death 3 occurred in the open-label extension study. Death 3 occurred with the patient who did not suffer macrohemorrhaging like patients 1 and 2.

Patient 3 died shortly before the disclosure about the results of the double-blind Phase 3. There was no autopsy at that time, and it was undoubtedly uncertain in the minds of the folks who are being accused of securities fraud here if they -- or the company -- I'll get to the individuals in a second -- as to what caused that death.

And scientific uncertainty is another doctrine that's important and is well established in this circuit. The *New Jersey Carpenters* case is a First Circuit case on scientific uncertainty and the entitlement of companies to

wait and assess what is going on before making a disclosure about it.

So it undoubtedly would have been premature at that time to talk about patient 3 and what happened with patient 3 without knowing.

THE COURT:  Response?

MR. D'ALOIA:  So I think it's important to actually look at what the statement said here because there's two distinct representations in the passage that we challenge. The first is that there were two deaths with concurrent macrohemorrhaging, I believe, is the term of art in the open-label extension study.  That's the first representation in that disclosure.

But then there's a second disclosure which says -- or a second representation which says something to the effect of, "It's our assessment that these cannot be attributed to the study drug."

Those are separate representations.  The first is not an opinion.  It does not rely on scientific evidence at all.  It's whether there was a death with hemorrhaging or not and --

THE COURT:  And the death of those two was disclosed with --

MR. D'ALOIA:  The death of the first two was disclosed.  And I would add that they were released in

publications in the weeks immediately before Biogen's release, but the third was not at that time; however, it occurred -- it wasn't shortly before.  I think it was well over a month before the release.

THE COURT:  No.  Counsel said that it was not a death by hemorrhaging.

MR. D'ALOIA:  We disagree with that.  We have included extensive allegations in the complaint which describe macrohemorrhaging throughout patient 3.  All three of these patients experienced severe ARIA, which is by definition hemorrhaging in the brain.

THE COURT:  And is it your contention that that was known prior to the autopsy?

MR. D'ALOIA:  Absolutely.  Whether a patient had hemorrhaging and whether they died are things that are reported in the initial adverse event report, which was immediately given to Eisai and under the JSC between to the companies provided to Biogen.  So it knew that well before it published the release in the end of November 2022.

MR. BONGIORNO:  It's just not true, Your Honor. It's not in the complaint.  We're not here to argue the facts, of course.  I know better than that.  He just said -- and I'm sure it was a mistake -- that in his complaint there are allegations all over the place about macrohemorrhaging of patient 3.  There are none.  Patient 3 did not have

macrohemorrhaging.  Patient 3 had many, many small hemorrhages in the brain, which is very unfortunate, common, very difficult to deal with, but it is much different than a macrohemorrhage.

And patients 1 and 2 had macrohemorrhaging, and that was what was being described in the statement that plaintiffs say is misleading for failure to talk about a third patient.

Now, these aren't the only patients who died, Your Honor, just to be clear.  Obviously, these are -- there are -- I don't know -- 2,000 folks, 800 and something on placebo and well over a thousand in the treatment arm in this trial.  And then there the folks on the placebo then convert over to the drug in the open-label extension.

There's are thousands of folks.  Obviously, they're elderly.  Obviously, they have multiple comorbidities.  Folks are going to know.  We all know folks who have Alzheimer's, and we know what that's like.

So the notion that another patient died, they're not sure why, didn't have their macrohemorrhaging, which what is being talked about in the release creates a duty to start talking about someone else who hasn't had an autopsy, who only died -- I don't know -- six weeks before the disclosure?  That's not fair.  That's not what the law requires.

I could talk about the case law, but I know you've

heard it and you're familiar with it, so I'll cut it off.

THE COURT:  So is that allegation there, the macrohemorrhaging?

MR. D'ALOIA:  We allege in paragraph 192 that there were 51 microhemorrhages in this patient.

And, I mean, look, on a certain level, micro/macro, I think that we're kind of losing the forest from the trees. The reason why they included this in their release is because ARIA was a severe safety concern for people taking this drug, and any form of hemorrhaging --

THE COURT:  So you're saying that if they're saying macrohemorrhaging, they need to disclose all hemorrhaging?

