UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FRANCES CLARITY STOKES and     *
THOMAS ALLEN GRAY, individually and   *
on behalf of all others similarly situated,    *
    *
    Plaintiffs,                  *
    *
       v.                     *
    *    Civil Action No. 1:24-cv-12691-IT
BIOGEN INC., CHRISTOPHER A.      *
VIEHBACHER, MICHEL VOUNATSOS,    *
MICHAEL R. MCDONNELL, and PRIYA   *
SINGHAL,                  *
    *
    Defendants.             *
    *

MEMORANDUM & ORDER

March 26, 2026

TALWANI, D.J.

In this securities fraud putative class action suit, Plaintiffs bring claims against

Defendants Biogen Inc. ("Biogen") and its President and Chief Executive Officer Christopher A.

Viehbacher, former President and Chief Executive Officer Michel Vounatsos, Executive Vice

President and Chief Financial Officer Michael R. McDonnell, and Executive Vice President and

Head of Development Priya Singhal (collectively, the "Individual Defendants") for alleged

violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j

and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5.

Pending before the court is Defendants' Motion to Dismiss Amended Complaint [Doc.

No. 48] for failure to plead any materially false or misleading statements or any facts that

support a compelling inference of scienter under Section 10(b) and Rule 10b-5 (Count I) or

"control person" liability under Section 20(a) (Count II). Id. at 1-2. For the reasons stated herein, Defendants' Motion to Dismiss [Doc. No. 48] is GRANTED.

## I.    Procedural Background

In May 2024, Plaintiff Thomas Allen Gray, individually and on behalf of a putative class that acquired Biogen stock between February 3, 2022, and February 13, 2024, filed a Class Action Complaint for Violation of the Federal Securities Law ("Complaint") [Doc. No. 1] against Biogen and three of the Individual Defendants in the U.S. District Court for the District of Colorado. Gray certified that, on July 20, 2023, he purchased eight shares of Biogen stock at $274.93 per share. Compl. at ECF 44 [Doc. No. 1].

On July 22, 2024, Frances Clarity Stokes moved for appointment as Lead Plaintiff. Mot. for App't as Lead Pl. 1–2 [Doc. No. 7]. Stokes certified that, on February 23, 2023, she purchased 220 shares of Biogen stock at $272.40 per share. Decl. of Jeremy A. Lieberman, Ex. 3, at ECF 3 [Doc. No. 8-3]. Based on the average closing prices of Biogen's stock from February 14 through May 13, 2024, Stokes estimated her loss to be $12,645. Lieberman Decl., Ex.. 1 [Doc. No. 8-1].

The assigned Magistrate Judge granted the motion and appointed Stokes as Lead Plaintiff for the putative class. Order 6 [Doc. No. 24]. On October 21, 2024, the Magistrate Judge granted Defendants' unopposed motion to transfer the case to this court pursuant to 28 U.S.C. § 1404. Order 4–5 [Doc. No. 29].

Lead Plaintiff Stokes and Plaintiff Gray filed their First Amended Class Action Complaint for Violations of the Federal Securities Laws ("Amended Complaint") [Doc. No. 43] on December 31, 2024, adding Priya Singhal as an Individual Defendant, more than doubling the putative class period, and significantly expanding their allegations. Plaintiffs assert that, between September 14, 2020 (more than two years and five months before the first purchase of shares by

either Stokes or Gray) and November 14, 2024 (almost five months after the original Complaint [Doc. No. 1] was filed), Defendants made over fifty false or misleading statements that induced Plaintiffs to acquire Biogen stock at artificially inflated prices and suffer economic harm when the price of that stock fell. See id. ¶¶ 1–2, 224–316. Defendants then filed the pending Motion to Dismiss [Doc. No. 48] Plaintiffs' Amended Complaint [Doc. No. 43] under Federal Rule of Civil Procedure 12(b)(6).

## II.    Standard of Review

When evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"Exhibits attached to the complaint are properly considered part of the pleading for all purposes, including Rule 12(b)(6)." Trans-Spec Truck Service, Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008) (internal citations and quotations omitted). The court may, in limited circumstances, consider documents not attached to a complaint "[w]hen the complaint relies upon a document, whose authenticity is not challenged[.]" Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (citation omitted); see also Clorox Co. P.R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 32 (1st Cir. 2000) (on a motion to dismiss,

3

considering advertising materials not included with the complaint because they were "integral" to assessing complaint's allegations of false advertising); Lydon v. Local 103, Int'l Bhd. of Elec. Workers, 770 F.3d 48, 53 (1st Cir. 2014) (in ruling on a motion to dismiss, "a judge can mull over 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'") (citation omitted).

Courts addressing motions to dismiss in securities fraud cases governed by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, routinely consider financial statements and transcripts that a complaint incorporates by reference. See, e.g., Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 232 n.2 (1st Cir. 2015); In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d 5, 13 n.2 (D. Mass. 2016), aff'd, 857 F.3d 34 (1st Cir. 2017). A complaint incorporates a document by reference where the allegations are "expressly linked to– and admittedly dependent upon–a document (the authenticity of which is not challenged)" such that the "document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998); see also Alt. Energy, Inc., 267 F.3d at 33.

Securities fraud allegations are held to heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and the PSLRA. 15 U.S.C. § 78u–4(b)(2). See In re Boston Sci. Corp. Sec. Litig., 686 F.3d 21, 27, 30 (1st Cir. 2012); N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 15 (1st Cir. 2009) (holding that the particularity requirement applies not only to actual fraud claims but also to "associated claims where the core allegations effectively charge fraud"). As with all allegations of fraud, a securities fraud claim must be dismissed unless it "state[s] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

### III.    Factual Background

#### A.    *The Parties*

Plaintiffs assert that their purchases of Biogen securities during the putative class period, as detailed above, were at "artificially inflated prices." Am. Compl. ¶ 6. [Doc. No. 43].

Biogen is a biotechnology company that develops and commercializes pharmaceuticals. Id. ¶ 23. It focuses largely on drugs for the treatment of neurological conditions, including multiple sclerosis ("MS") and Alzheimer's disease ("AD"). Id. Biogen's common stock is traded on the NASDAQ Global Select Market under the ticker "BIIB." Id. ¶ 7.

Defendant Vounatsos was Biogen's President and Chief Executive Officer and a member of Biogen's Board of Directors from January 2017 to November 2022. Id. ¶ 8.

Defendant Viehbacher has served as Biogen's President and CEO and as a member of Biogen's Board of Directors since November 2022. Id. ¶ 9.

Defendant McDonnell has served as Biogen's Executive Vice President and Chief Financial Officer since August 2020. Id. ¶ 10.

Defendant Singhal served as Biogen's Senior Vice President and Head of Global Safety & Regulatory Sciences from February 2020 to January 2022, and as interim Head of Development from January 2022 to January 2023. Id. ¶ 11. She has served as Biogen's Executive Vice President and Head of Development since January 2023. Id.

#### B.    *Events Prior to the Putative Class Period*

##### 1.    Tecfidera

In 2013, Biogen sought and received approval from the U.S. Food and Drug Administration ("FDA") for Tecfidera, an oral medication for the treatment of MS. Am. Compl. ¶¶ 24–25 [Doc. No. 43]. By 2018, annual sales of Tecfidera were $4.3 billion and accounted for thirty-five to forty percent of Biogen's global product sales. Id. ¶ 27.

In 2015, a former Biogen sales representative's *qui tam* complaint was unsealed. Id. ¶ 366. The relator alleged that Biogen "paid illegal kickbacks to physicians to prescribe its MS products, including Tecfidera, over competing products in violation of the False Claims Act and state law counterparts." Id.

In 2017, generic pharmaceutical manufacturers began challenging Biogen's Tecfidera-associated patents and initiated Abbreviated New Drug Applications ("ANDAs"), seeking FDA approval for generic versions of Tecfidera. Id. ¶¶ 55–56. In 2020, after Biogen lost a series of patent suits initiated by these generic manufacturers, "at least eight generic versions" of Tecfidera entered the market. Id. ¶¶ 90–91.

### 2. Vumerity

On November 17, 2017, Biogen announced its agreement to purchase the rights to an MS drug in development, later known as Vumerity. Am. Compl. ¶ 59 [Doc. No. 43]. Vumerity is a bioequivalent of Tecfidera, relying on the same "mechanism of action in the human body" as Tecfidera to treat MS but containing a different active ingredient. Id. Vumerity was protected under three distinct patents through 2033 and therefore not subject to competition arising from generic ANDA filings. Id. ¶ 60. Biogen sought to rapidly bring Vumerity to market. Id. ¶ 64.

In October 2019, Biogen received FDA approval for Vumerity and "directed [its] sales associates in the United States to switch as many patients as possible from Tecfidera to Vumerity once they could market it." Id. ¶ 67. By June 2020, Biogen's monthly unit sales of Vumerity had reached only 50,225 capsules, or the equivalent of 419 thirty-day supplies of Vumerity. Id. ¶ 159. That number was only two percent of the 2,495,616 capsules of Tecfidera, or approximately 41,594 thirty-day supplies, sold at the time. Id.

### 3. Biogen's Agreement to Develop Leqembi

In March 2014, Biogen entered into an agreement (the "2014 agreement") with Japanese pharmaceutical company Eisai Co., Ltd. ("Eisai"). Am. Compl. ¶ 77 [Doc. No. 43]. Under the 2014 agreement, Biogen and Eisai would "jointly develop" two drugs currently under study at Eisai for the treatment of AD, including Leqembi. Id. ¶¶ 77, 80. The 2014 agreement also permitted Eisai to opt into collaboration with Biogen on its AD products in development, including another drug known as Aduhelm. Id. ¶ 77.[1]

At the time Biogen and Eisai entered into the 2014 agreement, Eisai had completed a successful Phase 1 clinical trial of Leqembi and had recently initiated a Phase 2 clinical trial. See id. ¶¶ 32, 77. Under both the 2014 agreement and an amended Collaboration Agreement signed in 2017 (the "2017 agreement"), Eisai was the "primary lead for the development of [Leqembi], including clinical trial management and regulatory filings." Id. ¶ 79.

In March 2019, Eisai announced the initiation of an eighteen-month Phase 3 clinical trial for Leqembi (the "Phase 3 trial"). Id. ¶ 165. Before initiating treatment with either Leqembi or a placebo, Eisai tested each Phase 3 trial participant to determine if the participant was a carrier of the "ApoE4 allele." Id. ¶ 183. Individuals with ApoE4 are thought to be at a higher risk of developing AD and, as Biogen stated on the warning label for Aduhelm, a higher incidence rate for "Amyloid Related Imaging Abnormalities" ("ARIA"). Id. ¶ 183.[2] ARIA is "a serious and

---

[1] Plaintiffs' Amended Complaint [Doc. No. 43] includes detailed allegations involving Biogen's development of Aduhelm. See, e.g., id. ¶¶ 77–80, 93–115. Plaintiffs' claims do not directly involve Biogen's statements or omissions regarding Aduhelm, however, and the court references Aduhelm only as necessary for context.

[2] Plaintiffs also cite to a November 2021 article published in the *Journal of the American Medical Association*, entitled "Amyloid-Related Imaging Abnormalities in 2 Phase 3 Studies Evaluating Aducanumab with Early Alzheimer Disease." Id. ¶ 110. The article stated that

sometimes fatal condition seen in AD patients involving transient legions in the brain that present as 'abnormalities' on MRIs." Id. ¶ 109. ARIA may cause edema or hemorrhage in the brain and lead to "seizures, strokes, or death." Id.

Eisai intended to run subgroup analyses on the ApoE4 carrier population enrolled in the Leqembi Phase 3 trial. Id. ¶ 183.

C.      *Events During the Putative Class Period (September 14, 2020—November 14, 2024)*

    1.  Industry Positioning, MS Drug Competition, and Pharmacy Benefit Managers

Biogen relied on pharmacy benefit managers ("PBMs"), which function as "middlemen" between drug manufacturers and health plans, to sell Tecfidera and other products to patients. Am. Compl. ¶¶ 117, 120 [Doc. No. 43].

PBMs often enter "rebate agreements" with pharmaceutical manufacturers, under which the manufacturer provides the PBM with a post-sale rebate per eligible unit sold. Id. ¶¶ 128–29. Pharmaceutical manufacturers use rebates to incentivize PBMs "to either place a branded drug on a better tier of the PBM's standard formularies than any generics of that drug or simply exclude the generics from those formularies altogether." Id. ¶ 130.

Through rebate contracts with PBMs, Biogen sought to "disadvantage or exclude generic Tecfidera" from PBM formularies. Id. ¶ 146. Biogen paid to PBMs an average Tecfidera rebate of 19% in 2020, 45% in 2021, and 28% in 2022. Id. ¶ 148. In 2021, "more than 45% of the 300 million Americans with pharmacy benefit coverage were subject to formularies that did not give generic Tecfidera any better tier placement than Tecfidera[,]" despite generic Tecfidera's lower

---

"roughly 40% of participants" in the two Aduhelm Phase 3 trials conducted by Biogen "had suffered from ARIA, and one-quarter of those patients were symptomatic." Id.

price. Id. ¶ 153.[3] Although generic Tecfidera was "deeply discounted" relative to brand-name Tecfidera,[4] generic Tecfidera represented less than a third of all sales by June 2021. Id. ¶ 158.

Pharmaceutical rebate agreements attracted regulatory attention, including a U.S. Federal Trade Commission ("FTC") investigation announced on June 7, 2022.[5] During a public FTC hearing on June 16, 2022, an FTC Commissioner's statement was read aloud, including the Commissioner's position that "today's statement may appear to focus on pharmacy middlemen—PBMs—but the statement very much focuses on PBMs and manufacturers." Id. ¶ 320. The FTC also issued a press release that day, in which it announced the agency's intention to "ramp up enforcement against any illegal bribes and rebate schemes that block patients' access to competing lower-cost drugs." Id. Quoting the FTC Chair, the press release warned that "today's action should put the entire prescription drug industry on notice." Id. Between the close of trading on June 15 and June 16, 2022, Biogen's stock price declined from $197.26 per share to $191.53 per share. Id. ¶ 321.

On July 20, 2022, Biogen announced that it had reached a $900 million settlement in the aforementioned *qui tam* case. Id. ¶ 370.

---

[3] Plaintiffs also point to the relative positioning of Tecfidera and generic Tecfidera on the three largest American PBMs' formularies (OptumRx, CVS Caremark, and Express Scripts) between 2020 and 2022. Id. ¶¶ 149–51.

[4] Plaintiffs compare manufacturer Mylan's generic Tecfidera, which Mylan introduced in August 2020, as one such example. Id. ¶ 156.

[5] At the time of the announcement, the FTC also released a "model copy" of the orders issued to six PBMs, which included requests for "documents relating to formulary design for 'Rebated Drug Products,' defined to include 'dimethyl fumarate (Tecfidera).'" Id. ¶ 318.

2.  <u>Leqembi Development</u>

**a.  The Continuing Phase 3 Trial and FDA Accelerated Approval**

As previously noted, the Leqembi Phase 3 trial began in March 2019. Am. Compl. ¶ 165 [Doc. No. 43]. Eighteen months later, Eisai initiated the thirty-month open label extension ("OLE") phase of the trial, in which Phase 3 trial patients "who were on placebo [were permitted] to switch to Leqembi if they chose to do so." <u>Id.</u>

On May 6, 2022, Eisai sought "accelerated" FDA approval for Leqembi based on study data from the Phase 2 trial. <u>Id.</u> ¶ 168. The FDA agreed to review the Phase 2 trial data "as a surrogate endpoint reasonably likely to predict a clinical benefit" under the accelerated approval process and later use the Phase 3 trial data to verify any such clinical benefit. <u>Id.</u>

On January 6, 2023, the FDA granted accelerated approval for Leqembi based on the Phase 2 trial data, and Eisai filed a supplemental application for traditional FDA approval based on the Phase 3 trial data. <u>Id.</u> ¶ 176. Also on January 6, Eisai issued a press release announcing that Leqembi would be priced at $26,500 and explaining its pricing rationale. <u>Id.</u> ¶ 177.

The FDA granted full approval for Leqembi on July 6, 2023, but included a "black box" warning regarding the "uncommon but potentially serious side effect of ARIA." <u>Id.</u> ¶ 180. Later that day, the Centers for Medicare & Medicaid Services ("CMS") announced that the agency would cover the cost of Leqembi at the standard 80% Medicare rate but would require Medicare patients to "enroll[] in a registry to monitor real world treatment" with Leqembi. <u>Id.</u> ¶ 181.

**b.  Patient Deaths During the Phase 3 Open Label Extension**

While Eisai was obtaining FDA approval based on Phase 2 trial data, three patients died during the Phase 3 OLE.

### i.   Patient 1

Patient 1, an eighty-eight-year-old male, received a placebo during the core Phase 3 trial but shifted to Leqembi during the OLE. Id. ¶ 185. He was not an ApoE4 carrier, but he was taking prescribed blood thinners. Id.

On May 18, 2022, after reporting a recent fall, Patient 1 underwent an MRI that "ultimately showed that he had ARIA-E [ARIA causing edema] and ARIA-H [ARIA causing hemorrhage]." Id. On June 12, 2022, Patient 1 died "after suffering both a heart attack and four mini-stroke-like events." Id. In a mandatory adverse event report filed with the FDA, the Phase 3 trial investigator listed Patient 1's death as "related" to Leqembi. Id. ¶ 186.

Eisai requested that the Phase 3 trial's data and safety monitoring board (the "board") "look into" any relationship between anticoagulant use and heightened ARIA risk. Id. ¶ 187. After concluding that 3.1% of all patients in the Phase 3 trial using anticoagulants developed macrohemorrhages but only 0.46% of patients not on anticoagulants experienced the same, the board requested that Eisai add language to the trial consent forms expressly warning patients about this risk. Id. ¶ 187. Eisai did so on July 14, 2022. Id. The board did not recommend that Eisai exclude patients on anticoagulants from the Phase 3 trial. Id.