MR. D'ALOIA:  I believe that we would agree with that.  And I think that that is what investors -- the way that reasonable investors would interpret this release as well because they were keenly focused on whether this drug caused ARIA.  ARIA is hemorrhaging in the brain.

And if you start talking about macrohemorrhaging in two patients -- which, also, by the way, one of which died, you know, seven weeks before the release -- why aren't you also talking about another one that died six weeks before the release with hemorrhaging as well?

THE COURT:  Well, their argument for why they're not is because it was microhemorrhaging and they didn't know what it was.  That's what they're saying.

MR. D'ALOIA:  Well --

THE COURT:  And I don't know how -- what you're saying is that I -- that the -- I should ignore the word "macro" because -- "macrohemorrhaging" here -- because people were concerned about hemorrhaging.  I think that's what you're saying, but I don't think that allows -- I -- I mean, the problem here is, the way the law works, I've got to look at the exact words that they used.

MR. D'ALOIA:  Right.  But there is a difference between a statement that is false and a statement that is misleading.  We would say that this statement is definitely misleading because it led investors to believe that there were only two cases in the OLE of patients who had ARIA-related symptoms when they died.

THE COURT:  So I think what you're asking me to do is take a statement, take the inferences that people might draw from that statement and compare whether something should have been an omission as contrasted to those inferences rather than as contrasted to the literal language.

And I think the -- I think the First Circuit kind of holds me on that, that they are really saying that if it's -- if it's necessary to make that statement not misleading, they need to include it, but that they don't have to think of all the ramifications of what someone might infer from that statement and then bring it.

MR. D'ALOIA:  Absolutely, Your Honor.  But I think that we're not dealing with just what any person might think. We're dealing with reasonable investors.  And even defense counsel said before that whether a statement is misleading depends on the, quote/unquote, "impression that it leaves on investors."

So on a certain level, when you're looking at omission cases, you have to think about what a reasonable investor would take away from a statement.  And it is our view that this statement gave them the impression that there were only two deaths in the OLE with ARIA-related symptoms associated with them at the time of death.

It has nothing to do with whether Leqembi caused it or not, but this was the initial release that formed the basis for the market's views on the safety of this drug, and all investors were focused on the amount of deaths with concurrent hemorrhaging in the brain.

THE COURT:  Okay.

MR. BONGIORNO:  Shall I respond, Your Honor, or --

THE COURT:  Yeah, sure.

MR. BONGIORNO:  A couple of things. Macrohemorrhaging is a very big deal.  It's a hemorrhage of over 1 centimeter.

Microhemorrhaging is very common.  Folks have microhemorrhages that they don't know about all the time.

Any one of us could be having them at any time and not know it.  You find that out later when you look at the brain through a scan, autopsy, and other things.

So this micro/macro cavalier notion is just -- it's not fair, it's not right, and it's not a basis to accuse somebody of securities fraud, for sure.

Macrohemorrhaging is a very big deal, and it happens sometimes as a result of treatments and sometimes on its own.  One of the patients on placebo, and it's in the record, had microhemorrhaging.  It's in, I think -- a macrohemorrhage.  It's in paragraph 283 of the complaint, I think.  So I think that's very, very important.

And in terms of the state of the law, again, the way it was described is not accurate.  For an omissions case, I'll say it one last time, the *Abiomed* language; I won't repeat it for the transcript, but it's there.

And, finally, in terms of what needs to be disclosed and the not disclosed, this notion of somehow everyone thought there were no other deaths in this study on the treatment arm because we talked about two macrohemorrhage deaths is not the law and it's not anywhere close to what was said to give that type of impression.

And for that, I'll go to *Karyopharm* where, when I argued before the First Circuit in that case, there was a lot of back-and-forth on what does and does not need to be

disclosed because deaths weren't disclosed.  What were disclosed were the most common serious adverse events.  And that's what *Karyopharm* disclosed without disclosing the deaths, because they were not as common.

And the First Circuit said, "You didn't say how many deaths or not.  What you said was, 'What were the most common serious adverse events?'"  And by the way, in a footnote, they say, "And you didn't even really get it right, but the plaintiffs didn't complain about that.  What they're complaining about is a failure to disclose deaths.  And you weren't talking about that.  You were talking about serious adverse events, so that's okay."