### ii.   Patient 2

Patient 2, a sixty-five-year-old female who possessed two copies of the ApoE4 allele, received a placebo during the core Phase 3 trial study but transitioned to taking Leqembi as part of the OLE in August 2022. Id. ¶ 189.

On September 3, 2022, Patient 2 arrived at an emergency room after "display[ing] garbled speech." Id. Emergency room providers diagnosed Patient 2 with an ischemic stroke and, upon ordering a CT scan, "found . . . clear evidence of ARIA." Id. When a blood thinner was administered to Patient 2, she suddenly developed hypertension and "began screaming and

11

writhing in pain, requiring doctors to chain her to the gurney, induce a coma, and, eventually, administer a reversing treatment." Id.

Patient 2 suffered "extensive bleeding on the outer layer of her brain" and passed away several days later. Id. Subsequent MRI and CT scans "showed 'innumerable'" ARIA areas in Patient 2's brain. Id.

Patient 2's husband reported Patient 2's death and the surrounding circumstances "to the contract research organization who administered Leqembi to Patient 2 and, ultimately, to Eisai" through a meeting with the trial investigator assigned to Patient 2. Id. ¶ 190.

### iii.   Patient 3

Patient 3, a seventy-nine-year-old female who possessed two copies of the ApoE4 allele, received a placebo during the core Phase 3 trial but started receiving Leqembi in August 2022 as part of the OLE. Id. ¶ 192. After starting on Leqembi, Patient 3 reported experiencing headaches. Id.

On September 14, 2022, Patient 3 was taken to a hospital to be evaluated for a possible seizure. Id. While hospitalized, Patient 3 was administered a blood thinner for treatment of atrial fibrillation. Id.

"Brain scans" performed at the hospital "confirmed multifocal swelling and 51 microhemorrhages, consistent with 'severe' ARIA" in Patient 3's brain. Id. On September 19, Patient 3 suffered multiorgan failure and passed away. Id. At the time, the trial investigator assigned to Patient 3 filed an adverse event report with the FDA, in which Patient 3's seizure was "preliminarily" classified as "related" to Leqembi. Id. ¶ 193.

Eisai disagreed with the "related" classification based on Patient 3's seizure risk factors, including her age and underlying AD. Id.

### c.  Initial Reporting on the Phase 3 Trial Following these Deaths

On September 27, 2022, Eisai and Biogen published a press release announcing "positive top line results" from the Phase 3 trial, including that the study "met the primary endpoint by reducing clinical decline on the [relevant cognitive scale] by 27% compared with placebo." Am. Compl. ¶ 169 [Doc. No. 43].

On November 29, 2022, Eisai presented detailed results of the Phase 3 trial at an industry conference, with an October 22, 2022 data cutoff for the ongoing OLE component of the trial. Id. ¶ 204. During that presentation, Eisai reported two deaths during the OLE. Id. Based on the descriptive information included in its public presentation, the two study participant deaths reported by Eisai were those of Patient 1 and Patient 2. See id. ¶¶ 185–90, 204.

Eisai described both deceased patients as having displayed "concurrent macrohemorrhage" at the time of death." Id.[6] Eisai further stated that there was "no clear relationship of macrohemorrhage to ApoE4 status, baseline MRI, or timing of treatment" and that subjects taking anticoagulant medication could continue in the open label extension "with informed consent language regarding increased risk of cerebral hemorrhage with concomitant anticoagulant use." Id.

Biogen and Eisai also published a press release that day, in which the companies disclosed that Leqembi's "ARIA incidence profile was within expectations based on the Phase 2 trial results" but reported one death in the placebo participant group and two deaths in the Leqembi participant group during "the [Phase 3] core study and subsequent [OLE] study." Id.

---

[6] In an accompanying slide, Eisai described the deaths as follows: "1 case of macrohemorrhage in 65F E4 homozygous [for ApoE4] after tPA for left MCA occlusion (OLE) and 1 case in 87M E4 non-carrier [of ApoE4] on apixaban (stopped) then received heparin [an anticoagulant medication] for MI (OLE), cause of death cardiopulmonary)[.]" Id.

13

¶ 283. With respect to the two participant deaths, both of which occurred during the OLE study, the release stated: "Both cases had significant comorbidities and risk factors including anticoagulation contributing to macrohemorrhage or death. Therefore, it is Eisai's assessment that the deaths cannot be attributed to [Leqembi]." Id.

Also on November 29, 2022, Eisai published a peer-reviewed paper in the *New England Journal of Medicine* that purported to include detailed results of the Phase 3 trial. See id. ¶¶ 174, 206. The paper "did not discuss any [of] the deaths during the OLE period[,]" described in greater detail infra. Id. ¶ 206.

### d. Autopsy Results

A brain autopsy on Patient 1, performed on November 18, 2022, indicated that Patient 1 "suffered an intracerebral hemorrhage and that there was extensive ARIA at the site of the hemorrhage." Am. Compl. ¶ 188 [Doc. No. 43].

An autopsy of Patient 2 was performed "no later than the end of 2022." Id. ¶ 194. The pathologist who performed the autopsy, Confidential Witness 6 ("CW6"), discovered "brain swelling" and "frayed blood vessels." Id. The trial investigator who filed an adverse event report with the FDA listed Patient 2's death as "related" to Leqembi and noted that Patient 2's death was "a highly unusual case" in which the ARIA detected during autopsy were "not otherwise described in humans and suggest a host response to anti-amyloid beta therapy." Id. ¶ 191. Eisai disagreed that Patient 2's death was related to Leqembi and attributed her death to her age or the administration of a blood thinner while Patient 2 was undergoing treatment in the emergency room. Id.

CW6 concluded that Patient 2 suffered not from a stroke, but from "stroke-like symptoms of brain damage" and ultimately died from "multifocal intracerebral hemorrhage due to Leqembi infusion complicated by the fact that she appeared to have a stroke, leading to the use of [the

14

blood thinner]." Id. ¶ 194. CW6 offered to share the full details of Patient 2's autopsy with Eisai on two occasions but was rebuffed. Id. ¶ 195.

An autopsy of Patient 3 "coordinated" by Confidential Witness 7 ("CW7"), a board-certified vascular neurologist, was performed in March 2023. Id. ¶¶ 18, 196. During the autopsy, "more than 30 microbleeds" were discovered in Patient 3's brain. Id. ¶ 196. The autopsy results also included findings of "widespread inflammation [in Patient 3's brain] . . . with areas of 'necrotic' tissue, and blood vessels that appeared shredded and deformed." Id. The results supported the conclusion that Patient 3's cause of death was "'necrotizing vasculitis' related to treatment with Leqembi." Id.

In either late March 2023 or early April 2023, CW7 sent Patient 3's autopsy reports to a journalist "who, in turn, sent a copy to Eisai's public relation department." Id. ¶ 197. CW7 also sent copies of the autopsy report to "numerous scientists who work with Eisai and 'senior executives' at Eisai" and offered to send "all materials, including tissue slides, so Eisai and Biogen could review them." Id. Eisai's response, in CW7's recollection, was "'very slow, very limited, and did not occur in a timeframe when it might be helpful to the FDA approval process.'" Id.[7]

---

[7] Plaintiffs further allege that following review of the autopsy report:

> Eisai concluded as follows: "Given the findings of edema and microhemorrhages and considering the short latency to onset following the initiation of the open label extension and the subject's APO4 homozygous [two gene] status increasing the risk for ARIA events, the events of possible cerebral edema is classified as 'Related' to study medication" and, given the relationship between ARIA-E and seizures, classified the seizure as "Related" to Leqembi as well.

Id. ¶ 198.

### e.  Further Reporting

In light of the observation of ARIA during the Phase 3 study, Eisai performed additional analysis on data from a subset of Phase 3 study participants to compare ARIA rates in participants taking blood thinners to the rates in those not taking blood thinners (the "subset study"). Am. Compl. ¶¶ 290, 292 [Doc. No. 43]. In March 2023, Biogen and Eisai issued a press release reporting the results of the analysis. Id. ¶ 290. In sum, although ARIA rates were higher in those receiving Leqembi than those receiving a placebo in the overall study, Eisai found in the subset study that

> The risks of ARIA appear slightly higher in the placebo group with antiplatelet or with anticoagulants relative to placebo subjects not on anticoagulants (no antiplatelet or anticoagulation: 8.9%, antiplatelet: 9.7%, anticoagulation (anticoagulation alone or with antiplatelet): 10.8%). ARIA rates may be slightly lower in those on lecanemab treated with antiplatelet or with anticoagulation, relative to lecanemab treated subjects not with antiplatelet or with anticoagulation (no antiplatelet or anticoagulation: 21.8%, antiplatelet: 17.9%, anticoagulation: 13.3%).

Id. Biogen and Eisai also stated that, in the Phase 3 overall study, ARIA "did not occur more frequently in [Leqembi]-treated participants on antiplatelet or anticoagulant drugs compared to [Leqembi]-treated participants that were not on either." Id. On April 25, 2023, during Biogen's quarterly earnings call, Defendant Singhal referred to these results during her prepared remarks and, in her response to an analyst question later on, stated that Eisai "[did not] believe that the overall conclusions [regarding the safety of Leqembi for those with two copies of the ApoE4 gene] are different in terms of [the Phase 3 study] and confidence in the data." Id. ¶ 293.

### 3.  Commercial Launch of Leqembi and Further FDA Action

After receiving FDA approval and a CMS Medicare coverage determination "no later than July 6, 2023," Biogen and Eisai introduced Leqembi into the marketplace. Am. Compl. ¶¶ 180, 211 [Doc. No. 43]. Between the FDA's accelerated Leqembi approval in January 2023

and April 2023, Biogen's newly appointed CEO, Defendant Viehbacher, made various statements concerning "capacity restrictions" at "infusion centers" where Leqembi would be administered and with respect to MRIs[8] for patients who began taking Leqembi. Id. ¶ 214.

On May 15, 2023, the CEO of Eisai's United States business announced during a conference call that, "by the end of fiscal year 2023,[9] [Eisai] expect[s] about 10,000 patients to be on [Leqembi] by that time. . . . [i]n the United States." Id. ¶ 217. On September 11, 2023, while speaking at an industry conference, Viehbacher stated, "I think nothing that we're seeing says that the Eisai guidance can't be met, which is 10,000 patients by the end of their fiscal year, which is the end of March." Id. ¶ 303; see id. ¶ 304 (quoting Viehbacher's assertion at the same conference that "in some ways, having the target at the end of [Biogen's] first quarter [in March 2024] is more of a relevant benchmark . . .").

On August 22, 2023, the FDA's Deputy Director of Global Regulatory Strategy wrote to Eisai's Director of Regulatory Strategy that:

> [S]ince Leqembi was approved on January 6, 2023, we have become aware of clinical trial data showing an increased risk of symptomatic, serious, and severe amyloid relating imaging abnormalities (ARIA) in ApoE4 homozygotes who are treated with Leqembi compared to heterozygotes and noncarriers. . . . [and] data showing intracerebral hemorrhage that includes findings on neuroimaging suggestive of cerebral amyloid angiopathy (CAA) and use of anticoagulants."

Id. ¶ 210. Because the FDA considered this data to be new information, the agency required Eisai to conduct additional clinical trials for Leqembi. Id.

In November 2023, Viehbacher publicly stated that 800 patients had been prescribed Leqembi at that point in time and again referred to the 10,000 patient goal. Id. ¶ 306.

---

[8] As publicly stated by Viehbacher, "in the first 14 weeks [of taking Leqembi], [a patient] probably need[s] [three] MRIs according to [Leqembi's] label." Id. ¶ 214 (quotations omitted).

[9] Eisai's 2023 fiscal year ended in March 2024. See id. ¶ 303.

17

While speaking at an industry conference on January 8, 2024, Viehbacher's update on Leqembi's rollout included that "we've probably got a target of 10,000 [patients], and we're working our way through that." Id. ¶¶ 308–09. Also on that date, Viehbacher made additional public statements contextualizing the 10,000 patient goal, including that the goal was an attempt to "give people some sort of milestone" because there were "no real analogues for this launch," the 10,000 patient goal was an indication of expected "trajectory," and, although "there is no reason to say, that, we can't get there[,]" the "data were kind of choppy in December. So, for me, I am really looking for the January [2024] data. But where we are right now is, 10,000 isn't really what we are interested in anymore. It's how do we now get to the 100,000?" Id. ¶ 322.

On February 13, 2024, on its quarterly conference call, an Eisai officer stated that reaching the 10,000 patient goal by March 2024 would be "challenging" and that "there are approximately 4x greater number of patients on the waiting list than the current number of patients receiving the treatment," or 8,000 waiting list patients. Id. ¶ 324. During Biogen's quarterly conference call later that day, Viehbacher stated that there were "approximately 2,000 patients on [Leqembi] therapy at the moment" and expressed Biogen's belief that the company was making "very solid progress" with respect to Leqembi, particularly in reference to Eisai's "belief . . . that for all the patients on [Leqembi] treatment, they [sic] are at least three or fourfold of those who are actually in waiting rooms." Id. ¶ 315. Viehbacher reported that there were 3,800 patients expected to receive, but not yet prescribed, Leqembi. Id. ¶ 325.

4. Government Actions, Criticisms of Leqembi, and Further Statements from Eisai in the Second Half of 2024

On July 23, 2024, the Chair of the U.S. House Committee on Oversight and Accountability released a report on PBM contracting practices. Am. Compl. ¶ 328 [Doc. No. 43]. The report stated, inter alia, that "evidence suggests that decisions were often made based on the

economics of a medication, other than its benefit to patients or affordability," citing as support "Express Scripts First Production" on April 6, 2023. Id. Those documents included "documents addressing 'Tecfidera.'" Id.

On July 26, 2024, the European Union's European Medicines Agency ("EMA") publicly released "highlights" from its Committee for Medicinal Products for Human Use's ("CHMP") meetings to consider regulatory approval of Leqembi. Id. ¶ 330. In doing so, the EMA made public that CHMP recommended denying the request for Leqembi's market authorization and did so, at least in part, because Leqembi's therapeutic effect did not "counterbalance the risk of serious adverse events," including the risk of ARIA. Id. ¶ 331.

In September 2024, the FTC issued an administrative complaint charging the three largest PBMs with, inter alia, violations of Section 5(b) of the FTC Act, 15 U.S.C. §§ 41–58, with respect to the listing of insulin and insulin biosimilars on PBM-developed formularies. Id. ¶¶ 132, 139–40. The FTC press release accompanying the filing of the administrative complaint on September 20, 2024, warned that "all drug manufacturers should be on notice that their participation in the type of conduct challenged here raises serious concerns, and that the Bureau of Competition may recommend suit [of] drug manufacturers in any future enforcement actions[.]" Id. ¶ 334.

On September 23, 2024, the FTC publicly released its administrative complaint. Id. ¶ 336. In that complaint, the FTC alleged that PBMs' "demand for larger rebates has also inflated list prices for other critical drugs including treatments for autoimmune diseases and inflammatory conditions." Id. Plaintiffs state that MS, for which Tecfidera is prescribed, is "both an autoimmune and inflammatory condition." Id.

19

On October 16, 2024, the Therapeutic Goods Administration ("TGA"), Australia's regulating entity for pharmaceuticals, announced that it, too, would deny approval for Leqembi. Id. ¶ 338. In its announcement, TGA considered "the frequent occurrence of [ARIA] in patients treated with Leqembi" and concluded that Leqembi's therapeutic effect was not significant enough to "outweigh the associated safety risks." Id.

On October 23, 2024, *The New York Times* published an article in which it reported that Eisai did not inform Phase 3 trial participants who tested positive for ApoE4 that their risk of developing ARIA was elevated. Id. ¶ 340. The article also noted a previously unreported Leqembi-associated ARIA death that occurred after Leqembi became available on the public market. Id. As reported in the article, "several" Phase 3 trial participants "dropped out because of severe ARIA soon after receiving Leqembi, which Eisai confirmed were 'related' to Leqembi, according to adverse event reports reviewed by *The Times*." Id.

On November 8, 2024, Eisai released its quarterly financial report and revised its full-year Leqembi revenue forecast from $370 million to $280 million. Id. ¶ 342. Eisai also reported that 4,000 patients in the United States were currently taking Leqembi, "with another 6,000 eligible to start treatment." Id. When asked about the outlook for Leqembi during a quarterly conference call, Eisai's CEO advised that the company did not expect Leqembi to become profitable until the 2026 fiscal year. Id.

On November 14, 2024, the EMA announced that, upon reevaluation, CHMP recommended approving Leqembi for patients who "have only one or no copy of ApoE4," as those patients had a reduced risk of developing ARIA. Id. ¶ 346. The EMA also warned, however, that Leqembi must not be used by individuals taking anticoagulants due to an increased risk of developing hemorrhagic ARIA. Id.

Also on November 14, 2024, the FDA revised its approved label for Leqembi. Id. ¶ 346.

The new label limited Leqembi to individuals "with one or no copy of ApoE4" given the higher

risk of ARIA development in individuals with two ApoE4 copies and included new language

about additional risks for Leqembi patients who also used blood thinners. Id.[10]

## IV.    Count I – Violation of Section 10(b) of the Exchange Act and Rule 10b-5

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must

sufficiently allege six elements:

> (1) a device, scheme, or artifice employed to defraud; a material misrepresentation
> or omission; or an act, practice, or course of business which operates or would
> operate as a fraud or deceit upon any person; (2) scienter, or a wrongful state of
> mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5)
> economic loss; and (6) loss causation.

Zhou v. Desktop Metal, Inc., 120 F.4th 278, 287 (1st Cir. 2024) (citations omitted).

For each of the challenged statements, as to the first element, Plaintiffs allege either

material misrepresentations or omissions. Defendants challenge the sufficiency of those

allegations as well as Plaintiff's scienter allegations.