Here we're talking about two deaths from macrohemorrhaging.  And they're saying -- they're picking one other patient and saying you need to disclose that one too, even though it wasn't macrohemorrhaging.  There were other deaths as well, but we're going to focus on this one because there were a lot of microhemorrhages.  You first heard there were macrohemorrhages; and then, obviously, that got walked back.  I think that was very important, and I'll leave it at that.

MR. D'ALOIA:  Very briefly, Your Honor.  First of all, I apologize.  I'm not a doctor, and if I'm misusing terms, it's due to my own lack of familiarity.

But, you know, we continue to believe that there

was a disclosure obligation for the November '22 release for all the reasons we cited.  But I would turn the Court's attention to the release that was made in January 2023, which said that there were, quote/unquote, "fatal events of intracerebral hemorrhage in," quote/unquote, "other studies."

That is not limited to macrohemorrhages.  It is --

THE COURT:  Can you give me the paragraph?

MR. D'ALOIA:  Yes.  That's paragraphs 285 to 89. That statement is not limited to macrohemorrhages.  It is specific to hemorrhages in the brain.

And one of the arguments that defendants made in response to this was that they had already accurately disclosed the deaths in the November 2022 release.  But as Your Honor pointed out, that only spoke to patient 1 and 2 and did not include the case of cerebral hemorrhage death in patient 3.

THE COURT:  So, specifically, with regard to 28- -- I'm sorry; my eyesight isn't good enough here -- 285, what's your response?

MR. BONGIORNO:  So, Your Honor, that -- that's a disclosure, again, I think, about the Phase 3 results.  And it simply says, accurately, of course, there were -- it talks about hemorrhages greater than 1 centimeter was reported. And then it says, "Events of intracerebral hemorrhage, including fatal events in patients" --

THE COURT:  I'm sorry.

MR. BONGIORNO:  I'm sorry.

THE COURT:  Even though you're reading --

MR. BONGIORNO:  I'm going way too fast.  I'm sorry. It happens when I read, and I know it drives our court reporter crazy.  I apologize.

Again, we're at 285:  "Events of intracerebral hemorrhage, including fatal events in patients taking Leqembi, have also been reported in other studies."  That's true.  That's accurate.

I don't know what disclosure duty that's going to create that wasn't abided by here.  That's a description of incidence of ARIA in these studies.  It goes through them. It describes them.  And it says there were deaths, and there were deaths from hemorrhaging.

I don't know -- it may be we were supposed to put a number next to that.  It says "deaths."  It's plural.  It's a different release.  It's a different discrimination.  It's scientific in nature.  It's accurate.  And it doesn't create a misleading impression about anything.

MR. D'ALOIA:  Well, I think that one of the key words my colleague has glossed over is that they were reported.  Patient 3's death was not reported.

And, you know, I think Biogen rightfully, because the release used the word "reported," referred back to the

November '22 release, which, as we had just discussed, only discussed the deaths of patient 1 and 2, but not the death of patient 3 with intracerebral hemorrhaging.

MR. BONGIORNO:  Your Honor, that is not what "reported" means in this context.  It doesn't --

THE COURT:  So I'm sorry; for both of you, I'm not tracking this quickly enough.  So the reported line is where in this?

MR. BONGIORNO:  So, Your Honor, in 285 of the complaint, page 106 --

THE COURT:  Yep.

MR. BONGIORNO:  -- the first bolded language on page 106 is what we're talking about right now.

MR. D'ALOIA:  It's the third bullet point.

THE COURT:  Yep.  I see it.  So "Events, including fatal events, have also been reported in other studies."  So there have been studies that -- from which it has been reported?

MR. BONGIORNO:  Correct.  It doesn't mean reported in a press release, which is what was just suggested.

MR. D'ALOIA:  Okay.  But, first of all, we disagree with that.  But even --

THE COURT:  It says "reported in other studies."  I doesn't say "reported in other press releases."

MR. D'ALOIA:  Right.  But the other press release

was reporting the results of the study.

And I would say, kind of putting this point to the side, this was certainly -- you know, investors reading this would understand it to mean that there were the deaths that were previously disclosed by Biogen.  And there was only two that were disclosed by Biogen.  And this statement broadens the scope of the disclosure to cover all intracerebral hemorrhages.

THE COURT:  Okay.  Let me -- I am really running out of time, unfortunately.