### A.    *Materially False Misstatements or Omissions*

The fifty-six statements challenged by Plaintiffs can be grouped into three categories: (1)

statements about Biogen's sales of Tecfidera and Vumerity; (2) statements about Leqembi's

safety profile; and (3) statements about Leqembi's commercial prospects. The court will address

the categories in reverse order.

---

[10] The new language included the following warning: "Fatal cerebral hemorrhage has occurred in a patient taking an anti-amyloid monoclonal antibody in the setting of focal neurologic symptoms of ARIA and the use of a thrombolytic agent." Id.

1.   Statements About the Leqembi 10,000 Patient Goal

On May 15, 2023, the leader of Eisai's United States division stated that "[b]y the end of fiscal year 2023 [March 2024], we do expect about 10,000 patients to be on [Leqembi] by that time. . . . [i]n the United States." Am. Compl. ¶ 217 [Doc. No. 43]. Plaintiffs assert that Biogen "expressly adopted [the 10,000 patient] figure no later than September 11, 2023," through a statement by Defendant Viehbacher at an investment conference. Id. Viehbacher made similar statements in three other instances, including later at the same September 11 conference, on a November 8, 2023 earnings call, and at a conference on January 8, 2024. See id. ¶¶ 303–304, 306, 309.

Defendants do not dispute that Biogen and Eisai failed to reach the 10,000 patient goal by March 2024. See Mem. ISO Mot. to Dismiss 23 [Doc. No. 50]. Instead, Defendants argue that the challenged statements are protected under the PSLRA's "safe harbor," as the statements either "were both identified as forward-looking and accompanied by meaningful cautionary language" or "not alleged to have been made with actual knowledge of falsity." Id. at 21 (citing 15 U.S.C. § 78u–5(c)(1)).

The PSLRA's "safe harbor" provision shields securities issuers from liability in private actions based on false or misleading statements of material fact "with respect to any forward-looking statement, whether written or oral" where the statement is

> identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . or . . . the plaintiff fails to prove that the forward-looking statement . . . [if made on behalf of a business entity by or with the approval of an executive officer was] made . . . with actual knowledge by that officer that the statement was false or misleading.

In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 212 (1st Cir. 2005) (quoting 15 U.S.C.

§ 78u–5(c)(1)) (alteration in original); see In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d at 39.

The statute defines "forward-looking statement[s]" to include

> (A) a statement containing a projection of revenues, income . . . earnings (including earnings loss) per share, . . . capital expenditures, dividends, . . . or other financial items; (B) a statement of the plans and objectives of management for future operations . . . ; (C) a statement of future economic performance . . . ; (D) any statement of the assumptions underlying or relating to [any of the above].

In re Stone & Webster, 414 F.3d at 212 (quoting 15 U.S.C. § 78u–5(i)(1)) (alteration in original);

Hackel v. AVEO Pharms., Inc., 474 F. Supp. 3d 468, 473, 478 (D. Mass. 2020) (company's

statements about what it "expected[,]" "anticipated[,]" or "target[ed][,]" with respect to the

timeline on which it would release topline data were "clearly forward looking").

### a.  Statement of Present Fact

The court finds Viehbacher's first challenged statement to be a statement of fact that is

not protected by the safe harbor but is nonetheless insufficient to state a claim.

Although the statement did reference Eisai's, and by extension Biogen's, future goal as to

the number of patients prescribed Leqembi, the statement also communicated Biogen's present

impression, as of September 11, 2023, that the goal was attainable. See Am. Compl. ¶ 303 [Doc.

No. 43]) ("I think nothing that we're seeing says that the Eisai guidance can't be met, which is

10,000 patients by the end of their fiscal year, which is the end of March." (emphasis added)).

Where the PSLRA's safe harbor "is intended to apply only to allegations of falsehood as

to the forward-looking aspects of the statement[,]" In re Stone & Webster, 414 F.3d at 213, an

allegedly false or misleading aspect of the statement that is not forward-looking is not brought

under the safe harbor merely because it is accompanied by a forward-looking aspect. See id.; see

also N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 45 n.13 (1st

Cir. 2008) ("In analyzing a forward-looking statement, the aspect of the statement that is based

23

on the present facts must be distinguished from the aspect of the statement that is a future projection."). Taking this necessary distinction into account, the court finds that this September 11, 2023 statement is not a forward-looking statement to which the PSLRA safe harbor applies. See, e.g., Dahhan v. OvaScience, Inc., 321 F. Supp. 3d 247, 254 (D. Mass. 2018) ("Though the estimate that OvaScience would achieve 1,000 cycles is forward-looking, the element of Defendants' statements that pertained to the status of Defendants' current expectations or status were not forward looking, and are not protected by the safe harbor.").

Nevertheless, Plaintiffs have failed to allege facts to support their claim that Defendants knew this statement to be false and instead raise only an impermissible assertion of "fraud by hindsight." Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 457 (1st Cir. 2017). Particularly where Plaintiffs assert that Viehbacher's September 11, 2023 statements represent Biogen's first affirmative adoption of Eisai's 10,000 patient goal, see Am. Compl. ¶ 217 [Doc. No. 43], Defendants' early optimism as to the attainability of this goal is not rendered misleading by Defendants' failure to reach this goal months later. See ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 62 (1st Cir. 2008) ("[A] complaint may not simply contrast a defendant's past optimism with less favorable actual results in support of a claim of securities fraud." (quotation omitted)). Beyond alleging that Biogen did not achieve the 10,000 patient goal, Plaintiffs have alleged facts sufficient only to infer that, because the Leqembi rollout "in retrospect . . . lagged significantly behind the proposed timeline, the timeline must have always been impossible to achieve." Ganem, 845 F.3d at 457. Such an inference does not meet the requisite pleading standard under the PSLRA.

### b.  Forward-Looking Statements

The court agrees with Defendants that Viehbacher's second, third, and fourth statements are "forward-looking statements" for the purposes of the safe harbor.

To be shielded under the PSLRA safe harbor, a statement must both be forward looking and either accompanied by meaningful cautionary statements or not plausibly alleged to have been made with actual knowledge that the statement was false or misleading. See 15 U.S.C. § 78u–5(c)(1). If "actual knowledge" that the statement was false or misleading is established by inference, such inferences must be "strong," rather than merely plausible. See In re Pharms., Inc. Sec. Litig., No. 07-12581-GAO, 2007 WL 951695, at *9 (D. Mass. Mar. 28, 2007) ("Where the statements challenged by the plaintiffs are forward-looking in nature, the PSLRA ratchets the bar even higher: the facts pled by the plaintiffs must be sufficient to raise a strong inference that the issuer of the statement had actual knowledge of the statement's falsity."). The three forward-looking statements at issue here satisfy one or both conditions.

In these three statements, Viehbacher referred to the 10,000 patient goal in prospective language as a "target" or "aim" for results expected several months in the future. See Am. Compl. ¶¶ 304, 306, 309 [Doc. No. 43]; Hackel, 474 F. Supp. 3d at 478; Harrington v. Tetraphase Pharms. Inc., 2017 WL 1946305, at *10 (D. Mass. May 9, 2017) (company's assertion that it "continue[d] to target submission of a new drug application . . . by year end" was "squarely" within PSLRA's definition of forward-looking statements). Such statements are of the type the PSLRA contemplates as protected "statement[s] of the plans and objectives of management for future operations." See 15 U.S.C. § 78u–5(i)(1).

Viehbacher's assertion on November 8, 2023—that Biogen "ha[d] an aim of getting to 10,000 patients" by the end of March 2024—was made during a quarterly earnings call. See Am. Compl. ¶ 306 [Doc. No. 43]; Decl. of Jessica Lewis, Ex. 19, at 1, 3 [Doc. No. 49-19]. When read in context, the statement was subject to a formal cautionary statement from Biogen's head of investor relations at the beginning of the call:

25

> I'd like to point out that we will be making forward-looking statements which are based on our expectations. These statements are subject to certain risks and uncertainties, and our actual results may differ materially. I encourage you to consult the risk factors discussed in our SEC filings for additional detail.

Id. at 1 [Doc. No. 49-19]. The risk factors "discussed in [Biogen's] SEC filings[,]" included, inter alia, "risks associated with new product launches[,]" "the effectiveness of Eisai's and Biogen's commercial strategy for marketing Leqembi[,]" and "requirements such as participation in a registry and the use of imaging or other diagnostics[,]" all of which could "adversely affect[]" the company's ability to "successfully commercialize Leqembi." Lewis Decl., Ex. 4, at ECF 4 [Doc. No. 49-4]. Where Defendants' cautionary statements were "sufficiently related in subject matter and strong in tone to counter" the 10,000 patient goal, Hackel, 474 F. Supp. 3d at 478 (quoting In re Bos. Tech. Sec. Litig., 8 F. Supp. 2d 43, 53 (D. Mass. 1998)), Viehbacher's November 8, 2023 statement is covered under the PSLRA safe harbor. See id. (safe harbor applicable to oral statements where speaker referred back to warnings included in SEC filings); Isham v. Perini Corp., 665 F. Supp. 2d 28, 39 (D. Mass. 2009) (although "vague or boilerplate disclaimers are insufficient[,]" cautionary statements can be meaningful if they are "substantive and tailored to the specific future projections, estimates or opinions" challenged by the plaintiff (quotations omitted)).

Viehbacher made the September 11, 2023 and January 8, 2024 statements, in which he described the 10,000 patient goal as "more of a relevant benchmark" for Leqembi's rollout and as a "target . . . we're working our way through[,]" respectively, at investment conferences and did not accompany them with cautionary statements. See Am. Compl. ¶¶ 304, 309 [Doc. No. 43]. But Plaintiffs have not alleged facts sufficient to raise a strong inference that Viehbacher, Biogen, or any other Defendant had actual knowledge that the 10,000 patient goal could not or would not be reached on the timeline presented. For example, that Viehbacher spoke frequently

26

with his counterpart at Eisai or that members of Biogen and Eisai's joint steering committee "constantly" discussed the 10,000 patient goal does not, without more, indicate actual knowledge that the goal was unattainable.[11] See In re Ariad Pharms., Inc. Sec. Litig., 842 F.3d 744, 751 (1st Cir. 2016) (finding "glaring omission" in plaintiffs' characterization of statements as materially misleading where plaintiffs "do not . . . allege any specific facts about when the defendants learned of these adverse events").

Assertions from several confidential witnesses ("CWs") also do not fill the inferential gap. See Am. Compl. ¶¶ 214–15, 218–20, 222–23 [Doc. No. 43] (referencing the observations and opinions of CWs 8, 9, 10, and 11). Although CWs need not "recall all possible details from their former positions[,]" Collier v. ModusLink Global Solutions, Inc., 9 F. Supp. 3d 61, 73 (D. Mass. 2014), the allegations provided by CWs "cannot merely be 'conclusory allegations of fraud, but specific descriptions of the precise means through which it occurred, provided by persons said to have personal knowledge for them.'" Id. at 71 (quoting In re Cabletron Sys., Inc., 311 F.3d 11, 30 (1st Cir. 2002)); see Premca Extra Income Fund LP v. iRobot Corp., 763 F. Supp. 3d 121, 149 (D. Mass. 2025), appeal filed, No. 25-1192 (1st Cir. Feb. 2, 2025).

---

[11] The court also notes that Viehbacher made the challenged January 8, 2024 statement during the same investment conference presentation in which Plaintiffs assert that Viehbacher made a "corrective" disclosure as to both the 10,000 patient goal and Leqembi's roll-out more generally. See Am. Compl. ¶¶ 309, 322 [Doc. No. 43]; Lewis Decl., Ex. 20, at 6 [Doc. No. 49-20] ("There's still—we've probably got about a target of 10,000 and we're working our way through that."); id. at 7 ("Well remember, the 10,000 was really designed to give people some sort of milestone . . . because there are no real analogues for this launch. I haven't found a decent analog anywhere. So what I think we were trying to say is, this isn't going to be 100,000 patients, but it's not going to be a 1,000 either. . . . So that is a trajectory. And I think, where we are right now, there's nothing that we're going to do that's going to change us on the trajectory. We'll get there. We don't get there, I think everything we're seeing, there's no reason to say that we can't get there. But again, the data were kind of choppy in December, so for me, I'm really looking for the January data. But where we are right now is I know the 10,000 isn't really what we're interested anymore is how do we now get to the 100,000?").

Confidential Witness 8 ("CW8") and Confidential Witness 10 ("CW10") never worked for Biogen, see Am. Compl. ¶¶ 19, 21 [Doc. No. 43], and Plaintiffs do not allege with any specificity that Defendants were aware of these witnesses' observations or communications as to Leqembi's likely patient count. CW8, for example, worked as Eisai's medical director from June 2022 to July 2023. Id. ¶ 19. Although CW8 asserts "repeatedly" reporting negative feedback from physicians to Eisai's Executive Director of Medical Affairs and being told by an Eisai director that Eisai "expected to have no more than 5,000 patients" on Leqembi by the March 2024 deadline, see id. ¶¶ 215–16, Plaintiffs allege no facts suggesting this information was communicated to, or known by, Biogen or its officers.

Similarly, Plaintiffs rely on an account from CW10, a director in Eisai's Neuroscience Business Group from June 2020 to July 2023, of the process for determining an accurate patient uptake estimate and descriptions of "conversations in Eisai's clinical discussion as to whether the weak evidence of [Leqembi's] benefit effect would be a sufficient incentive for patients to overcome the barriers to receiving treatment." Id. ¶ 219. But Plaintiffs again fail to allege a link between this information from CW10, an Eisai employee, and knowledge possessed by Biogen or its officers. Accordingly, the allegations attributed to CW8 and CW10 do not offer a sufficient basis from which to infer that Defendants had actual knowledge that the 10,000 patient goal was unlikely to be achieved. See Coyne v. Metabolix, Inc., 943 F. Supp. 2d 259, 267, 271 (D. Mass. 2013) (confidential witness statements not enough to satisfy actual knowledge, in part because they were "not probative of any consciousness that the projected figures were impossible, or even that they might have been overly optimistic"); see also Abiomed, 778 F.3d at 245 (where confidential witnesses "did not even work at [defendant company]" during the class period, they

28

"would not have had firsthand knowledge of the state of mind of [defendant's] management during that period").

Confidential Witness 9 ("CW9") and Confidential Witness 11 ("CW11") did work at Biogen during the putative Class Period, with CW9 holding various positions "supporting drug development units" between November 2014 and October 2023 and CW11 holding various positions involving financial planning and analysis between August 2014 and December 2023. Am. Compl. ¶¶ 20, 22 [Doc. No. 43]. The mere fact of their employment, however, cannot compensate for statements that are "conclusory and too vague" for the purposes of sufficient allegations of actual knowledge. Coyne, 943 F. Supp. 2d at 267.

CW9, for example, alleges that Biogen based its "claims about progress" toward the 10,000 patient goal on registry data that "only reflects that patients have been screened and identified as a good candidate[,]" rather than patients who are taking, or will take, the drug. Am. Compl. ¶ 218 [Doc. No. 43]. At the same time, CW9 acknowledges that "patients taking Leqembi were recorded in patient registries, which can be filtered to show how many patients are on a certain drug." Id. (emphasis added). Plaintiffs also ask this court to substitute CW11's experience with, and knowledge of, Biogen's failed Aduhelm roll-out, along with CW11's opinion as to Biogen's attitude toward "system constraints[,]" for Biogen and its officers' knowledge regarding the Leqembi rollout. See, e.g., id. ¶ 220 ("CW11, who had been responsible for patient forecasting during the Aduhelm roll-out, described Biogen's lack of interest in accurately forecasting patients."); id. ("CW11[] summed up the attitude as, 'They look at issues like system constraints as a "tomorrow problem," and they never worry about anything other than what they think is a "today problem.""').

Even resolving all inferences in Plaintiffs' favor, as the court must do at this stage, no "strong inference" as to Biogen's actual knowledge can be drawn from the type of incongruous or temporally unconnected information offered by CW9 and CW11. See Coyne, 943 F. Supp. 2d at 267; In re Pharms., Inc. Sec. Litig., 2007 WL 951695, at *9 ("strong inference" as to actual knowledge of statement's falsity necessary when challenging forward-looking statements); In re Stone & Webster, Inc. Sec. Litig., 253 F. Supp. 2d 102, 121 (D. Mass. 2003) ("[C]onflicting allegations . . . undermine [plaintiffs'] own assertion that the disclosures . . . were false or misleading.").

2. Status of Leqembi Commercial Rollout

Plaintiffs identify six Biogen statements that allegedly misled investors as to the status of the Leqembi commercial rollout more broadly. See Am. Compl. ¶¶ 300–01, 308, 311, 314–15 [Doc. No. 43]. Plaintiffs assert that these statements were false or misleading when made, or omitted material facts necessary for such statements to not be misleading, because they failed to disclose that (1) Biogen had no infrastructure in place to effectively sell Leqembi; (2) infrastructure such as infusion centers would need to flexibly adapt to demand to not impede the rollout of Leqembi; (3) Biogen had no way to determine where progress was made on the "aggressive" 10,000 patient goal; (4) the 10,000 patient goal was adopted with no basis; (5) internal projections were significantly lower than the 10,000 patient goal; and (6) "thus, Biogen had no realistic ability to meet the 10,000 patient goal by March 2024, and indeed through the rest of the year." Id. ¶¶ 302, 305, 307, 309. Plaintiffs also allege that Defendants misled investors into believing that Biogen's Leqembi rollout could benefit from infrastructure implemented during the failed Aduhelm rollout. See id. ¶ 312.