Going back to a question I asked you earlier on, we had started on the Tecfidera, and I asked you if the Tecfidera claims were all omissions claims.  Is it true for the whole complaint that they're all omissions claims?

MR. D'ALOIA:  No, Your Honor.  I would disagree with that.  There are definitely statements that we believe are false.  I don't have the tally at my fingertips.  But, for instance, we would certainly classify the quantification of deaths in the Phase 3 study as a statement of fact that was simply not true.

THE COURT:  Okay.  And then I'd like to just give you a couple of minutes briefly on scienter from both sides.

MR. BONGIORNO:  Sure.  Your Honor, I just want to say one more thing about the 285.  That language they were just looking at is also from the FDA label itself, which is

our Exhibit 22.  So the notion that the FDA is allowing us to misrepresent something in a label on a drug is, I think, a difficult one for the plaintiffs to overcome.

So I talked a lot about the scienter piece in *Abiomed* with regard to omissions in general, but I'd like to talk just a little bit about some of the attempted allegations on scienter because I think they're important.

There are four individual defendants in this case. It's -- the -- there is very little, if any, detail on how any of these individual defendants knew whatever it is and understood whatever it is to be material and misleading by omission for these folks.

So, you know, they name the CFO and say, well, he was talking about revenue from Tecfidera, and he must have known about the contracts and the terms of the contract and that when he said whatever he said it was misleading.

There's nothing in the complaint that would leave one to understand that the CFO of the company knew the contract terms, knew that they were somehow violative of antitrust laws, knew that what he was saying would mislead investors when he said it because he didn't also say, "Oh, and by the way, we may be accused of violating the antitrust laws.  There may be a congressional inquiry or there may be lawsuit later about that."

Going individual defendant by defendant, they don't

have, they don't possess, the knowledge that's required in this circuit to plead scienter.  The stock sales do nothing for them.  There are automatic triggers to cover taxes. There's some pursuant to a 10b5-1 plan.  There's one defendant who didn't even sell at all.  And the scienter by status just doesn't work.

Core operations requires -- we cited the *Metzler* case.  There needs to be something more than just core operations.  And the core orientations theory doesn't really work here for much of the class period and for much of what we're talking about.  This is a just -- it is really difficult to understand how they can even try it with a class period of four years long and multiple products and things like that.

So we're not just weak on scienter.  We suffer from a lack of detail with regard to some defendants and a lack of knowledge and understanding with regard to all of them.  And so we're left with the complaint where there's no false statement, no duty to disclose, no omission, and most certainly no scienter.  And I'll leave it at that, Your Honor.

THE COURT:  Do you want to respond to the scienter?

MR. D'ALOIA:  Well, I think, you know, we fundamentally disagree that that's an accurate description of what is needed to plead scienter in this circuit for the same

reason that I mentioned before.  The *SEC v. Johnston* case and the *Aldridge* case is two examples of what we believe is the appropriate standard.

You know, I think defense counsel said earlier that the speaker needed to believe when they spoke that they would mislead investors.  That is a standard that elevates the pleading standard for scienter so far beyond the PSLRA that it makes it almost impossible to ever bring a claim of this type.  You would literally need to get inside of an executive's head in order to do that.

But the First Circuit recognizes from the language in the PSLRA itself that you can prove scienter from circumstance and from inference.  And our complaint, respectfully, I submit, goes beyond that.

So just to take the topics in order, the PBM Tecfidera claim, we allege in words of one syllable that the CEO, Mr. Vounatsos, and the CFO, Mr. McDonnell, approved and authorized the BOG contracts.  We also allege that they spoke frequently and gave detailed discussions about the rebates that they had entered into with PBMs in their public commentary.

We also say that there -- we also present a CW who was at a meeting where Vounatsos, the CEO, personally directed changes to the rebate arrangements with PBMs.

THE COURT:  So it -- I think you have alleged that

they had knowledge about the PBMs.  But what about the question we were exploring earlier about their knowledge of something wrong with the PBMs?

MR. D'ALOIA:  So I think a few things there, Your Honor.  Number one, I think not only did they know about the PBMs, but they knew that they were entering contracts with the PBMs to favor a more expensive brand-name product over less expensive generics.  And any executive knows that that is interfering with natural competition.