30

The following statements are representative of those challenged by Plaintiffs, with the specifically challenged statements and phrases indicated in bold text. During Biogen's earnings call for the second quarter of fiscal year 2023, Defendant Viehbacher stated:

> **I will say that the whole field organization is geared up for this.** This is a much more complex field organization than what you would have with a typical launch with the care navigators, with MSLs, with field reps, with regional thought leader professionals. **So there are going to be a lot of people actually holding hands with patients, with physician practices, trying to help make sure that this is as seamless as possible.**

Id. ¶ 300. Similarly, during the aforementioned September 11, 2023 investment conference, Viehbacher stated:

> There certainly seems to be demand there. I don't—I think we're confident in the demand. I think we're confident in the fact that physicians actually want to treat these patients. The CMS has moved quickly actually. And that in some ways, it shouldn't have been but kind of caught everybody off guard because **now we can go. There's no limitation.** I mean the registry seems to be pretty easy to operate.
>
> So this is now a question of filling the pipeline and pulling the patients through. And ultimately, we will see that. And ultimately, all of these physician practices will get good at this and understand this. But it is a heavy lift at the start. And I think we'll start to see that as we get through towards the end of the year. **I think nothing that we're seeing says that the Eisai guidance can't be met, which is 10,000 patients by the end of their fiscal year, which is the end of March.**

Id. ¶ 303. As another example, during Biogen's earnings call for the fourth quarter of fiscal year 2023, Viehbacher stated, **"Now as we look at what does drive growth, clearly, we have Leqembi. And I'll remind everybody that, again, we are not just pioneering in science but pioneering in commercial."** Id. ¶ 314.[12]

---

[12] Insofar as these statements refer to the 10,000 patient goal, the court has assessed Plaintiffs' claims in the preceding discussion and incorporates by reference the court's analysis as to the inadequacy of the relevant CWs' allegations. See Section IV(A)(1), supra.

31

Defendants counter that any such statements are either nonactionable statements of corporate optimism or are not adequately alleged to be false. See Reply 8–12 [Doc. No. 57]; Mem. ISO Mot. to Dismiss 24–25 [Doc. No. 50]. The court considers these arguments in turn.

### a. Statements of Corporate Optimism

Although a statement or omission's materiality is a "question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss. . . . not every unfulfilled expression of corporate optimism, even if characterized as misstatement, can give rise to a genuine issue of materiality under the securities laws." In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d at 41 (quotations omitted). Assertions of optimism or puffery "require a court to consider (1) whether the statement is so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information" and "(2) whether the statement was also considered unimportant to the total mix of information by the market as a whole." In re Wayfair, Inc. Sec. Litig., 471 F. Supp. 3d 332, 339 (D. Mass. 2020) (quotation omitted).

Here, many of the challenged statements, in whole or in part, are within the ambit of corporate optimism or puffery. Through Viehbacher, Biogen expressed generic confidence in, and bullishness about, the Leqembi rollout, including that the company was seeing, inter alia, "a number of green shoots" and "signs of progress[,]" Am. Compl. ¶ 306 [Doc. No. 43]; success in "pioneering this commercial approach[,]" id.; internal metrics "progress[ing] extremely nicely[,]" id.; "an awful lot of tremendous progress[,]" id. ¶ 308; and growth driven by sales of Leqembi and Biogen's success "not just pioneering in science but pioneering in commercial[,]" id. ¶ 314. Neither a reasonable investor nor the market as a whole would view these sanguine, subjective statements as material. See, e.g., In re Wayfair, Inc. Sec. Litig., 471 F. Supp. 3d at 338 (finding statements about defendant's "delight" with its progress, "incredibly bullish" view of its business, and expectation that market share would grow were "examples of expressions of loose

optimism and here immaterial"); In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d at 42 (finding

statements about "forward momentum[,]" "plenty of tailwind[,]" and the defendant's "belie[f]

that [a drug] will continue to be a major business driver" to be non-actionable corporate

optimism); In re Parametric Tech. Corp., 300 F. Supp. 2d 206, 218 (D. Mass. 2001) (finding

defendant's assertion of "'confidence' in 'the fundamental strength of its business' and its

'strong competitive position'" was "expectable corporate puffery" (quotations omitted)).

Accordingly, such statements are properly viewed as immaterial and inactionable for the

purposes of the PSLRA. See In re Wayfair, Inc. Sec. Litig., 471 F. Supp. 3d at 338; In re Biogen

Inc. Sec. Litig., 193 F. Supp. 3d at 4.

### b.  Insufficient Factual Allegations

The challenged statements that do not constitute corporate optimism or puffery refer, in

broad terms, to Biogen's affirmations that the Leqembi rollout was taking place according to

Biogen's plan, estimates of the number of patients taking or eligible to take Leqembi, and

deployment or redeployment of resources for the Leqembi rollout.[13] At core, Plaintiffs assert that

Defendants' statements were false, misleading, or omitted necessary information where such

statements did not disclose that Defendants lacked sufficient infrastructure and sales visibility

---

[13] See, e.g., Am. Compl. ¶ 300 [Doc. No. 43] ("I will say the whole field organization is geared up for this. . . . So there are going to be a lot of people actually holding hands with patients, with physician practices, trying to help make sure that this is as seamless as possible."); id. ¶ 301 ("[S]o far, everything is—as far as we're concerned, the launch is going to plan."); id. ¶ 308 ("So now there's kind of a rush. . . . So numbers of PET scans are going up. . . We're seeing a significant increase in the numbers of new patient starts on the registry."); id. ("So I think we're feeling pretty good. I'm looking forward to seeing how the January sales play out. A lot of positive data in December. . . ."); id. ¶ 311 ("A large portion of the resources released from the termination of the Aduhelm program will be redeployed in Biogen's AD franchise."); id. ¶ 315 ("[W]e have an indication that there are about 3,800 patients as of last week on the registry" and "we do believe we're making a very solid progress. And we believe that we have validated the go-to-market model.").

into the Leqembi rollout and had "no realistic ability" to meet the 10,000 patient goal. See Am. Compl. ¶¶ 302, 305, 307, 310, 312, 316 [Doc. No. 43]. Plaintiffs do not adequately allege that such statements were false or misleading.

Again, to survive a motion to dismiss, Plaintiffs must show "that defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." Ganem, 845 F.3d at 454 (quotation omitted). "A fact or omission is material if a reasonable investor would have viewed it as having significantly altered the total mix of information made available." Zhou, 120 F.4th at 292 (quotation omitted).

Plaintiffs have not sufficiently alleged that Defendants' statements regarding the Leqembi rollout plan or patient counts were not objectively true when made. Plaintiffs do not, for example, allege that, as of the July 25, 2023 earnings call, the Leqembi "launch" was not "going to plan" or that Biogen's field organization was not "geared up" for the rollout. Am. Compl. ¶¶ 300–01 [Doc. No. 43]. Plaintiffs' allegations as to Viehbacher's January 8, 2024 statement that Biogen was "not seeing any capacity constraints on PET scans, nor on MRIs, nor on infusion centers for the moment[,]" id. ¶ 309 (emphasis added), are likewise insufficient where the alleged falsity mainly arises via comparison to statements made nine to eleven months prior and an earnings call statement made one month later. See id. ¶ 214 (citing to statements from February 15, March 6, and April 25, 2023, in which Viehbacher discussed various capacity constraints); id. ¶ 325 (citing to the February 13, 2024 earnings call, during which Viehbacher asserted that "there [was not] an MRI capacity constraint per se" but acknowledged some difficulty in the "coordination" of "specific date[s]" and "the bottleneck of getting into the neurologist").

34

Similarly, Plaintiffs do not allege that, as of Biogen's February 13, 2024 earnings call, there were not, in fact, "3,300 patients on the registry" according to an analyst report or "an indication that there [were] about 3,800 patients as of last week on the registry." Id. ¶ 315. That Plaintiffs fail "to allege particularized facts supporting falsity . . . is . . . a facial pleading deficiency under the PSLRA and Rule 9(b)." Premca Extra Income Fund LP, 763 F. Supp. 3d at 148.

Insofar as Plaintiffs allege that various statements were rendered misleading due to omissions, "[S]ection 10(b) and Rule 10b-5 'do not create an affirmative duty to disclose any and all material information." Id. at 147 (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)). Even where an omission is material, it is actionable "only if it 'renders affirmative statements made misleading.'" Id. (quoting Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 265 (2024)). Plaintiffs must allege sufficient facts demonstrating that Biogen's statements were "so incomplete as to mislead." In re Karyopharm Therapeutics, Inc. Sec. Litig., 552 F. Supp. 3d 77, 86 (D. Mass. 2021) (quoting Hill v. Gozani, 638 F.3d 40, 57 (1st Cir. 2011)), aff'd sub nom. Thant v. Karyopharm Therapeutics, Inc., 43 F.4th 214 (1st Cir. 2022).

Here, the challenged statements, without more, convey only Biogen's assessment of present conditions that did not require additional detail, such as Biogen's reliance on a large sales effort, see Am. Compl. ¶ 301 [Doc. No. 43]; or are consistent with other factual allegations made by Plaintiffs. See, e.g., id. ¶ 303 (alleging that, in September 2023, Defendants described the Leqembi rollout as "a heavy lift at the start"); id. ¶¶ 306, 315 (as reported by Biogen, the number of Leqembi patients grew from 800 in November 2023 to 2,000 in February 2024); id. ¶ 315 (reporting "increased activity and volume" in diagnostic steps required for a Leqembi

35

prescription and cautioning that the number of patients on the registry "is not perfect information").

As to Biogen's statements regarding resource deployment, see id. ¶¶ 301, 311, Plaintiffs again fail to allege that Biogen was not deploying resources as reported. See Premca Extra Income Fund LP, 763 F. Supp. 3d at 148. For example, Plaintiffs suggest that Biogen's May 3, 2022 statement about its planned reduction of Aduhelm infrastructure, in which Defendant Vounatsos told investors that Biogen was "substantially eliminating commercial infrastructure" for the launch of Aduhelm as part of a $1 billion cost-cutting effort, Am. Compl. ¶ 114 [Doc. No. 43], renders misleading or lacking in necessary material information Defendants' statement in a January 31, 2024 press release declaring that a "a large portion if resources released resulting from termination of the Aduhelm program will be redeployed in Biogen's AD franchise[.]" Id. ¶ 311. But Plaintiffs' suggestion draws an erroneous equivalency between whether the remaining Aduhelm infrastructure would be sufficient for the launch of other AD drugs and whether the remaining Aduhelm infrastructure would be deployed for such launches. Biogen made no representations as to the former and was therefore not obligated to make additional adequacy disclosures, as Plaintiffs argue. See, e.g., Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (defendant's statement that it was selling a product "below cost" was "not misleading by reason of not saying how much below").

### 3.  Statements About Leqembi's Safety Profile

Plaintiffs allege both that Eisai failed to properly disclose a third participant death and that the severity of Leqembi's risk profile for ARIA was not properly communicated. See Am. Compl. ¶¶ 184–210 [Doc. No. 43].

Plaintiffs identify nine statements that allegedly misled investors as to Leqembi's safety profile, particularly with respect to the incidence and risk of ARIA in patients taking Leqembi.

36

See id. ¶¶ 283–89. Plaintiffs primarily contend that (1) Defendants failed to disclose a patient death that occurred during a Leqembi clinical study; and (2) to the extent Defendants did disclose patient deaths, Eisai's assessment that such deaths were not attributable to Leqembi, as adopted by Biogen, was false or misleading. See id. Defendants argue that the challenged statements are either inactionable statements of scientific opinion or did not give rise to additional disclosure obligations. See Mem. ISO Mot. to Dismiss 15–20 [Doc. No. 50].

As to Defendants' purported statements of scientific opinion, "courts have been clear that scientific opinions are just that: opinions." Harrington, 2017 WL 1946305, at *5; see In re Karyopharm Therapeutics Inc., Sec. Litig., 552 F. Supp. 3d at 89. "The most significant difference between statements of fact and expressions of opinion is that 'a statement of fact ("the coffee is hot") expresses certainty about a thing, whereas a statement of opinion ("I think the coffee is hot") does not.'" Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc., 22 F.4th 1, 7 (1st Cir. 2021) (quoting Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 183 (2015)). "Words like 'I think' or 'I believe' can play a role in demonstrating a lack of certainty, . . . but their use does not preclude the possibility that the statement as a whole may still mislead as to some fact[.]" Id. (quoting Omnicare, 575 U.S. at 193).

Analytical conclusions may constitute opinions where "two knowledgeable analysts, each acting in the utmost good faith," could arrive at divergent interpretations of the same data. Credit Suisse First Bos. Corp., 431 F.3d 36, 47 (1st Cir. 2005), overruled on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007); In re Karyopharm Therapeutics Inc., Sec. Litig., 552 F. Supp. 3d at 89 (although defendants' interpretation of data "may have been erroneous[,"] results from the FDA's and the defendants' differing methodology and analytical

37

assumptions as to the same data was a non-actionable scientific disagreement). Several circuits

explicitly extend this tenet to differing interpretations of clinical trial data. See, e.g., City of

Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 170–71 (3d Cir. 2014) ("Interpretations of

clinical trial data are considered opinions."); Kleinman v. Elan Corp., plc, 706 F.3d 145, 154 (2d

Cir. 2013) ("[W]here a defendant's competing analysis or interpretation of data is itself

reasonable, there is no false statement."); see also In re Sanofi Sec. Litig., 87 F. Supp. 3d 510,

543 (S.D.N.Y. 2015) (noting that courts have "repeatedly held publicly stated interpretations of

the results of various clinical studies to be opinions because reasonable persons may disagree

over how to analyze data and interpret results, and neither lends itself to objective conclusions"

(quotations omitted)), aff'd sub nom. Tongue v. Sanofi, 816 F.3d 199, 214 (2d Cir. 2016).

That a statement is properly classified as an opinion, however, does not necessarily

exclude "the possibility that the statement as a whole may still mislead as to some fact[.]"

Constr. Indus. & Laborers, 22 F.4th at 7. A statement of opinion

> may convey three facts: that the speaker has such a belief; that the belief fairly
> aligns with the facts known to the speaker; and, if stated in the context of the
> securities market, that the speaker has made the type of inquiry that a reasonable
> investor would expect given the circumstances.

Id. (citing Omnicare, 575 U.S. at 188–89). Accordingly, "if the real facts are otherwise, but not

provided, the opinion statement will mislead its audience." Shash v. Biogen, 84 F.4th 1, 12 (1st

Cir. 2023) (citing Omnicare, 575 U.S. at 188).

As to whether Defendants were required, but failed, to disclose additional facts regarding

the Phase 3 clinical trial data, "[d]isclosure of specific information is only required when

'necessary to make . . . statements made, in the light of the circumstances under which they were

made, not misleading'" Thant, 43 F.4th at 222 (quoting Matrixx, 563 U.S. at 44); see 17 C.F.R.

§ 240.10b–5(b). Thus, "if a company proactively discloses some facts about its product, it is not

thereby obliged to disclose <u>all</u> information that would be interesting to potential investors."

<u>Thant</u>, 43 F.4th at 222–23. (quotation omitted). Instead, a company "must only disclose those

facts 'that are needed so that what has been revealed would not be so incomplete as to mislead.'"

<u>Id.</u> at 223 (cleaned up) (quoting <u>Backman</u>, 910 F.2d at 16).

### a.  Completeness of Patient Death Disclosures

#### i.  *Number of Patient Deaths in the Phase 3 OLE Study*

Plaintiffs assert that the reported "safety results" of the Leqembi Phase 3 clinical trial in

Biogen and Eisai's November 29, 2022 joint press release was false or misleading because it

disclosed the death of two, rather than three, trial participants "with concurrent cerebral

macrohemorrhage[.]" Am. Compl. ¶¶ 283–84 [Doc. No. 43]. Plaintiffs raise similar claims with

respect to statements made by Defendants on January 6, 2023, April 25, 2023, July 25, 2023, and

August 1, 2024. <u>See id.</u> ¶¶ 288–89, 293–98.

The "data cutoff" for the information presented on November 29, 2022, was October 22,

2022. <u>See id.</u> ¶ 204. By the cutoff date, Patient 1 had died several months prior, and an adverse

event report filed with the FDA by the relevant clinical trial investigator indicated that the death

was "related" to Leqembi. <u>Id.</u> ¶ 186. Patient 2 had died roughly two months prior, and, as with

Patient 1, the relevant clinical trial investigator indicated in an adverse event report that the

patient's death was "related" to Leqembi. <u>Id.</u> ¶¶ 189–90. Both deaths were reflected in the press

release. <u>See id.</u> ¶ 283 ("In the core study and subsequent open-label extension study, rates of

death with concurrent cerebral macrohemorrhage were 0.1% in both the placebo group (1/897)

and the [Leqembi] group (2/1608)." (emphasis added)).

Plaintiffs assert that Defendants were obligated to disclose Patient 3's death alongside the

deaths of Patients 1 and 2. <u>See id.</u> ¶ 284. In Plaintiffs' view, the failure to do so contributed to

"the false impression that there were only two deaths in the [OLE study] with concurrent

symptoms of ARIA-H when, in fact, there were three." Id. But Plaintiffs' assertion does not align with Plaintiffs' other allegations as to Patient 3's death—namely, that (1) Patient 3's death, which occurred on September 19, 2022, was only "preliminarily classified . . . as 'related' to Leqembi in light of the extensive ARIA symptoms pending receipt of MRI scans and the autopsy report" as of the cutoff date, id. ¶¶ 192–93 (emphases added); and (2) there was no "macrohemorrhage," where the autopsy report determined that Patient 3 experienced "51 microhemorrhages[,]" rather than a macrohemorrhage, associated with Patient 3's death. Id. ¶ 192.

Where Plaintiffs allege that Patient 3's autopsy was not performed until March 2023 and the results provided to Eisai "in late March to early April 2023[,]" they cannot also plausibly allege that Defendants possessed full information subject to disclosure in November 2022. See In re Stone & Webster, 253 F. Supp. 2d at 121 (plaintiffs' allegations as to false or misleading disclosures "undermine[d]" by "conflicting allegations"). Plaintiffs' pleadings as to this challenged statement also do not survive the fundamental disjunction between the incidences of macrohemorrhage reported by Eisai and Biogen and the microhemorrhages later discovered in Patient 3's brain. See Am. Compl. ¶¶ 283, 192 [Doc. No. 43].

In Thant, the First Circuit held that investors did not plausibly allege that the defendant pharmaceutical company omitted material "data regarding the prevalence and severity of [disclosed adverse events]" from the company's clinical study of a new drug intended for treatment of multiple myeloma. 43 F.4th at 224; see id. at 224–26. Where the study participants were seriously ill and "pursuing their 'last chance' for survival[,]'" and where the defendant informed investors in its Form 10-K filings about "serious" adverse events observed during the study and the possibility that such events would negatively impact the likelihood of FDA

approval, the First Circuit concluded that investors could not plausibly believe the drug "was benign, or that the FDA would find it so." Id. at 224–25. Accordingly, "[a]lthough investors may have been interested in the specific serious [adverse events] experienced by . . . trial participants, . . . a company is not, by virtue of making some disclosures about its products, obligated to disclose all potentially interesting information." Id. at 226 (citing Backman, 910 F.2d at 16).

By contrast, in In re Ariad Pharmaceuticals, Inc. Securities Litigation, the defendant pharmaceutical company publicly "express[ed] optimism about [a new drug's] chances for approval with a 'favorable [FDA] label'" even after the FDA rejected the label and, despite possessing data indicating that cardiovascular issues were the most prevalent serious adverse events, reported that pancreatitis was the most prevalent. 842 F. 3d at 753. The First Circuit, through the lens of a scienter analysis, concluded that the defendant's overt omission as to the FDA and mischaracterization as to observed adverse events "would have altered the total mix of information available to investors." Id. Such misstatements therefore served as sufficient predicates for claims brought against the company under Section 10(b) and Rule 10b-5. Id.; Thant, 43 F.4th at 225 (examining the relevant portion of In re Ariad Pharmaceuticals, Inc. Sec. Litigation in the context of sufficiently pleaded materially misleading statements).

In line with Thant, the court finds that Defendants' November 29, 2022 statement as to the incidence of macrohemorrhage observed in the Leqembi Phase 3 trial did not give rise to a contemporaneous obligation to disclose Patient 3's death. See 43 F.4th at 226. As noted supra, the type of hemorrhage experienced by Patients 1 and 2 is not necessarily fungible with the type experienced by Patient 3. But, even setting this distinction aside, the November 29, 2022 press release adequately communicated the risk of microhemorrhages associated with Leqembi use,

the risk of ARIA more broadly, and the general relationship between Leqembi's risk profile and the likelihood of regulatory approval. See, e.g., Lewis Decl., Ex. 8, at ECF 2 [Doc. No. 49-8] (listing "ARIA-H (combined cerebral microhemorrhages, cerebral macrohemorrhages, and superficial siderosis)" as one of "[t]he most common adverse events (>10%)" where it was observed in 17.3% of those on Leqembi versus 9.0% of those on a placebo); id. (listing "ARIA-E (edema/effusion)" as one of "[t]he most common adverse events (>10%)" where it was observed in 12.6% of those on Leqembi versus 1.7% of those on a placebo); id. at ECF 5 (warning that "[r]esults in early-stage clinical studies may not be indicative of full results from later stage or larger scale clinical studies and do not ensure regulatory approval"). Investors were therefore adequately apprised of the risks associated with Leqembi, both as a product and as a driver of Biogen's business.

Thus, although investors "may have been interested" in the occurrence of, or preliminary determinations concerning, Patient 3's death or "wished to know more" about the association between microhemorrhages and Leqembi, see Thant, 43 F.4th at 226, Plaintiffs have not plausibly alleged that the information Defendants did disclose was materially misleading. Insofar as Plaintiffs raise the nondisclosure of Patient 3's death with respect to Defendants' subsequent statements on January 6, 2023, April 25, 2023, July 25, 2023, and August 1, 2024, the "total mix of information" presented in those statements similarly would not have been altered by such a disclosure. See Zhou, 120 F.4th at 292; Abiomed, 778 F.3d at 240 (citing City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 756 (1st Cir. 2011)).

There is, however, one statement in this category, referring to "other studies," that may meet the PSLRA's misleading statement standard. Plaintiff points to a joint press release issued by Biogen and Eisai on January 6, 2023, stating:

Incidence of ARIA

In Study 1 (Study 201), symptomatic ARIA occurred in 3% (5/161) of LEQEMBI-treated patients. Clinical symptoms associated with ARIA resolved in 80% of patients during the period of observation.

. . . .

Intracerebral hemorrhage >1 cm in diameter was reported after one treatment in LEQEMBI: 1 patient; placebo: zero patients. ***Events of intracerebral hemorrhage, including fatal events, in patients taking LEQEMBI have also been reported in other studies.***

Apolipoprotein E ε4 (ApoE ε4) Carrier Status and Risk of ARIA

. . . .

The incidence of ARIA was higher in ApoE ε4 homozygotes than in heterozygotes and noncarriers among patients treated with LEQEMBI. Of the 5 LEQEMBI-treated patients who had symptomatic ARIA, 4 were ApoE ε4 homozygotes, 2 of whom experienced severe symptoms. ***An increased incidence of symptomatic and overall ARIA in ApoE ε4 homozygotes compared to heterozygotes and noncarriers in LEQEMBI-treated patients has been reported in other studies.***

Am. Compl. ¶ 285 [Doc. No. 43] (the "other studies statement"). Plaintiffs allege that "the same or substantially similar statements . . . were also made by Biogen in press releases issued on January 10, 2023, March 5, 2023, and June 9, 2023." Id. ¶ 286.

Plaintiffs allege that Biogen's references to "other studies" were misleading, as they "gave the false impression that [there] were no such events in the recently completed Phase 3 study." Id. ¶ 287. Defendants counter that this language "mirrored the FDA-approved label for Leqembi" and must be read in the context of the "FDA-approved warning" included in each press release, which "described the incidence of ARIA in study participants, including the number of ApoE4 carriers relative to the incidence of ARIA." Mem. ISO Mot. to Dismiss 18–19 [Doc. No. 50]. Defendants also contend that the results from "other studies" refer to the results from the Phase 3 OLE, which Defendants characterize as "a separate study from the placebo-controlled, 18-month Phase 3 study." Id. at 19.

43

In Shash v. Biogen, Inc., 84 F.4th 1 (1st Cir. 2023), the First Circuit found misleading a statement in which a Biogen executive represented that, contrary to subgroup data of which Biogen was aware, "all" of its data from a clinical study were consistent with the need for a higher dosage of a drug under study. See id. at 12–13. Defendants' use of "other" in the "other studies" statement rings of a similar obliqueness, as investors could plausibly be misled into believing that the serious risks identified in the statement were observed in studies unaffiliated with the Phase 3 trial.

But this does not end the inquiry, as a misleading statement "must also be material" to proceed beyond a motion to dismiss. Id. at 13; see Thant, 43 F.4th at 222 (asserting that "neither factor alone is sufficient"). Here, the materiality of the "other studies" statement and similar assertions in subsequent press releases is unconvincing. As a threshold matter, the results of the Phase 3 OLE study, including the deaths of Patients 1 and 2, were published in November 2022, discussed supra, and thus already known to investors when Biogen and Eisai published the January 6, 2023 press release. See In re The First Marblehead Corp. Sec. Litig., 639 F. Supp. 2d 145, 155 (D. Mass. 2009) ("A plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed."). Plaintiffs have also not sufficiently pleaded that the "total mix of information" would have changed had the Phase 3 OLE study been properly referenced, as both the fundamental ARIA risk associated with Leqembi, and the greater ARIA risk for individuals with two copies of the ApoE4 allele, were adequately communicated, even if the precise source of information about those risks was unclear. See Zhou, 120 F.4th at 292; Abiomed, 778 F.3d at 240. *Cause of Patient Deaths in the Phase 3 OLE Study*

In addition to challenging the reported number of patient deaths in the Phase 3 OLE study, Plaintiffs also challenge Biogen and Eisai's conclusion, either stated explicitly or implied,

44

that these patient deaths could not be attributed to Leqembi. See Am. Compl. ¶¶ 283–84, 288–89

[Doc. No. 43].

In the November 29, 2022 press release, with respect to the deaths of Patients 1 and 2,

Eisai and Biogen stated, in relevant part:

> **In the core study and subsequent open-label extension study, rates of deaths with concurrent cerebral macrohemorrhage were 0.1%** in both the placebo group (1/897) **and the [Leqembi] group (2/1608).** The two cases on [Leqembi] occurred in the open-label extension study. **Both cases had significant comorbidities and risk factors including anticoagulation contributing to macrohemorrhage or death. Therefore, it is Eisai's assessment that the deaths cannot be attributed to [Leqembi].**

Id. ¶ 283. On January 6, 2023, the date on which the FDA granted Leqembi accelerated approval,

Biogen published a press release directing investors to "an additional news release from Eisai on

patient safety" and containing a hyperlink to that Eisai release. Id. ¶ 288.[14] The Eisai press

release stated:

> Important Considerations in the Study of Alzheimer's Disease
>
> Part of Eisai's commitment to patient safety is studying the frequency, pattern, causes and risk factors of diseases and health-related events in different populations. According to the World Health Organization (WHO), dementia is the seventh leading cause of death among all diseases and the Centers for Disease Control and Prevention (CDC) reports that AD is the leading cause of dementia and the fifth leading cause of death for those 65 years and older. According to the Alzheimer's Association, the average survival after diagnosis is typically three to eleven years (median survival time: eight years). **The patients who participate in trials for AD treatments have a relatively high rate of mortality due to the physical effects resulting from the natural progression of AD and the variety of medical conditions that develop as people continue to age.** For example, comprehensive reviews of the scientific literature have found that patients with AD have a significantly higher incidence of hemorrhagic strokes (strokes associated with bleeding in the brain). **When evaluating suspected serious adverse reactions, including death, of any clinical trial participants or patients**

---

[14] In their Memorandum [Doc. No. 50], Defendants asserted that they could not be held liable for this statement because it appeared in an Eisai-only press release. See id. at 19 n.20 (citing Janus Cap. Grp., Inc. v. First Deriv. Traders, 564 U.S. 135, 146–48 (2011)). Defendants did not, however, press this issue in their Reply [Doc. No. 57].

**prescribed medications outside clinical trials, one must consider factors like age, clinical history, concomitant medications, temporal correlation, biologic plausibility, and effects of dechallenge/rechallenge of the suspected drug**.

. . . .

ARIA-H can occur spontaneously in patients with AD. ARIA-H associated with monoclonal antibodies directed against aggregated forms of beta amyloid generally occurs in association with an occurrence of ARIA-E. ARIA-H of any cause and ARIA-E can occur together. ARIA is usually asymptomatic, although serious and life-threatening events, including seizure and status epilepticus, rarely can occur. When present, reported symptoms associated with ARIA may include headache, confusion, visual changes, dizziness, nausea and gait difficulty, and focal neurologic deficits may also occur. These symptoms usually resolve over time. Intracerebral hemorrhage greater than 1 cm in diameter has been reported. **Events of intracerebral hemorrhage, including fatal events, in patients taking LEQEMBI have also been reported.**

Id.

Defendants assert that these statements (the "cause-of-death statements") constituted scientific opinions and, consequently, disagreements with those opinions—whether from Plaintiffs or from external parties—cannot form the basis of a securities fraud claim "unless the opinion was objectively and subjectively false." Mem. ISO Mot. to Dismiss 16 [Doc. No. 50] (citations omitted). In considering this argument, the court must determine if either the November 29, 2022 statement or the January 6, 2023 statement "materially misleads" as to Biogen's belief that the patient deaths were not attributable to Leqembi; whether Biogen's belief fairly aligned with the facts known to it; or whether Biogen "made the type of inquiry that a reasonable investor would expect given the circumstances." Constr. Indus. & Laborers, 22 F.4th at 7 (citing Omnicare, 575 U.S. at 188–89).

The most tenable avenue through which Biogen could have accumulated knowledge indicating that the reported patient deaths were, in fact, attributable to Leqembi are the alleged collaboration and information sharing agreements between Biogen and Eisai. See Am. Compl. ¶¶ 77, 79 [Doc. No. 43]. According to Plaintiffs, the first of these agreements, entered into in

2014, set forth that Biogen and Eisai would "jointly develop and commercialize two product candidates under development by Eisai for the treatment of AD[,]" including Leqembi. Id. ¶ 77. In 2017, Biogen and Eisai "amended and restated" the 2014 agreement (the "2017 agreement"). Id. ¶ 79. Under the 2017 agreement, Eisai "remained the primary lead for the development of [Leqembi], including clinical trial management and regulatory filings." Id. (emphasis added). Plaintiffs allege that, although Eisai possessed "final decision-making authority over all matters relating to the [d]evelopment and [c]ommercialization" of Leqembi under the 2017 agreement, Biogen "did not lack visibility or input on those matters." Id. ¶ 377.

In support of this assertion, Plaintiffs point to Biogen's participation with Eisai in various joint committees related to the development of Leqembi, the information sharing between Biogen and Eisai facilitated by those committees, and Biogen and Eisai's agreement that neither party could issue a press release or public statement regarding their collaboration without the consent of the other. See id. ¶¶ 377–80. Singhal, as Plaintiffs emphasize, was the chair of Biogen and Eisai's "[j]oint [s]teering [c]ommittee[.]" Id. ¶ 383. Plaintiffs also highlight various statements made by Biogen executives regarding the Biogen-Eisai relationship, including Vounatsos' indications that Biogen and Eisai were "engaging very closely" and "working very closely" in 2018 and 2022, respectively, id. ¶ 381; and his assertion in 2022 that he "talk[ed] every second day with [his] opposite number" at Eisai, id. ¶ 382.

Although these allegations give rise to a plausible inference that Biogen and Eisai frequently communicated and possessed a detailed awareness of each other's work, they do not go so far as to permit a plausible inference that Biogen knew of the specific information and data on which Eisai based its conclusions as to the affected Phase 3 study patients' causes of death. And assuming, *arguendo*, that Biogen was privy to this information, Plaintiffs offer nothing from

47

which to infer that Biogen was aware of other information contradicting or otherwise calling into question Eisai's opinion that the patient deaths at issue cannot be attributed to Leqembi. See, e.g., Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 91 (1st Cir. 2008) (statement that a known problem with a physical product was "fixed" actionable where defendant was aware that another recall of the product would be announced one week later); Pizzuto v. Homology Meds., Inc., No. 1:23-CV-10858-AK, 2024 WL 1436025, at *9 (D. Mass. Mar. 31, 2024) (no actionable claim where plaintiffs did not allege that "any statements [defendant] made directly contradicted the undisclosed information").

Plaintiffs also cite several articles, published in scientific journals and industry publications between October 2022 and December 2022, that reported on the results of the Phase 3 trial and the deaths of Patients 1, 2, and 3. See Am. Compl. ¶¶ 201–03, 207 [Doc. No. 43]. At least three articles included statements from external physicians and researchers, several of whom opined that Leqembi caused or contributed to the deaths of Patients 2 and 3. See id. ¶ 201 (quoting October 29, 2022 Stat+ article, entitled "Death of patient in closely watched Alzheimer's trial raises concern about risk for some groups"[15]); id. ¶ 202 (quoting November 27, 2022 article in Science, in which a neurologist, upon review of Patient 2's case report, stated that "there's zero doubt in my mind that this is a treatment-caused illness and death . . . if the patient hadn't been on [Leqembi], she would be alive today"[16] (cleaned up)); id. ¶ 207 (quoting

---

[15] As quoted in the article, an Eisai representative acknowledged Patient 1's death but stated that "there's no reason to believe that [Leqembi] contributes to death overall in the study, or by any specific cause." Id.

[16] The article stated further that "several physicians and researchers, including several not involved in the [Phase 3 trial], reviewed the case report and agreed that Leqembi likely contributed to [Patient 2's] death," and that Eisai did not comment on the death but did state that "[a]ll the available safety information indicates that [Leqembi] therapy is not associated with an increased risk of death overall or from any specific cause." Id.

December 21, 2022 *ScienceInsider* article, which cited to "multiple neuroscientists" who "believe[d]" Patient 3's death was likely caused by Leqembi upon "review[] [of] the records at *Science*'s request"[17]).

When read in their full context, these articles speak to the existing scientific disagreement as to the role played by Leqembi in these deaths. The October 29, 2022 *Stat+* article, for example, also acknowledged that Patient 1 had suffered "multiple falls, a heart attack, a respiratory infection, and mini-stroke-like events" in prior months that could have also precipitated his death. Suppl. Decl. of Jessica Lewis Ex. 27, at 1–2 [Doc. No. 56-1]; see id. at 4 (noting that the relevant trial investigator concluded that Patient 1's death was "related" to Leqembi but also reported that Patient 1 suffered an unrelated heart attack before his death, along with "four mini-stroke-like events" later classified as "related" to Leqembi). Similarly, the November 2022 *Science* article referred to Patient 1's death as still "under investigation" at the time of publication and, with respect to Patient 2, described varying opinions, but no crystallized consensus, as to Patient 2's death. Suppl. Lewis Decl. Ex. 28, at ECF 2–6 [Doc. No. 56-2]. Although more explicit in its description of the hypothesized connection between Leqembi and Patient 3's death, the December 2022 *ScienceInsider* article acknowledged that "an autopsy, which could confirm that [Patient 3] had [the AD hallmark of] [cerebral amyloid angiopathy] and clarify [Leqembi's] role in her death," had not yet been completed. Suppl. Lewis Decl. Ex. 29, at ECF 5 [Doc. No. 56-3]. Where scientific uncertainty colored even the purportedly contrary

---

[17] The publication also stated that, within this group, one neurologist reported being "confident [Patient 3's seizure] was a side effect from" Leqembi and opined that "the failure of Eisai and Biogen to disclose [Patient 3's] case" during Eisai's November 2022 conference presentation was "concerning and undermines my confidence that the reported safety data is complete." Id.

49

opinions cited by Plaintiffs, such opinions do not demonstrate, or give rise to an inference of, falsity in Biogen and Eisai's conclusions.

More fundamentally, however, Plaintiffs have not sufficiently alleged that the factual basis of Biogen and Eisai's scientific opinion at issue was itself false. "A statement of opinion is not misleading just because external facts show the opinion to be incorrect." Omnicare, 575 U.S. at 188. Although Plaintiffs, and perhaps many in the scientific community, disagree that the non-Leqembi factors to which Eisai and Biogen point were the more likely causes of death for Patients 1, 2, and 3 than Leqembi-associated ARIA, disagreement with the company's findings is not enough to find them misleading. See City of Edinburgh, 754 F.3d at 170); Kleinman, 706 F.3d at 154 ("[Plaintiff] (and others) may take issue with Defendants' researchers and scientists, but where a defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement.").

Accordingly, in the absence of well-pleaded facts indicating that Biogen did not or could not believe that the three patient deaths were not attributable to Leqembi, or that this conclusion was the product of something other than a meaningful inquiry into the available data, Plaintiffs claims as to Biogen's cause-of-death statements do not meet the requisite pleading standard.

### iii.    Related Statements by Defendants Viehbacher and Singhal

In a similar vein, Plaintiffs point to statements in which Viehbacher or Singhal expressed confidence in Leqembi's safety profile. See Am. Compl. ¶¶ 295, 296, 298 [Doc. No. 43]. During a quarterly earnings call on July 25, 2023, Viehbacher stated that he "th[ought] the safety benefit of [Leqembi] [would] be quite important to physicians as we go forward." Id. ¶ 295. This statement, which merely asserted that physicians would consider the safety of Leqembi in making treatment decisions, is the type of truism that is "so general" that both "a reasonable

investor" and "the market as a whole" would find it "unimportant to the total mix of

information." In re Wayfair, Inc. Sec. Litig., 471 F. Supp. 3d at 339 (quotation omitted).

On the same call, Singhal, in response to an analyst's question regarding the

"mechanism" of ARIA, offered the following explanation and comparison to donanemab, an

alternative AD therapy:

> So, overall, I think we don't fully understand the mechanism of ARIA, but the data have been replicated for Leqembi in terms of a low incidence of ARIA, in the sense that **when you compare it with some of the other anti-amyloid/anti-beta amyloid antibodies, it is significantly lower and replicated twice**.
>
> **So, for example, in the Clarity AD study, we had an ARIA-E rate of about 12.6%, but with donanemab, we see an ARIA-E rate of 24%, a very similar sort of proportions with ARIA-H. So, I think that it also depends on the population that has been recruited. And as [Viehbacher] mentioned, these populations have been slightly different** with MCI being -- and the early population because we really believe that patients need to be treated earlier. So that could be playing a role. . . . **What I think we can say is that the observation that the incidence is significantly different. And therefore, I believe that the benefit risk is also different.** And that, I think, is what doctors should be looking at.

Id. ¶ 296. Roughly one year later, while speaking on another earnings call in August 2024,

Singhal stated, in relevant part, that "thousands of patients have now been treated with

[Leqembi] globally, providing further real-world evidence on the efficacy and manageable safety

profile." Id. ¶ 298.

Singhal's statements in July 2023 regarding the "mechanism" of ARIA and the

donanemab comparator is not sufficiently alleged to be false insofar as Plaintiffs challenge the

reported ARIA rates observed in the Leqembi Phase 3 study and in comparable donanemab

studies. There is no indication, for example, that these rates were incorrect or misleading, or that

the Leqembi-associated ARIA rate was not, in fact, lower than the donanemab-associated ARIA

rate. See Premca Extra Income Fund LP, 763 F. Supp. 3d at 148. To the extent Singhal's

statements are properly classified as scientific opinions, Plaintiffs offer no specific facts from

which to infer that Singhal or Biogen did not believe that the incidence of ARIA and the "benefit risk" were different for Leqembi versus alternatives, were aware of facts contrary to this conclusion, or failed to make a proper inquiry into the relevant issues and data. See Constr. Indus. & Laborers, 22 F.4th at 7 (citation omitted).

Plaintiffs' allegations as to Singhal's August 2024 statement are similarly deficient. Plaintiffs fail to allege specific facts indicating that Leqembi's benefits and risks were somehow unmanageable or unfavorable relative to the unspecified AD treatment alternatives to which Plaintiffs refer beyond the repetitive assertions regarding the deaths of Patients 1, 2, and 3 discussed above. See Am. Compl. ¶ 299 [Doc. No. 43] (asserting the statement was misleading "to the extent [that Defendants] speak about the safety 'benefit' of Leqembi relative to other AD therapies"). The language surrounding the challenged August 2024 statement also provides context from which a reasonable investor would conclude that Leqembi was not without safety risks, as Singhal clearly referenced CHMP's "negative opinion" on Leqembi. See id. ¶ 298. Plaintiffs have therefore failed to provide the court with a basis on which to infer that Singhal's August 2024 statement was false or misleading, or that additional disclosures were needed.

### b. Phase 3 Subset Study Disclosures

Plaintiffs assert that the statements made by Biogen and Eisai in their March 2023 press release regarding the relationship between Leqembi, blood thinners, and ARIA were false, misleading, or omitted material facts insofar as they did not reference the deaths of Patients 1, 2, or 3—all of whom carried the ApoE4 allele and were "either on or administered anticoagulant medication at the time of death." See Am. Compl. ¶¶ 290–91 [Doc. No. 43]. Plaintiffs do not challenge the accuracy or truthfulness of those statements, including that ARIA rates "may be slightly lower" in Leqembi patients on blood thinners compared with those only taking Leqembi and that, in the overall study, ARIA "did not occur more frequently" in those taking blood

thinners than those who were not. See id. ¶ 290. Accordingly, the court assesses only whether Biogen and Eisai's March 2023 press release statements were "so incomplete as to mislead." Backman, 910 F.2d at 16 (quotation omitted).

The First Circuit has "established that a company is not, by virtue of making some disclosures about its products, obligated to disclose all potentially interesting information." Thant, 43 F.4th at 226 (citation omitted). Here, although investors may have been interested in the ApoE4 carrier status or pharmaceutical regimens of Patients 1, 2, and 3, that alone is not sufficient to render Biogen's disclosures as to the statistical findings of the subset study or the overall study misleading. See id. Plaintiffs have also offered nothing to suggest that the deaths of Patients 1, 2, and 3 were not considered in the calculation of the ARIA rates presented in the March 2023 press release—in other words, that these three deceased individuals were on blood thinners and developed ARIA while participating in the Leqembi clinical trial does not speak to the ARIA occurrence rate observed in that trial or calculated in the subset study.

Plaintiffs also challenge similar statements made by Singhal during a quarterly earnings call in April 2023. See Am. Compl. ¶ 292 [Doc. No. 43] ("The results [of the subset study] were encouraging and showed that ARIA incidents were similar in the two groups."); id. ¶ 293 (with respect to ARIA in carriers of two ApoE4 alleles, "[Eisai] believe[s] that really the data set was rather small. The number of ApoE4 homozygotes was quite small. They don't believe that the overall conclusions are different in terms of [the Phase 3 study] and confidence in the data."). But, again, where Plaintiffs do not challenge the accuracy of the data and conclusions communicated by Singhal in these statements, they have not adequately demonstrated that the disclosure of specific information regarding Patients 1, 2, and 3 was necessary to render

Singhal's statements not "so incomplete as to mislead." <u>Backman</u>, 910 F.2d at 16 (quotation omitted); <u>see</u> <u>Thant</u>, 43 F.4th at 226.

    4.   <u>Statements About Industry Positioning, MS Drug Competition, and PBMs</u>

Plaintiffs challenge thirty-eight statements related to Biogen's sales of Tecfidera and Vumerity, relationship with PBMs, and MS pharmaceutical competition during the putative Class Period. <u>See</u> Am. Compl. ¶¶ 225–26, 228, 230, 232, 234–35, 237–39, 241–42, 244, 247, 250–52, 254–56, 258–60, 262–64, 266–68, 270–72, 274–76, 278, 280–81 [Doc. No. 43]. These statements can be broadly sorted into three categories: (1) statements about the competitive environment in which Biogen was selling Tecfidera and Vumerity; (2) statements explaining Biogen's operating results; and (3) statements concerning the function of managed care and PBM rebates in Biogen's sales model.

    **a.  Competitive Environment**

Within this category, Plaintiffs' central premise is that Biogen entered various anticompetitive pricing contracts with PBMs to protect its Tecfidera sales and bolster its Vumerity sales. Rather than disclose these contractual arrangements, however, Biogen gave investors the false impression that it was competing meritoriously with other MS pharmaceuticals, including new generic entrants, and doing so successfully. In Plaintiffs' words, such statements were false or misleading when made, or omitted necessary material facts, insofar as Biogen did not disclose that:

> (i) beginning in mid-2020, it entered into rebate contracts with PBMs to incentivize them to favor brand name Tecfidera over lower-cost generic versions of Tecfidera on their formularies or otherwise exclude generic Tecfidera from their formularies; (ii) many PBMs elected to do so to maximize their financial gain on the fees associated with the rebates offered by Biogen in such contracts; (iii) this significantly impaired legitimate competition from generic versions of Tecfidera; and (iv) the diminished competition from generic versions of Tecfidera, in turn, enabled Biogen to continue selling Tecfidera at supracompetitive prices and

volumes and switch patients from Tecfidera to Vumerity through the end of 2022. Id. ¶ 227; see id. ¶¶ 229, 231, 233, 236, 240, 243, 245 (raising the same or similar claims with respect to other statements).

Plaintiffs apply this logic across distinguishable statement types. Many of the challenged statements, such as Vounatsos' September 2020 assertion that Biogen "compete[s]" and "ha[s] opportunities and tactics to do things the right way—the Biogen way—to compete[,]" id. ¶ 225, fall under the umbrella of nonactionable corporate optimism or puffery. See Thant, 43 F.4th at 223; In re Wayfair, Inc. Sec. Litig., 471 F. Supp. 3d at 338–39; see, e.g., Am. Compl. ¶ 226 [Doc. No. 43] ("As long as we can innovate, we continue to do well"); id. ¶ 235 ("We believe [Vumerity's revenue] performance is a testament to a strong product profile and our team's ability to execute well, validating our plan announced mid last year to accelerate the launch of Vumerity."); id. ¶ 241 ("As a company, we always welcome competition, the way we did for MS[.]"); see also id. ¶¶ 230, 232, 237, 239, 242, 244.

Other statements in this subcategory present Biogen's quarterly and annual financial results, including Biogen's repeated explanations that period-over-period revenue declines in a particular drug category were mainly attributable to reduced Tecfidera demand and downward pricing pressure exerted by generic entrants. See id. ¶ 228 ("During the third quarter of 2020, [Biogen] began to experience the impact of multiple Tecfidera generic entrants in the U.S., and this [updated] financial guidance assumes significant erosion of Tecfidera in the fourth quarter of 2020, the pace of which is difficult to predict.");[18] id. ¶ 234 ("Our first quarter 2021 results were

---

[18] To the extent this statement laid out financial guidance as to Biogen's full-year performance in fiscal year 2020, such information is best characterized as a financial projection falling under the ambit of the PSLRA's statutory safe harbor. See 15 U.S.C. § 78u-5(i)(1)(A), (C); Metzler Asset Mgmt. GmbH v. Kingsley, 305 F. Supp. 3d 181, 211 (D. Mass. 2018).

consistent with our expectations across MS . . . despite increased competition."); id. ¶ 238 ("We continue to face competition from Tecfidera generics in the U.S., which impacted our year-over-year financial performance."). Where Plaintiffs allege that Biogen's MS product revenue, which necessarily includes Tecfidera sales, declined annually every year since 2018 and discuss in detail the threat to Tecfidera posed by generic entrants, see id. ¶¶ 48–56, Plaintiffs' claims that Biogen's statements explaining such declines were somehow specious are untenable. See, e.g., Zhou, 120 F.4th at 293 (no plausible allegation that statement involving timing of resin's FDA clearance "was either false or misleading" where plaintiff "acknowledge[d] that [defendant's resin product] was cleared by the FDA" in the challenged time period and "d[id] not allege that [the defendant] published" an announcement as to the FDA's decision "before the clearance date"); ACA Fin. Guar. Corp., 512 F.3d at 63 (no misrepresentation established where challenged statement "clearly stat[ed]" an intention on part of defendant opposite to that which plaintiff argued); Hill, 638 F.3d at 59 (company executives "had no obligation" to make public expert opinions that company's reimbursement strategy would fail "simply because they mentioned the risks associated with non-reimbursement by third-party payers in a profit statement").

But, even setting the finer distinctions aside, Plaintiffs' claims—whether directed at inactionable statements of corporate optimism or statements not sufficiently alleged to be false— cannot meet the requisite pleading standard where they simply lack internal coherence.

As illuminated during a hearing before this court, Plaintiffs vacillate between characterizing Biogen's PBM rebate activity as a violation of federal antitrust and anti-kickback laws, as indicated in their Amended Complaint [Doc. No. 43], or as untoward market behavior that, although not necessarily illegal, involved undisclosed market manipulation designed to

stymie generic Tecfidera competition. Compare, e.g., Am. Compl. ¶ 158 [Doc. No. 43] ("[B]y June 2021, generic Tecfidera accounted for less than a third of all sales. Thus, just as Biogen intended, its collusive conduct [with PBMs] significantly slowed the erosion of Tecfidera sales and allowed it [to] maintain a dominant market position.") and id. ¶ 155 ("Biogen paid kickbacks to the PBMs to impair competition from generic versions of Tecfidera. The rebates and fees it paid were . . . enormous payments to their faithless agents, the PBMs[.]"), with Opp'n 10 [Doc. No. 55] ("Plaintiffs claims do not depend on a violation of law, much less the antitrust laws.") and id. at 10 n.2 ("[T]he primary focus of those averments is that the statements gave the impression that Biogen was competing with Tecfidera generics "on the merits," rather than suppressing their ability to compete at all."). In viewing the pleadings in the light most favorable to Plaintiffs, the court will construe Plaintiffs' claims as asserting anticompetitive, but not illegal, conduct on Biogen's part. See Butler v. Balolia, 736 F.3d 609, 617 (1st Cir. 2013).[19]

Even characterizing Plaintiffs' charge as asserting that Biogen acted underhandedly, but not illegally, in its dealings with PBMs, Plaintiffs fail to connect such activity with an unfulfilled disclosure obligation. "When making a voluntary disclosure, a company that reveals one fact is not required to 'reveal all others that, too, would be interesting, market-wise.'" Zhou, 120 F.4th at 294 (quoting Backman, 910 F.2d at 16). Instead, the PSLRA requires only that a company "reveal the facts necessary to make the existing statement not so incomplete as to mislead." Id. (quotation omitted). Put simply, if a statement "leaves no impression" about a particular matter, it cannot give rise to a disclosure obligation as to that matter. See id. ("The challenged statement is not incomplete or misleading for failing to admit that some . . . resin was produced at a non-

---

[19] Plaintiffs' request to further amend their pleading "to make this clear if necessary[,]" Opp'n 10 n.2 [Doc. No. 55], is denied as moot.

compliant facility because the statement itself leaves no impression about [defendant's subsidiary's] regulatory compliance."); Gill v. Bluebird Bio, Inc., 784 F. Supp. 3d 422, 432 (D. Mass. 2025) (reasonable investors could not have been misled into believing that the FDA would not require a "black box warning" for a medical therapeutic where challenged statement "gave no impression as to whether the FDA would require such a warning. . . .").

Here, none of the statements challenged by Plaintiffs raise, reference, or even allude to Biogen's contracts and rebate agreements with PBMs. Accordingly, where Biogen's statements could not have given investors any impression as to the company's relationships with PBMs or use of such relationships to stave off generic Tecfidera competition, no concurrent obligation to disclose such information attached. See Zhou, 120 F.4th at 294; Gill, 784 F. Supp. 3d at 422.

Plaintiffs' invocation of various investigations, court cases, and confidential witness statements do little to bolster their claims regarding Biogen's purported manipulation of the MS drug market via PBM agreements. As a baseline issue for Plaintiffs, none of the external legal or administrative processes to which Plaintiffs cite have resulted in formal findings regarding, or adjudications of, Biogen's liability for the conduct Plaintiffs allege.[20]

---

[20] See Am. Compl. ¶¶ 132, 139–40 (referencing a 2019 House of Representatives investigation and a 2022 FTC investigation into pharmaceutical rebate agreements, as well as a 2024 FTC administrative complaint filed against the three largest PBMs); id. ¶ 318 (noting that publicly released documents from the 2022 FTC investigation indicate that the agency requested documents on Tecfidera rebates); id. ¶¶ 366–67, 399–400 (describing two whistleblower actions filed against Biogen, both of which ultimately ended in settlements); id. ¶ 328 (citing a 2024 House report, in which Tecfidera was "addressed" in documents produced by a major PBM in response to inquiries from the House).

In January 2026, Plaintiffs filed a Notice of Supplemental Authority in Opposition to [the] Motion to Dismiss [Doc. No. 67], in which they point the court to an opinion and order issued in In re Tecfidera Antitrust Litigation, No. 24-cv-7387 (N.D. Ill.). See Notice 1 [Doc. No. 67]. In that case, the court denied Biogen's motion to dismiss a complaint filed by a group of health benefit plans and health benefit plan sponsors alleging that "Biogen bribed PBMs to direct Plaintiffs' members away from generic dimethyl fumarate and towards Biogen's more expensive

Similarly, the confidential witnesses on which Plaintiffs rely offer little more than general observations and information concerning Biogen's rebate contract strategy and interest in switching patients from Tecfidera. Confidential Witness 3, for example, asserted that, under a strategy that "came from the 'corporate level'" at Biogen, Biogen's sales associates were instructed to "'try to transfer as many patients as possible from Tecfidera to Vumerity' in the United States." Am. Compl. ¶ 67 [Doc. No. 43]. Confidential Witness 5 "confirmed that Biogen, like any major pharmaceutical company, had a Pricing Committee consisting of 'senior' executives to review and approve drug prices and price changes[,]" with Confidential Witnesses 1 ("CW1") and 2 ("CW2") adding that "all" price changes required approval from Biogen's "Head of U.S. Market Access" and, in some instances, "other senior executives." Id. ¶ 147.

CW2 and Confidential Witness 4 ("CW4") do provide information that more explicitly references the "brand-over-generic" rebate contracts with which Plaintiffs take issue, but they do not do so in a manner sufficient to support the inferences on which Plaintiffs' claims rely. CW4, for instance, referenced a phone call on which Defendant Vounatsos allegedly stated that Biogen was "going to raise prices on every drug we've been doing R&D on because we pay a fee to the PBMs" and secondhand information she received from Biogen's Vice President of Government Affairs indicating Vounatsos believed this strategy "would be acceptable (to public opinion)[.]" Id. ¶ 145. But, even assuming *arguendo*, that this information could give rise to an actionable inference, it must be discounted where CW4 did not work at Biogen during the Class Period. See

---

brand products [i.e., Tecfidera and Vumerity], causing Plaintiffs to buy more of Biogen's drugs at higher prices than they would have otherwise." Notice, Ex. A, at 1 [Doc. No. 67-1]. The order and opinion, as a decision on a Rule 12(b)(6) motion, takes as true all well-pleaded facts in the plaintiffs' complaint and makes no factual findings.

Abiomed, 778 F.3d at 245 (no "firsthand knowledge of the state of mind of [defendant's management]" during the class period where confidential witness did not work for the defendant during that period).

CW2, who was employed by Biogen during the Class Period, explained that, after Biogen's Tecfidera patents were invalidated, the company "moved quickly to implement '[brand-over-generic] contracts . . . where the PBMs were paid to continue to dispense Tecfidera instead of generic.'" Am. Compl. ¶ 146. [Doc. No. 43]. According to CW2, "'most of the big PBMs' agreed to the [brand-over-generic] contracts[,]" which "ensured that the PBMs would make more money from Biogen when Tecfidera was dispensed instead of generics." Id. The "prevailing view" at Biogen "was that it was better to receiv[e] 50 percent of what was previously earned than nothing at all." Id.

Although this information allows for a reasonable inference that Biogen engaged PBMs in rebate agreements intended to benefit its own sales, it does not support an inference that such agreements gave rise to a disclosure obligation about the purportedly dubious nature of these agreements. Again, Biogen was not required to reveal information about which its statements left "no impression[,]" Zhou, 120 F.4th at 294—and, in particular, it had no obligation under Section 10(b) or Rule 10b-5 to accuse itself of misconduct. See Abiomed, 778 F.3d at 244 ("perverse result" if defendant company was required to "affirmatively admit[] widespread wrongdoing" with respect to a yet-undecided regulatory matter with the FDA); Hill, 638 F.3d at 59 (company principals "had no obligation" to make public negative expert opinions as to new reimbursement strategy "simply because they mentioned the risk associated with non-reimbursement by third-party payers in a profit statement"); In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[T]he federal securities laws do not require a company to accuse itself of

wrongdoing."), aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc., 165 Fed. App'x 928 (2d Cir. 2006).

### b. Explanations of Operating Results

Plaintiffs also challenge twenty-three statements in which Biogen, through its Form 10-Qs, Form 10-Ks, and quarterly earnings calls, discussed the drivers of its operating results, particularly with respect to its reduced revenue. Biogen's October 21, 2020 Form 10-Q, for example, stated:

> Biogen had another solid quarter despite the recent entrance of generic Tecfidera and the continued impacts of COVID-19, as we continue to execute well. . . . Total revenue for Q3 was $3.4 billion, a decline of 6% versus the prior year. **This decline was mostly driven by Tecfidera generic entry** and is inclusive of a 1% unfavorable currency impact. Total MS revenue, including Ocrevus royalties, was $2.3 billion, a decrease of 4% versus the prior year. **MS revenue during the third quarter began to experience the impact of the entrance of multiple generics of Tecfidera in the U.S.** while Q3 Tecfidera revenue outside the U.S. was $283 million, representing an increase of 1% versus the prior year with continued patient growth.

Am. Compl. ¶ 250 [Doc. No. 43]. Similarly, Biogen's April 22, 2021 Form 10-Q stated:

> Product revenue, net totaled $2,211.7 million for the first quarter of 2021, representing a $692.9 million, or 23.9%, decrease compared to $2,904.6 million in the same period in 2020. This decrease was primarily due to a $634.2 million, or 30.0%, decrease in MS product revenue and a $44.5 million, or 7.9%, decrease in SPINRAZA product revenue.
>
> **The decrease in MS product revenue was primarily due to a decrease in U.S. Tecfidera demand as well as higher discounts and allowances as a result of multiple Tecfidera generic entrants in the U.S. market.**
>
> . . . .
>
> Fumarate revenues include sales from TECFIDERA and VUMERITY. . . . For the three months ended March 31, 2021, compared to the same period in 2020, **the decrease of 69.6% in U.S. Fumarate revenue was primarily due to a decrease in Tecfidera demand as well as higher discounts and allowances as a result of multiple Tecfidera generic entrants in the U.S. market.** Additionally, revenue in the first quarter of 2020 reflected higher volume associated with additional shipping days. **The decrease was partially offset by an increase in Vumerity sales volume.**

61

Id. ¶ 260; see id. ¶¶ 251–52, 254–56, 258–59, 262–64, 266–68, 270–72, 274, 276, 278, 280 (challenging similar statements).

As with the subset of statements involving the competitive environment for Biogen's MS pharmaceuticals, discussed supra, Plaintiffs allege that these statements are false or misleading, or otherwise omit material facts necessary for the statements to not mislead, because they do not disclose Biogen's anticompetitive rebate agreements with PBMs. See, e.g., id. ¶¶ 253, 257, 261, 265. Plaintiffs allege that Biogen could not honestly attribute its revenue results to the erosion of Tecfidera sales and, later, the "partial[] offset" of increasing Vumerity sales where the true cause of its results was "Biogen's entry into illicit rebate contracts" that permitted Biogen to sell Tecfidera at "supracompetitive volumes and prices" and "switch patients to Vumerity." Id. ¶¶ 253, 257. Plaintiffs argue that, even if the challenged statements are "not technically untrue[,]" id. ¶ 253, they "gave the false impression that Biogen was experiencing the impact of unimpaired competition from Tecfidera generics." Id.

Plaintiffs again fail to sufficiently plead that the content of the actual statements they challenge are false or misleading—they do not, for example, plausibly allege that generic versions of Tecfidera were not, in fact, cannibalizing Biogen's Tecfidera sales or that Vumerity sales were neither increasing as presented nor helping to counteract falling Tecfidera sales. See Zhou, 120 F.4th at 293; ACA Fin. Guar. Corp., 512 F.3d at 63. Insofar as Plaintiffs claim that the statements omitted material information regarding Biogen's rebate agreements with PBMs, Biogen had no obligation to raise this information where these statements gave investors "no impression" as to such arrangements and where the disclosures Plaintiffs desired would have effectively compelled Biogen to unnecessarily accuse itself of wrongdoing. See Zhou, 120 F.4th

62

at 294; <u>Abiomed</u>, 778 F.3d at 244; <u>Hill</u>, 638 F.3d at 59; <u>In re Citigroup, Inc. Sec. Litig.</u>, 330 F.

Supp. 2d at 377.

### c.    Function of Rebates in Biogen's Sales Model

Finally, Plaintiffs challenge statements that specifically refer to rebates as a factor in

Biogen's revenue. Am. Compl. ¶¶ 247, 282 [Doc. No. 43]. Plaintiffs again assert that Biogen

misattributed its product revenue performance to declining Tecfidera sales and the offsetting

increase in Vumerity sales, rather than Biogen's "illicit rebate contracts" with PBMs. <u>Id.</u> The

earliest statement Plaintiffs challenge, from Biogen's 2020 Form 10-K, provided in relevant part:

> Product revenue reserves, which are classified as a reduction in product revenues, are generally characterized in the following categories: discounts, contractual adjustments and returns.
>
> . . . .
>
> Contractual adjustments primarily relate to Medicaid and managed care rebates, pharmacy rebates, co-payment (copay) assistance, Veterans Administration (VA) and Public Health Service (PHS) discounts, specialty pharmacy program fees and other governmental rebates or applicable allowances. . . . Managed care rebates represent our estimated obligations to third parties, primarily pharmacy benefit managers. Rebate accruals are recorded in the same period the related revenue is recognized, resulting in a reduction of product revenue and the establishment of a liability which is included in accrued expenses and other current liabilities. **These rebates result from performance-based goals, formulary position and price increase limit allowances (price protection).** The calculation of the accrual for these rebates is based on an estimate of the coverage patterns and the resulting applicable contractual rebate rate(s) to be earned over a contractual period.

<u>Id.</u> ¶ 247 [Doc. No. 43]. Plaintiffs allege that "[t]he same or substantially similar

statements . . . were made in the 2021 Form 10-K and the 2022 Form 10-K." <u>Id.</u> ¶ 248.

As with the statements evaluated above, Plaintiffs do not explain <u>how</u> investors could

have been misled by this statement, which explains the source of, and accounting methodology

concerning, rebate accruals embedded in Biogen's sales model. If anything, this statement aligns

with Plaintiffs' overarching assertion that Biogen made use of rebate agreements to improve

Biogen pharmaceuticals' position on drug formularies and protect the prices of its products

63

relative to competitors—the statement even goes so far as to describe rebates, in part, as "price protection." See In re The First Marblehead Corp. Sec. Litig., 639 F. Supp. 2d at 155 (no actionable claim can be "predicated on the concealment of information if that information was, in fact, disclosed."). Insofar as Plaintiffs challenge this statement based on purported omissions, Biogen was, again, not required to accuse itself of wrongdoing in the manner Plaintiffs suggest. See Abiomed, 778 F.3d at 244; In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d at 377.

The next challenged statement appeared only in Biogen's 2022 Form 10-K:

**The decrease in MS product revenue of $666.5 million, or 10.9%, from $6,096.7 million in 2021 to $5,430.2 million in 2022, was primarily due to a decrease in Tecfidera demand as a result of multiple Tecfidera generic entrants in North America,** Brazil and certain E.U. countries, and a decrease in Interferon demand due to competition as patients transition to higher efficacy and oral MS therapies.

Fumarate revenue includes sales from Tecfidera and Vumerity. . . . For 2022 compared to 2021, t**he 13.8% decrease in U.S. Fumarate revenue was primarily due to a decrease in Tecfidera demand as a result of multiple Tecfidera generic entrants in the U.S. market, partially offset by net price increases in Tecfidera driven by lower pharmacy rebates, managed care rebates and co-pay assistance as well as an increase in Vumerity sales volumes.**

Am. Compl. ¶ 281 [Doc. No. 43]. Where Plaintiffs have also alleged that Biogen disclosed its use of rebate contracts, including by referring to these contracts as "price protection[,]" in both the same Form 10-K and in two prior Form 10-Ks, see id. ¶ 247, this statement is neither misleading nor did it create an additional disclosure obligation on Biogen's part. See Zhou, 120 F.4th at 294; ACA Fin. Guar. Corp., 512 F.3d at 62; Hill, 638 F.3d at 59.

B.    *Scienter*

As the preceding discussion indicates, Plaintiffs have not sufficiently alleged that any of the fifty-six statements included in the Amended Complaint [Doc. No. 43] are actionable under the PSLRA. But, even if Plaintiffs had alleged actionable statements or omissions, Plaintiffs

64

must also "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). Plaintiffs have failed to do so here.

For the purposes of the PSLRA, scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Matrixx, 563 U.S. at 48 (quoting Tellabs, Inc., 551 U.S. at 319). It requires "a showing of either conscious intent to defraud or a high degree of recklessness." ACA Fin. Guar. Corp., 512 F.3d at 58. Plaintiffs must plead "the basis for inferring scienter[,]" Cardinale, 567 F.3d at 13, and such an inference "must be more than merely plausible or reasonable[,]" Tellabs, Inc., 551 U.S. at 314.

The court must engage in a holistic inquiry, in which it considers "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" Id. at 323. "'Strong' need not be 'irrefutable,' the Supreme Court has emphasized, but must be 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc., 152 F.4th 1, 12–13 (1st Cir. 2025) (quoting Tellabs, Inc., 551 U.S. at 324).

1. Leqembi's Commercial Prospects

With respect to statements regarding the 10,000 patient goal for, and general commercial rollout of, Leqembi, Plaintiffs anchor their scienter allegations to information from confidential witnesses and Defendants' purported body of commercial knowledge arising from Biogen's failed Aduhelm launch and Biogen's participation in joint committees with Eisai during the Leqembi development and launch processes. See, e.g., Am. Compl. ¶¶ 212–21, 379–83 [Doc. No. 43]. "The key question . . . is not whether defendants had knowledge of certain undisclosed facts, . . . but rather whether defendants knew or should have known that their failure to disclose those facts presented a danger of misleading buyers or sellers." City of Dearborn Heights, 632 F.3d at 758 (citation omitted).

Insofar as Plaintiffs depend on confidential witnesses to demonstrate scienter, for many of the reasons indicated supra, the confidential witnesses were not properly positioned to offer reliable information as to Defendants' knowledge or state of mind. Where, for example, CW8 and CW10 never worked for Biogen, and where Plaintiffs do not allege that CW9 and CW11 ever interacted with the Individual Defendants or were privy to sufficiently specific information in support of Plaintiffs' claims, Plaintiffs' reliance is misplaced. See Abiomed, 778 F.3d at 245; Coyne, 943 F. Supp. 2d at 267, 271; see also Collier, 9 F. Supp. 3d at 72 (confidential witnesses must offer "specific descriptions of the precise means through which [alleged fraud] occurred, provided by persons said to have personal knowledge of them." (quotation omitted)). To the extent the CWs do attempt to speak to what Defendants knew or believed, their assertions reflect the CWs' own knowledge or beliefs, rather than that of the Defendants. See, e.g., Am. Compl. ¶ 220 [Doc. No. 43] (referring to CW11's opinion that Biogen's approach to financial analysis does not properly consider relevant constraints and "look[s] at issues like system constraints as a 'tomorrow problem'"); id. ¶ 221 (noting that CW9 was "surprised" by the 10,000 patient goal timeline and thought it was "very suspicious"); id. (reporting that CW11 "agreed that the 10,000 [p]atient [g]oal was 'crazy'").

Plaintiffs are not helped by their broader assertions of scienter via Biogen's Aduhelm experience and formal collaboration with Eisai. For example, Plaintiffs point to statements made by Defendants McDonnell and Singhal indicating that Biogen shared its "learnings[,] . . . be they development learnings or commercial learnings[,]" from the failed Aduhelm commercialization with Eisai. See id. ¶ 212 (quoting McDonnell on September 12, 2022, and October 25, 2022); id. (quoting Singhal on December 1, 2022). But Plaintiffs are unable to offer more than broad generalizations as to what such "learnings" were, nor do they draw any connections between

66

specific alleged mistakes in the Leqembi rollout to specific alleged mistakes in the Aduhelm rollout. See, e.g., id. ¶¶ 213–14 (alleging that Viehbacher "consistently recognized since starting as CEO that Leqembi faced the same challenges" as Aduhelm where the president of Biogen's United States operations commented on a July 2021 call that "building this infrastructure for the appropriate use of Aduhelm will require time" and "each site will operationalize at different rates"). In any event, where several statements challenged by Plaintiffs include Biogen's own references to uncertainty in the Leqembi rollout,[21] Plaintiffs have not demonstrated that Defendants sought to intentionally mislead investors, or did so recklessly, with respect to Leqembi's rollout. As between Plaintiffs' desired inference and the alternative inference that Defendants believed they were progressing toward their commercialization goals even "if fitfully at times[,]" In re Genzyme Corp., Nos. 09-11267-GAO, 09-11299-GAO, 2012 WL 1076124, at *12 (D. Mass. Mar. 30, 2012), aff'd sub nom. In re Genzyme Corp. Sec. Litig., 754 F.3d 31 (1st Cir. 2014), the latter is the more compelling.

Finally, Plaintiffs' gestures toward Eisai and Biogen's formal collaboration agreements, joint committees, and other avenues of information-sharing do not push their scienter allegations above the conclusory level. In sum, Plaintiffs' factual allegations, taken as true at this stage, sufficiently posit that Biogen and Eisai worked very closely on the launch of Leqembi, Defendants Vounatsos and Viehbacher spoke regularly with Eisai's leadership about Leqembi,

---

[21] See, e.g., id. ¶ 303 (describing the Leqembi launch as "a heavy lift at the start" insofar as it involved coordination with physician practices); id. ¶ 304 (explaining that Biogen "know[s] [the Leqembi launch] is going to be choppy up before [the date set for attaining the 10,000 patient goal] and there'll be some centers that are off to the races and some that will take longer and it's kind of hard to predict, to be honest, how fast it's going to go"); id. ¶ 315 (acknowledging that Biogen's patient registry data was "not perfect information" where the company lacked "direct access to the patient registries").

and, at least via Defendant Singhal's position as chair of the companies' joint steering committee, Biogen and Eisai likely both participated in setting of the 10,000 patient goal. See Am. Compl. ¶¶ 379–83 [Doc. No. 43]. But these assertions, even when read together with the confidential witness allegations and Aduhelm-related allegations described supra, still do not give rise to the requisite antecedent inference that Defendants knew or should have known that the Leqembi commercialization would not meet Biogen's publicly stated goals, let alone that they knew or should have known that their failure to provide such information could mislead investors. See City of Dearborn Heights, 632 F.3d at 758; see also Yan v. ReWalk Robotics Ltd., 973 F.3d 22, 41 (1st Cir. 2020) ("[M]ere knowledge of facts is insufficient to support a strong inference of scienter . . . . There must be some allegation strongly implying that defendants had reason to believe their omissions to be fraudulent.").

2.  Leqembi's Safety Profile

As a threshold issue, where Biogen's statements concerning or incorporating Eisai's explanations or analyses of the results of the Phase 3 Leqembi study constitute inactionable statements of scientific opinion, Plaintiffs have, for the reasons described supra, failed to plausibly allege that Defendants did not believe these assessments or were aware of information rendering the bases of such assessments objectively incorrect. See Brill v. Invivyd, Inc., No. 1:23-CV-10254-JEK, 2024 WL 4228832, at *9 (D. Mass. Sep. 18, 2024). To the extent Plaintiffs again wish to rely on the existence of various information-sharing pathways between Biogen and Eisai, their assertions are equally unpersuasive here given the lack of specificity therein. See Am. Compl. ¶¶ 375–78, 381–82 [Doc. No. 43]. Plaintiffs nonetheless attempt to further ground their scienter allegations in commentary from third parties included in news and industry articles and assertions made by two confidential witnesses.

68

First, the cited publicly available articles detailing the deaths of Patients 1, 2, and 3 and critiquing Eisai's conclusions as to the associated causes of death cannot support the inference that Biogen, by virtue of the existence of these articles, was "on constructive notice" that "at least three patient deaths" were connected to Leqembi. See id. ¶¶ 373–74; Brennan v. Zafgen, Inc., 853 F.3d 606, 614 (1st Cir. 2017) (finding argument that defendants "knew, or were reckless in not knowing, about news and scientific articles that purportedly established a 'link' between [a pharmaceutical] and the occurrence of thrombotic adverse events" unpersuasive and insufficient to "support a strong inference of scienter under either a conscious intent or recklessness theory").

Second, the assertions of CW6 and CW7 on which Plaintiffs rely lack sufficient connection to Defendants' state of mind. CW6, a neuropathologist and professor of pathology, treated Patient 2 in the emergency room in the days prior to her death and witnessed Patient 2 "screaming and writhing in pain" after she was administered a blood thinner. Am. Compl. ¶¶ 17, 189 [Doc. No. 43]. "No later than the end of 2022[,]" CW6 performed an autopsy on Patient 2, during which CW6 discovered "brain swelling and frayed blood vessels" and "concluded that the cause of death was multifocal intracerebral hemorrhage due to Leqembi infusion complicated by the fact that she appeared to have a stroke, leading to the use of [a blood thinner]." Id. ¶ 194. Plaintiffs allege that CW6, while attending a conference, informed Eisai's Senior Medical Science Liaison about his findings and offered to "share the full autopsy details and discuss in detail." Id. ¶ 195. The Liaison declined CW6's offer but "said he would speak to 'senior people' on the Leqembi team and they would get back to him." Id. "Later, [the Liaison] sent an email attempting to rebut the link to Leqembi[,]" but there was otherwise no follow-up from Eisai with respect to CW6's alert. Id.

69

Similarly, CW7, a vascular neurologist and AD researcher, performed an autopsy on Patient 3 in March 2023, during which CW7 "discovered more than 30 microbleeds in Patient 3's brain[,]" "widespread inflammation[,]" "areas of dead or 'necrotic' tissue," and "blood vessels that appeared shredded and deformed." Id. ¶¶ 18, 196. CW7 concluded that Patient 3's cause of death was "'necrotizing vasculitis' related to treatment with Leqembi." Id. ¶ 196. In "late March to early April 2023[,]" CW7 "provided a copy of the autopsy report to a scientific journalist, who, in turn, sen[t] a copy to Eisai's public relation department." Id. ¶ 197. CW7 also "sent copies of the autopsy report to numerous scientists who work with Eisai and 'senior executives' at Eisai[,]" along with an offer "to share all materials, including tissue slides, so Eisai and Biogen could review them." Id. As alleged by CW7, "Eisai's response was 'very slow, very limited, and did not occur in a timeframe when it might be helpful to the FDA approval process.'" Id.

The court does not discount CW6 and CW7's medical opinions as to the causes of death for Patients 2 and 3. But the relevant inquiry for scienter turns on whether Plaintiffs sufficiently allege that Biogen or any Individual Defendants were aware of facts supporting these medical opinions, to the exclusion of accepting Eisai's opinions, and proceeded to make public statements that recklessly disregarded such facts or were made with the intent to deceive investors as to this information. See In re Stone & Webster, 414 F.3d at 214 (scienter not sufficiently pleaded where plaintiffs needed to allege "particularized facts which give strong support" to conclusion that "defendant knew the true facts, or knew that the challenged statement was false"); Tharp v. Acacia Comm'ns, Inc., 321 F. Supp. 3d 206, 229 (D. Mass. 2018) (rejecting scienter allegation where proposed amended complaint did not "contain specific

70

allegations to show that the Defendants knew or were reckless in not knowing that any statements were false when made").

Plaintiffs have not done so here. Where CW6 and CW7 did not provide, or attempt to provide, their respective autopsy reports to Biogen or the Individual Defendants, there can be no inference that Defendants were in receipt of the relevant information. To the extent Plaintiffs rely on an inferential chain that connects CW6 and CW7's actions to the Defendants, this, too, fails— neither CW6's provision of Patient 2's autopsy report on an unknown date to an unnamed Eisai employee, nor CW7's reliance on a "scientific journalist" and unknown "scientists who work with Eisai [and unnamed Eisai] senior executives" to somehow deliver Patient 3's autopsy report to Eisai, sufficiently support the necessary inference that Biogen or any Individual Defendant was at some point apprised of the relevant information by Eisai. See In re Stone & Webster, 414 F.3d at 214; Tharp, 321 F. Supp. 3d at 229; see also In re Psychemedics Corp. Sec. Litig., No. 17-10186-RGS, 2017 WL 5159212, at *5 (D. Mass. Nov. 7, 2017) ("It is an altogether different proposition to say that the fraudulent actions or statements undertaken by corporate officers in Company A can support not only a claim of scienter against Company A, but also against Company B, absent an alter-ego relationship.").

### 3. Industry Positioning, MS Drug Competition, and PBMs

With respect to Tecfidera, Vumerity, and Defendants' alleged participation in "brand-over-generic" rebate agreements with PBMs, Plaintiffs attempt to plead scienter by reference to, inter alia, confidential witness allegations, Vounatsos and McDonnell's purported awareness of PBM contracts in the broader marketplace, and the centrality of Tecfidera and Vumerity to Biogen's business. Even when considered together, these allegations are insufficient to plead scienter under the PSLRA.

71

As with Plaintiffs' other attempts to rely on confidential witnesses, the confidential witness allegations here give little support for scienter. Neither CW3 nor CW5 offer information beyond generalities concerning Biogen's pricing and sales strategies for Tecfidera and Vumerity. See, e.g., Am. Compl. ¶¶ 67, 147 [Doc. No. 43]. Equally unavailing are the allegations attributed to CW4, who did not work at Biogen during the Class Period, or to CW2, whose assertions as to the use and purpose of PBM rebate contracts are consistent with Defendants' public statements on the topic. See id. ¶¶ 15, 145–46. Compare id. ¶ 146 (under the rebate agreements, per CW2, "PBMs were paid to continue to dispense Tecfidera instead of generic" and would therefore "make more money from Biogen when Tecfidera was dispensed instead of generics"), with id. ¶ 247 (relaying that Biogen, in regulatory filings, described rebates as "result[ing] from performance-based goals, formulary position and price increase limit allowances (price protection)").

The court also notes that the confidential witnesses did not hold officer-level or similar leadership positions at Biogen during the Class Period; do not allege that they reported to individuals in such positions, including the Individual Defendants; and do not allege that they spoke to, or interacted with, the Individual Defendants. In the absence of any such allegations, there is no basis on which to conclude the CWs can credibly speak to the knowledge, beliefs, or state of mind of any Individual Defendant. See Abiomed, 778 F.3d at 245; In re iRobot Corp. Sec. Litig., 527 F. Supp. 3d 124, 142 (D. Mass. 2021) (determining that a confidential witness "not . . . alleged to have interaction with upper management" could not "be considered to present a strong inference for scienter"); In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d at 46 (finding no scienter in part because none of the main confidential witnesses, "most of whom were . . . five

72

levels removed from any of the defendants[,]" nor any other confidential witness "ever spoke with one of the defendants").

Similarly, Plaintiffs' attempt to plead scienter based on Defendant Vounatsos's participation in various industry trade groups, descriptions of Biogen's PBM contracts, and, along with Defendant McDonnell, purported awareness of two pre-2020 whistleblower suits is unsuccessful. First, Plaintiffs' attempt to link Vounatsos's board membership with the Pharmaceutical Research and Manufacturers of America ("PhRMA") from 2016 to 2022, see Am. Compl. ¶ 8 [Doc. No. 43]; the launch of the aforementioned House investigation in August 2017 directed at pharmaceutical price increases, see id. ¶ 355; and PhRMA's November 2017 report on such price increases relative to PBM incentives, see id. ¶ 356, amounts to little more than conjecture as to "any firsthand knowledge" Vounatsos possessed with respect to the specific rebate agreements with which Plaintiffs take issue. See, e.g., Luongo v. Desktop Metal, Inc., No. 1:21-cv-12099-IT, 2023 WL 6142715, at *14 (D. Mass. Sept. 20, 2023) (rejecting plaintiffs' "attempt to extrapolate from the fact that [defendant] frequently attended and/or ran sales meetings that he was privy to information about manufacturing practices and product quality" (quotation omitted)).

To the extent Vounatsos or McDonnell were likewise "aware" of the two *qui tam* complaints against Biogen unsealed in July 2015 and March 2017, see Am. Compl. ¶¶ 366–70 [Doc. No. 43], Plaintiffs likewise fail to demonstrate that any such knowledge—which, given the nature of the two complaints, would have concerned Biogen's alleged payment of kickbacks to physicians and to cover Medicare copays, rather than any such payment to PBMs—pertained to what Defendants knew or should have known relative to the alleged impropriety of Biogen's PBM rebate contracts. See Luongo, 2023 WL 6142715, at *14.

Plaintiffs also assert that Vounatsos's public statements between December 2016 and September 2021 "confirm[ed] that he stayed informed on PBM contracting for Biog[en]'s MS products, including Tecfidera." Am. Compl. ¶ 357 [Doc. No. 43]. Vounatsos made all but one of these "confirmatory" statements prior to the start of the Class Period. See id. ¶¶ 358–64 (citing to statements made in December 2016, March 2017, July 2017, October 2017, May 2018, June 2018, January 2020, and July 2020); cf. In re Biogen Sec. Litig., 857 F.3d at 44 (statements made by defendants "well after the end of the Class Period" did not "provide particularized insight into the defendants' knowledge at the time of the alleged misstatements"). With respect to the only statement made during the Class Period, Vounatsos, when asked at an investment conference about a pending appeal involving a Tecfidera patent, "[c]omment[ed] on the effect of a positive decision . . . stat[ing] 'we need to see the implications in terms of the PBMs and other partners.'" Am. Compl. ¶ 365 [Doc. No. 43]. Such a general statement does not suffice for the scienter analysis.

Finally, although they do not label them as such, Plaintiffs raise "core operations" allegations. Through such allegations, Plaintiff assert that the indispensability of Tecfidera and "the launch of a new AD franchise" to Biogen during the Class Period weighs in favor of a strong inference that Defendants either knew or were reckless in not knowing that their statements regarding Tecfidera, Vumerity, and Leqembi were misleading. Id. ¶¶ 398–403; see In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d at 51 (describing the role of "core operations" allegations in similar suits).

"[U]nder [Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)], the 'core operations' allegations" and the significance of Tecfidera, Vumerity, and Leqembi to Biogen's business "must be taken into account as part of the Court's assessment of the scienter

74

allegations." Id. Typically, however, courts are "hesitant to apply significant weight to 'core operations' allegations without other significant evidence of a defendant's intent or recklessness, or a 'plus factor.'" Metzler Asset Mgmt. GmbH, 305 F. Supp. 3d at 219 (citations omitted). Here, where the foregoing analysis demonstrates the relative weakness of Plaintiffs' other evidence regarding scienter, and where there is otherwise "no 'smoking gun' evidence or 'plus factor[,]'" Plaintiffs' "core operations" allegations add little to the scienter analysis. Id.; see In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d at 51; see also In re A123 Sys., Inc. Sec. Litig., 930 F. Supp. 2d 278, 285 (D. Mass. 2013) (concluding that "core operations" allegations were meaningful in Crowell v. Ionics, Inc., 343 F. Supp. 2d 1 (D. Mass. 2004), because there were also "allegations of the improper booking and accounting of fraudulent sales, buttressed by a 'plus factor'—an e-mail pointing to the company's vice president as the author of the scheme").

### 4. Stock Sales Allegations and Role of Corporate Incentives

As additional support for their scienter allegations, Plaintiffs assert that the Individual Defendants "stood to gain enormously from hiding anticompetitive practices and difficulties launching Leqembi" by virtue of their "stock and option incentives" and "performance-based cash incentives." Am. Compl. ¶ 384 [Doc. No. 43].

Plaintiffs allege, and Defendants do not dispute, that performance-based cash incentives were calculated based on a weighted basket of metrics, including "achieving MS global market share[,]" "leading MS in customer trust and value surveys[,]" "preparing for AD leadership[,]" "executing on Critical Alzheimer's Disease Initiatives[,]" and "launch readiness and execution of Leqembi[.]" Id. ¶¶ 386–89 (describing the factors considered for Biogen's cash incentives in 2020, 2021, 2022, and 2023). But where Plaintiffs "do not plead any additional or unusual facts concerning the company's executive compensation or the Individuals Defendants' receipt of compensation under the company's pay packages[,]" the allegations, "[s]tanding alone, . . . are,

75

therefore, insufficient." In re Atl. Power Corp. Sec. Litig., 98 F. Supp. 3d 119, 133 (D. Mass. 2015); see Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002) (fact that corporate officers' compensation depended on company's earnings "alone is not and cannot be enough to establish scienter"); Greebel, 194 F.3d at 197 ("[C]atch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are not sufficient." (quotation omitted)).

Plaintiffs also assert that Defendants Vounatsos, McDonnell, and Singhal's sales of Biogen stock are probative of scienter relative to the Defendants' "motivat[ion] to engage in a fraudulent course of conduct so that they could sell their share[s] at artificially inflated prices throughout the Class Period." Am. Compl. ¶ 392 [Doc. No. 43]. During the putative Class Period, Vounatsos sold 32,830 shares and "reaped proceeds of nearly $6.44 million." Id. ¶ 393. In the four years prior to the putative Class Period, Plaintiffs allege that Vounatsos sold "8,061 shares for proceeds of $2,483,115.60[,]" id. ¶ 394, which Plaintiffs emphasize was "less than a quarter of the shares sold during the Class Period," id.

Plaintiffs also allege that during the putative Class Period, McDonnell sold 16,740 shares and "reaped proceeds of nearly $4.25 million[,]" id. ¶ 395; and Defendant Singhal sold 7,814 shares and "reaped proceeds of nearly $1.92 million[,]" id. ¶ 396. Plaintiffs do not make any allegations in the Amended Complaint [Doc. No. 43] as to any trading activity prior to the putative Class Period. See id. ¶¶ 395–97; Greebel, 194 F.3d at 198 ("At a minimum, [insider trading pleaded] . . . must be unusual, well beyond the normal patterns of trading by those defendants."); Lenartz v. American Superconductor Corp., 879 F. Supp. 2d 167, 186 (D. Mass. 2012) (plaintiff "bears the burden of showing that insider sales were in fact unusual or suspicious in timing or amount[,]" which "requires the plaintiff to provide information on the defendant's

76

trading both before and after the class period, so the court can assess the sales in context"

(citation omitted)).[22]

Defendants contend that Plaintiffs fail to allege facts sufficient to overcome the

inference, based on Vounatsos and McDonnell's regulatory filings, that "they only made

automatic sales to satisfy tax obligations from vesting stock" or the inference that the stock sales

attributed to Singhal, also based on her regulatory filings, "were either automatic sales to satisfy

tax obligations from vesting stock or non-discretionary sales made pursuant to 10b5-1 plan."

Mem. ISO Mot. to Dismiss 33 [Doc. No. 50]. Plaintiffs disagree with the characterization of the

stock sales as tax-based or non-discretionary. See Opp'n 34 [Doc. No. 55].

The court need not settle this debate or wade further into Plaintiffs' insider trading

allegations. "[W]hile such insider trading may be 'probative of scienter[,]' it is not sufficient to

establish an inference of scienter on its own." In re Ariad Pharms., Inc. Sec. Litig., 842 F.3d at

754 (quoting Greebel, 194 F.3d at 197–98); see Quinones v. Frequency Therapeutics, Inc., 106

F.4th 177, 184 (1st Cir. 2024). Thus, Vounatsos, McDonnell, and Singhal's stock sales during

the putative Class Period are of no moment where Plaintiffs have otherwise failed, as the

preceding analysis demonstrates, to sufficiently allege facts that support an inference of scienter.

V.    **Count II – Violation of Section 20(a) of the Exchange Act**

Section 20(a) "imposes joint and several liability on persons in control of entities that

violate securities laws." Abiomed, 778 F.3d at 246 (citing 15 U.S.C. § 78t(a)). But where the

Amended Complaint [Doc. No. 43] fails to allege an underlying violation of federal securities

---

[22] In their Opposition [Doc. No. 55], Plaintiffs state that McDonnell "did not have any trading activity before the start of the Class Period[.]" Id. at 34. McDonnell was not employed by Biogen prior to 2020, see Am Compl. ¶ 10 [Doc. No. 43], so the absence of trading activity prior to the putative Class Period shows nothing suspicious.

law, for the reasons described supra, the Section 20(a) claim must also be dismissed. See Zhou,

120 F.4th at 296; Abiomed, 778 F.3d at 246; Greebel, 194 F.3d at 207.

### VI.    Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. No. 48] is GRANTED.

Plaintiffs' Amended Complaint [Doc. No. 43] is DISMISSED with prejudice.

IT IS SO ORDERED.

March 26, 2026                              /s/ Indira Talwani
                                           United States District Judge