THE COURT:  I'm -- I have a hard time with this argument that --

MR. D'ALOIA:  I mean, they're paying money to --

THE COURT:  Yes, but so is paying -- a fancy advertising.  I don't understand this notion of natural competition.  I wish we lived in a world where the only question is:  What's the best product for your money?  But that is not what we do, right?

MR. D'ALOIA:  But -- understood, Your Honor, and I can sense your consternation here.  But I would respectfully submit that Vounatsos was on trade associations that regularly spoke about this.

There were companies in the news before Biogen -- and not just companies, pharmaceutical companies, their main competitors, Teva, others that actually made MS products that were in the news before Biogen decided to engage in this

practice for doing this and were brought before Congress because it was considered to be anticompetitive at the time.

There's just -- there's no circumstance in which Vounatsos did not know that entering into brand-over-generic contracts was a legitimate form of competition.

MR. BONGIORNO:  I'll just respond very briefly, Your Honor, and I know we're out of time.

He's relying on -- and the Court said that he did accuse them of having knowledge of these contracts. Paragraph 146 is so incredibly weak on that accusation.

It needs to have a basis.  As this Court know, you can't just sue someone for securities fraud and say, "You knew, and I allege that you knew; therefore, I get over the hump."  You have to have a basis for it, a confidential witness, a document, an admission, a -- something that would -- that could lead the Court to infer that there's a basis for the allegation.  You can't just say --

THE COURT:  You can't say the CFO knows about the contracts that are being entered into?

MR. BONGIORNO:  Not for a fraud case, Your Honor, under the PSLRA.  I mean, if there's a basis for it, sure. If there's some reason to say that the CFO was reading the contract, knew the provisions of the contract, et cetera; but just sort of this scienter by status, which is what that would be, doesn't work.

THE COURT:  So if plaintiff could show that these individuals had knowledge of the contracts --

MR. BONGIORNO:  Uh-huh.

THE COURT:  -- does that get them there?

MR. BONGIORNO:  Absolutely not.  On scienter?  Not even close.

THE COURT:  Because why?

MR. BONGIORNO:  Because they would have to show that the contracts were somehow illegal and that the individual defendants believed and understood that at the time and had reason to.

But just to go back, and then I will sit down, paragraph --

THE COURT:  What about his notion that they just needed to know that it was anticompetitive?

MR. BONGIORNO:  I'm sorry; I didn't catch --

THE COURT:  I think he's arguing that they knew about the contracts.  The contracts were anticompetitive; therefore, they knew that these were anticompetitive contracts.  Would that be enough?

MR. BONGIORNO:  I don't -- I don't know about that, Your Honor, because it depends what -- whether anticompetitive in the sense that it's illegal and they're going to get not just accused but, you know, determined to have done it illegal and be fined or penalized.

I mean, of course, they're trying to fight off competition.  That's what they're there to do.  The generics are being entered into the market.  They're going to respond to it.  And as the Court suggested before, they're going to do the best they can within the confines of the law.  If someone later accuses them otherwise, that's another story, but that's hindsight.

But to go back to just the initial point on 146, Vounatsos and McDonnell directed, authorized, or otherwise permitted Biogen to enter into brand-over-generic rebate contracts with PBMs.  That's a guess.  They did this, this, or that.  They have no idea.  They're just guessing.  That's scienter by status.  That doesn't work.

THE COURT:  Okay.  I'm unfortunately out of time. I will hopefully be able to get to this quickly.  I know this has been sitting here for quite a while.  If I do need anything more, I will ask for it.

With regard to the supplemental filing, it is -- I am usually pretty tough on people giving me things after the fact.  But if something does come up, the way I follow this is I follow the First Circuit's rule that, essentially, if after argument there is a decision or something that needs to come to my attention that has come out, you're welcome to give me whatever it's called, a Rule 32(j) letter with the attached decision, but not a brief.

And I think this, what you gave me, was -- was pretty close to that, so --

MR. D'ALOIA:  Understood, Your Honor.  Thank you.

MR. BONGIORNO:  Thank you, Your Honor.

THE COURT:  Thank you.

THE DEPUTY CLERK:  We are in recess.

(Court in recess at 11:11 a.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 31st day of January, 2026.

/s/ Robert W. Paschal

_____

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter